Page 1

1           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF FLORIDA
2

3

   TROY CLOWDUS,
4

        Plaintiff,
5                                      CASE NO.
   v.                                  1:21-CV-23155(MM)
6

                                       CIVIL ACTION
7

   AMERICAN AIRLINES, INC.,
8

        Defendant.
9  ------------------------------/
10

11

        ==VIDEOTAPED DEPOSITION OF FEDERICO QUINTANA-VALLEJO==
12            (Conducted Via Videoconference)
13

14

      DATE:            March 22, 2022
15

16

17    TIME:            1:05 p.m. to 3:25 p.m.
18

19

      REPORTED BY:     TRICIA J. MARCH
20                     Notary Public
                       State of Florida
21

22

23

24

25    Job No. CS5141192

EXHIBIT B

```
1    APPEARANCES:

2

     WILLIAM T. WOODROW III, ESQUIRE
3    Stone & Woodrow, LLP
     250 West Main Street
4    Suite 201
     Charlottesville, VA 22902
5            Attorney for Plaintiff

6

7    KELLY H. KOLB, ESQUIRE
     Buchanan Ingersoll & Rooney, PC
8    401 East Las Olas Boulevard
     Suite 2250
9    Fort Lauderdale, FL 33301
             Attorney for Defendant

10

11

     ALSO PRESENT:

12

     TIMOTHY LENZ, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 22

```
 1    contact.
 2              Afterwards, he -- he sent me an email where
 3    he -- he threatened my convenience by threatening me with
 4    a subpoena, and he -- he called me a liar.
 5        Q.    Okay.
 6        A.    Basically that, yeah.  He -- he tried to
 7    intimidate me, I think.
 8        Q.    All right.
 9              MR. WOODROW:  Object to this as being
10    blatantly untrue.
11              You can -- you can read that email if you
12    would like.
13        Q.    Is there any other reason why you declined to
14    communicate with Mr. Clowdus' counsel?
15        A.    Oh, yeah.  I -- I -- I don't like people who
16    threaten me.
17        Q.    Has American Airlines promised you anything in
18    return for your truthful testimony here today, sir?
19        A.    No, not at all.
20        Q.    And have you understood my questions of you
21    today?
22        A.    Yes.
23        Q.    All right.  Have you told the truth?
24        A.    Yes.  As far as I recall, yes.
25              MR. KOLB:  I pass the witness.
```

```
 1              MR. WOODROW:  Okay.  Thank you.
 2                   CROSS-EXAMINATION
 3    BY MR. WOODROW:
 4        Q.    Mr. Quintana, I'd like to just reaffirm what
 5    Mr. Kolb said earlier when -- when he discussed that this
 6    testimony is being given under penalty of perjury, as if
 7    you were giving testimony before a judge.  And I'd just
 8    like to make you aware that perjury comes with a penalty
 9    of up to five years in jail and it is a felony, so it is
10    very important that you tell the truth here today; okay,
11    Mr. Quintana?
12        A.    Yes, sir.
13              MR. KOLB:  I think we're hearing more of the
14        reasons why you didn't want to speak with this
15        gentleman, but...
16        Q.    Mr. Quintana, I'd like you to tell me a little
17    bit about your background.
18        A.    I don't understand the question.
19        Q.    When -- when did you first start coming to the
20    United States?
21        A.    I must have been three or four, maybe.
22        Q.    Okay.  And what was -- what was your purpose
23    of travel back and forth at that point?
24        A.    Visiting family.
25        Q.    Okay.  Do you have family here in Miami?
```

1    A.    No, I do not.

2    Q.    Are you -- do you know anyone who works for

3 American Airlines?

4    A.    Yes.  I used to know one but not -- not

5 current.

6    Q.    Describe that relationship to me.

7    A.    He is my mother's late husband.

8    Q.    Okay.  And how long did he work for American

9 Airlines?

10    A.    I don't know.

11    Q.    Was it a matter of months or years?

12    A.    I don't know.

13    Q.    What position did he -- did he hold at

14 American Airlines?

15    A.    He was a mechanic.

16    Q.    Okay.  And did you know him well?

17    A.    Not -- not really, no.

18    Q.    Okay.  After the -- the passenger was removed

19 from the flight, did you have a conversation with anyone

20 about it?

21    A.    No, I did not.

22    Q.    Did you ever speak to the flight attendant

23 about it?

24    A.    No, I did not.

25    Q.    Did you see any other flight attendants in the

Page 31

```
 1    email?
 2         A.    Three or four.
 3         Q.    And how many times through text?
 4         A.    Maybe five or six.  Less than ten.
 5         Q.    Okay.  Okay.  How many times did I contact
 6    you, Mr. Quintana?
 7         A.    About seven times.
 8         Q.    And what -- was that through text or -- or
 9    email?
10         A.    I believe it was a couple of texts, one email,
11    and six phone calls in a row.
12         Q.    And what -- what did you respond to me in that
13    text?
14         A.    Which text are you referring to?
15         Q.    What -- what were your responses to me?
16         A.    To which of your requests for communication?
17         Q.    Well, you've -- you've said that I lied to
18    you, Mr. Quintana, and so now I would like to -- to go
19    through each communication that I had with you because I
20    most certainly never did.
21         A.    I --
22         Q.    And I most certainly never threatened you.
23         A.    I don't recall saying that you lied.
24               MR. KOLB:  Yeah.  Object.
25               Misconstrues --
```

1        Q.    I correct myself.

2              MR. KOLB:  -- testimony.

3        Q.    You -- you said that I accused you of lying,

4   and I most certainly never did.

5        A.    Can I -- can I -- can I read from the email

6   you sent me?

7        Q.    Well, I'm -- I'm pulling it up right now.

8        A.    Okay.

9        Q.    I'd like to go through our texts first.

10             Now, I texted you -- and if you have your

11   texts right there -- do you have your texts right there?

12       A.    Yeah.

13       Q.    Okay.  Well -- well, let me read it, and --

14   and you tell me if I'm misreading it.

15             My first communication with you was, "Good

16   afternoon, Mr. Quintana.  I'm a lawyer who represents a

17   fellow passenger from a flight you took from Miami to

18   Mexico last year.  AA has represented to us that they

19   spoke with you and you gave them a statement about the

20   incident involving a passenger getting kicked out of

21   business class.  We have reason to doubt that AA is being

22   truthful.  Could you please respond to the email I sent

23   to fedeus3@Gmail.com and just let us know if you remember

24   the incident, you spoke with AA, and whether you have

25   given them a statement.  God bless you if you do.  And

1    bless you if you don't, but please do."

2              Is that -- is that the -- is that the verbatim

3    substance of the first text that I sent you,

4    Mr. Quintana?

5         A.    It is, indeed, the text, yes, it is.

6         Q.    And that was the first communication that I

7    had with you, was it not?

8         A.    As far as I -- I can tell, yes.

9         Q.    Now, when you just testified a moment ago,

10   you -- you characterized my -- my overtures to you as

11   being aggressive, threatening, and accusing you of lying.

12        A.    I characterize your email as being such.

13        Q.    Okay.  Well, we'll get to that.

14              Now, I -- I spoke with American Airlines after

15   this, and I said, "I don't have his contact information.

16   I need it."

17              And they said, "Well, he got your text because

18   he called us directly after receiving the text."

19              Is -- is that -- is that accurate,

20   Mr. Quintana?

21              MR. KOLB:  Objection.  Form.

22        Q.    Did you call American Airlines' lawyers

23   directly after receiving this first text message from me?

24        A.    No, I did not directly, no.

25        Q.    So -- so were they not telling me the truth

Page 34

1    when they told me that "He certainly got your text

2    because he just called us after he got it"?  Is that --

3    is that not true, then?

4          A.    I wouldn't know the answer to that question.

5               MR. KOLB:  Objection.  Misconstrues testimony.

6          Completely fails to follow the witness' testimony.

7          Q.    Okay.  Mr. Quintana, you responded, a day

8    later to me, "This is Federico Quintana.  The email you

9    wrote down here has a typo.  Fedus3@Gmail.com is the

10   accurate one."

11              Now, had you spoken to American Airlines'

12   lawyer between the time that you received this first text

13   from me and between the time that you sent this reply to

14   me?

15         A.    I can't recall.

16         Q.    Well, Mr. Quintana, at this point you had not

17   received any email from me because the email that I

18   attempted to send had a typo.  So at this point, this is

19   the only -- the only overture of communication that I

20   have made to you.

21         A.    If you say so.

22         Q.    Why -- why, at this point, would you not just

23   text me back and say, "Yeah, I saw something"?  Why are

24   you --

25              MR. KOLB:  Objection.  Argument -- objection.

Page 35

```
 1        Argumentive.
 2        A.    I don't like the tone you sent the -- within
 3   the email you texted -- within the text, I don't like
 4   your tone.
 5        Q.    You don't like the tone of the text that I
 6   just read?
 7        A.    Yes.  Also --
 8        Q.    Did you feel threatened by this text that I
 9   just sent you?
10        A.    No.  No, I didn't feel threatened by this
11   text.
12        Q.    Okay.  So what -- what -- what didn't you like
13   about the tone of this text?
14        A.    Well --
15              MR. KOLB:  Objection.
16              Asked and answered.
17              MR. WOODROW:  No, it isn't.
18              MR. KOLB:  Go ahead.  Go ahead.  I'm sorry.
19              THE WITNESS:  Okay.
20              As you -- as you wrote down the text, you
21        represent that you are the counselor for a fellow
22        passenger, and I -- I fail to recognize that person
23        as a fellow passenger.  He didn't complete his
24        passage within the plane.  He wasn't my fellow
25        passenger.
```

Page 36

```
 1   BY MR. WOODROW:
 2        Q.    Now, is -- is that -- is that really the
 3   thrust of -- of what this text depends upon?
 4              I asked you if you had seen something?
 5        A.    For me, it is, yes.
 6        Q.    So why wouldn't you want -- why wouldn't you
 7   have wanted to tell me what you saw just because the guy
 8   didn't fly with you?  I don't understand.
 9        A.    I believe I've -- I have answered that
10   question.
11        Q.    Please answer it again, Mr. Quintana.
12              MR. KOLB:  Objection.
13              Asked and answered.  Now badgering --
14        bordering on badgering the witness.
15        Q.    Why -- why wouldn't you have wanted to tell me
16   what you saw, when I asked you in a nice way, just
17   because this man didn't ultimately fly with you?  I'm
18   confused.
19        A.    I believe I have answered that question, sir.
20        Q.    Could you answer again, please?
21        A.    I believe I have answered that question, sir.
22        Q.    Are you refusing to answer it again?  Because
23   I'm not clear as to your answer.  You said --
24        A.    I think --
25        Q.    -- you (inaudible) passenger.
```

1      A.    I was very clear.  I think I was very clear as

2  to my answer.

3      Q.    Is your answer, then -- let me rephrase --

4  because he was not a fellow passenger?  Is that the

5  substance of your answer?

6      A.    If you choose to put it that way, yes, sir,

7  that's my answer.

8      Q.    I would like you to state it again, please,

9  Mr. Quintana.

10      A.    I believe I have already --

11          MR. KOLB:  Objection.

12      A.    -- stated my --

13          MR. KOLB:  Asked --

14      A.    -- answer.

15          MR. KOLB:  -- and answered.  Oh, my God.

16      Q.    Mr. Quintana, when you -- when you next texted

17  me, you texted -- I texted you, "Federico, did you get

18  the email that I sent to your corrected address?  Please

19  respond."

20          You texted back, "Phone call died.  Call me

21  back when you can, please.  I have a few questions."

22      A.    Yes.  I -- I believe my following text clearly

23  states that I texted the wrong number.

24      Q.    Okay.  Now -- now, after -- after I received

25  this text from you, which I took in good faith that you

1   were trying to get in contact with me, I tried to call

2   you repeatedly, didn't I?

3        A.    If you say so, yes.

4        Q.    Did you receive a number of calls from me in

5   succession?

6        A.    I received a number of phone calls from an

7   unknown number.

8        Q.    Okay.  An unknown number that you -- you had

9   in a text thread with me right here; correct?

10        A.    If you say it's the same one, yes.

11        Q.    Okay.  Now -- now why did you -- why did you

12   just answer those calls and just leave dead air instead

13   of --

14        A.    Oh, I -- I had my -- how do you call them? --

15   my ear -- ear plugs -- you know the iPhone head -- head

16   thingies?  What are they called?  Ear plugs?  I don't

17   know.  And I -- I was trying to put my music back on

18   play, so I was -- I was answering it by mistake by -- by

19   double tapping the things.

20        Q.    All right.  Now, how did -- how did you know

21   that I called you seven or eight times if now you're

22   testifying that you received a call from an unknown

23   number?

24        A.    After -- after that, I noticed that I was

25   answering phone calls.  And after the phone calls had

1   stopped, I went to check -- to reference whether that

2   phone had anything to do with the texts I had been

3   receiving the prior -- that week.

4       Q.   Okay.  So after about the third call, I texted

5   you, "Your phone keeps answering but no sound."  Then I

6   texted again, "Trying to call you to answer your

7   questions like you asked.  If now is not a good time, let

8   me know."

9       A.   Uh-huh.

10      Q.   You see that text?

11      A.   Yes.

12      Q.   Okay.  Now, I called you three or four times

13  after that.  So you -- and you also answered and left

14  dead air.  Did you not make that connection between the

15  texts you received and the calls you were getting?

16      A.   No.

17      Q.   Okay.  And isn't it true that at one point --

18  because I didn't know if these were -- if this was a

19  phone malfunction or what, I -- I FaceTime called you,

20  didn't I?

21      A.   I could go through my -- yeah, yeah.  There

22  was a FaceTime -- FaceTime, yes.

23      Q.   Yeah.  And -- and did you see the -- did you

24  see the video come on and then you hit end?

25      A.   Well, I was -- I was using the headphones, so

Page 40

1    I wasn't -- I didn't have my phone on my hands with me.

2        Q.    Uh-huh.  And your phone was on your desk,

3    wasn't it?

4        A.    Yes.

5        Q.    Yes.

6              And after you saw the video come on, you hit

7    end; correct?

8        A.    It wasn't after I saw the video.  I was trying

9    to play my music.

10       Q.    Okay.  But you saw that the FaceTime had come

11   on and you ended it; correct?

12       A.    I hadn't noticed that --

13             MR. KOLB:  Objection.

14       A.    -- it --

15             MR. KOLB:  Asked and answered.

16       Q.    Okay.  So -- so why -- why -- so is it -- is

17   it your -- is it your testimony that you had no idea that

18   any of those calls were from me?

19       A.    At that point, no.

20       Q.    Okay.  And when -- and when did you figure

21   that out?

22       A.    Maybe four hours later.

23       Q.    Now, when you spoke with American Airlines,

24   did they advise you not to speak with us?

25       A.    Could you be more specific?

```
                                                        Page 41
 1          Q.    Did they advise you not to speak with -- with
 2     me when you spoke with lawyers for American Airlines?
 3          A.    No, they did not.  They very specifically told
 4     me that I could do whatever I wanted.
 5          Q.    Okay.  And -- and what had you asked them
 6     about that?
 7               MR. KOLB:  Objection.  Form.
 8          A.    Could you be more specific?
 9          Q.    Explain to me the conversation where they told
10     you to do whatever you want.
11          A.    So I was -- I asked American Airlines'
12     counselors if I was, in any way, shape, or form,
13     obligated to answer any of your attempts to communicate
14     with me --
15          Q.    And why were you --
16          A.    -- and they -- they --
17          Q.    Go ahead.
18          A.    -- told me that I could do whatever I wanted.
19          Q.    And why were you taking advice -- or
20     soliciting advice from American Airlines' counselors at
21     this point?
22          A.    I don't think they were giving me advice.
23     I --
24          Q.    Why --
25          A.    -- think -- I think they were telling me that
```

Page 42

```
 1    I could do whatever I wanted.
 2         Q.    I -- well, that's not the question I asked.
 3               I'm asking:  Why did you ask them for advice?
 4         A.    Because I am not familiar with the legal
 5    system in this country, and they had, so far, been pretty
 6    cordial and friendly with me.
 7         Q.    Why did you assume that they would be more
 8    cordial and friendly with you than I would?
 9               MR. KOLB:  Objection.
10               Asked and answered.
11         A.    I think I have already answered that question.
12         Q.    Well, so far, from the substance of my texts,
13    I don't think we've seen anything that wasn't completely
14    cordial, so --
15         A.    And that is your opinion.
16         Q.    Okay.  That -- that's -- that's also probably
17    an objective opinion of most people who read that.
18               Were you worried -- were you worried that your
19    ability to fly with American Airlines might have been
20    impacted negatively if you didn't cooperate with them?
21         A.    Not at all.  Not whatsoever.
22         Q.    Okay.  And how many times did you reach out to
23    American Airlines' lawyers as opposed to them reaching
24    out to you?
25         A.    Could you be more specific?
```

1       Q.     How many times did you call them instead of
2    them calling you?
3       A.     Three times, maybe.
4       Q.     You -- you called them three times.
5              And explain to me the reasons for you reaching
6    out in those instances.
7       A.     Confirming the date of my deposition,
8    returning texts and messages, calling back to missed
9    phone calls.
10      Q.     Okay.  And how many times did you -- did you
11   initiate email communications with them?
12      A.     Never.  Not that I recall.
13      Q.     Okay.  You -- you've testified that you have
14   three or four emails with them; is that correct?
15      A.     Yes.
16      Q.     Okay.  And we would like to have those,
17   Mr. Quintana, and we have a legal right to them.
18             Will you commit to sending them to me after
19   the -- this deposition is over today?
20             MR. KOLB:  Objection.
21      A.     I do have to --
22             MR. KOLB:  Objection to the threat.
23      Q.     You -- you -- you do.  I mean, I -- I -- I may
24   have to issue a subpoena, just like American Airlines did
25   for this deposition today.  But if you just send them to

Page 46

```
 1    Everyone's life would be much simpler if we all just
 2    shared the evidence we uncover, add it together, and
 3    figure out the sum.  But unfortunately, litigation isn't
 4    always a search for truth.
 5              "We, frankly, aren't interested in deposing
 6    you because we don't think that from your position, in
 7    Seat 4A, you could have observed much of value and we
 8    would not be bothering you like this if AA had not put us
 9    in this position, but AA's claims leave us little choice
10    in the matter now.
11              "If you will give us a copy of everything you
12    sent to AA and recount to us everything that you told AA
13    about what you remembered from that morning and then
14    answer a couple of follow-up questions if we have them,
15    we can contain our nuisance of you to this email
16    interaction.  Please let's take this route.  It will be
17    cheaper for us, and we have already spent a lot on this
18    case, and it will be far less of an inconvenience to you,
19    and that is important to us as well.  Best regards, Wil
20    Woodrow."
21              Is that the email that I sent you,
22    Mr. Quintana?
23         A.   It is, yes.
24         Q.   And -- and where in that email do -- do I
25    accuse you of lying?
```

Page 47

```
 1          A.    "We, frankly, aren't interested in deposing
 2     you because we don't think that, from your position in
 3     4A, you would have observed much of value."
 4          Q.    And you think that's me accusing you of
 5     lying as --
 6          A.    Yes, sir.
 7          Q.    -- opposed to saying that we aren't really
 8     interested in what you have to say because at this point
 9     we didn't think you had anything to say?
10          A.    I've -- I've answered your question, sir.
11          Q.    Okay.  And could it also -- could -- could it
12     also have meant we don't think you really have anything
13     to say and that's why we're not interested in pursuing
14     you?
15                MR. KOLB:  Objection.
16          A.    Not from what I could read.
17          Q.    Okay.  And where do you feel threatened in
18     that, Mr. Quintana?
19          A.    "It would be far less of an inconvenience to
20     you."  Also, there is a little text in italics where it
21     says "I have no desire to make your life miserable by
22     subpoenaing you with a deposition."
23          Q.    Yes.  And with -- would it have been easier,
24     Mr. Quintana, to have sent those emails and sent your
25     statement than it is today here giving a deposition?
```

Page 48

```
1              MR. KOLB:  Objection.
2              Speculation.
3       A.    I can't --
4              MR. KOLB:  Argumentative.
5       A.    I can't answer that question.
6       Q.    Well, you can answer that question.  And
7    don't -- and just ignore Mr. Kolb's objections.  Don't
8    take them as cues, please.
9              Which -- which would have been more of an
10   inconvenience, hitting forward for a couple of emails or
11   what you're doing right here right now today?
12       A.    This is --
13              MR. KOLB:  Objection.
14       Q.    Okay.  And --
15              THE COURT REPORTER:  I'm sorry.  I didn't -- I
16       didn't get that answer.  It was covered by the
17       objection.
18              Could you state your answer again, please,
19       Mr. Quintana?
20              THE WITNESS:  I don't feel inconvenienced by
21       doing this.
22   BY MR. WOODROW:
23       Q.    Okay.  So if I had just asked you to please
24   give us a deposition, you wouldn't have felt
25   inconvenienced?
```

1       A.    Maybe if you hadn't threatened to

2   inconvenience me I would have.

3       Q.    And what did I threaten to inconvenience you

4   by doing, if you represent --

5            MR. KOLB:   Objection.   Form.

6       Q.    -- that as a threat?

7       A.    I had -- could you rephrase that question?   I

8   don't think I understand it.

9       Q.    What -- what was the inconvenience that I was

10  referring to in my email?

11      A.    I -- I don't think I can answer that.   I don't

12  know what -- what you were thinking.

13      Q.    Right.

14            But just read what I wrote because I -- I

15  stated that I didn't want to inconvenience you with a

16  deposition, did I not?

17      A.    If that's the meaning you choose to give the

18  text, then okay.

19      Q.    Okay.   Well, let's -- let's go back and look

20  at that text again.

21      A.    Okay.

22      Q.    Okay.   I have, "AA has informed us that you

23  gave them a statement about what you remember of what

24  occurred, and I have no desire to make your life

25  miserable by subpoenaing you for a deposition."   That's

```
 1    what I said, isn't it, Mr. Quintana?
 2         A.    That is what you wrote.  However --
 3         Q.    So --
 4         A.    -- usually, when you use italics, you are
 5    trying to convey a different meaning that would otherwise
 6    be using non-italic lettering --
 7         Q.    And --
 8         A.    -- so I can only -- I can only assume that
 9    by -- by purposely putting that -- that particular bit of
10    text in italics, that what you are doing is threatening
11    me.
12         Q.    Okay.  And do you know what was in my mind
13    when I wrote that, Mr. Quintana?
14         A.    I do not.
15         Q.    And could I have been emphasizing the fact
16    that I really didn't want to inconvenience you by putting
17    that in italics?
18         A.    I don't --
19               MR. KOLB:  Objection.  Form.
20         A.    -- know.
21         Q.    Okay.  I could have, couldn't I?
22         A.    I don't --
23               MR. KOLB:  Objection.  Form.
24         A.    -- know.
25         Q.    Okay.  And so when did -- when did American
```

1    Airlines' lawyers contact you and ask you about giving a

2    deposition today?

3         A.    Two or three days after the -- this email.

4         Q.    And what did you say to them?

5         A.    Could you be more specific?

6         Q.    Did you -- did you say you didn't want to?

7    Did you say, "I'd be happy to"?

8         A.    I said, "If it's something you need to do."

9         Q.    Okay.  And when did they serve you with the

10   subpoena?

11        A.    I believe you have the information of the

12   subpoena with you.

13        Q.    Okay.  That -- that -- that's not what I

14   asked, Mr. Quintana.

15        A.    I don't have the subpoena with me.  Do you

16   have -- do you want me to step away and go grab the

17   subpoena so that I can answer that question?

18        Q.    That will be all right.  You don't have to do

19   that.

20              What's -- what's interesting to me,

21   Mr. Quintana, is that as I'm deposing you here today, I

22   feel the hostility that I -- that I usually would feel

23   from an employee of an airline who's -- who's trying not

24   to upset their employer.

25        A.    I feel the -- I feel hostility from you, too,

```
 1    so it's mutual.
 2         Q.    There's no hostility coming from me --
 3         A.    As --
 4         Q.    -- Mr. Quintana.
 5         A.    -- as far -- as far as you say.  I -- I feel
 6    that you're being very hostile, and I don't like the way
 7    you're speaking to me.
 8         Q.    Well, I'm just interested in getting at the
 9    truth here today, Mr. Quintana, for my client.
10              So did -- did American Airlines offer you any
11    incentives, such as miles or free flights to induce you
12    to -- you to give your testimony here today?
13              MR. KOLB:  Objection.
14              Asked and answered.
15         A.    I believe I've answered that question.
16         Q.    Okay.  You can answer again, Mr. Quintana.
17              He -- this is how it works.  He gets to
18    object, and that's for us later with the judge.  He can
19    go to the judge and he can say, "That was asked and
20    answered.  That was speculative.  That mischaracterized
21    testimony."  And we fight about that, but he's not saying
22    that for you today.  So if I ask you a question, just
23    please tune that out and answer my question to the best
24    of your ability, please.
25              MR. KOLB:  Mr. Quintana, you're free to refuse
```