**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Troy Clowdus

PLAINTIFF

VS.

American Airlines Inc.,

DEFENDANT.

Civil Action No.: 1:21-cv-23155-MM

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS**

Plaintiff TROY CLOWDUS, by and through undersigned counsel, hereby moves this Court to reject Defendant's Motion for Sanctions and to award the Plaintiff his legal fees for opposing this motion.

**Introduction**

1. The instant matter arises from an allegation of assault against the Plaintiff by an American Airlines flight attendant, which resulted in the Plaintiff being removed from the plane and banned for life from flying with the Defendant air carrier.

2. Federico Quintana (a primary subject of Defendant's motion) was a business class passenger who allegedly witnessed the incident.

3. Defendant's counsel is on ethical quicksand with respect to Federico Quintana, and how he protected, cultivated and ultimately presented this witness to the Plaintiff as a disinterested third-party when he was anything but that.

1

4. The Plaintiff is currently working on a motion to compel American Airline's communications with this witness.  As such, Defendant's counsel seems to be of the mind that a strong offense is the best defense.

5. Plaintiff's counsel is confident that his behavior towards both Federico Quintana and his mother has been unimpeachable.  As such, the Plaintiff will not spend time engaging with the charade of legal argument that the Defendant offers.  The Plaintiff will fully explain the facts and circumstances of these witnesses and will provide the Court with every attempted communication that the Plaintiff has had with them.  The Court can decide based upon ethics and common sense whether the Plaintiff's attorney has crossed a line or been anything less than professional or cordial with these witnesses.

**Background on Discovery Dispute and Witnesses Defendant Seeks to "Protect"**

6. The details are involved and the Plaintiff will expand on them below, but the crux of the matter is that both Defendant's counsel and the witness Quintana led the Plaintiff to believe that Mr. Quintana was a disinterested third-party witness – not explicitly with outright lies, but certainly implicitly in how questions were asked, answered, and evaded.  It turns out, he was not.

7. The Plaintiff's counsel was sand-bagged at the Quintana deposition, expecting an impartial witness and encountering unexpected hostility and advocacy for AA.  It was strange enough that the Plaintiff hired a private investigator to seek whether Quintana had ties with a flight attendant on the flight that morning or with AA in general.

8. The investigator discovered evidence that Mr. Quintana, in fact, had very significant ties to American Airlines through his mother's death benefits, and was in fact likely

flying in business class that day for free.  When asked about flying business class that day, Quintana merely said that his mother buys his tickets for him.  When asked if he was flying on a "buddy pass," Quintana (and AA) left Plaintiff to believe that his mother had instead paid for his ticket. (Exhibit A)

9.  Now in its motion, for the first time, AA casually admits that Quintana was, in fact, flying on a "buddy pass."

10.  If American Airlines was actually concerned about the inconvenience of this lawsuit to Quintana and his mother, as its motion purports to be, it would have volunteered and agreed to stipulate to all of the connections that it has with this family, rather than leaving them to the Plaintiff to uncover with investigators and attempted subpoenas.

**Good-Faith Basis for Believing Witness Quintana was Untruthful**

11.  The Plaintiff has a very good-faith basis for believing that Mr. Quintana provided untruthful testimony for the benefit of American Airlines, which provides him (we now know for certain) with essentially free air travel, and we also suspect free health care.

12.  Mr. Quintana, seated three rows back in a window seat across the aisle, claimed to have closely watched the Plaintiff from the moment that he boarded, and overheard three interactions where he alleges the flight attendant spoke to the Plaintiff about his mask,[1] though no other party makes similar claims.[2]  Then, when the incident occurred, and Mr. Quintana was, by his own words, paying very close attention, he

_____

1 Describing in detail a mask that Mr. Clowdus has never owned.
2 Mr. Clowdus boarded first and had one of his two interactions with the flight attendant upon boarding.  Quintana claims that he boarded last, but still witnessed and recounted three negative interactions between the flight attendant and Mr. Clowdus.

witnessed the incident in exquisite detail,[3] but he conveniently (since it would establish the crucial publishing prong required in Plaintiff's defamation claim) claims that he didn't hear the three cries of  "YOU HIT ME!" that were loud enough to *bring a co-worker in from the jet bridge to see what was going on.*  (Exhibit B, C)

13. There are only two rational possibilities to derive from this testimony:  either Quintana was not paying attention whatsoever and fabricated his testimony out of whole cloth, or he was paying some attention and was somehow led to understand that he should "forget" the portion of his recollection that had to do with the most dramatic moment of the incident – when the flight attendant cried "YOU HIT ME!"

14. At deposition, Plaintiff's counsel asked Mr. Quintana if he would voluntarily, after the deposition, send the Plaintiff the record of his communications with AA and any statement that he had prepared for AA prior to the deposition.  Quintana said he didn't know if he would, and then he avoided and ignored every effort on the Plaintiff's part to obtain the communications before he left for Mexico.  (Exhibit D)

**American Airlines' Likely Motivation with this Motion**

15.  AA likely files this motion because it does not want to see the Plaintiff depose Quintana's mother and establish as evidence in this case that Quintana was a prejudiced witness.  And AA really does not want to see the Plaintiff get every inch of mileage at trial that he will from the way in which AA attempted to sell this witness as an impartial arbiter, when in fact he was as compromised as any employee with the self-interested motive of keeping his employer happy.  The jury had the right

---

[3] Videos taken subsequently cast extreme doubt on the ability of him to have observed either the Plaintiff's eyes or the bag making contact from where he was sitting.

to be given the complete picture, and AA had hoped to leave it obscured.  That may
not be a bright-line ethical breach, but it is certainly a shade of gray.

### The Record of Plaintiff's Attorney's Communications with the Witnesses

16. Counsel for AA, Mr. Kolb, grossly – disingenuously and unethically –
    mischaracterizes the communications that the Plaintiff's counsel has had with both
    Mr. Quintana and Ms. Cookson.

17. Mr. Kolb points to Mr. Quintana's bizarre claims in his deposition about Plaintiff's
    counsel's attempted communications with him as evidence of Plaintiff's counsel's
    impropriety, but this was the same polite script that the Plaintiff's attorney used with
    all of the passengers, and when these communications were made, the Plaintiff had no
    reason to think there was anything special about Mr. Quintana.

18. Mr. Kolb includes as an exhibit in his motion much of the deposition interaction
    between Plaintiff's counsel and Quintana surrounding Plaintiff's attempted
    communications, but he fails to include the first page, which is somewhat
    illuminating as the witness had an email printed and ready to read.  (Exhibit E).

19. Since, Mr. Quintana will be unavailable for trial the video deposition was taken with
    the intent that it would be shown to the jury.  As such, Plaintiff's attorney felt the
    need to spend an inordinate amount of time rehabilitating his own impugned character
    by reading the actual communications into the record and asking the witness where he
    felt threatened, where he felt accused of being a liar, etc.  It is not quite clear why AA
    believes that this colloquy says more about Plaintiff's counsel than it does about the
    witness.

20. In his initial disclosures, Mr. Kolb "hid" Mr. Quintana among two other passengers who supposedly "witnessed the incident," but when Plaintiff's attorney finally contacted them, they had actually witnessed nothing. (Exhibits F, G)

21. When called on it, Mr. Kolb initially amended his disclosures to include all 10 business class passengers as individuals with knowledge, but removed from all the phrase, "witnessed the incident." (Exhibit H)

22. After Plaintiff's outraged response and commitment to seek AA's work product, Mr. Kolb walked it back and said only Quintana had given a statement; then, after additional persistent negotiations, AA finally provided additional contact information (though providing an email address with a typo).  (Exhibit I)

23. Plaintiff's first overtures to Mr. Quintana were in the context of believing that he had likely seen just as much as the other two passengers identified by AA who "witnessed the incident" – that is, nothing.  Plaintiff believed that AA was purposefully wasting his time, so was merely attempting to make contact with the passenger and cross him off the list.

24. Plaintiff first reached out by text, with no response:

> Good afternoon Mr. Quintana, I am a lawyer who represents a fellow passenger from a flight you took from Miami to Mexico last year.  AA has represented to us that they spoke with you and you gave them a statement about the incident involving a passenger getting kicked out of business class.
>
> We have reason to doubt that AA is being truthful.
>
> Could you please respond to the email I sent to ***********
>
> And just let us know if you remember the incident, you spoke with AA, and whether you have given them a statement.

God Bless you if you do!  (And bless you if you don't…but please
do) (Exhibit J)

25. In deposition, Mr. Quintana said this text was very off-putting because of the
reference to Mr. Clowdus as a fellow passenger…Quintana didn't consider him to be
one. (AA Motion for Sanctions, Exhibit B)

26. When Plaintiff's counsel sought to explore what this meant. Mr. Kolb coached the
witness to just repeat "you have my answer." (*Id*.)

27.  Plaintiff also wrote an email (to the wrong address) with no response.

28. When Plaintiff asked for better contact information from AA, counsel was informed
that Mr. Quintana had received his text because he had called AA about it.

29. Shortly afterwards, Plaintiff received a short text from Mr. Quintana, providing his
correct email address. (Exhibit J)

30. Plaintiff re-sent his email, still believing that Quintana was a disinterested third-party,
who probably saw nothing and just really didn't want to get involved:

 Good afternoon Mr. Quintana,

Thank you for clarifying that my prior email address for you was
incorrect.  It was the one given to me by AA.

As you know by now, I am a lawyer for Troy Clowdus, a fellow
passenger on a flight you took last year to Mexico.  He was kicked
off the flight and banned for life because he accidentally bumped
the flight attendant with his bag while handing it to him.  Knowing
you have spoken with AA, I'm sure that is not the story they tell,
but it is the unfortunate truth and it has been a long legal fight so
far in search of justice.

AA has informed us that you gave them a statement about what
you remember of what occurred, *and I have no desire to make your
life miserable by subpoenaing you for a deposition*.  However, I
just got off the phone with AA counsel, and they continue to
maintain two positions:  one, that your statement is very damaging
to our client  (having the advantage of knowing for sure what

actually occurred, we doubt them on this point); and two, they refuse to share the statement with us – claiming that it is privileged work product.  They are adamant:  if the guy won't respond to you, you'll just have to subpoena him and depose him…We aren't telling you what he told us.

This, in our view, is a bullying tactic – everyone's life would be much simpler if we all just shared the evidence we uncover, add it together, and figure out the sum.  But unfortunately, litigation isn't always a search for truth.  We, frankly aren't interested in deposing you because we don't think that from your position in Seat 4A you could have observed much of value.  And we would not be bothering you like this if AA had not put us in this position.  But AA's claims leave us little choice in the matter now.

If you will give us a copy of everything you sent to AA and recount to us everything that you told AA about what you remembered from that morning, and then answer a couple of follow-up questions if we have them, we can contain our nuisance of you to this email interaction.

Please let's take this route.  It will be cheaper for us (and we have already spent a lot on this case), and it will be far less of an inconvenience to you.  And that is important to us as well.

Best Regards,

Will Woodrow (Exhibit K)

31. The ways that both Quintana in his deposition and Mr. Kolb in his motion try to characterize this text and this email as threatening or accusing him of lying don't hold water.  In deposition, Mr. Quintana was making up a reason after the fact why his sympathies lay with AA because he didn't want to admit that AA was responsible for much of his family's provision.

32. After no response to this email, except the short text response: "email received," Plaintiff's counsel sent two more texts before AA's sudden reversal of direction and decision to depose Quintana:

Ok will you respond please?

8

I know this is an inconvenience and is not your problem and I
don't want to inconvenience you further by a deposition

And:

Please confirm at least that you intend to respond in the next day or
so I do not spend time preparing a subpoena and securing a process
server

I'm not speaking empty words — I really don't want to
inconvenience you. However, AA has put us in this position by the
games they are playing.

Incidentally, AA told me yesterday that you called and spoke with
them after you received our first text.

That's fine, and it's fine if your recollection appears to be harmful
to us. We're not insecure about the truth.

But we do need to speak with you one way or the other. And we
really would like it to be the easy way.

So please respond with at least an indication that you intend to
respond shortly.  (Exhibit J)

33. After these communications, American Airlines deposed Quintana, and Plaintiff's

counsel sent one more communication after the deposition was over:

Mr. Quintana,

Thank you for appearing at deposition today.  I'm sorry we got off
on the wrong foot.  These things can be stressful.
I too enjoyed it by the end and appreciate your candor.  While we
disagree that what you saw was intentional, that's ok.  You saw
what you saw and are entitled to your own interpretation.

Much of your testimony today was, otherwise, very helpful
because it directly contradicted some very important claims made
by various people.  So thank you for being willing to come
forward, even if you thought it would be damaging to us.  You
seem like a good guy, so thank you.

Could you please forward me those communications that you had
with American Airlines prior to today so that we aren't surprised
by anything at trial?

I'd really appreciate it, and good luck in your travels.

Will (Exhibit L)

34. Needless to say, Plaintiff's counsel was being overly gracious in the substance of this communication, basing his tone off of Quintana's rather strange comment to him after the deposition had concluded about how much he enjoyed the deposition.  Quintana never responded to this email.  Plaintiff's counsel was left to speculate that Quintana's comment at the end had been a subtle way of gloating that he thought he had bested Plaintiff's counsel.

35. After the subsequent investigation revealed the likelihood of the compromise to Mr. Quintana's impartiality, Plaintiff challenged AA about it and was met with silence and the refusal to give over its communications with Quintana (subject of a motion to compel soon to be filed).  Mr. Quintana similarly left for Mexico after dodging a process server and without providing the communications that were asked for.

36. Quintana's mother was the only remaining means to establish Quintana's relationship with AA.  She has now been served three times.  She has been in communication with AA.  (Exhibit M).  Each time she has been served has been more difficult and has taken a longer stakeout by the process server.

37. On the first subpoena, Plaintiff's attorney noticed a date well in advance because Ms. Cookson refused to communicate.

38. When she was finally served, she called and spoke with Plaintiff's counsel and said she would be out of the country on that date.  Plaintiff's counsel said not to worry about it, asked what date would be convenient for her and said he would issue a new

subpoena, just please not to give the process server a hard time (which she did.  It necessitated another stakeout.) (Exhibit N)

39. Mr. Kolb knew at the time, more than 10 days in advance, that the Plaintiff had accommodated Ms. Cookson and rescheduled the April 25 deposition.  (Exhibit O).  His allegations now to the contrary as some evidence of Plaintiff's bad behavior are dishonest and tiresome.

40. The second subpoena for the May 2 deposition was cancelled due to Mr. Kolb's bad behavior.  On the Friday afternoon before the Monday morning deposition, the case was dismissed with leave to amend.  (See DE#32).  The Plaintiff's attorney asked four times over the weekend if Mr. Kolb was of the mind that discovery should continue, even though the underlying action was temporarily closed.  His only response was to bluster about his Rule 11 motion.  Finally, since Mr. Kolb would not confirm that he intended to show up Monday morning (or even that he agreed there was a legal basis to proceed), Plaintiff's attorney's fifth attempted communication with Mr. Kolb was to cancel the deposition "since he had not responded."  (Exhibits P, Q).  Tuesday afternoon, Mr. Kolb resurfaced, and had the nerve to demand that his own depositions that week would move forward.  (Exhibit R). As Plaintiff's attorney had rescheduled his week, he declined.  (Exhibit R).

41. Plaintiff's attorney had been unable to communicate whatsoever with Ms. Cookson since the phone conversation where he agreed to reschedule the deposition.  As such there was little faith that she would have shown up for that Monday morning deposition in any event, especially without a zoom link and no email address at that point to send it to.

42. On Monday, after the deposition was scheduled to be taken, and still not having heard

a word from Ms. Cookson, Plaintiff sent this email:

Ms. Cookson,

You were scheduled to appear for deposition this morning, and I have not been able to reach you all week. Your phone has been off. I have left you multiple texts and you have not responded.

Fortunately, I have had cause to reschedule this deposition, so I released you from the obligation.

However, the complete lack of response and cooperation from you leads me to believe that you did not intend to obey the subpoena. Please do not make that mistake.

I have no desire to cause you legal trouble. However, we believe that your son was less than truthful in his deposition; it has damaged our case; and we would like to know why. You are required by the court to appear for deposition as commanded. You risk being held in contempt by the Court if you do not.

Though he hid this from us, our investigation has led us to believe that you receive extensive benefits from American Airlines, which may explain why your son claimed to have witnessed events which subsequent videos we have taken show that he could not have seen from where he was seated. All I can say is that we regret to inconvenience you, but your son brought this on you, not us.

When I reissue the subpoena, I would like to offer you the convenience and the courtesy of appearing remotely by Zoom. The fact that you did not respond this last time makes me think that I am going to have to compel you to show up at a law office.

I am going to reissue you a subpoena probably for this Friday or next Monday. If you would like to appear remotely by Zoom, you need to contact me promptly before I issue it, and let me know that you intend to cooperate.

I don't know how familiar you are with the US legal system but I would encourage you to do some research on Google. You do not want to ignore a subpoena…nothing good comes of it.

We have no quarrel with you. I'm sure you are a very nice lady. You have no interest in our lawsuit and we have no interest in you.

If you just show up and truthfully answer our questions, you have no reason to worry that it will be an unpleasant experience.  Unlike some lawyers, I am a fundamentally decent person, and I don't mistreat people.

There are three categories of questions that we are going to ask you about:  your benefits with AA, being the surviving spouse of an employee, and if those include flight benefits.  The whereabouts of your son, the circumstances of him agreeing to provide testimony against our client, and his communications with you on the subject. And any communications that AA has had with you about our lawsuit.  You are also required to bring with you the documents that the subpoena describes.  If you wish to appear remotely, then you must commit that you will take steps to ensure that I receive those documents electronically on the morning of the deposition.

Please respond promptly to this email.

Sincerely,

Will Woodrow (Exhibit S).

43. In response, Ms. Cookson replied that she "had every intention to show up."

44. Plaintiff's counsel replied:

Ms. Cookson,

You would have had no way to appear without me sending you the deposition link.  Your phone has been off all weekend.  Without responding to any of my texts, I would have had no way to do so. I've just today had to do additional research to find your email address.

If you respond promptly and cooperatively, I am happy to let you appear remotely, but I need some evidence of good faith.  (Exhibit T).

45. Ms. Cookson did not respond, so Plaintiff's counsel sent another email:

Ms. Cookson, I have (sic) having a new subpoena sent out tomorrow.   Should I put the address of the court reporters office or would you like to appear by zoom?  If I allow you to appear by zoom, will you commit to sending me the documents described in the subpoena by email before the start of the deposition?

I'm happy to work with you but I have to know that you are out there…

 If I don't hear back, I will have to default into the reporters office

Regards,

Will Woodrow (Exhibit U)

46. Ms. Cookson still did not respond.  The final communication that the Plaintiff's attorney sent to Ms. Cookson before Mr. Kolb filed the present motion is this:

Ms. Cookson,

This is  the third email that I have sent you since your terse response that you "had every intention to appear."

I have tried to explain to you that my efforts to communicate have been for your convenience.  I would like you to have the opportunity to take this deposition on a day of your choice, from your couch, with a cup of coffee, and then go on with your day.

Your lack of response to any of my emails is forcing me to require you to drive across town to the office of the court reporter, with the documents that I have asked for printed out, on a day of my choice.

Stone-walling me is only inconveniencing yourself, and honestly, I have no desire to do that.

I will re-issue a new subpoena for next Friday after lunch.  If I don't hear from you by then it will have the remote address on it.

Please get back to me before then if you would like a different arrangement or a different day next week.  If I issue it for Friday and you later tell me that Friday is no good, I'm not going to cancel the subpoena.  This is your opportunity right now to communicate with me.  So please do

Will Woodrow (Exhibit V)

47. Plaintiff has re-served a subpoena to Ms. Cookson for this Friday, though she made it the most difficult service yet to complete, necessitating another costly stakeout.  She has still not responded in any way to any communications since her terse claim that

"she had every intention to be there," and Plaintiff's only further communication has been to send her the Proof of Service for the most recent subpoena.  (Exhibit W).  In all likelihood AA knows whether she intends to show up for her deposition on Friday; Plaintiff does not.

48. The reasonable indication from her silence is that she intends to ignore the subpoena. As such, the Plaintiff's decision to notice the deposition for the reporter's office is to remove any potential excuses that she (or AA as her quasi-representative) might make to the court, such as internet problems, not receiving the link, not being tech savvy, not being able to make a pdf, or anything else that might plausibly explain her not showing up or producing the documents in her possession.

49. If she responds before Friday, Plaintiff still has no objection to allowing her to take the deposition remotely – as Plaintiff's attorney has even yesterday reaffirmed to AA, since Ms. Cookson seems to be in constant communication with Mr. Kolb.

50.  AA's concern for Ms. Cookson's convenience did not extend to taking the Plaintiff up on this proposal of mutual cooperation.  Mr. Kolb demurred, saying he thought she was getting her own counsel now.  (Exhibit X).  Would that fact prevent him from calling her and obtaining confirmation that she would appear with the requested documents so that she could have the convenience of appearing from home?  Of course it would not.  Which makes Mr. Kolb's cries of outrage in this motion seem particularly insincere.

51. As to Mr. Kolb's request for a special master, a simple review of even the deposition excerpt that he included as his own exhibit shows improper objections and coaching of the witness.  Plaintiff additionally attaches the entire deposition for the Court's

perusal if it so desires to do so.   (Exhibit Y).  Mr. Kolb's bad behavior in deposition, which the Court noticed and addressed in our last hearing together, is the only possible reason that a special master may be needed here; but Plaintiff's counsel has dealt with his type before and is comfortable proceeding alone.

52. Defendant has, at a late hour, supplemented his motion alleging that Plaintiff's attorney scrawled "The judge is watching." on the front of the latest subpoena.  That was apparently done by the process server (without Plaintiff's attorney's knowledge) after being forced to stake out her apartment for hours for the third time when she refused to answer the door.  He finally established she was there and left drop service.  Not particularly threatening, but also not Plaintiff's attorney's style. (Exhibit Z).

53. For the foregoing reasons and explanations, the Plaintiff asks that Defendant's motion be denied and costs assessed to the Plaintiff for being forced to defend against this spurious attack.

Respectfully Submitted,

   /s/ William T. Woodrow III
   _____

William T. Woodrow III (*pro hac vice*)
Stone & Woodrow LLP
250 West Main St. Suite 201
Charlottesville, VA 22902
will@stoneandwoodrowlaw.com
Phone: 855-275-7378
Attorney for Plaintiff

Rook Ringer (Fla Bar ID #1015698)
reringer@lentolawgroup.com
Lento Law Group, P.A.
222 San Marco Ave., Ste. C
St. Augustine, FL 32084
(904) 602- 9400
*Local Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing document was served upon the following attorneys of record by CM/ECF on this 10th day of May, 2022.

> Kelly Kolb
> Robert D. Pecchio
> Labor & Employment Practice Group
> 401 East Las Olas Boulevard
> Suite 2250
> Ft. Lauderdale, FL 33301
> 954 703 3900 (office)
> 954 703 3944 (direct)
> kelly.kolb@bipc.com
> robert.pecchio@bipc.com

/s/ William T. Woodrow III

_____

William T. Woodrow III