IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Troy Clowdus<br><br>PLAINTIFF<br><br>VS.<br><br>American Airlines Inc.,<br><br>DEFENDANT. | Civil Action No.: 1:21-cv-23155-MM<br><br>FIRST AMENDED COMPLAINT FOR DEFAMATION |

INTRODUCTION

This is an action against American Airlines Inc. (hereinafter "AA") for defamation, resulting from an incident that occurred on June 10, 2021 at Miami International Airport where an AA flight attendant falsely accused Mr. Clowdus of a felony assault, resulting in a permanent flight ban for Mr. Clowdus, the revocation of his AA benefits and other damages and hardship.

JURISDICTION & VENUE

1. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.A. 1332 (a) (1).

2. Venue in this district has been selected by Plaintiff pursuant to 28 U.S.C. § 1391 (b) (2) because it is a District in the United States where the events occurred.

3. The amount in controversy in this action exceeds $75,000, inclusive of costs and attorneys fees.

PARTIES AND JURISDICTION

4. Plaintiff Troy Clowdus is a US citizen who is domiciled in Miami, Florida.

5. AA is a domestic corporation with its principal place of business in Fort Worth, Texas.

## GENERAL ALLEGATION OF AGENCY

6. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the complained of agents, contractors and employees of AA was a servant of Defendant, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment.

## GENERAL ALLEGATION OF COMPLIANCE

7. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, in the course of his dealings with the Defendant, the Plaintiff complied in all respects, whether or not material, with all conditions, requirements, ordinances, and legal and contractual undertakings incumbent upon him in connection with his Contracts with Defendant AA, and with the rules and ordinances of the authorities at the airport of departure, all aircraft placards and all crew member instructions.

## FACTUAL ALLEGATIONS

8. At 6:30AM on June 10, 2021, Mr. Clowdus was one of the first passengers to board AA Flt 1303 MIA-MEX.

9. While boarding, he noticed that the lead flight attendant ,Carlos Merino, was behaving in a loud and somewhat manic fashion.

10. As he moved to sit down, Merino informed him that his satchel would need to go in the overhead bin, as he was seated in a bulkhead seat.

11. Mr. Clowdus nodded his compliance and proceeded to sit down, believing from his past experience flying business class that Merino meant that it needed to be stowed prior to takeoff but not immediately upon boarding.

12. During boarding, Merino stood in Mr. Clowdus' row and aggressively exhorted passengers: "Let's go, Let's go, Let's go."

13. Mr. Clowdus put in his headphones and began working on his phone.

14. After several minutes Mr. Clowdus felt Merino staring at him. Upon looking up, he noticed Merino appeared angry.

15. Mr. Clowdus took out his headphones to hear Merino say in a loud and angry voice, "Give me the bag now!"

16. Mr. Clowdus wondered why Merino appeared so upset since he had never previously experienced this sort of behavior from a flight attendant on previous flights with AA.

17. Mr. Clowdus felt attacked by the hostility so he looked back down to his phone as he immediately moved to comply with Merino's request by reaching down with his left hand and pulling the bag from under his left leg and placing it across the armrest to the far side of the seat beside him.

18. As he did, he felt the bag make slight contact with Merino. He initially thought Merino was taking the bag from him but then realized he was still holding it.

19. Merino glared at him with rage and shouted, "You hit me!"

20. Mr. Clowdus was stunned by the accusation, since he had not, in fact, hit Merino. Merino then shouted even more loudly, "You hit me!"

21. Feeling attacked, Mr. Clowdus denied hitting Merino and said, "No, no I didn't! I handed you my bag!"

22. Merino shouted, "NO! YOU HIT ME! That's it! I'm not taking this crap anymore!" and then stormed away.

23. Mr. Clowdus immediately looked around for another flight attendant to assist him but did not see any other flight attendants in the front of the plane.

24. A few seconds later Merino returned. Mr. Clowdus immediately put his hands in the air and attempted to deescalate the situation by apologizing.

25. Merino, however, refused to listen, pointed his finger at Mr. Clowdus and waved it back and forth while saying slowly, "I don't care! You are not flying on my plane!"

26. Merino then turned and walked toward the front of the plane.

27. Mr. Clowdus heard Merino from where he was seated repeatedly saying in an elevated voice to someone in the front galley area, "I will not fly with him!"

28. Shortly thereafter another AA employee, who discovery has identified as "Ground Security Coordinator" or "GSC,"Mr. Henriquez, approached Mr. Clowdus, apologized for the inconvenience, and asked if he could speak with Mr. Clowdus off the plane.

29. Once in the jetway, Mr. Clowdus explained the situation to GSC Henriquez. Henriquez apologized but said Merino was refusing to fly unless Mr. Clowdus was removed from the flight.

30. GSC Henriquez apologized profusely and promised to put Mr. Clowdus on the very next flight and to personally escort him to it.

31. GSC Henriquez had been standing outside the plane in the jetway at the time the incident occurred and heard Merino shouting "you hit me!"

32. Upon hearing this shout, GSC Henriquez immediately boarded the plane to see what was happening.

33. When GSC Henriquez peered around the corner in the moments during and immediately following the incident, the only flight attendant he observed in business class was Merino.

34. AA internal rules dictate that, for incidents at the gate, a GSC shall interview the targeted passenger and then take part in the discussion between the captain and the complaining crew member(s) to determine whether the appropriate action is to remove the passenger from the flight.

35. However, GSC Henriquez did not speak to Mr. Clowdus about the incident until after the decision to remove him had been made and they both had exited the plane.

36. GSC Henriquez was aware that Merino was claiming to have been assaulted at the time that he removed Mr. Clowdus from the plane.

37. GSC Henriquez attempted to convince Merino to allow Mr. Clowdus to remain on the flight.

38. GSC Henriquez had the authority to decide whether or not to rebook Mr. Clowdus on a later flight based upon his evaluation of the incidence of removal.

39. Mr. Clowdus asked GSC Henriquez if he should file a complaint against Merino. GSC Henriquez assured him that he would be filing a report about Merino himself, but that Mr. Clowdus could do so as well.

40. GSC Henriquez did file a report to his direct supervisor where he stated that he believed that Merino unnecessarily escalated the incident. See Exhibit A.

41. In his report, GSC Henriquez specifically disputed the veracity of any other flight attendant witness reports claiming to have observed the incident because he stated that he

was the closest to what happened and the other flight attendants were in the back of the plane when he looked around the corner.  See Exhibit A.

42. AA investigators did not review GSC Henriquez's report before making the determination to ban Mr. Clowdus for life from flying with American Airlines.

43. No reasonable person would believe that Mr. Clowdus had intended his bag to make contact in an offensive manner with the flight attendant, and he did not, in fact, intend for it to do so.

44. No reasonable person would characterize the slight and inadvertent contact Clowdus' bag made with Merino while Clowdus attempted to hand Merino the bag as Merino instructed him to do as an "assault."

45. Mr. Clowdus  filed a complaint through the American Airlines web site while he waited for his next flight.

46. However, AA investigators did not review Mr. Clowdus' complaint before making the determination to ban him for life.

47. GSC Henriquez did meet Mr. Clowdus at his next flight and made sure that he boarded without incident, once again apologizing.

48. Shortly thereafter, several men boarded the plane, identified themselves as AA security, and instructed Mr. Clowdus in a manner usually taken with criminals to "follow them off the plane."

49. The security agents' removal of Mr. Clowdus from the flight was a direct result of the defamatory statement Merino had made in his report claiming that Mr. Clowdus had physically assaulted him.

50. After he was removed from the plane, Mr. Clowdus explained the incident to the head of security, who expressed sympathy and said that he would be filing a report and that everything should be cleared up in a few days.

51. After arriving home and decompressing from the trauma of that morning, Mr. Clowdus began making alternative arrangements to fly to Mexico City with another airline. At that point he realized he had been accused of a federal crime and was terrified that Merino would further defame him by filing a fraudulent police report in order to have him arrested.

52. After 11 days, Mr. Clowdus received an email from American that their investigation was complete and that his benefits were revoked and he was banned for life from flying with American Airlines.

53. No one interviewed Mr. Clowdus before this action was taken.

54. Investigators affirmed in deposition that they made no independent investigation in making the decision to ban the passenger, but rather relied solely upon the Corporate Event Reporting System "CERS" reports filed by Merino and one other flight attendant who wrote her report in the third person, suggesting it was a second hand account.

55. Investigators affirmed in deposition that, as a general rule, they take the word of their flight attendants at face value and discount any claims of a passenger to the contrary. As one investigator explained: criminals often make up stories to justify their behavior. If a passenger assaults an employee he has committed a crime, so the passenger should not be believed.

56. Investigators did not reach out in person, by phone, or by email – did not reach out in any way at all – to any involved party or any party with potential knowledge of the incident to

determine the veracity of the allegation of felony assault before making the determination to ban Mr. Clowdus for life.

57. Investigators did not obtain either the CERS report filed by GSC Henriquez or the report that GSC Henriquez submitted to his direct supervisor, despite the fact that the role of the GSC in such incidents is to interview the passenger and to mediate the situation if possible, so his report would likely provide a valuable perspective.

58. In his CERS report, GSC Henriquez did not characterize what occurred as an assault.

59. No avenue of contact or appeal was provided to Mr. Clowdus.

60. Mr. Clowdus travels frequently to South America from Miami for business and being banned from flight on Defendant's airline has cost him greatly in both time and expense and limited his ability to expand his business or develop new business opportunities.

61. Mr. Clowdus has had hundreds of thousands of miles nullified for purposes of his air travel,[1] valuable status in American Airlines' loyalty program revoked, as well as the loss of lounge benefits for which he pays a yearly fee.

62. Mr. Clowdus has suffered tremendous mental and emotional distress as a result of this incident.

## COUNT I – DEFAMATION PER SE

63. Paragraphs 1-62 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

64. Flight attendant Merino accused the Plaintiff of the federal crime of assaulting an airline employee who was engaged in the performance of his duties.

---

[1] They have not been taken but he cannot use them for flights – the only purpose that they had value for him.

65. The aforementioned statement accusing Mr. Clowdus of assaulting a flight attendant is defamatory per se.

66. The statement accusing Mr. Clowdus of assaulting Merino was of and concerning Mr. Clowdus.

67. Flight attendant Merino knew that he was accusing the Plaintiff of a felony when he shouted "YOU HIT ME!"

68. Flight attendant Merino knew that he was accusing the Plaintiff of a felony when he reported that he was assaulted.

69. Flight attendant Merino knew that he was making a false accusation.

70. Flight attendant Merino knew that such a serious accusation would result in a lifetime ban for Mr. Clowdus from flying on American Airlines.

71. Upon information and belief, Flight attendant Merino, enlisted another flight attendant (Deon Gray) to provide a statement supporting his false allegation by providing a corroborating CERS report stating that she witnessed the alleged assault, even though there is evidence that she did not personally witness the interaction based upon discrepancies in her CERS report and the deposition testimony of others present, including GSC Henriquez.

72. Flight attendant Merino made the defamatory statement accusing Mr. Clowdus of felony assault with common law express malice because the primary motive of his making the false and defamatory statement was an intention to injure Mr. Clowdus.

73. Flight attendant Merino used his privileged position to gratify his malevolence by getting Mr. Clowdus unjustifiably removed from two planes and banned from flying with American Airlines for life.

74. Flight attendant Merino published this defamatory accusation to non-managerial employee Flight attendant Deon Gray when he asked her to corroborate his account.

75. Flight attendant Merino published this defamatory accusation to non-managerial employee GSC Henriquez when he made the allegation.

76. Flight attendant Merino published this defamatory accusation to every passenger in business class when he shouted "you hit me!" three times, loudly enough to bring in GSC Henriquez from the jetway to see what happened.

77. Based upon an interview between Plaintiff's investigator and the passenger seated in 3B (names of passengers withheld due to confidentiality agreement), Flight attendant Merino additionally published his defamatory accusation in a conversation after the flight departed.

78. Based upon the deposition of the passenger seated in 3A, Flight attendant Merino also published his defamatory accusation in conversation after the flight departed to the passenger seated in 3E.

79. The passenger in 3A testified that she overheard Merino say that "he did not know why people had to behave like that."

80. By shouting, "YOU HIT ME!" loudly enough to cause an employee from the jet bridge to board the aircraft, there is sufficiently reliable evidence of publication to infer that at least some of the passengers in business class overheard the defamatory shout.

81. Flight attendant Merino published his defamatory accusation to at least one non-managerial employee in corporate security, when he filed his CERS report. The identity of that individual is, upon information and belief, Chris Reddig.

82. Flight attendant Merino published his defamatory allegation to non-managerial employee Aristides Maldonado, the investigator who received Merino's CERS report from non-managerial employee Chris Reddig.

83. Upon information and belief, the defamatory statement accusing Mr. Clowdus of assaulting Mr. Merino was published to every non-managerial ticketing agent, customer service agent, and gate agent companywide through American Airlines' internal computer system.

84. Upon shouting "YOU HIT ME!" within the hearing of other passengers and restating the defamatory claim to at least one other passenger in later conversation, flight attendant Merino knew at the time he published the defamatory statements about Mr. Clowdus they were false.[2]

85. Merino abused any qualified privilege he had to publish the defamatory statements about Mr. Clowdus with any managerial or non-managerial employees of AA because he made the defamatory statement with express malice and with the knowledge that it was false..

86. The express common law malice motivating Merino's publication of his defamatory statements about Clowdus eliminated any qualified privilege he had to share the defamatory allegation that he had been assaulted with either managerial or non-managerial employees of AA.

87. American Airlines is vicariously liable for Merino's defamatory statements because he was acting within the scope of his employment when he made the false accusation.[3]

---

[2] See *American Airlines v. Geddes*, 960 So. 2d 830, 833 (Fla. Dist. Ct. App. 2007).
[3] See *Valeo v. E. Coast Furniture Co.*, 95 So. 3d 921, 925 (Fla. Dist. Ct. App. 2012); see also *Holtzman v. B/E Aerospace, Inc.*, 2008 WL 214715, at *4 (S.D. Fla. Jan. 24, 2008)

88. American Airlines is also liable for Merino's defamatory statements because they ratified and/or approved the statements in the results of their investigation and by banning him from American Airlines for life.

89. American Airlines ratified Merino's defamatory statements on June 11, 2021, when non-managerial investigator Aristides Maldonado summarized the results of his "investigation" in the Internal Refuse List Checklist, stating as fact that "passenger Clowdus physically assaulted FA 1 Carlos Merino by grabbing his carry-on bag and deliberately hitting the FA in the stomach with it." This determination was adopted without question by AA.

90. Both by failing to conduct any investigation whatsoever into the truth of the felony accusation before adopting it and by republishing the defamation to an unnecessarily wide audience, including, upon information and belief, any ticketing agent, gate agent, or customer service agent accessing Mr. Clowdus' record, American Airlines lost any qualified privilege that it had to publish the defamation among non-managerial employees.[4]

91. Upon information and belief, American Airlines rushed to judgment about Mr. Clowdus because it was serving its own interest in doing so – projecting support for its flight attendants during a time in COVID when much media coverage was focused upon mask mandates and flight attendants getting abused by angry passengers.

92. Plaintiff has suffered direct and quantifiable damages as a result of the reputational harm inflicted upon him by Defendant, including valuable miles now worthless for flight

---

[4] See *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 135–36 (1993); see also *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 380–81 (Minn. 1990).

     redemption, valuable status, valuable privileges, the cost of his foregone ticket and replacement tickets, the cost of tickets purchased for subsequent business trips with more expensive and less convenient smaller airlines, the cost of his lost time as now travel involves many more hours and multiple layovers, and the cost of lost business as travel has become a greater impediment.

93. Plaintiff additionally seeks punitive damages in an amount to be determined at trial for the malicious actions taken by Defendant's employee, the flight attendant.

## PRAYER FOR RELEF

94. Wherefore, Plaintiff prays for relief from this Honorable Court as follows:

95. For the false and defamatory felony accusation, per se defamation damages in an amount to be determined at trial but not less than $75,000.

96. For punitive damages in an amount to be determined at trial.

## JURY TRIAL

97. Pursuant to the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.

Respectfully Submitted,

    /s/ William T. Woodrow III
William T. Woodrow III (VSB 88122)
Admitted PHV
Stone & Woodrow LLP
250 West Main Street, Suite 201
Charlottesville, VA 22902
Email:   will@stoneandwoodrowlaw.com
Phone: (855) 275-7378
*Attorney for the Plaintiff*

       /s/ Rook Ringer
Rook Ringer (Fla Bar ID #1015698)
reringer@lentolawgroup.com
Lento Law Group, P.A.
222 San Marco Ave., Ste. C
St. Augustine, FL 32084
Phone: (904) 602- 9400
*Attorney for the Plaintiff*