IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Troy Clowdus<br><br>PLAINTIFF<br><br>VS.<br><br>American Airlines Inc.,<br><br>DEFENDANT. | Civil Action No.: 1:21-cv-23155-MM |

**PLAINTIFF'S MOTION TO COMPEL DISCOVERY FROM DEFENDANT AMERICAN AIRLINES**

Plaintiff TROY CLOWDUS, by and through undersigned counsel, hereby moves this Court to compel Defendant AMERICAN AIRLINES to provide better and complete written discovery responses, answers and documentation to Defendant's Responses to Plaintiff's Fourth Request for Production, Request No. 1 (Exhibit A), Defendant's Responses to Plaintiff's Fifth Request for Production, Request No. 1 (Exhibit B), and Defendant's Responses to Plaintiff's Third Interrogatories, No. 1 (Exhibit C).

**Background and Introduction**

1. The instant matter arises from an allegation of assault against the Plaintiff by an American Airlines flight attendant, which resulted in the Plaintiff being removed from the plane and banned for life from flying with the Defendant air carrier.

2. The Plaintiff denies that he committed an assault, and he has brought an action against the Defendant for defamation per se, since it is a federal crime to assault a member of an airline flight crew.

3. The witness who is the subject of the discovery requests at issue (Federico Quintana) was a passenger on the plane, who, according to Defendant's Amended Initial Disclosures, had "witnessed the incident" and provided AA with a statement about what he allegedly saw and heard. (Exhibit D).

4. AA produced Quintana for video deposition with the understanding that he would be returning to Mexico and subsequently unavailable for trial.  (Exhibit E).

5. For a variety of objectively substantive reasons, the Plaintiff believes this witness to have been materially untruthful in his deposition testimony.

6. AA did not disclose to the Plaintiff that Quintana was other than a disinterested third-party witness, so the Plaintiff and his attorney were surprised at deposition to discover that Quintana seemed to be very sympathetic towards AA and correspondingly hostile towards Plaintiff and Plaintiff's attorney.

7. After the deposition, the Plaintiff hired an investigator to try to understand the reason for the clear bias.

8. The investigator discovered that Quintana has a significant family connection to AA, and was likely flying for free, using his mother's death benefits from her late husband.

9. When asked in deposition if he knew anyone who worked for AA, Quintana downplayed the connection:  He said that his stepfather used to work for AA as a mechanic, but he didn't know the man very well and he couldn't say whether he had worked for AA for a span of years or months.  (Exhibit F)

10. The Plaintiff's investigator produced records showing that Quintana shared an address with the stepfather for at least 10 years.  (Exhibit G)

11. When asked in deposition if he was flying on a "buddy pass," Quintana asked what that meant.  When plaintiff's attorney restated the question as: "had anybody given you a ticket that would enable you to fly?" Quintana replied: "yes, my mother paid – paid; paid for my plane ticket home."  (Exhibit H)

12. Quintana was later asked if he normally flew business class and he said no.  Why was he flying business class that morning?  He didn't know.  "Well, it's a much more expensive ticket…" He replied: "It's my mother who buys my tickets for me."  At which point AA, presumably knowing that the line of questioning was potentially fruitful, intervened with the objection: "asked and answered, yet again."  (Exhibit H)

13. Only in AA's motion for sanctions was it finally confirmed that Quintana was flying essentially for free on a buddy pass that day. (ECF #34, Pg. 2)

14. It is troubling enough that AA would allow the Plaintiff to have the misperception that Quintana had no ties to AA, but what is even more troubling from the standpoint of credibility is that it also seemed to have been important to Quintana that the Plaintiff did not realize the fullness of his connection with the airline.

15. Only after spending thousands of dollars with an investigator does Quintana's inexplicable hostility to the Plaintiff and implausible testimony about things that he could not have seen from where he was sitting finally make sense:  Quintana most likely views himself as a member of the AA family – an airline that has supported his own family throughout the years and is taking care of his mother in her old age, including with the generous benefit that allows her family to stay connected with essentially free flights.

## The Statement

16. On the day before Quintana's deposition took place, the Plaintiff filed a response to Defendant's 12(c) motion, in which the Plaintiff argued that he would establish the "publishing" prong of defamation by deposing passengers to find one who heard the flight attendant repeatedly shout "YOU HIT ME!" (ECF #18, pgs. 7-8)

17. The Plaintiff knew that this means of publishing may not have been on AA's radar because the Plaintiff had, deficiently, failed to plead it.[1] *Id.*

18. So it was exceedingly strange when Quintana claimed in deposition to be paying very close attention to the incident when it occurred, claiming to overhear at least three normal-voiced interactions between the flight attendant and the Plaintiff,[2] yet when the climax of the incident occurred and the flight attendant shouted the defamatory statement three times – *loudly enough to bring a co-worker in from the jet bridge to see what was happening* – Quintana claimed that the flight attendant never said a word.  Quintana claimed that the flight attendant just looked at the Plaintiff in quiet shock and then walked to the front of the plane. (Exhibit I).

19. Quintana's testimony is 180 degrees at odds with the testimony of two other AA employees <u>and the flight attendant himself</u>, all of whom testified during their depositions that the flight attendant stated aloud, "YOU HIT ME!", two to three times.  (Exhibits J, K, L).

---

[1] A deficiency that was subsequently corrected with an amended complaint
[2] Claiming that the Plaintiff was rebuked three times for the improper wearing of his mask, implausibly claiming that each time he was confronted about it, he refused to pull the mask up over his nose in direct defiance of the flight attendant, describing in detail a mask that the Plaintiff has never owned, and all this despite the fact that the flight attendant never claimed there was any interaction whatsoever around the Plaintiff's mask, nor did he claim as many interactions with the Plaintiff for any reason as Quintana described in precise detail.  The improper mask-wearing narrative was allegedly why Quintana was paying such close attention to Mr. Clowdus from the moment that he boarded. (Exhibit I).

20. There are only two plausible explanations for Quintana failing to hear the flight attendant's defamatory words if he was indeed paying such close attention to the incident as he testified: either he did not witness the incident at all, in which case he would be lying, or he was attempting to help AA by claiming that he did not hear the flight attendant make the defamatory statement when he did, in which case he would also be lying.  Either possibility is problematic for AA.

### Plaintiff's efforts to obtain the statement from Quintana

21. Upon realizing in deposition that there was more to Quintana's testimony than met the eye, and that this was the only opportunity that the Plaintiff would have to examine him, the Plaintiff's attorney asked Quintana if, once the deposition was over, he would email him his communications with AA, including the statement he gave, so that the Plaintiff would not have to seek them through a subpoena duces tecum.  Quintana refused to commit to do so. (Exhibit M).

22. On February 23, 2022, Plaintiff's attorney sent a very nice email to Quintana after the deposition, requesting these documents again.  Quintana never responded, so Plaintiff engaged the same process server who had, with ease, previously served Quintana for AA. (Exhibit N).

23. The process server discovered that the likely reason Quintana had met him in a park rather than at his residence when he was originally served for deposition was so that he could provide a false address on the subpoena return. (Exhibit O).

24. On February 25, 2022, the process server was able to locate the correct address where Quintana was staying with his mother, Angelica Cookson, and spoke with her.  Ms. Cookson informed him that her son was in Mexico.  (Exhibit O).

5

25. Having spoken with the security guards in the building where Ms. Cookson lived, the process server did not believe Ms. Cookson was being truthful.  Over the next few days, the process server made several efforts to serve Quintana with the subpoena duces tecum, including staking out the apartment building.  (Exhibit O).

26. On February 30, 2022, Ms. Cookson instructed security that no one was to be allowed in the building unless they spoke to her first and "no visitors for her son Federico Guiterrez." (Exhibit P).

27. There are two reasonable inferences that can be drawn from Ms. Cookson's instructions, which were documented in the building's security log: (1) Quintana was not in Mexico as she had told the process server; and (2) Ms. Cookson was savvy enough to know that if she admitted that he was staying with her, the security would be required to let the process server inside, so she provided a false name.

28. Ultimately, Plaintiff's Mexican investigator could not determine whether Quintana actually lives in Mexico or just claimed to in order to avoid trial.  He does not believe that Quintana resides at the Mexican address that AA eventually provided to the Plaintiff, nor does the investigator believe that a resident of Mexico City would use an expensive US-based cellular phone like Quintana does.  The investigator did discover evidence, however, that Cookson likely received flight benefits from AA, which would establish bias on the part of Quintana.

## The Family Connection

29. Based on the belief that Cookson receives flight benefits from AA, the Plaintiff has attempted to depose her to establish her family's connection with AA, Quintana's connections with his stepfather, Quintana's actual whereabouts, as well as to inquire what she knew of Quintana's (and possibly her own) interactions with AA regarding the lawsuit

and whether she was shown or had a copy of the statement that Quintana provided to AA. AA, however, has moved to "protect" Ms. Cookson from the non-existent "threats" it alleges that the undersigned has made.  The Plaintiff believes this is nothing more than a motion to quash Ms. Cookson's deposition in disguise.

30. AA has refused every discovery request for the statement and to provide the Plaintiff with evidence in another useable form that will enable the Plaintiff to establish that Quintana has family connections to AA, and hence a motive to lie.  That is the crux of this motion to compel.

31. AA's position that this is irrelevant information is wrong.  If Quintana is truly an independent third-party witness with no connection to AA, the jury would likely give substantial weight to his testimony.  If, on the other hand, Quintana has a connection to AA – namely, the ability to travel for free as a result of his family's flight benefits – and has a motive to offer favorable testimony for AA, a jury would likely give his testimony significantly less, if any, weight.  A jury could choose to believe Quintana's account, but it should not do so based upon the thought that "this man has no conceivable reason to say anything but the truth." That would be too much reliance – there is a conceivable reason that Quintana might be motivated to color the truth, and the jury deserves to know it.

32. Ordinarily, this problem could be remedied by Plaintiff at trial at the time Quintana testifies during cross examination.  However, since Quintana will be unavailable for trial, unless Plaintiff is allowed to depose Ms. Cookson as to her connection to AA, the jury will never know that her son had a motive to testify in AA's favor.  Likewise, the only way plaintiff can establish whether Quintana testified consistently with his statement to AA about not hearing

the flight attendant make the defamatory statement accusing Clowdus of assaulting him is if he is able to obtain the statement.

33. The Plaintiff fully expects that AA will come to the motion hearing with an argument to the Court how the Plaintiff's intended deposition is irrelevant and should not go forward.

34. Throughout all the Plaintiff's efforts to communicate with both Quintana and Cookson, the Plaintiff's attorney has been made aware that both of these individuals look to AA as if personally represented by the airline – asking AA for advice in how they should respond to Plaintiff's overtures.

### Discovery Items at Issue, Defendant's Objections, Plaintiff's Position

I. **Fourth Request for Production, No. 1**

*Specific Item to Be Compelled:*  Emails and texts between AA and passenger Federico Quintana and the statement that he signed.
*Specific Objections:*  Invades work product

*Request:*

**Every email, text, or statement prepared by third-party passengers in response to Defendant queries about what they witnessed on the complained-of flight. This includes the statement prepared by Federico Quintana and statements prepared by any other passengers. This request applies only to statements, emails, and texts that provide a mere recitation of the passenger's eyewitness account of what happened on the day in question. *Arugu v. City of Plantation*, No. 09-61618-CIV, 2010 WL 11515702, at *7 (S.D. Fla. Oct. 26, 2010) ("Contrary to Plaintiff's assertion, the witness statements are not a mere recitation of the Arugu boys' eyewitness account of what happened on the day in question. If this were the case, the statements would not be deemed work product because underlying facts that support claims or defenses are not protected by the work-product doctrine."); See also *Dunkin Donuts, Inc. v. Mary's Donuts, Inc.*, 206 F.R.D. 518 (S.D. Fla. 2002) (finding facts supporting plaintiff's claims were not protected as work product).**

RESPONSE:

Defendant objects to this request as invading the work product privilege. This request encompasses witness statements collected by Defendant's counsel after the commencement of this lawsuit, in connection with the defense of this lawsuit and in anticipation of trial. This Court has previously deemed similar materials as protected from disclosure based on the work product doctrine. See *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 644 (S.D. Fla. 2011) ("A witness

statement taken by a party's attorney or agent in anticipation of litigation is protected work product.") (citing *United States v. Chatham City Corp.*, 72 F.R.D. 640, 642 (S.D. Ga. 1976)).

Moreover, Plaintiff fails to carry his burden to defeat the work product privilege by narrowing his request to "mere recitation of the passenger's eye witness account." Plaintiff has not shown a "substantial need for these written statements" which would otherwise be privileged, and Plaintiff has not, nor can he, demonstrate that he cannot obtain the substantial equivalent of such statements without undue hardship. *Bridgewater*, 286 F.R.D. at 644. To wit, Plaintiff has already deposed Mr. Quintana, and he has the capability to subpoena/depose any other passenger onboard the complained-of-flight. Id. (holding that the plaintiff had failed to defeat the work product doctrine and demonstrate "substantial hardship" regarding witness statements of individuals that plaintiff could depose). Plaintiff's cited case, *Arugu v. City of Plantation*, followed this reasoning and sustained the party's objection to the production of witness statements based on the work product doctrine. *Arugu*, 2020 WL 11515702 at *9-10.

Defendant is withholding responsive information/documentation on the basis of the foregoing objections.

**Plaintiff's Position:**

35. For whatever reason, AA solicited a signed statement from Quintana early in the litigation, then made no indication that it intended to depose Quintana until made aware of the Plaintiff's resolve to do so.  A reasonable conclusion is that AA intended to somehow use this statement in lieu of deposition testimony.  See *Huet v. Tromp,* 912 So. 2d 336, 339 (Fla. Dist. Ct. App. 2005) ("if materials are to aid counsel in trying a case, they are work product, but any work product privilege that existed ceases once the materials or testimony are intended for trial use."); See also *5500 North Corp. v. Willis*, 729 So.2d 508 (Fla. 5th DCA 1999); *Alamo Rent–A–Car v. Loomis*, 432 So.2d 746 (Fla. 4th DCA 1983); *Wackenhut Corp. v. Crant–Heisz Ent., Inc.*, 451 So.2d 900 (Fla. 2d DCA 1984).

36. The Plaintiff has a reasonably strong basis to believe that Quintana's statement will provide evidence that is useful for impeachment.  See *Id*. ("Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or they might be useful for purposes of impeachment

9

or corroboration. And production might be justified where the witnesses are no longer available or can be reached only with difficulty.") (citing *Hickman v. Taylor*, 329 U.S. at 495, 511 (1947).

37. Both Quintana and his mother have intentionally thwarted Plaintiff's efforts to obtain these materials on his own through use of a subpoena. *Id.*

38. AA hopes to use Quintana's video deposition at trial, even though the Plaintiff will have no opportunity to impeach Quintana's testimony with facts only learned once the deposition had ended. As such, Quintana has already testified. See *United States v. Nobles*, 422 U.S. 225, 248 (1975) ("Indeed, it is very difficult to articulate a reason why statements on the same subject matter as a witness' testimony should not be turned over to an adversary after the witness has testified. The statement will either be consistent with the witness' testimony, in which case it will be useless and disclosure will be harmless; or it will be inconsistent and of unquestioned value to the jury.")

39. See also the concurrence in *Hickman v. Taylor*, 329 U.S. 495, 519 (1947) ("The question remains as to signed statements or those written by witnesses…such a statement might be useful for impeachment of the witness who signed it, if he is called and if he departs from the statement. There might be circumstances, too, where impossibility or difficulty of access to the witness or his refusal to respond to requests for information or other facts would show that the interests of justice require that such statements be made available. Production of such statements are governed by Rule 34 and on 'showing good cause therefor' the court may order their inspection, copying or photographing.")

40. Quintana is presently AA's star witness because he is allegedly a disinterested passenger with no dog in the fight. However, if Quintana is not, in fact, a disinterested witness and/or

his witness statement contradicts his deposition testimony, then he loses all credibility. The Plaintiff deserves this opportunity to test Quintana's credibility because he will not have the opportunity to do so at trial: Quintana has already testified.

41. AA has controlled access to Quintana from the beginning and has made it very difficult for the Plaintiff to pursue answers.

### The history of AA's behavior with this witness supports disclosure

42. On December 17, 2021, in response to Plaintiff's first discovery requests, AA refused to provide passenger statements, citing work product. It also produced the names of all passengers in business class in its answer to Plaintiff's interrogatories but refused to provide contact information for them (other than some addresses). It subsequently amended its initial disclosures to identify three specific passengers who "witnessed the incident." For two of the three identified passengers, AA provided addresses. For Quintana, AA said only "address unknown." (Exhibits Q, R).

43. Though Plaintiff had asked for contact details, AA refused at this point to provide them. (Exhibit Q).

44. On January 6, 2021, after meeting and conferring, AA agreed to provide phones numbers for passengers, and Plaintiff agreed to hold off challenging AA's work product objection until after making further effort to contact the passengers. (Exhibit S).

45. The Plaintiff eventually made contact with two of the three passengers who allegedly "witnessed the incident." They informed the Plaintiff that they, in fact, did not witness the incident. (Exhibit T).

46. On February 17, 2021, Plaintiff's attorney confronted AA about this incongruity during their next "meet and confer" phone call regarding passenger statements, at which time he also

asked for email addresses so the Plaintiff could continue with his own efforts to contact the passengers. (Exhibit U).

47. The next day, AA served revised initial disclosures, moving all 10 business class passengers into the "persons with knowledge" category, but removing the description "witnessed the incident" from all of them. (Exhibit V)

48. Plaintiff's attorney confronted AA about doing so – saying that, by all appearances, AA was playing a game to waste the Plaintiff's time and money, and the Plaintiff was ready to take the matter to the Court. (Exhibit W).

49. AA then conceded that the only passenger statement it had only collected was from Quintana.

50. At this point, the Plaintiff decided that contacting Quintana and possibly taking his deposition was essential, but AA had provided no address and only a phone number that was not being answered.

51. AA initially told the Plaintiff that he would need to get an investigator to locate Quintana. However, not even having a country of residence in which to begin a search, Plaintiff declined this approach and asked for any other contact information that AA possessed.

52. AA reluctantly provided an email address for Quintana. The Plaintiff eventually discovered that it was rendered useless by a typo. (Exhibit X).

53. AA, upon further demand, provided a Mexican address for Quintana. A subsequent Mexican investigator hired by the Plaintiff could not locate Quintana at that address.

54. After further complaint by the Plaintiff, AA informed Plaintiff's attorney that Quintana had received his text because Quintana had called AA about it the same day. (Exhibit X).

55. Shortly after this revelation, Quintana finally responded by text to correct his email address, but then only responded "email received" to the email that he was sent. (Exhibit X).

56. AA then pivoted and informed Plaintiff's attorney that it was working on getting a U.S. address so it could serve Quintana for a deposition. AA made this happen in short order.

57. What is hard to understand is why it seemed that AA needed to be pushed so hard before deciding to depose its "star" witness. It seemed that AA would otherwise have been content to rely only upon the signed statement that it had already procured. As such, it seems reasonable to conclude that AA intended to somehow use this statement as evidence in the case, thereby waiving any work product privilege that could arguably exist.

58. It can be reasonably interpreted from the facts that AA intentionally impeded the Plaintiff's access to Quintana throughout discovery until the Plaintiff made it a large enough issue that AA had no choice. It is incontrovertible that Quintana avoided every effort of the Plaintiff to speak with him, and he solicited advice from AA about doing so. The Plaintiff has spent a large amount of money trying to gain equal access to this witness, and he has not succeeded.

59. If it can be inferred from Defendant's communications with Quintana that Quintana has a cozier relationship with AA than AA led the Plaintiff to believe, or that he changed his testimony to no longer hear the defamatory words, then the jury deserves to hear about it. And if his statement diverges significantly from the extemporaneous recollection and incredibly detailed narrative that he offered in deposition, the jury has a right to learn about that too – especially considering that the jury will not get to weigh Quintana's credibility in person, and the Plaintiff will not have another opportunity to question him.

## II.     Fifth Request for Production, No. 1

*Specific Items to be Compelled:*     Records identifying Quintana's stepfather's benefits from AA

*Specific Objection:*     Privacy, relevance

*Request:*

**Regarding the passenger witness deposed by American Airlines, Federico Quintana, please produce records identifying all benefits accrued by his late stepfather during his time of employment as a mechanic with American Airlines, and records identifying all benefits still being received by his mother, Angelica Cookson.   This includes but is not limited to pension, credit union, health insurance, and flight privileges such as reduced price and or standby tickets.**

RESPONSE:

   Defendant objects to this compound request on multiple grounds, and will answer each subpart of this request individually.

   First, with regard to the portion of this request dedicated to "records identifying all benefits accrued by his [Quintana's] late stepfather during his time of employment as a mechanic with American Airlines," Defendant objects on the grounds of privacy and relevance.

   This aspect of the request clearly and impermissibly seeks documents reflecting personal and private financial and healthcare information of a deceased former AA employee, who is not alleged to have any involvement in any aspect of the claims or defenses in this lawsuit.

   Second, with regard to the portion of the request dedicated to "records identifying all benefits still being received by his [the passenger, Quintana] mother, Angelica Cookson," Defendant also objects on the grounds of privacy and relevance.

   This aspect of the request clearly and impermissibly seeks documents reflecting personal and private financial and health care information of a deceased former AA employee's widow (and the mother of the passenger, Quintana) who is not alleged to have any involvement in any aspect of the claims or defenses in this lawsuit.

   Plaintiff is seeking this personal and private health care and financial documentation for the sole purpose of potentially impeaching or showing bias of the deceased AA employee's stepson – Quintana - an unrepresented, non-party witness who was a passenger on the flight in question and who has testified that he observed Plaintiff (a first-class passenger) intentionally assault Defendant's flight attendant. However, the grossly speculative possibility that the discovery "might" impeach a witness is insufficient to allow discovery of otherwise non-discoverable facts. See *Duck v. Warren*, 160 F.R.D. 80, 83 (E.D. Va. 1995) (the mere assertion that discovery may reveal impeachment evidence is not sufficient to justify production); *Lambert v. Chase Manhattan Bank, N.A.*, Case No. 93 CIV 5298LMMRLE, 1996 WL 252374, *5 (S.D. N.Y. May 14, 1996) (finding that party's assertion that the use of information as a "possible

impeachment tool is too speculative to support discovery of the documents at issue"). Further, discovery of otherwise relevant evidence is routinely denied for a host of reasons, including privacy concerns, Fed.R.Evid. 412 concerns, etc. Indeed, "[e]ven if relevant, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information." *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990).

This request is, therefore, an objectionable encroachment on the individual's privacy (e.g. the compelled disclosure of his financial and health care information) of a deceased AA employee and his widow, and is also objectionable as irrelevant to the claims and defenses in this matter. Furthermore, the documentation requested is irrelevant even for the purpose of impeachment, as any responsive documentation would not serve to impeach anything—rather, the documents would simply establish that the passenger's deceased stepfather accrued AA employee benefits during his employment – a not surprising but also inadmissible fact – and his widow survived to some of those benefits.

In light of the foregoing objections, Defendant is withholding records related to Quintana's stepfather's benefits during employment, and Defendant is withholding documents related to Ms. Cookson's survivor's AA pension benefits, access to credit union, and flight privileges. Defendant has no responsive documents regarding any health insurance benefits provided to Ms. Cookson through AA.

**Plaintiff's Position:**

60. Plaintiff will articulate his position more fully below, as these final two requests have an overlapping rationale and justification, but as an initial matter, the Plaintiff clarified to counsel for AA during their "meet and confer" conversation that the Plaintiff was not interested in any details that would invade privacy – just documents establishing that Ms. Cookson receives a pension and flight privileges which she is able to use to allow Quintana to fly for free.

   III.   Third Interrogatories to Defendant, No. 1

*Specific Item to Be Compelled:*   Identify benefits of stepfather, years worked with AA, benefits received by Quintana through mother.
*Specific Objections:*   Privacy and relevance

*Request:*

**For the deceased stepfather identified by Federico Quintana in his deposition, please identify his position and term of service with American Airlines and the benefit package that he received upon death or retirement and what component of those benefits conveyed to his surviving spouse, Angelica Cookson. This request includes, but is not limited to, the**

**identification of any pension, health insurance, or flight benefits that Ms. Cookson still receives and whether any of those benefits extend to her son, identifying with particularity whether her son is receiving health insurance through American Airlines and whether he is receiving reduced price or standby tickets through his mother's benefits.**

RESPONSE:

Defendant objects to this compound request on multiple grounds, and will answer each subpart of this request individually.

First, with regard to the portion of this request dedicated to "records identifying all benefits accrued by his [Quintana's] late step-father during his time of employment as a mechanic with American Airlines," Defendant objects on the grounds of privacy and relevance.

This aspect of the request clearly and impermissibly seeks documents reflecting personal and private financial and healthcare information of a deceased former AA employee, who is not alleged to have any involvement in any aspect of the claims or defenses in this lawsuit.

Second, with regard to the portion of the request dedicated to "records identifying all benefits still being received by his [the passenger, Quintana] mother, Angelica Cookson," Defendant also objects on the grounds of privacy and relevance.

This aspect of the request clearly and impermissibly seeks documents reflecting personal and private financial and health care information of a deceased former AA employee's widow (and the mother of the passenger, Quintana) who is not alleged to have any involvement in any aspect of the claims or defenses in this lawsuit.

Plaintiff is seeking this personal and private health care and financial documentation for the sole purpose of potentially impeaching or showing bias of the deceased AA employee's stepson – Quintana - an unrepresented, non-party witness who was a passenger on the flight in question and who has testified that he observed Plaintiff (a first class passenger) intentionally assault Defendant's flight attendant. However, the grossly speculative possibility that the discovery "might" impeach a witness is insufficient to allow discovery of otherwise non-discoverable facts. See *Duck v. Warren*, 160 F.R.D. 80, 83 (E.D. Va. 1995) (the mere assertion that discovery may reveal impeachment evidence is not sufficient to justify production); *Lambert v. Chase Manhattan Bank, N.A.*, Case No. 93 CIV 5298LMMRLE, 1996 WL 252374, *5 (S.D. N.Y. May 14, 1996) (finding that party's assertion that the use of information as a "possible impeachment tool is too speculative to support discovery of the documents at issue"). Further, discovery of otherwise relevant evidence is routinely denied for a host of reasons, including privacy concerns, Fed.R.Evid. 412 concerns, etc. Indeed, "[e]ven if relevant, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information." *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990).

This request is, therefore, an objectionable encroachment on the individual's privacy (e.g. the compelled disclosure of his financial and health care information) of a deceased AA employee and his widow, and is also objectionable as irrelevant to the claims and defenses in this matter. Furthermore, the documentation requested is irrelevant even for the purpose of impeachment, as any responsive documentation would not serve to impeach anything—rather, the documents would simply establish that the passenger's deceased step-father accrued AA

employee benefits during his employment – a not surprising but also inadmissible fact – and his widow survived to some of those benefits.

In light of the foregoing objections, Defendant is withholding records related to Quintana's step-father's benefits during employment, and Defendant is withholding documents related to Ms. Cookson's survivor's AA pension benefits, access to credit union, and flight privileges. Defendant has no responsive documents regarding any health insurance benefits provided to Ms. Cookson through AA.

**Plaintiff's Position:**

61. AA proffered that neither Quintana nor Cookson receive medical benefits from AA. The only two remaining categories of interest to the Plaintiff are Ms. Cookson's pension and flight benefits.

62. The Plaintiff is not interested in the amount of Ms. Cookson's pension – just the bare fact of its existence.

63. The Plaintiff is not interested in the destinations and actual usage of Ms. Cookson's flight benefits – just an explanation of the benefit and whether Quintana can enjoy it. AA has already proffered this information in an inadmissible form during a meet and confer telephone call.

64. Again, all Plaintiff wants with these requests is some sort of useable evidence to demonstrate Quintana's family connection with AA and that he was flying essentially for free that day.

65. AA attempts to argue that this family connection creates no conceivable bias, but even the facts of this case disagree. The Plaintiff went into the Quintana deposition expecting a disinterested witness – even if his recollection was not particularly helpful to the Plaintiff. What he encountered was bias and advocacy: "I mean, sure. But I'm under the impression that accidental assault is still assault" (Exhibit Y).

66. It was the recognition of the bias that caused the Plaintiff to engage an investigator.

67. And it does not take an expert in psychology to understand that a child who grew up knowing that his family was on the "AA team," who knew that his family's provision came from AA, who travelled using amazing flight benefits from AA, who became a man now observing that AA is caring for his mother in her old age, and is still providing their family with amazing flight benefits, which everyone enjoys…it does not take an expert to understand that this man may have a sense of gratitude to AA. This man, when approached, may be inclined to help AA to the best of his ability. Could his "help" translate into a helpful lie? Of course it could. And the jury has a right to consider all of the evidence that may bear upon the facts alleged in the case.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7(a)(3)

Undersigned counsel for Plaintiff hereby certifies that he conferred with counsel for Defendant via e-mail and telephone to resolve the discovery issues presented in this Motion, but this Court's intervention is required at this time.

Respectfully Submitted,

_____

William T. Woodrow III (*pro hac vice*)
Stone & Woodrow LLP
250 West Main St. Suite 201
Charlottesville, VA 22902
will@stoneandwoodrowlaw.com
Voice: 855-275-7378
Attorney for Plaintiff

      /s/ Rook Ringer
Rook Ringer (Fla Bar ID #1015698)
reringer@lentolawgroup.com
Lento Law Group, P.A.
222 San Marco Ave., Ste. C
St. Augustine, FL 32084
(904) 602- 9400
*Local Counsel for the Plaintiff*

**CERTIFICATE OF SERVICE**

      The undersigned certifies that a copy of the foregoing document was served upon the following attorneys of record by CM/ECF on this 23rd day of May, 2022.

      Kelly Kolb
Robert D. Pecchio
Labor & Employment Practice Group
401 East Las Olas Boulevard
Suite 2250
Ft. Lauderdale, FL 33301
954 703 3900 (office)
954 703 3944 (direct)
kelly.kolb@bipc.com
robert.pecchio@bipc.com

 

_____
William T. Woodrow III