UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 2021-cv-23153

TROY CLOWDUS,

    Plaintiff,

v.

AMERICAN AIRLINES, INC.,

    Defendant.

_____/

**MOTION FOR SANCTIONS AND**
**INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rules of Civil Procedure 37, 41 (b), and this Court's inherent authority, Plaintiff TROY CLOWDUS ("Clowdus") requests this Court impose sanctions on Defendant AMERICAN AIRLINES, INC. ("AA") and its counsel for intentionally disregarding its instructions at the May 24, 2022 hearing regarding communicating with unrepresented passengers and states as grounds:

**Introduction.**  Plaintiff's counsel is not accustomed to moving for sanctions against the opposing party or its counsel.  He does so reluctantly, and only after carefully reviewing the transcript of this Court's May 24, 2022 hearing and the relevant documents.  Unfortunately, the events giving rise to this motion leave him little choice, given the Court's recent admonition about communicating with non-party witnesses and the necessity of counsel refraining in any way from attempting to influence their testimony.  Indeed, it is difficult to say what is more disturbing about AA's conduct:  the fact that it blatantly ignores this Court's warning and proceeded to contact a material witness in a manner expressly prohibited by the Court, or that it occurred less than one month after the May 24, 2022 hearing.

## **FACTS**

**1.    The May 24, 2022 hearing**.

As the Court is aware, on May 9, 2022, AA filed an Emergency Motion for Sanctions which accused Clowdus counsel, William Woodrow, of threatening and harassing a non-party witness in the case. Specifically, AA claimed that Woodrow was "inhibit[ing] and/or frustrate[ing] the fair examination of future witnesses" and improperly attempting to influence their testimony. [D.E. 34, at 3].

On May 24, 2022, the Court held a hearing on AA's motion. At the hearing, Magistrate Judge Louis informed the parties that she was troubled by the manner in which counsel were improperly attempting, whether subtly or otherwise, to influence the testimony of unrepresented witnesses who were not parties to the case. Magistrate Judge Louis did not mince words, stating in no uncertain terms that it was improper for any of the lawyers to try and influence the testimony of non-party witnesses in communications with them by presenting that party's version of the facts:

> THE COURT:   I think it is hard for me to make the observation, or conclude as you have, that it was threatening without hearing that from the witness, *but it absolutely infected them with your version of the facts. The correspondence went so far what was beyond appropriate to try and get a witness's untainted perspective of what actually occurred.* But then at the deposition, the coaching was outrageous. Just outrageous. *And so I need both of you to stop, okay?  We're going to get the witness's testimony without prejudicing them one way or the other.* . . . I hopefully have conveyed to you the problems that I've seen, and just my intention to cut a clear path to how we finish the discovery in this case that has to be taken . . .

***

> Now . . . before I move on.  Then with respect to the motion for sanctions, *I hope Mr. Woodrow has heard me loud and clear about communicating with witnesses no matter who they are, and telling them a version of events or advocacy or otherwise.*  Frankly—and this is not a global statement that would apply across every practice and every *witness.  But here communicating any version of the events to them would be improper.*

Transcript of May 24, 2022 Hearing before Magistrate Judge Lauren Louis [D.E. 53] ., p. 4, ll. 10-20; p. 6, ll. 22-24; p. 21, ll. 9-17 (emphasis added)["Trans."]; *see also* Trans., p. 9, ll. 2-5 ("So, like right out of the gate, this – *this advances an advocacy, for an unrepresented witness who's not a lawyer, and just right out of the gate, the correspondence that I've seen has this witness in a peculiar, precarious position*.  And it didn't get better from there, okay?  So when I read this, I was, like, we're going to have to talk in person but then I read the deposition and I was, oh, God, we're all going to have to talk in person")(emphasis added); Trans., p. 8, ll. 9-11, ll. 20-21 ("Well, let me be clearer then in the type of the language that caught my eye, and that I thought was problematic . . . .[F]rom your perspective, *your e-mail tells him your version of the facts.* . . .Knowing you have spoken to AA.  I'm sure that is not the story they tell . . . ")(emphasis added)

Mr. Kolb, for his part, assured the court that AA would never attempt to influence the testimony of witnesses, and that it went out of its way for business reasons to err on the side of caution when communicating with passengers:

> Unlike plaintiff's counsel, we have AA business concerns at issue.  *We're not allowed to harass our passengers for purposes of litigation.  If they don't want to be involved, we back away,* so we have to walk carefully in setting up that passenger's deposition.

Trans., p. 17, ll. 23-25; p. 24, ll. 1-2.

Magistrate Judge Louis followed up the May 24, 2002 hearing with a written order on discovery on May 31, 2022, in which she noted, among other things, that "[u]nfortunately, the transcript [of Mr. Quintana's deposition] reveals that defense counsel engaged in conduct similar

3

to what it accuses Plaintiff's counsel of committing, specifically, *attempting to influence the witness's testimony."*(emphasis added).

On June 2, 2022, less than two weeks after the May 24, 2002 hearing and <u>two days after Judge Louis issued her written order</u>, Mauricio Fernandez, AA's local counsel in Mexico, texted Mr. Ramirez to ask him to contact him about "an important matter." Mr. Ramirez did not respond. The following day, Mr. Fernandez again texted Mr. Ramirez telling him he needed to discuss "an important matter" with him. When Mr. Ramirez again did not respond, Mr. Fernandez sent him a third text on June 6, 2022, which read as follows:

> Good afternoon, Juan, I hope you're well.
>
> Just as I was telling you a few days ago, my name is Mauricio Fernandez and I represent one of the most prestigious Foreign Investment Legal Firms in Mexico. *I'm writing you because we are correspondents of Buchanan, Ingersoll & Rooney, P.C., an important legal firm in Fort Lauderdale, United States, which represents American Airlines* in the state of Florida. *At the request of the legal firm Buchanan, Ingersoll & Rooney, P.C.*, we have been charged with contacting you and requesting with the utmost respect your cooperation *in carrying out justice* for the incident which occurred on an American Airlines flight, which I understand you were travelling on, *where a person inexplicably reacted in a violent manner by throwing their Laptop on one of the flight attendants of said flight, who was hurt and filed charges against the person who hurt her.* Specifically, we would only require you to state as a witness to what you witnessed the day of that unfortunate event before the competent authority, whether in person, or by videoconference through an official platform used by the Local Authorities in the United States. If you choose the first option, we would coordinate with you on the date of the hearing and your flight would be entirely paid for(round trip), as well as travel expenses and lodging in the City of Miami so you can appear for testimony, or in the case of the latter option, it would just be a matter of asking for your time, and only the amount necessary to carry out the hearing virtually at a place convenient for you. *Please, I ask you to consider the options explained above, since it's important for justice to be done in this matter and your testimony is decisive*. If you agree and are comfortable with it, we could have a videoconference with you with the President of my Law Firm Ernesto Velarde and an assistant, so that you can meet us and we can speak calmly about this. Thank you in advance for your attention and I hope to hear news from you soon. Greetings Mauricio Fernandez

*See* Composite Exh. A (emphasis added). On June 7, 2022, AA's Mexican counsel texted Mr. Ramirez a third time requesting again that he contact him. *Mr. Ramirez responded that he was*

4

*uncomfortable being involved in the case* and that he was busy. (emphasis added). AA's counsel nevertheless persisted in texting him a fourth time, telling him that they respected his decision but that he still wishes to talk to him for five minutes. *Id.*

The following day, Mr. Ramirez texted Eduardo Muriel, a private investigator hired by Mr. Clowdus, a copy of the text messages he received from AA's counsel in Mexico. Mr. Ramirez had previously spoken with Mr. Muriel about the incident and provided him with a signed notarized statement of what he recalled. *See* Exhs. B & C. He also sent him an e-mail describing in detail AA's attempts to speak with him earlier in the year. *See* Exh D. The e-mail indicates that sometime towards the end of February or early March, a representative from AA contacted him and asked him to sign "a document they had drafted, which described the altercation caused on flight 1303." *Id.* The AA representative asked him what had occurred that day. Mr. Ramirez told him that he had not observed Mr. Clowdus assault the flight attendant but that he heard Mr. Merino complaining about it. *Id.* The AA representative asked him if he remembered Mr. Merino's and Mr. Clowdus's behavior that morning. Mr. Ramirez stated that he "never saw aggressive behaviors, nor the blow that is mentioned," but he could not provide more information since he had fallen asleep. *Id.* The AA representative stated that he would send Mr. Ramirez a document "that relates exactly what I had said in our call" for him to review. *Id.* However, when he received the document the following day, it contained things that he had not said "nor could testify happened" so he decided not to reply. *Id.* AA (and presumably Mr. Kolb) would both have known about these communications with the witness prior to the May 24, 2022 hearing when he represented to the Court that "[w]e are not allowed to harass our passengers for purposes of litigation" and "[i]f they don't want to be involved, we back away."

5

2. **The Witness Statements**

Although AA's interactions with Mr. Ramirez are by far the most egregious example of its attempt to influence the testimony of non-party witnesses because they occurred within days of the May 24 hearing, they are not an isolated occurrence. Indeed, Magistrate Judge Louis was sufficiently concerned about AAs communications with another passenger, Federico Quintana, that after reviewing his deposition transcript, she indicated a desire to review the statements of all of the passengers taken by AA in camera before ruling on whether they were work product:

> THE COURT: I'm going to be candid with you here. I'm concerned enough about the Quintana issue that I am likely to seek those statements for in camera inspection . . .

Trans., p. 27, ll. 25; p. 28, ll. 1-2.

Magistrate Judge Louis was right to be concerned. A review of Mr. Quintana's declaration prepared by AA's counsel and the drafts that preceded it call into question whether AA attempted to influence Mr. Quintana's testimony. In the first unsigned draft of Mr. Quintana's declaration prepared by AA (AA00129-131)[Exh. E], which was based on an interview with him, the draft states: "Additionally, due to this diagonal angle, *I could also observe the Male Passenger's face and facial expressions as he spoke with flight attendant* during these interactions. Although I could not hear what was being discussed between the Male Passenger and the flight attendant, *I easily observed the Male Passenger's* body language and *facial expressions which showed*, that as the interactions progressed, *the Male Passenger was growing more and more agitated*." (emphasis added). However, in the second draft and the declaration he signed, (AA00126-128, 136-138)[Exh. F], the statements concerning Mr. Clowdus's face and facial expressions were removed. There are only three possible conclusions that can be drawn from this change: either (1) AA prepared the draft without first speaking with

Mr. Quintana, which seems unlikely given the detail and specificity of the draft and the fact that AA testified it interviewed the passengers first; (2) Mr. Quintana told them to remove the statements, in which case they would have known he had lied to them and have an obligation to inform the court; or (3) AA removed those statements from his declaration because it knew they were not truthful since Mr. Clowdus's was required to wear a CDC mandated mask. Under any of these scenarios, AAs conduct is troubling.[1]

Additionally, and of equal concern, are the blatant inconsistencies between Mr. Quintana's declaration, which he signed under penalty of perjury, and his deposition testimony. For instance, in his declaration, Mr. Quintana stated that "he could not hear what was being discussed between the Male Passenger and the flight attendant." However, when it came time for his deposition, he miraculously grew a pair of ears:

> MR. WOODROW: Okay. So the first interaction you heard with this flight attendant, did he say anything about a bag or was it just about the mask?
>
> MR. QUINTANA: The first—the first one I heard—*I could hear other things after*, but I was – I was specifically looking at him to –do the pantomime of the mask. *So I was – I was listening for those words. So yeah, I – the first one I , for sure heard him say,* "Please put on your mask sir."

---

[1] The declaration of Elja Keizer, another passenger, raises similar concerns. In what appears to be the original, unsigned draft of Mr. Keizer (AA00124-125)[Exh. G], ¶9 of the statement says, "No flight attendant or any other AA employee or official ever spoke loudly or aggressively to this Male Passenger," and paragraph 12 states, "Throughout the entire flight, including in my interactions with them, I would describe the flight attendants' behavior as courteous, calm, and professional." However, in Mr. Keizer's signed declaration (AA00122-00123)[Exh. H], ¶9 includes the qualifier "To my knowledge" and the flight attendants' behavior is described merely as "normal." While the changes to Mr. Keizer's declaration are certainly more benign, they also suggest an attempt by AA to put words in the witness's mouth, particularly since the same exact words –courteous, calm and professional—were used to describe the flight attendants in other passenger declarations.

7

*See* Deposition Transcript of Federico Quintana ["Quintana Dep."][Exh. I], pp. 65, ll. 6-14; (emphasis added); see also Quintana Dep., pps. 67, ll. 1-4 ("this second time the instructions were, 'Please put on your face mask. And sir, I'm going to need to put that – I'm going to need you to put that carry-on on –on the overhead bin'"); pp. 71, ll. 12-15 (MR: WOODROW: And so to the best of your recollection, *what were the precise words of that exchange as it played out*? MR. QUINTANA: *"I – I'm –I'm going to need you to –to—to stow the bag on the overhead bins."*)(emphasis added).

Similarly, Mr. Quintana swore in his declaration that a few minutes after he was seated, he noticed Mr. Clowdus " seated in the first row, <u>window seat,</u> on the right side of the plane (when facing forward), <u>speaking aggressively with the flight attendant</u> . . ." (Exh. F, ¶6)(emphasis added). However, in his deposition he testified that he was "positive Mr. Clowdus was in an <u>aisle seat</u>." Exh. I, pp. 10, ll. 21-23; p. 103, ll. 4-7 ("The seat next to him was empty, and *I remember him sitting on the aisle seat. If you're saying that his assigned seat was the window one, then he wasn't using that one.*")(emphasis added), and that he never heard Mr. Clowdus say anything:

> MR. WOODROW: You didn't hear him say any – *did you hear any words come out of his mouth at any point during that –during his time aboard the plane*?
>
> MR. QUINTANA: Are we speaking about the passenger?
>
> MR. WOODROW: The passenger, yes.
>
> MR. QUINTANA: *No, I didn't*.

*See also* Exh. I, p. 98, ll. 16-25 ("I believe you've testified that you never heard the passenger speak. . . ."Yeah. I –I—I never heard the passenger speak."); pp. 67-68 (stating that he could not speak to whether Clowdus was angry when he saw him interact with Merino).

Perhaps most notably, in his declaration, Mr. Quintana says nothing about Mr. Clowdus being asked by Mr. Merino to put on his mask. Yet during his deposition, he had a distinct recollection that Mr. Merino asked him repeatedly to put on his mask, <u>something even Mr. Merino did not testify to.</u> Although AA would certainly not be responsible for Mr. Quintana perjuring himself in his deposition if it had not directed or coached him to do so–which Clowdus does not have evidence of and is not claiming—the stark discrepancy between the statement in his declaration and his deposition testimony on what is unquestionably a material fact raises questions which cry out for an answer as to whether AA knew he was being untruthful and what steps, if any, they took to advise the court.[2] *See Nix v. Whiteside*, 475 U.S. 157, 168-169, 106 S.Ct. 988, 89 L.Ed. 2d 123 (1986)("The special duty of an attorney to prevent and disclose frauds upon the court derives from the recognition that perjury is as much a crime as tampering

---

[2] The situation with Mr. Quintana is all the more troubling given AAs delay in providing Clowdus's counsel with Mr. Quintana's contact information. On November 10, 2021, Clowdus served AA with his First Request for Production, seeking contact information for all business class passengers and his First Interrogatories seeking the same, as well the further identification of individuals with knowledge of relevant facts. On December 17, 2021, AA responded to Clowdus's First Request for Production by refusing to provide contact information for business class passengers, although Clowdus had given AA a 7-day extension on its discovery response to ensure that a protective order was first in place for this purpose. (Exhibits J, K) AA simultaneously responded to Clowdus's First Interrogatories by identifying Mr. Quintana among three passengers with "knowledge of relevant facts," providing some addresses for identified passengers but <u>no address for Mr. Quintana or Mr. Espinoza.</u> Exhibit L. On January 5, 2022, counsel for the parties met and conferred, at which time AA agreed to provide phone numbers for each passenger. Exhibit M. However, AA did not provide Clowdus's counsel with the phone numbers for the passengers until January 12, 2022 – <u>the same day that it received Quintana's signed statement</u>. Exhibits N, O. It also provided Clowdus with an incorrect phone number for Mr. Espinoza. On February 10, 2022, Clowdus went back to AA and requested email addresses for the passengers. Exhibit P. AA agreed to provide them on February 23, 2022. Exhibit Q. On February 24, 2022, AA served its Fourth Amended Disclosures, which contained an incorrect email address for Mr. Quintana and <u>no email address for Mr. Espinoza</u>. Exhibit R. On March 1, 2022, AA obtained a signed statement from Mr. Espinoza. Exhibit S. <u>The following day,</u> AA served its Fifth Amended Disclosures, in which <u>for the first time</u> it provided <u>the correct e-mail address and phone number</u> for Mr. Espinoza. Exhibit T.

with witnesses or jurors by way of promises and threats, and undermines the administration of justice.")

**ARGUMENT**

**THIS COURT SHOULD IMPOSE SANCTIONS ON
AA AND ITS COUNSEL FOR INTENTIONALLY FLOUTING
MAGISTRATE JUDGE LOUIS'S INSTRUCTIONS
REGARDING INFLUENCING THE TESTIMONY OF NON-PARTY WITNESSES**

It is beyond peradventure that federal courts have the power, by statute, rule, and common law to impose sanctions against recalcitrant lawyers and parties. *Carlucci v. Piper Aircraft Corp., Inc.*, 775 F.2d 1440, 1446 (11th Cir. 1985); *Collar v. Abalux, Inc.*, 2018 WL 3328682 (S.D. Fla, July 5, 2018), at *9. "While the law may demand zealous advocacy on the part of an attorney, it cannot condone attorneys demeaning themselves and the judicial process[.]" *Carlson v. Bosem*, No. 04-61004-CIV, 2007 WL 1496693, at * 5 (S.D. Fla, Apr. 9, 2007), *aff'd*, 298 F. App'x 861 (11th Cir. 2008).

The Eleventh Circuit has held that Rule 37 (b) permits the court to impose sanctions on a party if they willfully of in bad faith fail to obey a discovery order. *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542-43 (11th Cir. 1993). Sanctions may include awarding attorney's fees against the offending party, striking pleadings in whole or in part, rendering a default judgment against the disobedient party, or issuing a finding of contempt. Rule 37(b)(2)(A). A finding of bad faith may be demonstrated by "delaying or disrupting the litigation, or *hampering enforcement of a court order*." *In re Walker*, 532 F.3d 1304, 1309 (11th Cir. 2008)(emphasis added). The purpose of sanctions under Rule 37 is not only to prevent unfair prejudice to the litigants but also to ensure the integrity of the discovery process. *Aztec Steel Co. v. Fla Steel Corp.*, 691 F.2d 480, 482 (11th Cir. 1982); *Goforth*, 766F.2d at 1535 (district court did not abuse its discretion in dismissing case where party deliberately refused to comply with directions of the

court). Although the striking of pleadings is not justified if a party's failure to comply with a court order was the result of simple negligence or a misunderstanding, if the party does not provide a "credible explanation of how he interpreted an order . . . the party's unsupported assertion that it misunderstood the order is insufficient. *Id.* at 1543; *accord, Betty K Agencies, Ltd. v. M/V Monada*, 432 F.3d 1333, 1338 (11th Cir. 2005)(the striking of pleadings may be imposed where a party engages in willful contempt or contumacious conduct, and the district court specifically finds that lesser sanctions would not suffice). Furthermore, while the striking of a party's pleadings is appropriate only as a last resort when less drastic sanctions would not ensure compliance with the court's orders, a court is not required to first impose lesser sanctions if the lesser sanction would be ineffective. *Id.* at 1544. The finding that lesser sanctions would not suffice may be implicit or explicit. *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999); *Zocaras v. Castro*, 465 F.3d 479, 484 (11th Cir. 2006).

Additionally, Rule 41 (b) authorizes a district court to dismiss a complaint for a party's failure to comply with a court order or the federal rules. *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985). As with Rule 37, the striking of pleadings under Rule 41 (b) is appropriate only where there is a clear record of "willful" contempt and an implicit or explicit finding that lesser sanctions would not suffice. *Gratton v. Great American Communications*, 178 F.3d 1373, 1375 (11th Cir. 1999). Although Rule 41 (b) refers to dismissal of a plaintiff's complaint, as opposed to the striking of a defendant's pleadings, district courts have applied the same analysis to the striking of pleadings and entry of a default against a defendant as they have to dismissing a plaintiff's complaint. *Holland v. Westside Sportsbar & Lounge, Inc.*, 2020 WL 7390723 (M.D. Fla., Aug. 11, 2020), at * 2-3; *Tine v. Boca Leche, Inc.*, 2015 WL 13777476 (S.D. Fla., June 25, 2015), at *; *In re: Noso*, Inc., 2007 WL 809658 (M.D. Fla., March 15, 2007), at * 1; *Coupling

11

*Solutions v. Davidson*, 2012 WL 12868743 (S.D. Fla, Nov. 8, 2012), at * 1-2; *Pharma Funding, LLC v. FLTX Holdings, LLC*, 2020 WL 8084174 (S.D. Fla, Dec. 28, 2020), at * 3 (striking defendant's pleadings for failing to comply with court orders); *Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538. 1543 (11th Cir. 1985)(where defendants made clear they would not comply with court order, only effective remedy was entry of a default judgment); *KLX, Inc. v. Your Container Solutions, Inc.*, 2018 WL 6978698 (S.D. Fla, Nov. 15, 2018), at * 3-4 (striking defendant's pleadings for failure to comply with court order); *Mitchel v. VegasSportsConsultants.com*, 2019 WL 3426038 (S.D. Fla, May 23, 2019), at * 5 (entering default judgment against defendant for willful failure to comply with court orders); *Inmuno Vital, Inc. v. Telemundo Group, Inc.*, 203 F.R.D. 561, 573 (S.D. Fla. 2001)(prejudice to the plaintiff an important consideration in the determining whether lesser sanction would suffice).

Finally, the Court has inherent authority to sanction counsel and parties for their actions. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991). This authority is based, in part, on courts' inherent need to effectively manage the cases before them, and secure the proper functioning of the judicial system, by promoting parties' compliance with court orders, judgments, and procedures. *Id.* The key to a finding of sanctions pursuant to the court's inherent authority is bad faith. *Peer v. Lewis*, 606 F.3d 1305 (11th Cir. 2010). While the rules and statutes permitting the imposition of sanctions may only reach certain individuals or conduct, "the inherent power extends to a full range of abuses and "exist[s] to fill in the interstices." *Id.* at 1314. Moreover, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power to sanction bad faith conduct in the course of litigation." *Bertin v. Zadok Real Estate Holdings, LLC*, 2012 WL 13012463 (S.D. Fla., Feb. 3, 2012), at *11; *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209-10 (11th Cir.

1985)(upholding a $50,000 fine against counsel for intentional misconduct imposed by district court under its inherent power to sanction attorneys practicing before it).

    A.    **Sanctions are warranted in this case because AA and its counsel willfully disregarded the Court's instructions regarding influencing testimony of non-party witnesses.**

At the hearing on May 24, 2022, Magistrate Judge Louis could not have been clearer: she did not want any communications with unrepresented non-party witnesses that gave either party's version of the facts. She made clear that such communications were improper and that she did not want to see any communications that did so in the future from either side. The attorneys for both parties were present and clearly understood what she was saying – namely, that any communications with unrepresented witnesses remain entirely neutral. Yet within less than two weeks of the hearing, lawyers for AA blatantly disregarded this admonition and proceeded to send text messages to Mr. Ramirez stating that Clowdus "inexplicably reacted in a violent manner" by "throwing his laptop on one of the flight attendants," that the flight attendant had been "injured" and had "filed charges against the person who hurt [him]." *See* Exh A. He also went on to ask him to give a deposition "since it is important that justice is done in this matter and your testimony is decisive," and asked him to meet with the president of his law firm so they could speak "calmly" about the incident. *Id.*

Even if Magistrate Judge Louis's instructions were ambiguous—which they plainly were not—there is no conceivable way this text message can be read as a neutral communication that presents an impartial version of the facts. Mr. Clowdus's conduct, according to the text message, was inexplicable and violent. He did not hand or pass his bag to the flight attendant. He threw it with sufficient force that it injured Mr. Marino and resulted in him filing charges against Mr. Clowdus.

13

Moreover, these were not communications casually prepared by an administrative assistant or someone without knowledge of the case. On the contrary, they were sent by an attorney from "one of the most prestigious Foreign Investment Legal Firms in Mexico[3]" who was working in conjunction with Buchanan, Ingersoll & Rooney, P.C., "an important legal firm in Fort Lauderdale which represents American Airlines in the state of Florida." Mr. Fernandez also made clear that he was contacting Mr. Ramirez "[a]t the request of the legal firm Buchanan, Ingersoll & Rooney, P.C.," to request his cooperation "in carrying out justice." It is difficult to imagine how a 24-year-old Mexican would not feel intimidated by such a text, particularly when he had previously spoken with a representative from American several months earlier and declined to execute the declaration it prepared because it did not accurately reflect what he had told them. Ex. C.

Perhaps most significantly, had Mr. Ramirez not sent the text messages to Clowdus's investigator, neither Clowdus or the Court would have ever been the wiser. And although they were not in existence at the time of the hearing, one thing is certain: they are not "innocuous." *See* Trans., pp. 30, l. 10.

### B. Sanctions are warranted in this case because AA and its counsel misled the Court during the May 24, 2022 hearing about its attempts to influence non-party witnesses.

In addition, sanctions are also warranted because American misled the court during the May 24, 2022 hearing about the manner in which it communicated with non-party witnesses. American did not simply accuse Mr. Clowdus's counsel at the hearing of making improper statements in his communications with Ms. Cookson and Mr. Quintana. It affirmatively represented that when a non-party witness did not want to involve himself in a lawsuit, it

---

[3] *See* www.velardedenache.com/about/ [Exh. U]

14

"backed away." The texts from Mr. Fernandez and the June 8, 2022 e-mail from Mr. Hernandez, however, demonstrate this is untrue. American contacted Mr. Hernandez in February, 2022 and asked him to sign a written statement about what he witnessed. When he didn't do so because it did not accurately reflect what they told him, however, they did not "back away." Instead, they doubled down on their attempts to induce him into providing a deposition by portraying Clowdus as a villain and the flight attendant as an injured victim deserving justice, all the while maintaining to the court that they were the paragon of neutrality when they were anything but. It also potentially explains why Magistrate Judge Lewis came away from Mr. Quintana's deposition with a sense that he was "spring-loaded to cater to American's point of view." Exh I., p. 8, ll. 16-17.

This, of course, makes AA's delay in providing Clowdus with the contact information for the passengers all the more troubling. Viewed in a vacuum, AAs failing to provide Mr. Quintana's phone number and e-mail address until the day after they obtained a signed statement from him and failing to provide the correct number and e-mail address to Mr. Espinoza until they obtained a signed statement from him could be viewed as inadvertent. But when coupled with all of AA's other actions, including brazenly ignoring the Court's instructions not to influence the testimony of non-party witnesses and changing material facts in Mr. Quintana's statement, it is difficult to simply view these actions as mere coincidences.

**C.     No lesser sanction than the striking of AA's pleading will be effective.**

Were this simply a situation of "no harm, no foul," the Court could impose a monetary sanction on AA for disregarding its clear directive, or award Clowdus his attorneys fees. The problem is that because of the manner in which AA handled Mr. Ramirez, he is now reluctant to testify about what he observed, which is not consistent with Mr. Marino's version of events. It

15

also calls into question the veracity of Mr. Quintana's testimony, which even the magistrate found baffling. And it raises the question of what other prejudicial communications AA may have had with the other witnesses similar to those of Mr. Fernandez that Clowdus is unaware of.

## CONCLUSION

Although the circumstances surrounding Mr. Quintana's deposition and the other passenger statements are unclear, two things are certain: (1) AA and its counsel were aware as of May 24, 2022 that any communications with non-party passenger witnesses were required to be neutral so as not to taint their testimony. Yet despite being clearly and unambiguously told that by Magistrate Louis, AA and its counsel sent text messages less than two weeks later to at least one witness that flagrantly disregarded this order; and (2) AA's counsel told the court that it would never attempt to influence or pressure a non-party passenger witness. Yet less than two weeks later, they did precisely that. In light of these serious violations, as well as the other issues outlined in this motion, Mr. Clowdus requests this Court impose sanctions on Defendant AMERICAN AIRLINES, INC. and its counsel, including but not limited to: (1) imposing monetary sanctions, including attorney's fees, against AA and its counsel; (2) striking the testimony of Mr. Quintana; (3) precluding AA from using any passenger depositions or statements at trial and prohibiting any passengers with whom it had contact from testifying at trial; and (4) striking AA's defenses and entering a default judgment on liability against AA.

## CERTIFICATE OF GOOD FAITH
## CONFERENCE WITH OPPOSING COUNSEL

Pursuant to Local Rule 7.1(a)(3), I hereby certify that I conferred with Kelly Kolb, counsel for Defendant American Airlines, Inc., on June 16, 2022 to resolve the issues that are the subject of this motion, but could not reach an agreement.

Respectfully Submitted,

**THE LAW OFFICE OF**
**DAVID H. POLLACK, LLC**
75 Valencia Avenue, Suite 100
Coral Gables, FL 33134
Tel. No.:	(305) 372-5900
Fax No.:	(305) 372-5904

BY:	/s/David H. Pollack
	**DAVID H. POLLACK**
	Fla. Bar No. 0955840

/s/ William T. Woodrow

William T. Woodrow III (*pro hac vice*)
Stone & Woodrow LLP
250 West Main St. Suite 201
Charlottesville, VA 22902
will@stoneandwoodrowlaw.com
Phone: 855-275-7378
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system and plaintiff was served by U.S. Mail at the address on file with the Court on June 16, 2022.

THE LAW OFFICE OF
DAVID H. POLLACK, LLC
75 Valencia Avenue, Suite 100
Coral Gables, FL 33134
Tel. No.:	(305) 372-5900
Fax No.:	(305) 372-5904

BY:	/s/David H. Pollack
	**DAVID H. POLLACK**
	Fla. Bar No. 0955840