**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

CASE NO: 2021-cv-23153

TROY CLOWDUS,

      Plaintiff,

v.

AMERICAN AIRLINES, INC.,

      Defendant.

_____/

## PLAINTIFF'S REPLY TO AMERICAN AIRLINES, INC's RESPONSE TO HIS MOTION FOR SANCTIONS <u>AND RESPONSE TO AA'S CROSS MOTION FOR SANCTIONS</u>

Plaintiff TROY CLOWDUS files his Reply to Defendant AMERICAN AIRLINES, INC's ("AA") Response in Opposition to his Motion for Sanctions and his Response to AA's Cross Motion for Sanctions.[1]

### <u>INTRODUCTION</u>

In its Response to Plaintiff's Motion for Sanctions and Cross Motion for Sanctions ("Response and Cross-Motion"), AA attempts to deflect the Court's attention from its own misconduct by making specious and unfounded allegations of witness tampering against Clowdus's counsel and his investigator. Specifically, AA asserts that Clowdus's motion provides "*solid record proof* that Plaintiff's counsel (through his Mexican 'criminologist' affiliated with multiple Mexican and U.S. governmental entities) has convinced previously cooperative witnesses to discontinue cooperation with [AA]," and that it did so in response to comments made by the Court at the May 24, 2022 hearing." *See* [D.E. 61], p. 2 (emphasis added). Unfortunately for AA, these allegations fail to hold up under even minimal scrutiny for

---

[1] Though Replies are limited to 10 pages under Local Rule 7.1 without leave of court, since AA has filed both a reply and a Cross Motion for Sanctions in one document, Clowdus is entitled to 20 pages under Rule 7.1 to respond to both documents.

two reasons:  first, because there is no evidence to support them,[2] and second, because they do not alter the <u>undisputed</u> facts that: (1)  AA engaged Mexican counsel on May 25, 2022 for the express purpose of contacting a witness on multiple occasions who it knew did not wish to be deposed;  and (2) AA's Mexican counsel behaved in a manner specifically proscribed by the Magistrate.

This is not a situation, as AA implies, of bad behavior on all sides.  When the Court admonished both parties at the May 24, 2022 hearing, Plaintiff's counsel listened and immediately conveyed the Court's message to Clowdus, who in turn relayed it to his investigator, Eduardo Muriel:

> Eduardo,
>
> The judge got upset today with my attorney for his communication with passenger witnesses. The judge thought my attorney tried to influence the passenger statements with the way he asked questions.
>
> Please be careful when you interview passengers. Do not coach them. Or make any suggestive comments. Please do not do anything to influence their testimony in any way.
>
> Only ask them what they remember and then ask for a statement in their words. Do not influence the passenger statement in any way or write their statement for them. Otherwise the statement will be worthless to us.
>
> Thank you again for all your efforts helping me in this matter.

Exh. C.

This was not a course correction, but a reaffirmation of what Mr. Clowdus had told Muriel from the beginning when he first hired him:

> Muriel:  And as for the interview, it's not much of a problem for me if the questions don't imply that they have to acknowledge something illegal.

---

[2] For instance, AA makes the bald assertion that Clowdus's counsel, through Mr. Muriel, convinced previously "cooperative witnesses to discontinue cooperation with [AA]."  However, as discussed more fully below, Plaintiff's counsel neither hired Mr. Muriel nor spoke with him until shortly before filing their Motion for Sanctions in order to verify the information contained in his declaration.  *See* Exhs. A and B.  They also never spoke with either of the two Mexican witnesses, Juan Hernandez-Ramirez and Jairo Espinoza, that AA accuses them of supposedly tampering with.  *Id.*

> Clowdus:  No. No. Nothing illegal. Nada…These four men I want you find were the most likely to know the truth of what happened that morning and they will save my life if they say the TRUTH. [3]  (emphasis original).

*See* Exh. D., pp. 8-9.

In contrast, after specifically telling the Court  during the hearing that AA did not pursue non-party witnesses who did not wish to give testimony,  *see* Transcript of May 24, 2022 hearing ["Trans"],  p. 17, ll. 23-25, p. 24, ll. 1-2, AA hired Mexican counsel the following day to track down Fernandez-Ramirez and Espinoza to try and pressure them into giving deposition testimony which did not accurately reflect what they told AA when they initially spoke with Sara San Martin back in February.  Exhs. E-G.  What's more, they did so even though it should have been clear to AA's Miami counsel that Fernandez-Ramirez and Espinoza did not wish to communicate further with AA.  Exh. A to D.E. 55, p. 10.

Nor is Clowdus's Motion a last-ditch attempt, as AA claims, to resurrect a defamation claim on "life support."[4]  On the contrary, as the Court pointed out during the May 24, 2022 hearing, the affidavits and deposition testimony of the witnesses in this case demonstrate that there are significant and material issues of fact that are in dispute with respect to Clowdus's defamation claim which a jury must decide.  *See* Trans., pp. 18, ll. 20-21, p. 19, ll. 1-3, p. 20, ll. 15-17.  AA's attempt to conflate the Motion to Dismiss with Clowdus' Motion for Sanctions is simply a red herring intended to divert the Court's attention from AA's misconduct.  The same is true of the unfounded suggestion that Mr. Clowdus hired Mr. Muriel to intimidate Mr. Hernandez-Ramirez or Mr. Espinosa or that he did so because of his work as a criminologist.  In fact, as Clowdus's communications with Mr. Muriel demonstrate, his singular focus was on locating the four passenger witnesses and setting up an interview with them so that he could obtain a statement as to what they observed on the flight.  Exh. D, pp. 6-8.

---

[3] Although Clowdus's communications with his investigator are likely protected by the work product and investigator privileges, because of the severity of the allegations made by AA, Clowdus has attached them to this Reply and Response to Cross Motion.  Clowdus is in the process of having the Spanish portions translated (though it will be a translation of a "google translate" translation) and will supplement the exhibit when complete.

[4] AA's snarky comments that Clowdus's lawsuit was "read last rights" and that his defamation claim is "on life support" are yet another example of the type of over the top statements the Court admonished the parties to refrain from making.

Fortunately, the court need not speculate as to the veracity of what these witnesses told AA or whether anyone influenced or misrepresented their testimony, since both Hernandez-Ramirez and Espinoza are now represented by Mexican counsel unaffiliated with Clowdus or anyone on his team and have expressed a willingness according to their counsel to appear at an evidentiary hearing via zoom.  Exhibit F & G.[5]  Additionally, Espinoza has provided, through his attorney, an unsolicited affidavit stating that the declaration AA prepared for him does not accurately reflect what he told AA he observed on June 10, 2021 during his call with San Martin.  Exh. F.  The Court can make its own determination of what occurred and whether sanctions against AA are warranted.

## FACTS PERTINENT TO THE MOTION

The facts material to the Motion and Cross Motion begin with AAs initial attempts to contact Hernandez-Ramirez and Espinoza earlier this year.  On February 28, 2022, Robert Pecchio, AA's attorney, directed his paralegal, Sonia San Martin, to contact Hernandez-Ramirez and Espinoza.  Exh. H. Based on her conversations with them, according to Pecchio, San Martin assisted him in preparing draft declarations in English, which she sent to Hernandez-Ramirez and Espinoza on March 1, 2022.  Exh. H.[6]  Hernandez-Ramirez did not return his because it did not accurately reflect what he had told San Martin.  Exh. E.  According to Pecchio, Espinoza signed and returned his within two hours.  Exh. H, ¶ 10.  At the time he signed the declaration, Espinoza was not fluent in English and did not review the affidavit carefully.  Exhs. F & G.  However, he assumed that it accurately reflected what he had told San Martin, which he later discovered was not the case.  Exhs. F & G.  For instance, the declaration prepared by AA states: "After taking my seat, I observed a male passenger . . . seated in the first row, aggressively and intentionally sling his bag at a male flight attendant . . . who had appeared to be trying to help this male Passenger with the bag prior to having the bag forcefully shoved into his body," and "I would describe the Male Passenger's behavior as unmannerly, uncivil, aggressive and spoiled."  Exh. S

---

[5] Clowdus's counsel was first contacted by the witnesses Mexican counsel, Julio Cesar Ramirez y Villafana on July 4, 2022 in an unsolicited e-mail.  *See* Exh. G.  Prior to that time, neither Clowdus nor his lawyers had ever spoken with Mr. Ramirez y Villafana or were even aware until just shortly prior that he existed.  Exh. A & B.

[6] Although much of Pecchio's declaration is based on firsthand knowledge, some of the statements pertaining to conversations his legal assistant had with the passengers are not.

to D.E. 55.   However, the sworn affidavit executed by Mr. Espinoza states that "I didn't notice any aggressiveness or hostility from the passenger or the flight attendant because I didn't see any argument." Exh. F.

About a month after AA initiated contact with Hernandez-Ramirez and Espinosa, Clowdus contacted Eduardo Muriel, a private investigator based in Mexico City, to help him locate Hernandez-Ramirez and Espinosa.  Clowdus did so because he believed the contact information AA provided him with was either incomplete or inaccurate.  Exh. I.  Clowdus found Muriel through the internet in a search for private investigators in Mexico City.  Exh. I.  Prior to hiring him, he made sure that he was credentialed as an investigator in Mexico so that he would be qualified to offer testimony in a United States court.  Exh.  I.   Clowdus's sole purpose in retaining Muriel was to have him locate Hernandez-Ramirez and Espinosa and obtain statements from them about what they observed on the flight that morning.[7]  Exh. I.

Muriel initially offered to do a comprehensive background search on Hernandez-Ramirez and Espinoza, including providing Clowdus with a complete description of addresses and places they regularly visit, as well as information on their friends, activities, and marital status.  Exh. D, pp. 6.  Clowdus made clear that he was not looking to perform that kind of search, and that he was only hiring Muriel to locate Hernandez-Ramirez and Espinosa and meet with them so they could tell him what they remembered from that morning.  Exh. D, pp. 6-8.  He also made clear that he did not want Muriel to do anything illegal and for the witnesses to simply tell the truth.  Exh. D, p. 9.   There is no evidence that Clowdus or his counsel ever directed Muriel to do anything other than obtain statements from Hernandez-Ramirez and Espinosa or that Muriel did so.

On May 5, 2022, Muriel texted Clowdus that he had located Hernandez-Ramirez in Texas and that he was willing to give a statement in front of a notary concerning what he observed on the flight.  Exh. D, pp. 34-36.  Muriel also informed Clowdus that he was still attempting to locate Espinosa.  Exh. D, p. 36.  Neither Clowdus, his counsel or Muriel had any indication that AA had interviewed or prepared draft statements for either Hernandez-Ramirez or

---

7 Clowdus also tasked Muriel with locating three other passengers and later to determine whether Carlos Merino, the flight attendant who claimed Clowdus assaulted him, had truthfully represented his work history during his deposition.  Exh. D, pp. 2, 30-31.

Espinoza until the Court directed AA to disclose an updated privilege log prior to the hearing on May 24, 2022.[8]

On May 24, 2022, the Court held a hearing on AA's Motion for Sanctions against Plaintiff's counsel, for the original purpose of determining whether the Plaintiff had threatened or harassed third-party witnesses.  At the hearing, the Court did not agree that the Plaintiff's counsel appeared to have engaged in threatening of harassing behavior.  Instead, the Court had two primary concerns:  coaching witnesses [9] and approaching third-party witnesses with a biased version of events.  With respect to AA's allegations against the Plaintiff's attorney, AA's attorney stated: "Unlike plaintiff's counsel, we have AA business concerns at issue. We're not allowed to harass our passengers for purposes of litigation. If they don't want to be involved, we back away, so we have to walk carefully in setting up that passenger's deposition."  Trans., 17, ll. 23-25, p. 24, ll. 1-2.

The day after the Court's admonition to the parties, AA retained the Mexican law firm Velarde Danache to persuade Hernandez-Ramirez and Espinoza to give depositions, even though both witnesses had been refusing to respond to calls and e-mails from the Spanish speaking paralegal working for AAs Miami counsel and AA had specifically conceded at the hearing that (Espinosa) "at the moment doesn't want to be deposed."[10]   Trans., p. 17, ll. 6-8.

Between June 2 and June 6, 2022, Mauricio Fernandez, an associate from Velarde Denache, texted Hernandez-Ramirez six times asking him to meet with Fernandez's senior partner to give testimony in the case.  Exh A. to D.E. 55.  Fernandez continued to text

---

8 The Plaintiff did not learn the content of these statements until the parties voluntarily exchanged statements on June 7, 2022.

9 The court noted that the behavior of AA's counsel during the deposition of Mr. Quintana was "outrageous, just outrageous" and cautioned AA against coaching witnesses during deposition. Trans, p. 4, ll. 16-17.  Unfortunately, AA's counsel ignored the Court's admonition and continued to obstruct the examination of witnesses even after the May 24 hearing.  On June 9, 2022, counsel for AA improperly stopped the deposition of Hilda Minaya, grandstanding for minutes that the Plaintiff was not allowed to question the witness outside the scope of her direct examination.  Thereafter, the witness refused to substantively answer any further questions.  Exh. J.

10 AA presumably arrived at this conclusion based upon the fact that Espinosa stopped responding to calls from AA's Miami counsel.

Hernandez-Ramirez even though he expressly stated that he did not wish to speak with him. Exh. A to D.E. 55, p. 11.  Hernandez-Ramirez forwarded Muriel copies of the texts he received from Fernandez, which Muriel forwarded to Clowdus.[11]

**ARGUMENT**

AA's Response to the Motion for Sanctions and Cross Motion boils down to essentially three points: (1) the motion is factually inaccurate; (2) AA did not know about—and did not authorize—the content of the text messages sent by its Mexican counsel; and (3) sanctions are unjustified because Plaintiff engaged in the same conduct as AA.  In addition, AA argues that even if sanctions were warranted, striking its pleadings is too severe a remedy.  Clowdus addresses each of these points in turn.

**I.      The Motion for Sanctions is not "Factually Inaccurate."**

AA argues that Clowdus's Motion for Sanctions is premised on factual "inaccuracies." However, aside from stating that Hernandez-Ramirez did not respond to Fernandez's initial text, instead of telling him to leave a voicemail to which he did not respond, it is unclear what factual "inaccuracies" AA is referring to.   On the contrary, IT IS A FACT that:

• after receiving a draft declaration prepared by AA, Hernandez-Ramirez chose not to sign and return it. Exh. D to D.E. 55;

• over the next 15 days Hernandez-Ramirez received two more e-mails asking him to sign and return the declaration, which he declined to do. Exh. D to D.E. 55;

• notwithstanding his decision not to sign and return the declaration, AA hired a Mexican law firm, Velarde, to try and persuade him to cooperate with AA and to give a deposition (Exh. H);

• over the course of several days, Fernandez' sent six text messages to Hernandez-Ramirez to try and convince him to give a deposition, telling him that "It is important for justice to be done in this matter and your evidence is decisive" (Exh. A to D.E. 55);

• Hernandez-Ramirez informed Fernandez that he did not wish to meet with AA's Mexican counsel or be involved in the case (Exh. A to D.E. 55, p. 11);

---

11 AA has not provided the Court with the text messages that Fernandez would almost certainly have been sending to Espinoza at the same time.

• Despite Hernandez-Ramirez telling him this, Fernandez sent two additional text messages to him, saying in one: "the last thing we want to do is bother you.  However, I beg you…"(Exh. A to D.E. 55, pp. 10-11)[12]

• All of Fernandez's actions occurred after the May 24 hearing.

None of these facts are inaccurate, and (unlike the Cross Motion) all are supported by record evidence which Plaintiff had prior to filing its motion.

**II.   AA violated the Court's direction regarding communications with unrepresented third-party witnesses.**

AA argues that sanctions are unwarranted because its Miami attorneys were unaware of and did not approve, the wording of the text messages sent by its Mexican lawyers.  See Response at 3 (Fernandez had "no reason or authorization to discuss AA's contentions in [the] lawsuit with Hernandez-Ramirez," and AA's Miami counsel "had no reason to instruct or permit such a communication since Hernandez-Ramirez's and Espinoza's version of events was known months earlier and since Fernandez' communication misstated AA's contentions altogether.") But regardless of whether AA's Miami attorneys signed off on the exact words used by its Mexican counsel, the fact remains that Velarde Danache, "acting on behalf of Buchanan Ingersoll," engaged in the persuasion it was paid for, resulting in the necessity of Clowdus's counsel filing his Motion for Sanctions.  Moreover, even if Fernandez was not authorized by AA to make the statements he did, it strains credulity to believe that he would have offered to transport Hernandez-Ramirez and Espinoza to Miami and put them up in a hotel at AA's expense to sit for a deposition without first receiving permission from either AA and/or its Miami counsel.[13]  All of  which begs the question:  if Hernandez-Ramirez and Espinoza both refused to respond to AAs e-mails and phone calls from its Miami counsel, why did AA engage Velarde

---

[12] There are only three ways to persuade an "uncooperative witness":  incentivize, intimidate, or improperly appeal to a sense of justice.  Fernandez's texts arguably did all three.  The Mexican firm did exactly what it was paid to do, and exactly what this Court said not to do.

[13] While the offer of a free trip to Miami does not constitute a *quid pro quo* or facially improper inducement, it is unclear why AA would offer the passengers an all-expense paid trip to Miami when all of the other depositions of foreign witnesses (or any witnesses) in this case were conducted by Zoom.

Danache to continue to pressure them to provide deposition testimony when it represented to the court that it did not do so?

AA claims that it hired the Mexican firm merely to facilitate coordinating Espinoza's deposition, which he previously agreed to. [14]  But if that were the case and Espinoza were comfortable doing so, there would have been no need for AA's American lawyers to retain Velarde Denache, since they had been previously been in contact with both witnesses through Sonia San Martin, a Spanish speaking legal assistant in their office.  AAs own exhibits establish that San Martin had both witnesses e-mail addresses and phone numbers at the time AA retained Velarde and both witnesses had hers.  There was nothing preventing her from contacting them and from them responding to her *if they wished to do so*—which they obviously did not for the reasons stated in their own words or affidavit. *See* Exh. D to D.E. 55, and Exh. F. Furthermore, San Martin was able to communicate with both witnesses in Spanish.  The only reason for AA to hire Mexican counsel the day after the May 24 hearing was either to pressure Hernandez-Ramirez and Espinoza to testify, which they obviously did not wish to do at that point, or to try and get them to say that they had been intimidated by Muriel into not cooperating with AA, which is not the case.  *See* Exh. D to D.E. 55 and Exhs. F-G.  In other words, AA hired the Mexican firm to do exactly what it did.[15]

---

[14] AA claims in its Response that Espinoza had agreed to give a deposition "in March." Exh. H, ¶ 14.  Since AA does not substantiate this claim with email or text and makes no mention of any subsequent telephone conversations, it is unclear when in March (or how) this alleged agreement occurred.  AA also does not explain why it waited 2-3 months, until almost the close of discovery, to finally seek this deposition, particularly since if it accurately reflected what Espinoza had told them, it would have seriously undermined the Plaintiff's claim.

[15] An even more basic observation about the impropriety of hiring Velarde Denache to contact these passengers is this:  why should the knowledge that the Plaintiff had his own statement on the way have caused such a sudden need for AA to get in touch with them?  AA already knew what they would say – it had a signed statement from one of them.  Neither party would know until weeks later that there was a conflict between the draft prepared by AA for Ramirez and the statement that he provided to the Plaintiff.  Collecting a statement should be as routine as collecting the mail.  So why the sudden flurry of concern?  If both parties are obtaining the truth and neither party is omitting any inconvenient truth (such as hearing "you hit me"), then a statement collected by one party should be the same as a statement collected by the other.  Why the sudden need for AA to get in touch with these passengers and reassert influence?  AA hasn't offered a good explanation.

Moreover, AAs response to the Motion for Sanctions is telling. Whereas AA could have simply fallen on its sword and taken responsibility for violating the Court's admonition, as Clowdus's attorney did at the May 24 hearing, AA chose instead, without any evidence, to point the finger at Clowdus's counsel and investigator and accuse them of witness tampering based solely on the fact that Hernandez-Ramirez and Espinosa stopped communicating with them and the fact that Muriel was approved by the American embassy. In fact, as Hernandez-Ramirez and Espinosa's affidavits state—and as they presumably will testify—they chose to stop communicating with AA because they felt harassed and that their words were, for whatever reason, not accurately represented.

### III. There is no evidence that Clowdus or anyone on his team improperly attempted to influence or tamper with any witnesses.

AA alternatively argues in its Response and Cross Motion that sanctions against it and/or its counsel are unwarranted because Clowdus's conduct was no different than its own. This attempt at "whataboutism" should be seen for what it is: an effort to gaslight Plaintiff and divert the Court's attention from what actually occurred. First and foremost, Clowdus's motion is premised on AA's violation of the Court's directions regarding witness communications after May 24. In the case of AA, there is uncontroverted evidence that – regardless of the explanations AA offers – AA violated the Court's command. There is no such evidence that Clowdus or any of his team did so. In fact, the only evidence shows that they did not.

Second, AA's allegations of witness tampering are based on nothing but the assumption that because Hernandez-Ramirez and Espinoza elected to cut off communication with AAs Miami attorneys, someone on Clowdus's team "must have" directed or persuaded them to do so. But as their affidavits and willingness to testify at an evidentiary hearing demonstrate, that is not the case. Hernandez-Ramirez and Espinoza did not feel *according to their sworn statements* that the statements AA prepared for them accurately represented what they told San Martin occurred on the morning of their flight. *See* Exh. D to D.E. 55 and Exhs. E-F. They also felt pressured *by AA* according to their own words to give deposition testimony when they did not wish to do so. Contrary to AA's assurances to the Court, AA did not "back away." Trans., pp. 17, ll. 23-25, p.

24, ll. 1-2.  This is not a case of both parties behaving badly – AA has attempted to run roughshod over the Plaintiff from the start.[16]

### A.    No evidence of witness tampering involving Hernandez-Ramirez.

AA's accusation that the Plaintiff tampered with Hernandez-Ramirez and caused him to stop communicating with AA falls completely flat when placed on a timeline.  AA spoke with Hernandez-Ramirez on February 28, 2022, at which time he agreed to sign a statement reflecting what he remembered of the incident.  AA says that it has no idea why Hernandez-Ramirez suddenly refused to communicate any further and refused to sign the draft statement over the subsequent two weeks.  But Hernandez-Ramirez has explained the reason:  he felt like AA was trying to put words in his mouth and he did not want to get into trouble.  Exh. E; Exh. D to D.E. 55.

The chronology of events is consistent with Hernandez-Ramirez's and Muriel's accounts of what occurred.  Muriel did not speak with Hernandez-Ramirez until May 5, 2022, months after Hernandez-Ramirez stopped taking calls from AA.  Exh. C to D.E. 55. This fact alone should put any claims of witness tampering to rest, since the decision to cut off contact with AA was Hernandez-Ramirez's alone.   On May 27, 2022, Hernandez-Ramirez notarized his affidavit for the Plaintiff.  Although Clowdus learned on or about May 23, 2022 that AA had spoken with Hernandez-Ramirez and prepared a draft statement for him, he had no idea of the contents of that statement at that time.   It was not until June 7, 2022, when AA and Clowdus exchanged their respective draft and signed statements, that Clowdus learned of the significant discrepancies between the May 27 affidavit Hernandez-Ramirez signed and the unsigned declaration AA prepared for him in March.  When Clowdus saw these discrepancies, he was obviously

---

[16] Incidentally, contrary to AA's assertions in its Response, Mr. Espinoza claims in his statement that he was called by AA in the days prior to February 28, but he did not answer.  This conflicts with AA's claim that it did not receive Mr. Espinoza's contact details until the day of February 28.  Clowdus is not accusing AA's attorneys of providing untruthful declarations to the Court, since it is possible Mr. Espinoza is remembering multiple calls on the day of February 28 before he answered.

However, what is certainly not true is AA's claim that the Plaintiff did not ask for all contact information for these passengers from the very beginning.  Plaintiff's first RFP #17, dated November 10, 2021, reads: "Please provide the passenger PNR and the names and *contact information* for every other passenger in first class."  Exh. K (emphasis added).

concerned.  Even though the affidavit was unsigned, he wanted to understand the reason for the differences.  As a result, he asked Muriel to request an explanation directly from Hernandez-Ramirez for the discrepancies, which Hernandez-Ramirez agreed to provide.  Exh. D to D.E. 55.

In its Response, AA attempts to impugn Hernandez-Ramirez's credibility by pointing out that his May 27, 2022 affidavit contains information about what Merino told him after the flight took off not contained in his June 8, 2022 e-mail.  However, Hernandez-Ramirez wrote the June 8, 2022 email to explain the discrepancies between his May 27 affidavit and the unsigned draft prepared by AA.  Since there is no mention of Merino's comments in the unsigned draft, there would be no reason for him to mention it in the June 8, 2022 e-mail.[17]

AA argues that there is no material difference between the declaration it prepared and Hernandez-Ramirez's June 8, 2022 email.  That is untrue.  The draft declaration prepared by AA states that the Male Passenger's behavior "appeared to demonstrate that he was irritated with the Male Flight Attendant, *and that he was speaking aggressively to the Male Flight Attendant*." (emphasis added).  However, the June 8, 2022 e-mail specifically says that Hernandez-Ramirez "*never saw aggressive behaviors*, nor the blow that is mentioned."  (emphasis added).   Nor is there any inconsistency between Hernandez-Ramirez's May 27 affidavit and his June 8, 2022 e-mail.  The May 27 affidavit says that Hernandez heard Merino say to Clowdus that he hit him but does not state that he observed Clowdus hit him.  The June 8, 2022 e-mail says that although he did not see Clowdus hit Merino he "did see that the flight attendant was complaining about a blow."[18]  Both of those statements are at odds with AAs draft declaration, which says that Hernandez-Ramirez did not hear anything that was said by Merino or Clowdus.  And neither the May 27 or the June 8 statements say that Merino was "trying to calm down a male passenger,"

---

[17] San Martin likely never specifically asked Hernandez-Ramirez if Merino discussed the incident with him after the flight departed when she spoke with him because AA's focus was on what he observed prior to the flight taking off and Clowdus getting removed from the plane. Furthermore, there would be no benefit to AA to include this information in its declaration, since it would provide evidence of republication of the defamatory statement to passengers.

[18] It appears that AA takes issue with Hernandez-Ramirez's use of the words "did see" in the June 8 e-mail, viewing it as materially different from the use of the word "heard" in the May 27 affidavit.  But this likely seems at most an issue of word choice or translation, since it would be impossible to "see" Merino complaining about being hit without hearing him say that he was hit. The important point is that AA's draft declaration omits mention of this fact altogether.

which is what the draft declaration states.  Either way, none of this is a basis for concluding either that Hernandez-Ramirez affidavit is untruthful, or that it was the product of coaching or witness tampering.  The more ready conclusion is that Ramirez told AA that he heard Merino complaining that Clowdus hit him, but AA chose to put in his draft that he heard nothing.[19]

**B.    No evidence of witness tampering involving Jairo Espinoza.**

There is also no evidence that anyone on Clowdus's team tampered with Espinosa's testimony.  Neither Clowdus, his attorneys, or Muriel have ever spoken with Espinosa.  Exhs.A, B & I.  The first communication Clowdus's counsel had with anyone associated with Espinoza was on July 4, 2022, when they received an email from a Mexican lawyer, Hernandez-Ramirez's uncle, advising them that he was representing Hernandez-Ramirez and Espinoza. Exhs. A & B.  Attached to the email was a notarized statement from Espinosa retracting the statement AA collected from him three months earlier and explaining why the earlier statement was not accurate and why he stopped communicating with AA.  Exh. F.  The affidavit was not prepared by anyone on Clowdus's team, nor were they aware of its existence until shortly before they received it.  Exhs A, B, & I.   There is simply no evidence that anyone tampered with or sought to influence Espinosa's testimony.  If anything, the fact that Espinosa is represented by independent counsel unrelated to anyone on Clowdus's team puts that argument to rest.

**C.    No evidence of witness tampering by Plaintiff's Investigator Eduardo Muriel.**

AA's "evidence" that Muriel tampered with Hernandez-Ramirez's and Espinosa's testimony consists of the fact that he has an impressive website, he has performed work for the United States and Mexican governments, and that some cases he has worked on have received media attention.  But these facts in no way remotely establish evidence of witness tampering or intimidation, let alone artful persuasion.  If they did, thousands of prominent attorneys and former government attorneys would be guilty of witness tampering

There is no evidence that any of the witnesses knew who Muriel was prior to his contacting them or anything about his background.  Certainly, Clowdus did not choose him because of any alleged notoriety:

---

[19] One of the primary objects of the Plaintiff in seeking out and deposing passengers was to establish that some passenger heard the defamation, thereby establishing the publishing prong of the claim.

Clowdus: And I would be happy to have you get started now but I need to verify your license and credential will be accepted by a US court.

…

Muriel: Let's wait for you to come and then you will have a clearer semblance of us and there you will see if I can be trusted or not. Greetings

Ex. D, pp. 17-18.

More importantly, there is no evidence that his background would have or did influence any witnesses' testimony or willingness to speak with AA in any way or that he attempted to intimidate anyone.  Muriel is an elderly man, not Arnold Schwartzneger.   The notion that because at some point during his career he worked on cases that garnered some media attention he engaged in witness tampering is not only laughable, but borderline defamatory.[20]

Clowdus did nothing wrong by hiring a private investigator who has done work for the Mexican and United States governments and who describes his company as the "First and Most Prestigious Investigation Agency" in Mexico.  On the contrary, he did what any litigant up against a major multinational corporation with unlimited resources would do: hire the most qualified person.  Indeed, the issue is not how Muriel describes himself in websites or in newspaper advertisements, but whether he said anything improper to Hernandez-Ramirez when he spoke with him.  There is no evidence that either Clowdus, Muriel or his counsel did anything to improperly influence Hernandez-Ramirez's testimony or to violate the Magistrate's instructions.  Furthermore, the idea that Mr. Muriel's star power overawed Ramirez is laughable, particularly since Hernandez-Ramirez had no idea who he was when he introduced himself. Exh. L.

Even more baseless is the claim that Mr. Muriel somehow stopped Espinoza from cooperating with AA:  Mr. Muriel has never spoken with Espinoza, nor has anyone else from the

---

[20] AA attempts to portray Mr. Muriel as a celebrity, who would be well-known by the average Mexican citizen.  Perhaps if Mr. Muriel were "Dog, the Bounty Hunter" or "Magnum, P.I." this argument might carry some weight.  But barring an eponymous tv show, it is not likely that the average Mexican citizen pays any more attention to the investigative profession than their American counterparts do.   Furthermore, a self-promoting website and paid advertisements hardly make someone a celebrity or constitute evidence of witness intimidation.

Plaintiff's team.  Exhs. A, B, L.  In fact, by the time that Mr. Muriel reached out, Espinoza wanted nothing to do with either party.

### C.  Passenger Federico Quintana and his mother Angelica Cookson are relevant to the Plaintiff's Motion for Sanctions.

At the May 24, 2022 hearing, the Court said "there is an incredibly weird thing brewing with these two witnesses." Trans., pg. 4, ll. 21-22.   The reason that the discrepancies between Quintana's statement and his deposition testimony go beyond the merely "weird" is that they are consistent with a pattern.   Two of the three young Mexican men in business class that morning have repudiated the statements that AA drafted for them.  Quintana has not specifically repudiated the statement that AA drafted for him, but, in deposition, he repudiated all of the inflammatory language in his statement, except when it was force fed back to him.[21]  The language of Quintana's statement also is nearly identical to the language in the statements prepared for Ramirez and Espinosa.

"Mistake" is at the heart of AA's defense to this motion.  But a close examination of how AA has engaged with Quintana and his mother reveals that AA does indeed seek to cultivate third-party witnesses to provide favorable testimony.  None of AA's actions that have crossed the line with third-party passengers can be defended as a mistake. [22]

---

21 Mr. Kolb:  Okay. And the same question with respect to Mr. Clowdus' conduct during this entire incident. How would you describe his demeanor and conduct?

Mr. Quintana:  Other than the fact that he -- he swung around the thing to hit the flight attendant, he -- like, he didn't argue at all when he was asked to deboard the plane, so he complied peacefully.

Mr. Kolb:  Okay. Would it be fair to describe his conduct as an angry toddler being forced to give up his favorite toy?

Mr. Quintana: Yeah.  Exh. I to D.E. 55, pps.20-21.

22 The Plaintiff deposed another passenger, Jaewon Kim, who has not been previously mentioned.  However, in the context of AA's behavior with these other witnesses, what happened during her deposition is relevant.  When Plaintiff's counsel spoke with Kim, she volunteered that she observed the flight attendant so angry that he was "red in the face."  Exh. B. As this was a favorable observation for the Plaintiff's case, he set up a videographer and deposed her.  At deposition her testimony was 180 degrees different – the flight attendant was a little upset but not angry, and she didn't see much of anything.  When asked if the flight attendant was red in the face, she denied it. Exh M, pps 7-8.  However, she also revealed in deposition that

For instance, prior to Ms. Cookson's deposition, Mr. Peccio attempted to schedule a call with her to prepare her for her deposition. While there is, arguably, nothing inappropriate about a party to litigation reaching out to prepare a third-party witness for deposition, what is both odd and inappropriate is that he arranged for her son, Mr. Quintana, who had already been deposed, to be present on the call. Exh. O. What possible reason could there be for Mr. Quintana – who had already given his statement and deposition months before – to be on a call to prepare Ms. Cookson for her deposition other than to make sure her testimony harmonized with his?[23]

To say that Ms. Cookson proved to be an uncooperative witness is an understatement. Her testimony can be summed up by this response: "I don't remember, and it's not important. And, I mean, I really don't care. So I -- I choose to forget everything, that it's not important to me." Exh P, pg. 52. She refused to translate her own text messages to her son because she "was not a professional translator." Exh. P, pgs. 75-76. She implausibly claimed that she had never spoken with her son about the incident beyond the couple of texts that he sent from the plane on the morning of, and that she was barely aware that he had given a deposition. Exh P, pgs. 73-75. However, he gave the deposition from her apartment, while she was working from home, and just days later she was instructing building security to not allow (a process server) in to see her son Federico "Guiterrez."[24] Exh. P, pgs 39-42, 47-50, Q.

For whatever reason, Mr. Quintana and his mother, as the Court remarked about Mr. Quintana in the May 24, 2022 hearing, seemed "spring-loaded to cater to American's point of view." Trans., pg. 8, ll. 16-17. In text messages to his mother from the flight, Quintana said there was an incident between a flight attendant and a passenger where the passenger was

---

counsel for AA had spoken with her the night before. Exh. M, p.19. This was strange enough that Plaintiff's counsel sent her an email after the deposition thanking her for coming forward but inquiring gently why she had backed away from what she had said on the phone. She never responded. Exh N.

23 And there are other odd coincidences that suggest witness coaching. Cookson described Clowdus in her deposition as a "spoiled tantrum brat." Exh. P, pgs. 83, 86-87. That description is remarkably similar to the one that appears in her son's statement -- "angry toddler," (Exh. N to D.E. 55, ¶18) which she allegedly never saw, and in the statement that Espinosa repudiated, which described Clowdus as being "spoiled." Exh. S to D.E. 55, ¶10.

24 She had no explanation for this wrong name, but if she had provided the correct name, security would have been legally required to let the process server pass.

removed, but there were "no blows" and Quintana did not observe well enough to see whether (the Scottish-descended) passenger was a Mexican.  Exh. R.  In deposition, Quintana was certain of an intentional blow and described Clowdus in detail, including recounting three discrete interactions between Clowdus and Merino, (Exh. I to D.E. 55, pp.14-17) though subsequent timestamps obtained in discovery reveal that Clowdus was removed almost immediately after Quintana boarded.[25]

To put a not too fine a point on it, AA does not deserve the benefit of the doubt when it comes to third-party passengers complaining about how they were approached.  AA seems to have mastered the very behavior that the Court forbid.

**IV.     Sanctions against AA are warranted because there is no way of undoing the damage to the testimony of the witnesses.**

This motion for sanctions is specifically about AA's willful disregard of the Court's May 24, 2022 instruction, but it is more broadly about the world's largest airline intimidating or seeking to manipulate three young Mexican nationals to obtain inaccurately slanted testimony – testimony that if AA's plan had gone off without a hitch, the Plaintiff would never have seen until summary judgment.[26]  Unlike the implausible and wholly unsubstantiated claims made about Mr. Muriel, it is AA – the global behemoth – that plausibly could intimidate these young foreign nationals "without needing to say a word,"  and it is AA that improperly pursued and harassed them even after it assured the Court that it would never do so.

---

[25] Clowdus ticket scanned 6:27 AM.  Quintana ticket scanned 6:39 AM. Henriquez deboards Clowdus and enters him on the waitlist for the next flight 6:49 AM.  The overlap is 10 minutes, but with the time taken for Quintana to descend the jetway, stow his bag and find his seat, for the aftermath of the incident to occur, with the decision made to deboard Clowdus, the entry onto the plane of Henriquez and subsequent discussion and decision to remove Clowdus, the time for Clowdus to collect his things and ascend the jetway, and the time for Henriquez to log into the system and make his entry placing Clowdus on the waitlist for the next flight, the overlapping window of time where Quintana could have observed three discrete interactions prior to the incident occurring is virtually non-existent.  Exh. S.

[26] AA claimed at the May 24 hearing that it had not collected these statements for use in the case, (Trans. Pg. 26, ll. 12-15) but it would be malpractice NOT to use two signed statements from "star" witnesses.  The only question is:  why didn't AA intend to depose them until in both cases, the Plaintiff forced AA's hand?  The Plaintiff submits the suggestion that AA knew that the statements it had collected were more powerful than deposition testimony would prove to be.

AA's behavior in discovery has materially undermined Clowdus's ability to make his case.  Four non-party witnesses who all observed something of the incident have all been compromised in some way.  Even more importantly, the Plaintiff's only AA employee advocate, Jose Henriquez, recanted his statements corroborating Clowdus's version of events after being shown Quintana's tainted statement.

By attempting to cultivate testimony from third-party passengers, rather than let them speak in their own words, AA has, in the case of Kim, caused her to withhold her actual observation (the flight attendant was red in the face), in the case of Quintana, corrupted his testimony entirely, and in the cases of Ramirez and Espinosa, caused them to want nothing further to do with the lawsuit other than appear at an evidentiary hearing if the Court requests. All of these witnesses are beyond the reach of the Court for trial.  Quintana's testimony will not be subject to cross-examination.  But most irreparably, AA's ground security coordinator, Mr. Henriquez, whose contemporaneous statements strongly bolstered Clowdus's version of events, has now lost faith in his own observation of events that morning after being shown a different "unbiased" account from third-party Quintana.[27]  When asked why his testimony was so starkly different from the observations in his report made within hours of the incident, Henriquez essentially said that he didn't know then what he knows now.

While the striking of witnesses and pleadings under either Fed. R. Civ. P. 41(b) or 37(b)(2)(A) is a severe sanction, it is appropriate where there is "a willful or bad faith failure to obey a discovery order." *Malautea v. Suzuki Motor Co*., 987 F.2d 1536, 1542 (11th Cir.1993); see also *United States v. Certain Real Property Located at Route 1, Bryant, Alabama*, 126 F.3d 1314, 1317 (11th Cir.1997) ("We consistently have found Rule 37 sanctions such as dismissal or entry of default judgment to be appropriate, however, only 'where the party's conduct amounts to flagrant disregard and willful disobedience of discovery orders.'") (quoting *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir.1987)); see also *Chudasama v. Mazda Motor Corp*., 123 F.3d 1353, 1371 (11th Cir.1997) (Rule 37 sanctions of striking pleadings and entering default

---

[27] While AA has not admitted that it showed Quintana's statement to Henriquez before his deposition, neither has AA denied it.

judgment requires a finding that 'noncompliance' with the compel order was intentional or in bad faith).[28]

While it is true that "the severe sanction of a ... default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's order." *Baker v. Soil Tech Distributors, Inc*., 2008 WL 4844095, at *2 (S.D. Fla. Nov. 10, 2008) (citing Malautea 987 F.2d at 1542.) the damage done by AA to Mr. Clowdus in this case cannot be rectified by any less.

The record in this case provides clear and convincing evidence that AA's behavior constituted "willful disregard" of the Court's order.  AA deliberately hired the Mexican firm the day after the Court's admonition, even though both witnesses had severed contact with its Miami office.  The only reasonable conclusion from this action is that AA wanted separation – it wanted to continue its actions "by proxy" so it could not directly be accused of ignoring the Court's command not to "hard sell" witnesses with a biased approach.  AA did not hear the Court and obey:  AA heard the Court and then took steps to avoid punishment for its willful continued disobedience to the Court.  It knew that Ramirez and Espinosa no longer wished to be contacted and that at least one of them was speaking with the Plaintiff, so AA hired the Mexican firm for a "full-court press" to regain access to Hernandez-Ramirez and Espinoza and influence over them.  And indeed, had Hernandez-Ramirez not voluntarily forwarded copies of the text messages to Muriel, neither Clowdus nor the court would have ever been the wiser.

The situation that the Court is left to address is one where Clowdus's ability to prosecute his claim has been seriously compromised.  His position is that flight attendants Merino and his friend Gray are lying about what happened.  The AA employee who directly challenged Merino and Gray on the day of the incident, and who was Plaintiff's star witness, has been stripped of his certainty as a result of the manner in which AA "prepared him" for his deposition.  Every other potential witness who could have vindicated Mr. Clowdus has also been muddied by AA.  Moreover, AAs conduct has caused Clowdus to incur substantial attorney's fees that he would never have incurred had AA acted appropriately.  Accordingly, any sanction the court fashions

---

[28] See also *Mercer v. Raine*, 443 So. 2d 944, 946 (Fla. 1983) ("willful disregard" sufficient); *Commonwealth Fed. Sav. & Loan Ass'n v. Tubero*, 569 So. 2d 1271, 1273 (Fla. 1990) ("willful or deliberate disregard")

should include attorney's fees, even though attorney's fees alone will not right the imbalance AA has created when this claim is considered by a jury.

## CONCLUSION

For all the foregoing reasons, Clowdus's Motion for Sanctions should be granted and AA's Cross Motion for Sanctions should be denied.

Respectfully Submitted,

**THE LAW OFFICE OF**
**DAVID H. POLLACK, LLC**
75 Valencia Avenue, Suite 100
Coral Gables, FL 33134
Tel. No.:        (305) 372-5900
Fax No.:        (305) 372-5904

BY:     /s/David H. Pollack
        **DAVID H. POLLACK**
        Fla. Bar No. 0955840

        /s/ William T. Woodrow
        William T. Woodrow III (*pro hac vice*)
        Stone & Woodrow LLP
        250 West Main St. Suite 201
        Charlottesville, VA 22902
        will@stoneandwoodrowlaw.com
        Phone: 855-275-7378
        *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system and plaintiff was served by U.S. Mail at the address on file with the Court on

July 18, 2022.

<div style="margin-left: 40%;">

THE LAW OFFICE OF
DAVID H. POLLACK, LLC
75 Valencia Avenue, Suite 100
Coral Gables, FL 33134
Tel. No.:    (305) 372-5900
Fax No.:    (305) 372-5904

BY:    <u>/s/David H. Pollack</u>
        **DAVID H. POLLACK**
        Fla. Bar No. 0955840

</div>