Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                        CIVIL ACTION
                    CASE NO.: 1:21-cv-23155
 3

 4

 5    TROY CLOWDUS,

 6            Plaintiff,

 7    vs.

 8    AMERICAN AIRLINES, INC.,

 9            Defendant.
      _____/

10

11

12

                     DEPOSITION OF TROY CLOWDUS

13

14

15        TAKEN BY:     Attorney for Defendant

16        DATE:         Tuesday, February 1, 2022

17        TIME:         Commencing 10:00 a.m.
                        To 2:00 p.m.

18

          PLACE:        Veritext Legal Solutions

19                      Zoom Videoconference

20        REPORTED BY:  Dawn Neukomm, RPR
                        Registered Professional Reporter

21                      State of Florida at Large

22

23

      Job No. CS5002471

24

25
```

**EXHIBIT "C"**

Page 2

1  APPEARANCES:
2
3        WILLIAM T. WOODROW, III, ESQ.
         Stone & Woodrow, LLP
4        Attorneys at Law
         250 West Main Street
5        Suite 201
         Charlottesville, Virginia  22902
6        (855) 275-7378
         (will@stoneandwoodrowlaw.com)
7
         Attorney for Plaintiff
8        Troy Clowdus
9
10
         KELLY H. KOLB, ESQ.
11       ROBERT D. PECCHIO, ESQ.
         Buchanan Ingersoll & Rooney, PC
12       Attorneys at Law
         401 East Las Olas Boulevard
13       Suite 2250
         Fort Lauderdale, Florida  33301
14       (954) 703-3944
         (kelly.kolb@bipc.com)
15
         Attorney for Defendant
16       American Airlines, Inc.
17
18
19
20
21
22
23
24
25

Page 3

1           E X A M I N A T I O N
2                                    Page
3
     Direct Examination by Mr. Kolb          5
4
     Cross-Examination by Mr. Woodrow        156
5
     Certificate of Reporter Oath           161
6
     Reporter's Deposition Certificate      162
7
     Read & Sign Letter                     163
8
     Errata Sheet                           164
9
10
11          E X H I B I T S
12                                   Page
13  Defendant's Exhibit No. 1          27
        (Complaint)
14
     Defendant's Exhibit No. 2          32
15       (Tickets)
16  Defendant's Exhibit No. 3          33
        (Conditions of Carriage)
17
     Defendant's Exhibit No. 4          36
18       (AAdvantage Program Terms & Conditions)
19  Defendant's Exhibit No. 5          51
        (Plaintiff's Amended Interrogatory
20       Answers)
21  Defendant's Exhibit No. 6          89
        (Plaintiff's AA Complaint)
22
     Defendant's Exhibit No. 7          108
23       (6/10/21 E-Mail from AA)
24  Defendant's Exhibit No. 8          109
        (6/22/21 E-Mail from AA)
25

Page 4

1  EXHIBITS (continued)
2  Defendant's Exhibit No. 9          111
        (Plaintiff's AA Complaint #2)
3
     Defendant's Exhibit No. 10         137
4        (Ticket Price Differential)
5  Defendant's Exhibit No. 11         136
        (Active Miles Screenshot)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1  THEREUPON,
2                TROY CLOWDUS,
3  was adduced as the deponent herein, and upon first
4  being duly sworn upon oath, was questioned and
5  testified as follows:
6              DIRECT EXAMINATION
7  BY MR. KOLB:
8      Q.  Can you state your name, please, sir?
9      A.  Troy Clowdus.
10      Q.  All right.  Mr. Clowdus, my name is
11  Kelly Kolb.  I represent American Airlines in this
12  lawsuit that you filed.  I've asked you to appear
13  today, so we can discuss some of the particulars of
14  your lawsuit that concern some flights that you were
15  not allowed to board on June 10th of 2021.  Do you
16  understand who I am and why we're here today?
17      A.  Yes, sir.
18      Q.  Have you ever had your deposition taken
19  before?
20      A.  Yes.
21      Q.  And how long ago was it?
22      A.  It's probably been 15, 16 years, 10
23  , 15 years.  It's been awhile.
24      Q.  And generally what was that in connection
25  with?

2 (Pages 2 - 5)

1  in your mid 50s, would that be about right?
2      A.  If you were to what.
3      Q.  If I were to guess that you were in your mid
4  50s, would that be about right?
5      A.  Yes.  That's correct.
6      Q.  All right.  And you're not currently married;
7  is that correct?
8      A.  I'm currently divorced.
9      Q.  Do you have anyone living with you in your
10  residence?
11      A.  I have a friend that's staying with me
12  temporarily.
13      Q.  Do you have any children or siblings?
14      A.  I have no children.  I have five siblings.
15      Q.  Are they in Florida?
16      A.  Four of them are in Florida.  One is in
17  Massachusetts.
18      Q.  Have you discussed with them the
19  circumstances of your lawsuit?
20      A.  Not in detail.  None of them except one
21  sister that has a general idea that, you know, I have
22  litigation, but I have not spoken in detail with her
23  about it.
24      Q.  When's the last time you spoke with her?
25      A.  About this or in general?

1      Q.  Yes, sir.  I'm sorry.  Yeah, about the
2  lawsuit and the incident.
3      A.  Probably a few months ago.  I don't recall.
4  I tried not to talk about it with anybody to be honest.
5      Q.  Understood.  Are your parents still alive?
6      A.  Yes, they are.
7      Q.  Where are they?
8      A.  Both in Florida.
9      Q.  Have you discussed this lawsuit with them at
10  all?
11      A.  No.
12      Q.  In preparing for today, I ran across the name
13  of David Clowdus.  Is that one of your siblings?
14      A.  My older brother's name is David Clowdus,
15  yes, and my father's name is David Clowdus.
16      Q.  And what, if any, connection do they have
17  Southeast Offset?
18      A.  My older brother used to work with me at
19  Southeast Offset, but he hasn't since 2005, and 2006 I
20  think was the last time he was there.
21      Q.  Can you give me an idea of your height and
22  weight?
23      A.  I'm 5-11, and I weight 205 pounds.
24      Q.  And has your weight and height changed any
25  since June of last year?

1      A.  No.
2      Q.  All right.  What about Mr. Marino, do you
3  have any guess as to what his height and weight was
4  back in June of 2021?
5      A.  No idea.
6      MR. WOODROW:  Objection.
7      THE WITNESS:  Yeah, I have no idea.  I
8  couldn't tell you what he looked like if I saw him
9  today.
10  BY MR. KOLB:
11      Q.  Do you recall if he was in stature smaller
12  than you, the same or bigger?
13      A.  I have no idea.  I barely interacted with the
14  man, like five seconds.
15      Q.  Currently do you live in Miami Beach?
16      A.  I do, yes.
17      Q.  How long have you lived on Regal Alto
18  Terrace?
19      A.  I live on 11 Island Avenue right now.
20      Q.  How long o have you lived there?
21      A.  Well, I've owned this property for six years,
22  seven years.  I lived on Regal Alto before, but they're
23  right beside each other.  I own both properties.
24      Q.  Where were you living in 2012 (sic)?
25      A.  12?

1      Q.  Where were you living last June?
2      A.  11 Island.
3      Q.  Okay.  Did you ever serve in the military?
4      A.  Excuse me?
5      Q.  Did you ever serve in the military?
6      A.  No, I never did.
7      Q.  Can you give me a brief thumbnail sketch of
8  your education beyond high school?
9      A.  I attended a bachelor university.  I received
10  my Bachelor's Degree in Theology.  I attended briefly
11  grad school at the University of Texas for business,
12  and then I left there and started my own business.  And
13  a couple of years ago, I went back to grad school and
14  finished my Master's Degree in fine arts.
15      Q.  All right.  And where did you get your
16  Master's?
17      A.  Miami International University.
18      Q.  Did I understand you to say that you did not
19  obtain a degree from the University of Texas?
20      A.  No, I did not.  I attended one semester.
21      Q.  When was that roughly, what year; do you
22  remember?
23      A.  Yeah.  It was 2003.
24      Q.  All right.  I have a great affinity for
25  Austin.  I was born there.

4 (Pages 10 - 13)

Page 14

1    A.  Yeah?
2    Q.  While my dad was taking the bar exam, which
3  tells you probably that I was not an anticipated baby.
4    A.  I love Austin.  It's one of my favorite
5  cities.
6    Q.  Yeah.  It's very nice.  All right.  A
7  Bachelor's in fine arts and a BA in theology.  Any
8  other degrees, certifications, trade schools --
9    A.  No.
10    Q.  -- that you can recall?
11    A.  No.
12    Q.  Have you ever been arrested or convicted of
13  anything other than a moving violation?
14    A.  Never.
15    Q.  And I believe we looked briefly at your
16  social media, specifically Instagram.  We didn't see
17  any reference to this incident at all.  Have you posted
18  anything about this at all?
19    A.  Never once.  I wouldn't.  I have no interest
20  in this being ever put out there.
21    Q.  All right.  We ran across a couple of
22  lawsuits, and it's a little bit unclear to me.  There's
23  either one or two bankruptcies, and then there's a
24  lawsuit that you filed against a company called WMLJ.
25  Can you tell me I guess about WMLJ?

Page 15

1    A.  WMLJ?
2    Q.  Yeah.
3    A.  Oh, okay.  WMLJ was a contractor who took
4  $60,000 and disappeared on me.  You know, it's South
5  Florida?
6    Q.  Yes, sir.  I was going say.  Yes, sir.  Yes,
7  sir.  And at any time did you file personal
8  bankruptcy?
9    A.  I did in 2002 after 9/11.  My business went
10  into Chapter 11, reorganized, and we came out of it.
11  It was all part of that.
12    Q.  And the business you're talk about is
13  Southeast Offset?
14    A.  Yes.  Yeah.  I lost most of my revenue for
15  six months after 9/11.
16    Q.  Understood.  Other than the incident on
17  June 10th of last year, how has your experience with
18  American Airlines been over the 30 years you've been
19  flying?
20    A.  I've never had an issue.  I've always been
21  very happy.  And normally I am very pleased and
22  satisfied with my interactions with all American
23  Airlines' employees.  This is the first unfortunate
24  event.
25    Q.  All right.  Do you know anybody that works at

Page 16

1  American Airlines?
2    A.  No, I don't.  As far as on a personal level
3  as a friend.
4    Q.  Yes.  Yes, sir.
5    A.  No, I do not.
6    Q.  Do you have any experience, training, skill
7  or education in aircraft operation?
8    A.  No, I do not.
9    Q.  How about aircraft security?
10    A.  No, I do not.
11    Q.  How about handling passengers onboard an
12  aircraft?
13    A.  No, I do not.
14    Q.  All right.  Let's go through your employment
15  real quick.  You've been with Southeast Offset for
16  20 something years; is that right?
17    A.  Yes.  Yes.
18    Q.  And during that period of time, you've had
19  some other side occupations far lack of a better word?
20    A.  No, I have not.  It's been my only source of
21  employment since I was 26.
22    Q.  All right.  Were you ever involved with a
23  company called Clowdus Properties?
24    A.  Yes.  That was a real estate holding company.
25    Q.  And between what years were you involved with

Page 17

1  Clowdus Properties?
2    A.  From whenever it was incorporated until
3  whenever we shut it down.  I don't have that
4  information in front of me, but we opened it to -- we
5  opened it because the bank that we were getting a
6  property loan on it required us to do that.  They
7  didn't want for -- they wanted some -- they requested
8  that we hold it in a separate company to protect it.
9    Q.  All right.  And what was your position and
10  job duties at Clowdus Properties?
11    A.  I think I was just -- I'm trying to remember
12  how which we structured it because it was so long ago.
13  I'm assuming I was the president, but I might have been
14  the officer or one of the officers.
15    Q.  And what was the business of Clowdus
16  Properties?
17    A.  It was just a holding company for the real
18  estate that Southeast Offset occupied.  It owned one
19  piece of property.  That's all it did.  Like I said, it
20  was just a legal requirement for the bank that we were
21  using.
22    Q.  Got it.  All right.  Let's talk about
23  Southeast Offset real quick.  Can you give me a
24  thumbnail sketch of what the business of Southeast
25  Offset is, what it does?

5 (Pages 14 - 17)

Page 50

1    A.   I would say it's fairly accurate.  After I
2  reread it, I think there were some smaller details that
3  were left out, but, yes, it's fairly accurate.
4    Q.   All right.  Would you agree that the
5  affidavit that was signed on July 22nd of last year
6  would be a more accurate accounting of the events than
7  what your memory might be now?
8    A.   Probably -- I don't know how to answer that,
9  but, yes, I think it might be, but I don't know.
10    Q.   Okay.
11    A.   Because I mean I've thought a lot about it,
12  and as time has passed, you know, you recall certain
13  things that you didn't remember at the time.  So, no, I
14  would say my memory is better now, but --
15    Q.   Okay.  So maybe your affidavit isn't the most
16  accurate recounting of events?
17    A.   I think it's accurate.  I don't think there's
18  anything in there that's not true.  I don't know if
19  it's the most -- I think that there are things in it --
20  I think there were things that I remember now that were
21  not included in the affidavit, and it's just, you know,
22  things that I thought about.
23    Q.   Let me share my screen with you one more
24  time.
25    A.   Okay.

Page 51

1    Q.   These are your amended interrogatory answers,
2  and these are dated January 12th of this year, and let
3  me scroll to Interrogatory 5.  Can you see that?
4    A.   Yes.
5        MR. KOLB:  And I'll mark these
6  interrogatories answers as Exhibit 5.
7        (Defendant's Exhibit No. 5 will so be marked
8  for identification.)
9  BY MR. KOLB:
10    Q.   And I'll summarize it here.  Interrogatory 5
11  basically asked you to describe what happened on the
12  occasion in question.  And the answer contains an
13  objection, and then later, it says here plaintiff's
14  affidavit provides a complete narrative, and plaintiff
15  has no facts to add.  Do you see that?
16    A.   Yes.
17    Q.   Now this was signed by you or submitted just
18  a few weeks ago.  Are you telling me now that your
19  affidavit might not be the most complete narrative, and
20  that you do have facts to add?
21    A.   No.
22    Q.   Okay.  You said a moment ago that some things
23  were left out of the affidavit.  Can you tell me about
24  that?
25    A.   After you read it, you realize that there

Page 52

1  were, you know, thoughts that you had that you never
2  put in the narrative.  You're trying to put everything
3  in, but, you know, I don't -- to answer you question,
4  yes, I think it's the most complete response.
5    Q.   All right.  Were there drafts of this
6  affidavit sent back and forth between you and your
7  counsel before you signed it?
8        THE WITNESS:  Wil?
9        MR. KOLB:  No.
10        MR. WOODROW:  You can answer that.
11  BY MR. KOLB:
12    Q.   It's just yes or no.  Go ahead.  You can
13  answer.
14        THE WITNESS:  Wil, do I answer?
15        MR. WOODROW:  You can answer.
16        THE WITNESS:  Yes, of course, there were
17  drafts.
18  BY MR. KOLB:
19    Q.   Do you recall over what period of time those
20  drafts were exchanged?
21    A.   A week maybe.
22    Q.   All right.  So you started working on this
23  maybe the second week of July.  Okay.  Is there
24  anything that you want to add having thought about it
25  to your affidavit that would make it more complete and

Page 53

1  more accurate?
2    A.   The only thing I would probably add is I put
3  in the affidavit that I verbally said what the F, and
4  when I look back, I'm not sure that those words came
5  out of my mouth.
6    Q.   Okay.
7    A.   But, you know, the one thing I didn't put in
8  the affidavit was the fact that we were both wearing
9  masks, and it's very difficult to communicate
10  accurately when you're both wearing masks.  I'm not
11  always sure what he was thinking or saying, and I'm not
12  sure that he fully understood what I was thinking or
13  saying.  I think that's the only thing I would add.
14    Q.   Okay.  All right.  What is your first
15  recollection of encountering Flight Attendant Marino on
16  June 10?
17    A.   I think I was the first person on the plane,
18  and as soon as I boarded the plane, he was standing in
19  the front galley.  And I nodded my head at him good
20  morning.  And then as I got into my aisle seat, the
21  first interaction was he said to me, you know you have
22  to put that bag in the overhead bin.  And that was
23  before I was even seated, and I just shook my head, and
24  I said yes.
25    Q.   Say that again.  You know you have to stow

Page 54

1 that bag?
2     A.  He said in somewhat of a sarcastic tone of
3 voice, you know you have to put that bag in the
4 overhead bin, and I said yes.
5     Q.  All right.  So you clearly heard and
6 understood that instruction from Mr. Marino; is that
7 correct?
8     A.  Yes.  But I always fly bulkhead almost
9 always, and my understanding from his comment was that
10 I would have to put it up there once boarding was
11 completed because in 20 something years of flying
12 business class, that's how -- I've never had a flight
13 attendant ask me to put away my stuff until they
14 completed boarding.  So what's what I assumed he was
15 saying.
16     Q.  You said a moment ago that because everyone
17 was wearing masks, you weren't sure what either of you
18 understood?
19     A.  Well --
20     Q.  Why did you have an understanding that you
21 wouldn't have to stow it until the boarding process was
22 completed?
23     A.  Just because of past experience.  Normally
24 when you're flying business class, they give you the
25 luxury of working on your electronic devices until they

Page 55

1 finish boarding.  That's always been my experience, and
2 that's what -- I mean he said you know you have to
3 store that in the overhead bin, and I shook my head
4 yes.
5     Q.  Okay.
6         MR. WOODROW:  I think we lost him.
7         MR. KOLB:  Well, that's okay.  I need to go
8 down the hall anyway.
9         MR. WOODROW:  Okay.  Do you want to take a
10 couple minute break then?
11         MR. KOLB:  Yeah, let's just take a break.
12 It's been about an hour and 20.
13             (Brief recess was taken.)
14         MR. KOLB:  Back on the record.
15 BY MR. KOLB:
16     Q.  Just before we broke, Mr. Clowdus, you said
17 that your first interaction with Mr. Marino was as you
18 boarded.  He said you're going to have to put that bag
19 up in the overhead bin.  You nodded your
20 understanding.  And your understanding was that you
21 wouldn't have to put it up until after boarding was
22 completed?
23     A.  Correct.
24     Q.  Did Mr. Marino --
25     A.  And then he stood beside me.  For most of the

Page 56

1 rest of the time, he was standing beside me interacting
2 with other passengers as they boarded.
3     Q.  Did Mr. Marino tell you that you could hang
4 onto your bag until boarding was completed, and you
5 wouldn't have to stow it until then?
6     A.  He did not say that specifically, no.
7     Q.  All right.
8     A.  But he saw me put it -- he saw me sit down
9 and set it beside my feet and then stood in the aisle
10 beside me.  So didn't say anything following it up, and
11 his exact words were you know have to -- you know
12 you know will have to put that in the overhead bin, and
13 I said, yes, of course.
14     Q.  And in your lawsuit, you allege that he was
15 acting in a loud, manic, aggressive manner and
16 exhorting passengers to move.  Can you tell me
17 specifically what you observed in Mr. Marino's conduct
18 in that regard?
19     A.  Well, it's 6:30 in the morning, and most of
20 the people getting on including myself were sleepy.
21 And he seemed to be very manic and was very loud and
22 abrasive.  And he was standing beside me in the front
23 row, and every passenger coming on as they passed him,
24 if they stood in the aisle, he would -- I don't know
25 the correct word.  It was like he was a drill sergeant

Page 57

1 instructing every person clear the aisle; clear the
2 aisle; let's go; let's go; let's go.  He was in a very
3 big rush to get everybody into the plane and in their
4 seats.
5     Q.  Do you know why that was?
6     A.  Well, I didn't know that morning, but I have
7 heard since, or I've read since that flight attendants
8 don't get paid until the cabin doors are closed, and
9 they get a bonus if international flights get to their
10 destinations on time.  So I think now looking back,
11 that he was in a big rush to get everybody seated
12 because he doesn't get paid, I'm assuming.  But, you
13 know, I don't know his mind, and that's just an
14 assumption, you know.  I don't know.
15     Q.  Where did you read that flight attendants
16 don't get paid unless the plane departs on time?
17     A.  I read it in an article when I was reading
18 about it that flight attendants' pay doesn't begin
19 because it's one of the things flight attendants
20 complained about was that they don't get paid until the
21 doors are closed.
22     Q.  Go ahead.
23     A.  And they get bonuses based on if the plane
24 gets there on time.  Now I'm speculating.  This is pure
25 speculation.

15 (Pages 54 - 57)

1    Q.  Right.  Do you recall where you saw that
2  article?
3    A.  No.
4    Q.  Do you have any personal knowledge that that
5  is, in fact, how flight attendants get paid?
6    A.  Well, I read it.  I don't know that it's
7  true, but that's what I read.  So that's my impression
8  at this moment.  Like I said, I'm just speculating.
9    Q.  Do you have any other knowledge as to why it
10  was important to get that flight out on time that
11  morning?
12    A.  No.  No.
13    Q.  Other than having --
14    A.  My screen is frozen.  Can you guys still see
15  me?
16    Q.  I can see a frozen you.
17    A.  Okay.
18    Q.  Do you want to give it a minute and see if it
19  refreshes.  There you go.
20      MR. WOODROW:  There it is.
21      MR. KOLB:  Yeah, you're good.
22  BY MR. KOLB:
23    Q.  And other than acting as a drill sergeant, is
24  there anything else that led you to believe that
25  Mr. Marino was loud, aggressive, manic or acting as if

1  he was on amphetamines?
2    A.  I don't know if he was on amphetamines.  His
3  mannerisms and his behavior was like he had either a
4  lot of coffee, or he's an extremely hyper person.  But
5  his demeanor with all the passengers, not just me, was
6  very abrasive and very aggressive.
7    Q.  How specifically?
8    A.  Just the way that he was talking to them, his
9  tone of voice and his mannerisms.  He's not friendly at
10  all.
11    Q.  What mannerisms did you observe?
12    A.  Well, it's just the way that he was moving
13  and the way that he's just very manic.  It was just his
14  body movements and the way he was moving around and the
15  way that he was talking to people.
16    Q.  Do you have any experience with amphetamines
17  yourself?
18    A.  No, sir.
19    Q.  Do you have any medical training that would
20  allow you to determine --
21    A.  No, sir.
22    Q.  -- if someone was on amphetamines?
23    A.  No, sir.  I have seen friends on
24  amphetamines.  I've seen people out on Miami that were
25  taking amphetamines.  I don't know if that counts.

1    Q.  Okay.
2    A.  But, no, I'm not a doctor, and, no, I don't
3  have any medical experience.  But it is Miami Beach,
4  and it's not uncommon.
5    Q.  Well, we're not talking about Miami Beach.
6  We're talking about an airline.
7    A.  Yes, but I believe he lives in Miami Beach.
8    Q.  Other than what you have described -- go
9  ahead.
10    A.  No.  I mean he lives in Miami Beach, I
11  believe, or he lives in Miami.  And that is not
12  something that is uncommon in this city.
13    Q.  So you think amphetamine use is common in
14  Miami Beach?
15    A.  It is.  I do believe that, yes.
16    Q.  Do you think it's common for flight
17  attendants to use amphetamines on the job?
18    A.  I have no idea.  I wouldn't know how to
19  answer that.
20    Q.  All right.  Other than what you've told me
21  already, do you have any other reason to believe that
22  Mr. Marino or any other flight attendant was on
23  amphetamines on June 10 of 2021?
24    A.  No, sir.
25    Q.  Did you interact with any other flight

1  attendants on the first flight other than Mr. Marino?
2    A.  No.  The individual that took me off, I
3  wasn't sure if -- do you know to say he's a CSM,
4  customer service manager?  But is it Mr. Fernandez?
5    Q.  Enriques.
6    A.  Enriques.  Okay.  I thought he might be a
7  flight attendant when he first interacted with me, but
8  I still don't really understand or know what his
9  position was.  But those were the only two individuals
10  I spoke to.
11    Q.  Did you see any other flight attendants on
12  the aircraft that day?
13    A.  No.  No, none.  There were none in the front
14  of the plane and none that I could see when any of this
15  happened because I did look.  I was hoping either the
16  pilot or another flight attendant would help me with
17  Mr. Marino.  I was hoping that somebody would assist
18  me.  I was really hoping for the pilot, but he never
19  came back.
20    Q.  So when you entered the aircraft, you saw
21  only one flight attendant in the galley area by
22  business class?
23    A.  Yes.
24    Q.  All right.  So when Mr. Marine told you that
25  you would have to stow your bag, I believe you

Page 62

1 testified earlier that you put it by your legs. Did
2 you put it behind your legs, in between your legs and
3 the seat?
4     A.  I put it behind my left leg as I was about to
5 use -- I was about to take out my iPad to use my iPad,
6 and I never got a chance.
7     Q.  So you heard Mr. Marino's first instruction
8 that you'd have to stow the bag. You assumed you
9 didn't have to do it right away, and you made no effort
10 to immediately comply with his instruction; is that
11 correct?
12     A.  Well, I didn't hear it as an instruction. I
13 heard it as you will need to before we finish
14 boarding. That's what I understood, and he never said
15 anything after that. He stood right beside me as I set
16 it beside my leg, and he never said anything further.
17 He didn't. So in my mind, we were both under the
18 same -- I was working under the same impression that he
19 gave me in like every other flight I've ever been on.
20 I never ever had a flight attendant require you to
21 immediately put your electronic devices away before
22 they even finish boarding, never once in my life. And
23 I'll be honest with you. I'm not sure that that's what
24 he was saying. I think that he was saying you will
25 need to before we finish boarding, and that's what I

Page 63

1 think he was saying.
2     Q.  Your understanding of that not having to
3 immediately stow your carry on is something that's
4 unique to business class; correct?
5     A.  No. It seems to be in general whether you're
6 in coach or business, but in business, they tend to
7 give you a little more latitude. I've had business
8 class where there's been flight attendants who didn't
9 require you to even stow it until they were taxiing.
10 I've had that before. I worked on my iPad. I worked
11 on my laptop all the way up until we got to the
12 runway. So it all depends on the flight attendant.
13     Q.  Correct. And this flight attendant didn't
14 tell you that you could leave your bag out until you
15 were taxiing, did he?
16     A.  He said what I told you. He said you know
17 you'll need to stow it, and I said yes.
18     Q.  Right. You understood that instruction, and
19 you heard it?
20     A.  I understood that before we took off, I would
21 need to put the bag in the overhead bin.
22     Q.  But that's not what he said, is it? He said
23 you'll need to stow that bag in the overhead bin,
24 period?
25     A.  You know you will as in, in, the future, you

Page 64

1 will need to stove that bag. He did not say,
2 Mr. Clowdus, or did he not say stow that bag now. He
3 said you will need to. That's very important,
4 Mr. Kolb. I think it's an important distinction. He
5 did not command me to put the bag away. He told you
6 will need to.
7     Q.  And you decided to take him I guess at his
8 word and put the bag behind your legs?
9     A.  Based on past experience and based on him
10 saying you will need to, I operated under the
11 assumption that he was referring to a future event.
12 And then he stood beside me with my bag at my feet and
13 never said anything further.
14     Q.  Was he looking at your bag as he stood beside
15 you while the passengers were boarding, or was he
16 looking someplace else?
17     A.  He saw me place my bag at my feet. He saw
18 me.
19         MR. KOLB:  Objection; nonresponsive.
20 BY MR. KOLB:
21     Q.  My question was, after you placed the bag
22 behind your legs, what was Mr. Marino looking at, your
23 bag or the passengers boarding the aircraft, or do you
24 know?
25     A.  Well, he's standing right beside me, and I'm

Page 65

1 assuming he saw it, but I can't tell you. I'm not
2 Mr. Marino, but he saw me place my bag at my feet. He
3 was there standing beside me.
4     Q.  And then sometime later as your bag is behind
5 your legs, and you're looking at your phone with your
6 earphones, you look up, and you hear Mr. Marino again
7 asking you to stow your bag in the overhead bin; is
8 that correct?
9     A.  No.
10     Q.  What happened?
11     A.  I'm sitting in my seat. I'm answering text
12 messages from my step-daughter. I'm preoccupied. I
13 feel him staring at me. I have my earphones in. I'm
14 not sure if he's talking to me or not. But I look up,
15 and he's glaring at me. I take out my earphones, and
16 he barks at me, give me the bag. That's what
17 happened. He used like give me the bag. Like he was
18 extremely angry, irritated and annoyed.
19     Q.  And was there any confusion at that point as
20 to whether he wanted you to stove your bag in the
21 overhead bin immediately?
22     A.  No confusion. He was pissed off.
23     Q.  All right. And what did you do after you
24 heard that second clear instruction to stow your bag?
25     A.  I reached under and picked up my bag and

17 (Pages 62 - 65)

Page 66

1 handed it to him.
2    Q.   All right.  Where was he when this was
3 happening?  Was he in your aisle?  Was he in the aisle,
4 or was he in the seat next to you?
5    A.   He was in the aisle.
6    Q.   And you're in the window seat?
7    A.   I'm in the window seat.
8    Q.   And are there two or three seats on your side
9 of the aircraft?
10    A.   There are two, two business class seats.
11    Q.   How much time had elapsed between
12 Mr. Marino first instructing you to stow your bag and
13 the second time he instructs you to stow your bag, if
14 you know?
15    A.   A few minutes.  I mean the honest answer is I
16 would say no more than four or five minutes.
17    Q.   Okay.
18    A.   But I don't know exactly, but four or five
19 minutes.
20    Q.   So he says give me the bag.  You pull it out
21 from behind your legs.
22    A.   My left leg, yes.
23    Q.   And you hand it to him?
24    A.   I swung it out over the passenger because the
25 business class seats are very large, and the bag is

Page 67

1 very floppy.  And I picked it up, and I swung it out
2 over the seat towards him because with his tone of
3 voice, I wasn't looking at him.  It was the way he was
4 talking to me.  It was very intimidating.  Can you
5 still see me because I've lost everything on here.
6    Q.   Yeah, we've got you.
7    A.   Okay.  We're good.
8    Q.   All right.  So four to five minutes between
9 when you boarded, and he said you'll need to stow the
10 bag.  And when you looked up, you felt him staring at
11 you, and he barked give me the bag?
12    A.   Yes.
13    Q.   At that point, you swung it out over the seat
14 next to you, and I believe according to your affidavit,
15 you said you might have impacted Mr. Marino?
16    A.   I felt the bag make contact, yes.  I felt it
17 bump his arm or his leg as I was reaching out towards
18 him.
19    Q.   Your complaint says that when he asked you
20 the second time to give me the bag, you shook your head
21 in disbelief.  Can you explain why you did that?
22    A.   Because of the way -- because of him yelling
23 at me give me the bag.  I'm a grown man.  I've never
24 had somebody yell at me like that.  I'm not accustomed
25 to that in that circumstance.  It completely caught me

Page 68

1 off guard.
2    Q.   How loud was he yelling, he being Mr. Marino?
3    A.   You want me to do it for you now?  I mean it
4 wasn't a scream.  It was a very elevated -- you know,
5 it was very elevated, give me the bag.
6    Q.   Was it loud enough for others in first class
7 to hear?
8    A.   Yes, absolutely, but that was the thing.
9 There was no one seated behind me at that time.  There
10 was one individual seated in 1-A, and I didn't see
11 anyone else behind me in business class.  So the only
12 other individual I saw when this event happened was the
13 individual in 1-A.
14    Q.   So you saw no one else in business class
15 other than one other person?
16    A.   Yeah.  After this happened, I looked.  When
17 he walked off in the initial encounter, he walked up
18 front.  I looked in the seat behind me to see if there
19 was someone there because I was looking for someone --
20 you know, I was looking to see if anyone one else was
21 seeing what I was seeing.  I was looking for help.  And
22 I looked across, and there was only one individual in
23 business class that I could see from my seat, but I was
24 seated.  And I looked back down the aisle, and there
25 were no flight attendants and nobody else that I could

Page 69

1 see.
2    Q.   All right.  So your recollection is there
3 weren't ten people in first class?
4    A.   There was what?
5    Q.   There weren't at least ten people in first
6 class that day?
7    A.   I could not see anyone, but they hadn't
8 finished boarding.  You know, the doors were not
9 closed.  But there was no one behind us and no one
10 across except for one individual in 1-A.  That was the
11 only people that I saw, the only other passenger that I
12 say.
13    Q.   Doesn't first class board first?
14    A.   Yes.
15    Q.   But you didn't see anybody else in first
16 class when all of this happened except for 1-A?
17    A.   1-A is the only individual that I saw.  And
18 after this happened, I looked to see if he was looking
19 to see what was going on, and he was looking down at
20 his phone.
21    Q.   Okay.  So you swing the bag out over the seat
22 next to you, and you're not looking at Marino?
23    A.   Correct.
24    Q.   You're shaking your head in disbelief?
25    A.   No.  I only shook my head when he first spoke

18 (Pages 66 - 69)

1     Q.   Did you hear him use those words?
2     A.   No, I did not.
3     Q.   All right.  You first encountered
4  Mr. Enriques after the bag had impacted Mr. Marino and
5  after you and Mr. Marino had this discussion about
6  whether you hit him or not; correct?
7     A.   Correct.
8     Q.   So at that point, all of the events that give
9  rise to this lawsuit or at least the assault, the
10  alleged assault had already occurred; correct?
11     A.   Correct.
12     Q.   Do you know where Mr. Enriques was before he
13  entered the aircraft?
14     A.   No, I do not.
15     Q.   When you overheard this conversation between
16  Mr. Enriques and Mr. Marino, do you know if anyone else
17  was present at the front conversation?
18     A.   I could not see -- I could not see
19  them.  I could only hear them.
20     Q.   All right.  And if I'm remembering right,
21  you're in the window seat, and there's a bulkhead
22  blocking your view --
23     A.   Correct.
24     Q.   -- of the galley area by the cockpit;
25  correct?

1     A.   Correct.
2     Q.   All right.  So Mr. Enriques comes over to
3  you, and does he speak to you in your seat, or does he
4  take you out onto the jetway?
5     A.   No.  No.  I'm seated, and he comes over and
6  leans over in a very, I would say, professional and
7  courteous manner and asked if I would please step into
8  the jetway, so he could talk to me.
9     Q.   So you two go into the jetway, and what does
10  he say to you?
11     A.   He says what happened, and I told him I
12  really have no idea.  And then I asked him what
13  happened, and he said he didn't know.  And I asked him
14  if Mr. Marino acts like this every day, and he told me
15  he didn't know.  This was the first time he had ever
16  worked with him.  But he had never experienced anything
17  like this in his career.  And then I proceeded to tell
18  him, you know, that he asked for my bag, and I
19  explained to him that I accidentally bumped his arm or
20  leg, and he accused me of hitting him.  And then
21  Mr. Enriques apologized for Mr. Marino's behavior, and
22  then he spent the next 20 or 30 minutes trying to
23  assist me.
24     Q.   How would Mr. Enriques apologize for
25  Mr. Marino's behavior if he never saw it?

1     A.   You'll have to ask Mr. Enriques.
2     Q.   I have.
3     A.   Well, I'm telling you what he said to me.
4     Q.   Your testimony is that Mr. Enriques
5  apologized.  Did he specifically apologize for
6  Mr. Marino's behavior, or are you making that
7  assumption?
8     A.   He apologized for me being removed from the
9  plane, and he apologized for the inconvenience.  To say
10  he specifically apologized for Mr. Marino, no, it
11  wasn't specifically for that.  He apologized for the
12  situation and my inconvenience.
13     Q.   Do you have any complaints regarding your
14  interactions with Mr. Enriques on the first flight?
15     A.   Oh, absolutely not.  He was extremely
16  professional and the bright spot of that morning.
17     Q.   Did you at any time overhear any
18  conversations Mr. Enriques had with the captain?
19     A.   No.
20     Q.   Do you know if Mr. Marino had the authority
21  to order you off the aircraft?
22     A.   I do not know.
23     Q.   All right.  So I take it then Mr. Enriques
24  asked you to gather your belongings and follow him back
25  to the gate podium at that point?

1     A.   He asked me if he could speak with me, yeah.
2     Q.   Out on the jetway; right?
3     A.   Yes.  Correct.
4     Q.   And that's the conversation you told me about
5  earlier where --
6     A.   Yes.
7     Q.   -- he asked you what happened, and you said
8  you don't know?
9     A.   Yeah.
10     Q.   And he says I don't know what happened
11  either.  And then do you go back to your seat, or do
12  you wait in the jetway while this conversation is going
13  on between Marino and Enriques?
14     A.   No.  No.  No.  You're out of sequence.  Him
15  and Marino spoke in the front.  I could hear Marino
16  telling him I'm not flying with that man.  He kept
17  calling me that man.  And then Mr. Enriques came back
18  to me and asked if he could speak with me out in the
19  jetway, and I said of course.  And I got up and walked
20  out with him, and as we walked up the jetway, you know,
21  that's when the conversation I'm telling you about
22  occurred.  When we got to the top of the jetway, he
23  went on the computer and spent 15, 20 minutes getting
24  me on the next flight and helping me navigate Mexico
25  City because I had a connecting flight to Mexico City.

22 (Pages 82 - 85)

Page 106

1 was going to take this. So I was concerned. Later
2 that night, I went back and forth all day about whether
3 to go, but I did not purchase another ticket until late
4 that night.
5     Q. Did anybody throughout all of these events we
6 just discussed, did anybody at American Airlines say
7 that they were going to have you charged with an
8 assault?
9     A. No.
10    Q. Did you wind up hiring a criminal defense
11 lawyer?
12    A. No, I did not.
13    Q. All right. So let's see here. Let me show
14 you this, and this looks like an E-mail from American
15 Airlines to you. It bears a Bate's label of AA0010
16 through 0011. Do you recall receiving this?
17    A. My screen is blank.
18    Q. How's that?
19    A. No. It's just a black screen.
20    Q. Well, maybe you need to refresh again.
21    A. Okay. I'll refresh again.
22    Q. Thanks.
23    A. No. I'm still not seeing it.
24       MR. KOLB: If you want to reboot your
25 computer then, and we can go off the record again for a

Page 107

1 minute?
2       THE WITNESS: I'm going to completely exit
3 and then rejoin.
4       MR. KOLB: All right. See you in a couple of
5 minutes.
6       (Brief recess was taken.)
7       MR. KOLB: Let's go back on the record.
8 BY MR. KOLB:
9     Q. Let me try to share my screen again. How is
10 that?
11    A. Yes, I can see it.
12    Q. Can you tell me what this is?
13    A. It's the last correspondence I received from
14 American Airlines.
15    Q. This might be one before the last. This one
16 says they're currently conducting an internal
17 investigation. Do you see that?
18    A. Oh, yeah, you're right.
19    Q. Does this look like an E-mail you received on
20 or around June 10 of 2021 from American?
21    A. Yes. I think this is the last one based on
22 what you have determined -- no, this is the last one
23 that I received.
24    Q. All right. So I'll mark this as Exhibit 7.
25 This is an American Airlines E-mail to Mr. Clowdus

Page 108

1 which is Bate stamped AA103 through 111. In this one,
2 it mentions the Conditions of Carriage. Do you see
3 that in the first paragraph?
4     A. Correct. Yes, I see it.
5       (Defendant's Exhibit No. 7 will so be marked
6 for identification.)
7 BY MR. KOLB:
8     Q. Is that right around the time you started
9 looking at the Conditions of Carriage, or was it some
10 time later?
11    A. No. This around about the time that I
12 started engaging Wil and his law firm.
13    Q. All right. Do you recall receiving an E-mail
14 on or about June 10 advising you that your flight
15 privileges had been suspended pending an investigation?
16    A. Yes, I recall that. Yes.
17    Q. Let me show you another one. Maybe I can
18 help clarify it. This E-mail is dated June 22nd. Can
19 you see that?
20    A. Yeah.
21    Q. And it starts out American Airlines has
22 completed an internal investigation. Do you see that?
23    A. Yes.
24    Q. All right. Is it this June 22nd letter, when
25 this is labeled Plaintiff's Production 3 through 4, is

Page 109

1 this the final letter that you recall receiving
2 advising you that you have been permanently suspended?
3     A. Yeah, I believe this is the final letter.
4     Q. So let's go back to this one, Exhibit 7
5 marked AA10 through 11 (sic). Having looked at the
6 subsequent June 22nd E-mail, does it refresh your
7 recollection as to whether this one might have been
8 received by you on June 10 advising you that --
9     A. Yes.
10    Q. And your response to this was to try to find
11 a lawyer; is that correct?
12    A. I think I had already had been speaking -- I
13 don't remember the exact time frame, but I think I had
14 already contacted Wil's partner by then but before
15 this. But if not, it was immediately following this,
16 but I think I had already spoken to his partner prior
17 to this letter, yes.
18    Q. All right. And then sometime later on
19 June 22nd, you received this E-mail from American
20 Airlines labeled Plaintiff's production 3 through 4.
21 Can you see that?
22    A. Yes.
23       MR. KOLB: I'm going to mark this as
24 Exhibit 8.
25       (Defendant's Exhibit No. 8 will so be marked

28 (Pages 106 - 109)

Page 122

1  passenger?
2       MR. WOODROW: Objection.
3  BY MR. KOLB:
4     Q.   Your answer, sir?
5     A.   No answer.
6     Q.   Are you refusing to answer?
7     A.   You're asking me to speculate about something
8  that I don't -- you know, the plain language says, yes,
9  they have the authority, but that's not what happened.
10 So I don't know why you're asking me the question.
11    Q.   I'm not asking you what happened, sir. We've
12 already been through that. I'm asking you to read the
13 plain English. All right? And the question is, is
14 based on the plain English, if a passenger is reported
15 to have been disorderly, abusive or violent or refused
16 to obey instructions, the Conditions of Carriage allow
17 the airline to refuse transport; correct?
18    A.   I believe so, yes.
19    Q.   All right. So let's get rid of that. Let me
20 go back to the Advantage Terms, and let me make it a
21 little bigger. I'll represent to you, sir, that
22 Exhibit 4 is the American Advantage Program Terms and
23 Conditions in effect on June 10 of 2021. And the
24 second page, which is labeled AA0064, it says in this
25 bullet point here, it lists a number of reasons why an

Page 123

1  advantage account can be terminated, suspended, etc.
2  And it says in so many words, that your participation
3  in the program is subject to the Conditions of
4  Carriage. Do you see that? Let me highlight it for
5  you.
6     A.   Yes.
7     Q.   Okay. Would you agree with me then that if a
8  passenger were to violate the American Airlines'
9  Conditions of Carriage, that would also constitute a
10 violation of the American Airlines Advantage Program
11 Terms and conditions?
12    A.   Yes. If a passenger violates the Conditions
13 of Carriage, yes. That's what it says.
14    Q.   And then one of the consequences of violating
15 the advantage program terms and conditions is that your
16 tickets and all accrued mileage could be forfeited, and
17 your future participation in the advantage program
18 terminated. Do you see that?
19    A.   Yes.
20    Q.   All right. To your knowledge, has American
21 Airlines terminated your advantage program membership?
22    A.   To my knowledge, they have not.
23    Q.   Okay. And to your knowledge, have they
24 forfeited or voided your accrued miles?
25    A.   To my knowledge, they have not.

Page 124

1     Q.   It asks in some written discovery for you to
2  describe your damages, and I want to go through what
3  you and your counsel have provided. Let me show you
4  this. That's not it. Hang on one second. All right.
5  There we go. Let me do it this way. You listed a
6  number of categories of damages you're seeking in this
7  lawsuit, and I want to run through them with you.
8       MR. KOLB: And the first, Mr. Woodrow, I'm
9  referring to the supplemental disclosures.
10 BY MR. KOLB:
11    Q.   The first category of damages is the fair
12 differential in twice monthly travel of approximately
13 $1500 a month. Can you tell me how you calculated that
14 figure?
15    A.   The difference in fair, the cost to travel to
16 Fort Lauderdale versus to Miami, the additional time.
17    Q.   What fair difference is there between
18 Fort Lauderdale and Miami that would give rise to a
19 $1500 a month increase in airfare?
20    A.   The difference in airfare, and it varies
21 from each trip. It varies from trip to trip, just
22 taking an average. But I sent you an example of the
23 cost of a ticket from American versus the cost for a
24 ticket from other carriers.
25    Q.   Let me see if I find that.

Page 125

1     A.   And it can fluctuate from a few hundred to
2  even more.
3     Q.   All right. Can you see that?
4     A.   Yep.
5     Q.   Is that what you were referring to earlier
6  about the fare difference?
7     A.   Correct.
8     Q.   This $75 for American Airlines, is that the
9  cost of cashing in miles at an American Airlines
10 ticket?
11    A.   No. That's their straight price. It has
12 nothing to do with using miles or anything else.
13    Q.   $75 to Cali, Columbia?
14    A.   For a one way. And that fluctuates. It can
15 go from $75 to $200. It goes back and forth.
16    Q.   All right. Other than what is shown in
17 Plaintiff's Exhibit 6 (sic), do you have any other
18 documentation to support a $1500 a month fare
19 differential?
20    A.   Well, it's not a $1500 fare difference. It's
21 also including the transportation cost between
22 traveling to Fort Lauderdale, which is an hour away,
23 versus 15 minutes to the airport where I live. And so
24 you have additional transportation costs. And I can't
25 remember what else was put in there to be honest with

32 (Pages 122 - 125)

Page 146

1    MR. KOLB:  Objection; nonresponsive.
2    THE WITNESS:  Now what the damages are and
3 how they're calculated, I will leave up to the
4 attorneys and to the jury.  And if there is no -- you
5 know, if this means there's no, then I will live with
6 that.  I leave it up the jury and the attorneys.
7    MR. KOLB:  Objection; nonresponsive.
8 BY MR. KOLB:
9    Q.  My question was really directed towards your
10 component of damages that you suffered the effective
11 nullification of 170,000 reward miles.  And my question
12 is, in light of the fact that those miles are not your
13 property, can you explain to me and the jury how it is
14 you think you can sue for the loss of something which
15 was never yours?
16    A.  And I'll give you the same answer.  I leave
17 it up to the attorneys and to the jury to decide that.
18    Q.  Okay.  We talked earlier about your mental
19 anguish and emotional distress.  Has that affected your
20 daily life, your social relationships, your social life
21 at all, or is it just business?
22    A.  We covered that before.  Why are we covering
23 it again?  I don't understand why you continue asking
24 the same questions over and over.
25    Q.  Well, this is a different question.  I asked

Page 147

1 you earlier about how you could describe your anxiety,
2 and this question is how has it affected your daily
3 life?
4    A.  It has affected everything.  It affects my
5 ability to travel.  It has affected my ability to see
6 my girlfriend.  It's affected my ability to travel with
7 my friends.  So I mean it's such an ambiguous
8 open-ended question.  I don't understand the question.
9    Q.  Other than what you've told me earlier, can
10 you describe for me any other way in which your
11 emotional distress, which you claimed to have suffered,
12 has affected your daily life, your social life or your
13 relationships?
14    A.  I don't know how to answer that question.
15    Q.  You've got another component of damages where
16 you claim to have suffered a damaged reputation.  Can
17 you tell me how your reputation has been damaged?
18    A.  My reputation is everything in Miami with the
19 business community.  My biggest client is a daily legal
20 paper, and I make approximately -- I net a million
21 dollars a year.  The contractor is coming up.  My
22 reputation is everything as far as maintaining that
23 client.  And in this current environment where there
24 are legitimate flight attendants that are legitimately
25 being beat to death, to have a flight attendant falsely

Page 148

1 accuse me of something, the damage to my reputation
2 would be massive and probably will cost me millions of
3 dollars in business.  If you're going to ask me
4 immediately this moment, no, I've not lost that client,
5 not yet, but I very well could.
6    Q.  Do you have any indication if that's likely
7 to happen?
8    A.  Well, I know the client, and I know the
9 environment.
10    Q.  Are they aware of this?
11    A.  What's that?
12    Q.  Are they aware of this incident?
13    A.  No.  No one is aware of it.  I've kept this
14 completely under wraps as much as possible to avoid
15 that.
16    Q.  All right.  Do you have any knowledge that
17 American Airlines has published its report of your
18 assault on Marino and its ban of you from their airline
19 to anyone else on American Airlines?
20    A.  I have no knowledge at the moment.
21    Q.  Do you have any knowledge that other than the
22 one or two people that you've spoken in general terms
23 to about the June 10th incident and the ban, that
24 anybody else anywhere on the planet knows about these
25 events?

Page 149

1    A.  I mean I think you asked me this question
2 earlier, but again not that I'm aware of.
3    Q.  Would you agree with me that the first
4 publication of the circumstances of June 10, 2021 and
5 following occurred when you filed your lawsuit?
6    A.  I don't know that it was.  I don't know what
7 American has done.  I don't know what they've done or
8 not done.
9    Q.  Okay.
10    A.  I can't answer that question if I don't know
11 what American has done.
12    Q.  All right.  You don't have any knowledge that
13 American has published it to any third party?
14    A.  I don't have any knowledge of that.
15    Q.  My question is based on what you know.  Would
16 you agree that the first publication of the events of
17 June 10 and subsequent occurred when you filed your
18 lawsuit in federal Court in Miami?
19    MR. WOODROW:  Objection.
20 BY MR. KOLB:
21    Q.  You can answer.
22    A.  I can't answer that.
23    Q.  Why not?
24    A.  Because I don't -- I don't know what American
25 has done, and you keep speculating and say if

38 (Pages 146 - 149)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.