Aristides Maldonado
March 08, 2022

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

TROY CLOWDUS,                        :

        Plaintiff,            :   Case No.
                                         1:21-CV-23155-MM
      v.                            :

AMERICAN AIRLINES, INC.,             :

        Defendants.           :
-------------------------------

DEPOSITION OF ARISTIDES MALDONADO

APPEARING REMOTELY FROM

MIAMI-DADE COUNTY, FLORIDA

March 8, 2022

10:02 a.m.

REPORTED BY:
JENNIFER D'ANGELO, RPR, CCR-NJ
APPEARING REMOTELY FROM PHILADELPHIA COUNTY,
    PENNSYLVANIA

**EXHIBIT "E"**

Aristides Maldonado
March 08, 2022

Page 2

1  REMOTE APPEARANCES:
2
3       STONE & WOODROW, LLP
        BY: WILLIAM T. WOODROW, ESQUIRE
4       will@stoneandwoodrowlaw.com
        250 West Main Street, Suite 201
5       Charlottesville, Virginia  22903
        (855) 275-7378
6            Attorney for Plaintiff
7
        BUCHANAN, INGERSOLL & ROONEY, P.C.
8       BY: KELLY H. KOLB, ESQUIRE
        kelly.kolb@bipc.com
9       401 East Las Olas Boulevard, Suite 2250
        Fort Lauderdale, Florida  33301
10      (954) 703-3900
             Attorney for Defendant
11
12
13  ALSO PRESENT: Troy Clowdus
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                    I N D E X
2
3   WITNESS                                    PAGE
4   ARISTIDES MALDONADO
5       BY: Mr. Woodrow                           5
6
7
8                      - - -
9
10
11                 E X H I B I T S
12  NUMBER       DESCRIPTION                   PAGE
13  Exhibit-A    IRL Packet                      40
14  Exhibit-B    E-mail                          42
15  Exhibit-C    Customer Service Manual         44
16  Exhibit-D    CERS Reports                    53
17  Exhibit-E    Tour Report                     60
18  Exhibit-F    Customer Communication          63
19
20
21
22
23
24
25

Page 4

1   REPORTED REMOTELY FROM PHILADELPHIA COUNTY,
2                    PENNSYLVANIA
3                       - - -
4            THE REPORTER:  The attorneys
5   participating in this deposition acknowledge
6   that I am not physically present in the
7   deposition room and that I will be reporting
8   this deposition remotely.  They further
9   acknowledge that, in lieu of an oath
10  administered in person, the witness will
11  verbally declare his testimony in this
12  matter is under penalty of perjury.
13           The parties and their counsel
14  consent to this arrangement and waive any
15  objections to this manner of reporting.
16  Please indicate your agreement by stating
17  your name and your agreement on the record.
18           MR. WOODROW:  William Woodrow,
19  attorney for the plaintiff.  I agree to
20  that.
21           MR. KOLB:  Kelly Kolb, counsel for
22  defendant.  We agree as well.
23           THE REPORTER:  Thank you.
24           Mr. Maldonado, could you raise your
25  right hand, please?

Page 5

1   Do you swear the testimony you are
2   about to give will be the truth, the whole
3   truth, and nothing but the truth, so help
4   you God?
5            THE WITNESS:  I do.
6            ARISTIDES MALDONADO, having been
7   duly sworn, was examined and testified as
8   follows:
9            THE REPORTER:  And, Mr. Maldonado,
10  could I have the address where you are
11  currently, please?
12           THE WITNESS:  Oh, this is One
13  Biscayne --
14           MR. KOLB:  Two Biscayne Boulevard,
15  Miami, Florida, Suite 1500.
16           THE REPORTER:  Thank you.
17           You can go ahead, Mr. Woodrow.
18           MR. WOODROW:  Thank you.
19               EXAMINATION
20  BY MR. WOODROW:
21  Q.   Good morning, Mr. Maldonado.
22  A.   Good morning, sir.
23  Q.   As you heard, my name is Will Woodrow.  I'm
24  here on behalf of the plaintiff, Troy Clowdus, an
25  individual who you had occasion to investigate last

Aristides Maldonado
March 08, 2022

Page 10

1  A.     Basically it was to monitor the caterers
2  doing the -- you know, bringing the food on board
3  because at that time CBP would not allow the
4  aircraft to leave or allow the aircraft to be
5  boarded until the catering was done to avoid
6  commingling.  So we were there basically
7  representing CBP making the observation, and at that
8  time the aircraft was allowed to board as long as
9  one of us was present watching the caterer.
10 Q.     Okay.  And what does CBP stand for?
11 A.     Customs and Border Protection.
12 Q.     I see.  Okay.  And what kind of incidents
13 with passengers would you get involved in?
14 A.     Basically if we have a call regarding an
15 incident, involving a subject passenger or a
16 passenger that would not comply with the
17 instructions of the flight attendants or the agents.
18 And we would respond -- sometimes we would get the
19 call, we would respond, and sometimes it would be
20 after the fact.  We would get information that there
21 was a certain issue on a certain flight.
22 Q.     Now, would you be doing the role of a GSC or
23 would you be providing kind of the muscle in case
24 the passenger --
25 A.     Well, not really the muscle because, you

Page 11

1  know, at that time I was no longer law enforcement.
2  So it was basically to do a report to see what
3  happened, what transpired if we have to do any kind
4  of report.  But as a GSC, no.
5  Q.     Would there also be a GSC on the scene when
6  you would be responding to these reports or these
7  incidents --
8  A.     Yeah.  If it was a departing flight, yes,
9  there was supposed to be a GSC present.
10 Q.     Okay.  And how long did you do this role
11 for?
12 A.     Well, that's basically a role that has been
13 ongoing.
14 Q.     Do you still do this role?
15 A.     Yes, except for the CBP part.  That role
16 ended just before Covid back in 2020.
17 Q.     Okay.  And so what's your job title today?
18 A.     Right now, well, they change our title.
19 It's security coordinator, but it's basically doing
20 the same role.
21 Q.     And do you work under the umbrella of
22 corporate security?
23 A.     Yes.
24 Q.     Okay.  And who do you report to in corporate
25 security?

Page 12

1  A.     I report to my manager who is Kevin Crowley.
2  Q.     Okay.  And who is John Kirby?
3  A.     John Kirby is also a manager that is -- he's
4  assigned to the west coast.
5  Q.     And is he -- is he above or below Kevin
6  Crowley?
7  A.     I don't know.
8  Q.     Okay.  And as a security coordinator, what
9  do you do for AA in the course of a day's work these
10 days?
11 A.     These days, what I do is basically we get an
12 incident that happened throughout the region because
13 we're responsible -- from our area, we're
14 responsible from -- really from Georgia all the way
15 down to South America.  So any incidents that happen
16 in any airport or any flight originating from any --
17 including the Caribbean as well.  So any incidents
18 that happen in any of those regions, we're
19 responsible for.
20 Q.     And you're responsible in what sense?
21 A.     We get notifications from security
22 operations when there's an incident involving a
23 passenger.  It could be also involving an employee
24 or it could be an incident with a -- you know, with
25 a certain aircraft.  But mostly -- what we get

Page 13

1  lately is mostly incidents with disruptive
2  passengers and those are, like I said, depending on
3  the region we get those reports from security
4  operations.
5  Q.     And do you interact with any of these
6  passengers or are you a secondary --
7  A.     We actually interact with them because, like
8  I said, we get those reports.  If an incident
9  happened, let's say, in Punta Cana, Dominican
10 Republic, we get the reports.  We don't interact
11 with the passengers.  We go with whatever reports we
12 get that originate from that area.
13 Q.     And what is your -- what is your job
14 function once you get those reports?  What are you
15 doing with them?
16 A.     We're doing -- you know, we do -- we gather
17 all the reports, we actually generate our own report
18 depending on what happened.  And then we send those
19 reports, we put them in a computer system and
20 they're basically titled by whatever the incident
21 was.
22 Q.     And is the purpose of these reports to
23 assign, follow on action, be it punishment or a
24 flight ban, or is there some other purpose as well?
25 A.     It depends.  Mostly could be information,

Aristides Maldonado
March 08, 2022

Page 14

1  but it also could be depending on what the incident
2  was. It could be related to whether a person might
3  be banned.
4  Q.    Okay. Is that the usual thrust of these
5  reports, determining whether or not to ban a
6  passenger?
7  A.    Well, as far as determination, we don't do
8  that. We just make the reports and they go and
9  whoever makes a determination what to do with that.
10 We just get all the information that is required.
11 Q.    And do you make a recommendation as to what
12 action should be taken?
13 A.    No, we don't make recommendations. We just
14 get information and we just put all the facts that
15 we have available at the time.
16 Q.    Who makes the determination about what --
17 what action was taken?
18 A.    As far as determination, I don't know. But
19 I send my reports, anything regarding to any
20 passenger, that goes to security operations. And
21 from there, whoever makes the determination, I don't
22 know.
23 Q.    Who does it go to in security operations?
24 A.    That would be whoever the person is on duty,
25 but if it's regarding a ban that goes to John Kirby.

Page 15

1  Q.    And does that go to him because he's the
2  regional manager or because he's in charge of all
3  bans?
4  A.    As far as I know, he's the person that is in
5  charge as far as the refusals.
6  Q.    Okay. And so he makes the final
7  determination as to whether or not the findings of
8  your report are valid?
9       MR. KOLB:   Objection. Form.
10      THE WITNESS:   I don't know if he
11      does or not. All I know is that the reports
12      go to him.
13 BY MR. WOODROW:
14 Q.    Okay. Do you ever get any pushback? When
15 you file a report, does John Kirby ever call you up
16 and question -- question your report?
17 A.    Yes, he has.
18 Q.    Give me an example, please.
19 A.    If there's probably enough sufficient
20 information regarding a passenger or maybe if there
21 was information that was not complete, he might call
22 me or send me an E-mail to ask further.
23 Q.    And does he ever ask you to go back and
24 investigate more fully?
25      MR. KOLB:   Objection. Form.

Page 16

1       THE WITNESS:   I don't think he has
2       done that. He usually will ask me if
3       there's anything additional, and I will tell
4       him -- I say, yes, I have more, or I don't,
5       that's all I have.
6  BY MR. WOODROW:
7  Q.    When you put together an IRL packet -- is
8  that what it's called? An IRL packet?
9  A.    Yes.
10 Q.    Do you put all of the evidence that you
11 relied upon in that packet?
12 A.    Whatever I have available at that time, yes.
13 Everything that I have available.
14 Q.    So anything that's pertinent that you have
15 is reflected in that packet?
16 A.    Yes.
17 Q.    Okay. So what kind of training did you
18 receive from AA to conduct these investigations?
19      MR. KOLB:   Objection. Form.
20      THE WITNESS:   As far as training,
21      just on-the-job training.
22 BY MR. WOODROW:
23 Q.    Did you receive any -- any extra training in
24 the nature of investigations or how to conduct them?
25 A.    No.

Page 17

1  Q.    And what sort of on-the-job training did you
2  engage in?
3  A.    Basically from experienced investigators
4  that we have.
5  Q.    When you were taught to investigate for AA,
6  what was -- did they teach you -- did they teach you
7  a specific method in how they wanted you to conduct
8  investigations?
9       MR. KOLB:   Objection. Form.
10      THE WITNESS:   Just basically to
11      gather all the information available. And
12      when I submit the report, make sure that I
13      have complete and accurate reports so I can
14      submit it.
15 BY MR. WOODROW:
16 Q.    And when they taught you to gather all the
17 information available, what were the protocols that
18 you were led to understand that you should engage in
19 do so?
20 A.    As far as protocols, what are you referring
21 to? What kind of protocols are you talking about?
22 Q.    Well, you said they taught you to gather all
23 the information. How -- how were you to go about
24 gathering the information?
25 A.    Look at whatever -- you know, any witnesses,

Aristides Maldonado
March 08, 2022

Page 42

1   MR. KOLB: Objection. Form.
2   THE WITNESS: It took about a day,
3   I guess.
4   BY MR. WOODROW:
5   Q.   Okay. And then did you send this report to
6   John Kirby?
7   A.   Yes.
8         (Exhibit-B was marked for
9         identification.)
10  BY MR. WOODROW:
11  Q.   Okay. And so what I'm -- one thing I'm
12  curious about, and let me just go to Exhibit-B here.
13  This is the letter sent to Mr. Clowdus informing him
14  of his ban. What is the date at the top of this
15  letter?
16  A.   It says June 22nd.
17  Q.   Okay. So I'm curious why it would take
18  almost two weeks between the investigation being
19  completed and Mr. Clowdus being informed that he was
20  banned?
21       MR. KOLB: Objection. Form.
22       THE WITNESS: I don't know.
23  BY MR. WOODROW:
24  Q.   Okay. All right. Let's go back to the IRL
25  packet -- we're in the IRL packet. Yeah, we are.

Page 43

1   So you've already testified that the IRL
2   packet comprises every piece of evidence that you
3   relied upon in the investigation; is that correct?
4         MR. KOLB: Objection. Form.
5         THE WITNESS: Yes.
6   BY MR. WOODROW:
7   Q.   Okay. Does every CERS report pertaining to
8   the incident go into the packet?
9   A.   Every CERS report that I have available,
10  yes.
11  Q.   Okay. Now, if you had called and
12  interviewed someone or if you had E-mailed for
13  further information, would there be a record of that
14  call in the packet or a copy of that E-mail?
15  A.   Yes.
16  Q.   Okay. So how do you decide when you've
17  collected enough information?
18  A.   Once I look at the CERS reports, I saw that
19  I have what I needed, I went ahead and completed my
20  packet and sent it.
21  Q.   So if a GSC was involved with resolving the
22  factor incident, would you try to obtain the CERS
23  report of the GSC on site?
24  A.   I was not on site and I don't know as far as
25  the GSC doing a report.

Page 44

1   Q.   Well, what is the role of the GSC with
2   respect to passenger incidents?
3   A.   As far as I understand, they respond and
4   they take whatever action is necessary. In that
5   case, I believe it was removal of the passenger.
6         (Exhibit-C was marked for
7         identification.)
8   BY MR. WOODROW:
9   Q.   Well, if -- let's look at Exhibit-C, a
10  little bit about the role of the GSC and see if
11  that's something you're familiar with. Let's go
12  down to page 53, 6b(4). So this is -- what is this
13  document? Do you recognize it?
14  A.   Just what it says there. I've never seen
15  it. Customer service manual.
16  Q.   Okay. Let's see what this section's about.
17  G, customer misconduct. Do you see that?
18  A.   Yes.
19  Q.   All right. Let's go down to six. Six is
20  customer's conduct at the airport. Let's look at B,
21  escalation. Four. Could you read four out loud,
22  please?
23  A.   Yeah. It says, Contact a ground security
24  coordinator or member of management to assist you
25  with this situation. The GSC will speak with the

Page 45

1   customer and then determine whether they should
2   permit or deny boarding through a collaborative
3   discussion with the agents who were involved in the
4   incident.
5   Q.   Okay. Thank you. Now, let's go down to
6   seven. Seven is on the plane, so customer's conduct
7   on the plane. Let's look at A2 through 4. Once the
8   customer has scanned their boarding card and is
9   ON'd. Can you read two through four out loud,
10  please?
11  A.   The captain -- excuse me. The captain will
12  call for a GSC to the aircraft to assess the
13  situation with the flight attendant and captain. If
14  a GSC is unavailable, a member of management will be
15  called to the aircraft.
16       The GSC will speak with the customer in an
17  effort to resolve the issue.
18       A collaborative discussion among the
19  captain, flight attendant, and GSC or member of
20  management must take place before a customer can be
21  removed for reasons other than clear violations of
22  federal regulations.
23  Q.   Okay. Thank you. Please take a drink.
24  That was painful to listen to.
25  A.   Yes, sir.

Aristides Maldonado
March 08, 2022

Page 82

1  Q.   And what is this?
2  A.   The CERS report that was submitted by flight
3  attendant Merino.
4           MR. KOLB:  Which exhibit is this
5       for the depo?
6           MR. WOODROW:  This is Exhibit-D.
7           MR. KOLB:  I thought Gray was D.
8           MR. WOODROW:  All three of them are
9       together in one exhibit; Gray, Merino, and
10      Henriquez.
11          MR. KOLB:  Got it.  Thanks.
12 BY MR. WOODROW:
13 Q.   And is this a CERS report that you relied
14 upon in conducting your investigation?
15          MR. KOLB:  Objection.  Form.
16          THE WITNESS:  Yes.
17 BY MR. WOODROW:
18 Q.   Okay.  Same deal.  Facts related to the
19 event.  Created on 6/10/21 at 8:13.  Passenger was
20 asked at the beginning of boarding process to place
21 his bag on the OHB before we were to go out of
22 space.  Passenger got mad about it but accepted to
23 do it later.  After being finished boarding and
24 checking the cabin, I asked passenger to place his
25 bag in the OHB, even I offered to do it myself.  He

Page 83

1  was so aggressive about it, I explained the rule to
2  him about bulkhead and he grabbed his bag and
3  deliberately hit me in my stomach very hard with it.
4  I asked him, you just hit me with your bag.  And he
5  replied very aggressively, no, I didn't.  I advised
6  the captain about it immediately and because his
7  aggressively behavior it was decided to remove him
8  from the flight.  This behavior should not be
9  tolerated by AA at all.  I was physically assaulted
10 by this man and the company should do something
11 about it.
12      Okay.  We can stop right there.  As an
13 investigator, did you consider it at all unusual
14 that Mr. Gray's account was more rich in factual
15 detail than Merino's despite the fact that she
16 presumably had her own job that she was doing that
17 morning?
18          MR. KOLB:  Objection.  Form.
19          THE WITNESS:  I don't know what
20      you're saying as far as she was doing
21      another job.
22 BY MR. WOODROW:
23 Q.   Well, she was another flight attendant, was
24 she not?
25 A.   Yes, but what are you referring to?  I did

Page 84

1  not understand that question.
2  Q.   Well, did both Mr. Merino and Mrs. Gray have
3  their own jobs that they were performing that
4  morning in preparation for the airplane to depart?
5           MR. KOLB:  Objection.  Form.
6           THE WITNESS:  I don't know.
7  BY MR. WOODROW:
8  Q.   Do you have any reason to believe that
9  Mrs. Gray was for some reason shadowing Mr. Merino
10 in his duties that morning?
11          MR. KOLB:  Objection.  Form.
12          THE WITNESS:  I don't know.
13 BY MR. WOODROW:
14 Q.   Was it your belief at the time that you
15 conducted your investigation that Mrs. Gray was
16 shadowing Mr. Merino and that is how her report was
17 so flush with detail?
18          MR. KOLB:  Objection.  Form.
19          THE WITNESS:  No.
20 BY MR. WOODROW:
21 Q.   Okay.  As an investigator, did it give you
22 pause that Ms. Gray placed Mr. Clowdus as standing
23 there glaring at Merino after he hits him, but
24 Merino never claims in his report that Clowdus rose
25 from his window seat?

Page 85

1           MR. KOLB:  Objection.  Form.
2           THE WITNESS:  Can you repeat the
3       question?
4  BY MR. WOODROW:
5  Q.   We just read Mrs. Gray's report.  And in it
6  she says, After the passenger struck him and stood
7  there glaring at the number one.  Do you see that?
8  A.   Yes.
9  Q.   Okay.  And now Merino's report, does he ever
10 say that the passenger rose from his 1F window seat?
11 A.   No.
12 Q.   Did you notice that discrepancy at the time?
13 A.   I don't know if that's a discrepancy.
14 Q.   If a passenger is standing there glaring in
15 one report and he's sitting in a window seat in the
16 other, is that not a discrepancy?
17          MR. KOLB:  Objection.
18      Misrepresents the documents, argumentative.
19          THE WITNESS:  Like I said, I don't
20      know.  I wasn't there, so I don't know what
21      he might have put in there.  Maybe he forgot
22      to put it in the report.  I don't know.
23 BY MR. WOODROW:
24 Q.   But you didn't question further into the
25 possible discrepancy at the time, did you?

Aristides Maldonado
March 08, 2022

Page 98

```
 1      decision.
 2              THE WITNESS: Like I said, I don't
 3          know what Mr. Merino saw or heard because I
 4          never saw that report.
 5   BY MR. WOODROW:
 6   Q.     Mr. Henriquez --
 7   A.     Henriquez. Sorry. Thank you.
 8   Q.     Right. And today we did see that report;
 9   correct?
10   A.     Yes.
11   Q.     And today we saw the tour report where he
12   expressed the opinion that it was really the flight
13   attendant's fault for escalating the situation;
14   correct?
15   A.     Yes.
16   Q.     And should Mr. Henriquez's opinion been also
17   included and evaluated in the decision whether or
18   not to ban Mr. Clowdus?
19              MR. KOLB: Objection. Form.
20              THE WITNESS: It would go in the
21          report if I had it available, but like I
22          said the determination it was not up to me.
23   BY MR. WOODROW:
24   Q.     I understand that it was not. And that's
25   why I'm asking you whether it should have been
```

Page 99

```
 1   included such that now that you've seen it, it would
 2   be the type of situation where you include it after
 3   the fact?
 4              MR. KOLB: Objection. Form.
 5              THE WITNESS: If I had it
 6          available, I would have included it, yes.
 7   BY MR. WOODROW:
 8   Q.     And if you had it available and there was
 9   not this lawsuit and you came to your attention
10   through the normal course of events, would you
11   reopen the file and include it for further
12   consideration?
13              MR. KOLB: Objection. Form.
14              THE WITNESS: I would include the
15          report. But like I said the reconsideration
16          part, I don't know.
17   BY MR. WOODROW:
18   Q.     Okay. Are you testifying then that if you
19   had the tour report and Mr. Henriquez's CERS
20   statement after the fact, that you would include it
21   and resend it up the chain of command?
22   A.     I would have included them and just put them
23   in the report. That's what I would have done.
24   Q.     Mm-hmm. I understand that that's what you
25   would've done. I'm asking you is that what you
```

Page 100

```
 1   would do after the fact in the situation like we
 2   discussed where sometimes you go back and try to fix
 3   something that you got wrong?
 4              MR. KOLB: Objection. Misconstrues
 5          prior testimony, calls for speculation.
 6              THE WITNESS: I don't know.
 7              MR. WOODROW: Okay. All right.
 8          That's all I got.
 9              MR. KOLB: Reserve all of our
10          questions until the time of trial. Madam
11          Court Reporter, we will read and sign.
12              THE REPORTER: Okay. So, Mr. Kolb,
13          you'd like a copy of the transcript?
14              MR. KOLB: Yes.
15              (Witness excused.)
16              (The deposition concluded at
17          12:23 p.m.)
```

Page 101

```
             C E R T I F I C A T I O N

         I, JENNIFER D'ANGELO, Registered
Professional Reporter, do hereby certify:
         That prior to being examined, the witness in
the foregoing proceedings was by me duly sworn to
testify to the truth, the whole truth, and nothing
but the truth;
         That said proceedings were taken remotely
before me at the time and places therein set forth
and were taken down by me in shorthand and
thereafter transcribed into typewriting under my
direction and supervision;
         I further certify that I am neither counsel
for, nor related to, any party to said proceedings,
not in anywise interested in the outcome thereof.
         In witness whereof, I have hereunto
subscribed my name.
                                    - - -

DATE: 3/29/22           _____
                        Jennifer D'Angelo, RPR, CCR-NJ
```

Aristides Maldonado
March 08, 2022

Page 102

1  ACKNOWLEDGEMENT OF DEPONENT
2
3
4       I, ARISTIDES MALDONADO, have read the
5  foregoing deposition given on February 8, 2022,
6  consisting of page one to page 100 inclusive, and it
7  is true, correct and complete to the best of my
8  knowledge, recollection and belief, except for the
9  corrections, if any, attached on a separate sheet
10 herewith.
11
12
13 _____
14 Aristides Maldonado
15
16
17
18
19
20
21
22
23
24
25

Page 103

1                    ERRATA
2  Page, Line                    Change
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____