**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| | : | |
| TROY CLOWDUS | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | DOCKET NO.: 1:21cv23155 |
| v. | : | |
| | : | |
| AMERICAN AIRLINES, INC. | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant, AMERICAN AIRLINES, INC. ("**AA**" or "**Defendant**"), files this Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment as to Plaintiff and in support thereof states as follows:

### STATEMENT OF UNDISPUTED FACTS[1]

1.     Plaintiff, an AA business class passenger, boarded AA's Flt 1303 from Miami to Mexico City on June 10, 2021 ("**the Flight**"), and was seated in the first row bulkhead seat.[2]

2.     Plaintiff was aware that passengers seated in the bulkhead seat must stow their bags in the overhead compartment.  Upon boarding, however, Plaintiff did not stow his bag in the overhead compartment.[3]

3.     AA's flight attendant Carlos Merino ("**Merino**") advised Plaintiff that he needed to stow his bag in the overhead bin. Although Plaintiff heard Merino's instruction, Plaintiff did not

---

[1] The Statement of Undisputed Material Facts will be referred to as "SUMF" throughout this Motion.

[2] Amended Complaint (DE 40), ¶¶ 8, 10.

[3] Deposition of Plaintiff, 53:14-24; 54:5-12; 56:3-10, 61:24-62:6.  [For the purposes of this Motion, deposition transcripts shall be cited as "Name of Deponent, Page Number: Line Number."]  **The cited excerpts from Plaintiff's Deposition are attached to this Statement as Exhibit C.**

stow his bag, or move to stow his bag in the overhead compartment, and instead placed his bag at his own feet.[4]

4.      Later, in response to being confronted by Merino for not stowing his bag, Plaintiff "swung" his bag toward Merino and struck Merino with the bag.[5]

5.      After striking Merino, Plaintiff was removed from the aircraft.  Merino did not remove Plaintiff from the aircraft, and Merino had no authority to remove Plaintiff from the aircraft.  The Flight Captain made the decision to remove Plaintiff from the aircraft.[6]

6.      AA's Corporate Event Reporting System ("**CERS**") Manual requires that the flight attendants "most involved" in such events complete a CERS Report "providing as much details as possible" about the event.[7]

7.      In compliance with the CERS Manual, flight attendant Merino filed a CERS Report detailing his observations of the incident.[8]

8.      AA Corporate Security Investigator, Aristides Maldonado ("**Maldonado**"), received and reviewed Merino's CERS Report as part of his duties conducting the investigation of the incident.[9]

9.      Maldonado compiled other documents with Merino's CERS Report into an Internal Refuse List packet ("**IRL Packet**") which he forwarded to AA Regional Corporate Security Manager of Investigations, John Kirby ("**Kirby**") as required by AA practices.[10]

---

[4] Amended Complaint (DE 40), ¶¶ 10, 11; *see also* Deposition of Plaintiff, 53:14-24; 54:5-12; 56:3-10, 61:24-62:6; Deposition of Merino, 10:18-11:11.  **The cited excerpts from Merino's Deposition are attached to this Statement as Exhibit D**.
[5] Deposition of Plaintiff, 66:24-67:3; Deposition of Merino, 11:12-15.
[6] Deposition of Merino, 12:10-13:3; Deposition of Plaintiff, 84:20-22.
[7] Declaration of John Kirby ¶ 5-6.  **The Declaration of John Kirby ("Kirby") is attached to this Statement as Exhibit A.**
[8] Deposition of Merino, 52:9-13; Declaration of Kirby ¶ 10.
[9] Deposition of Maldonado, 13:5-21; 82:1-16.  **The cited excerpts from Maldonado's Deposition are attached to this Statement as Exhibit E.**
[10] Deposition of Maldonado, 14:16-15:5; 42:5-7; Declaration of Kirby ¶¶ 9-12.

10.     Kirby is responsible for reviewing *all* such investigatory reports for American Airlines companywide and worldwide.[11]  Kirby made the determination to place Plaintiff on the IRL (AA's internal no-fly list) which permanently banned Plaintiff from flying on future AA flights.[12]

11.     Despite his placement on the IRL, AA has not terminated Plaintiff's AAdvantage program membership (AA's rewards program), nor has AA forfeited or voided Plaintiff's accrued rewards mileage.[13]

12.     AA does not share its IRL list with external third parties.[14]

## I.     CONCLUSION

For the reasons argued above, AA respectfully requests that this Honorable Court grant Defendant's Motion for Summary Judgment as to Plaintiff's libel *per se* claims.


Respectfully Submitted,


                                             **BUCHANAN INGERSOLL & ROONEY PC**
                                             *s/ Kelly H. Kolb*
                                             Kelly H. Kolb, Esq.
                                             Florida Bar Number: 0343330
                                             kelly.kolb@bipc.com
                                             Robert D. Pecchio, Esq.
                                             Florida Bar Number: 1005955
                                             Robert.pecchio@bipc.com
                                             401 East Las Olas Boulevard, Suite 2250
                                             Fort Lauderdale, FL  33301
                                             T:      (954) 703-3944 - F:   (954) 703-3939
                                             *Attorneys for Defendant*


---

[11] Deposition of Maldonado, 15:1-5; Declaration of Kirby ¶ 4; Deposition of Kirby, 14:14-15:7.  **The cited excerpts from Kirby's Deposition are attached hereto as Exhibit F.**
[12] Deposition of Kirby, 10:3-16; 31:1-5; 14:21-15:3; Deposition of Plaintiff, 108:24-109:3; Declaration of Kirby ¶ 12.
[13] Deposition of Plaintiff, 123:20-25.
[14] Deposition of Plaintiff, 148:16-149:2; **Defendant's Answer to Plaintiff's Interrogatory No. 16, Plaintiff's First Set of Interrogatories attached to this Statement at Exhibit B;** Declaration of Kirby ¶ 13.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this the _____, a true and correct copy of the above and foregoing has been filed with the Clerk of Court using the CM/ECF system. I FURTHER CERTIFY that the foregoing document is being served this date, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner of those counsel or parties who are not authorized to receive electronically Notices of Electronic filing on the counsel of record or *pro se* parties identified on the attached Service List.

**SERVICE LIST:**

William T. Woodrow III
250 West Main Street, Suite 201
Charlottesville, VA 22902
E-mail: will@stoneandwoodrowlaw.com

Rook Elizabeth Ringer, Esq.
LENTO LAW GROUP
222 San Marco Ave., Ste. C
St. Augustine, FL 32084
E-mail: reringer@lentolawgroup.com

David Pollack
POLLACK LAW FIRM
75 Valencia Avenue, Suite 100
Coral Gables, FL 33134
Tel: (305) 372-5900 / Tel: (855) 275-7378
Tel: (904) 602-9400
E-mail: david@davidpollacklaw.com
*Counsel for Plaintiff*

By:_____
Kelly H. Kolb

DocuSign Envelope ID: A4006B10-3E0A-4724-9D2D-7C8C234B453D

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 1:21-CV-23155-KMM

TROY CLOWDUS

    Plaintiff,

vs.

AMERICAN AIRLINES, INC.

    Defendant.

_____/

### DECLARATION OF AMERICAN AIRLINE'S REGIONAL CORPORATE SECURITY MANAGER OF INVESTIGATIONS, JOHN KIRBY

    John Kirby, pursuant to 28 U.S.C. §1746, does hereby state under penalty of perjury that the following is true and correct:

    1.    My name is John Kirby. I am over 18 years of age. I have personal knowledge of the matters stated below.

    2.    I am Regional Corporate Security Manager of Investigations for American Airlines ("**AA**"). I have been employed by AA in that capacity since September 2017.

    3.    In this position, I oversee a group of AA Corporate Security Investigators who conduct and review investigations into a broad range of AA security issues, including investigations into reported on-board customer misconduct.

    4.    I am also the Manager responsible for reviewing all investigatory reports for AA companywide and worldwide that require a determination as to whether to place an individual on AA's Internal Refuse List ("**IRL**") – i.e., the list of persons who are permanently prohibited from flying with AA.

**EXHIBIT "A"**

DocuSign Envelope ID: A4006B10-3E0A-4724-9D2D-7C8C234B453D

5.     AA's Corporate Event Reporting System ("**CERS**") Manual, under AA's General Policies and Procedures, requires that all safety, security or medical events, including passenger disruption on-board flights, be reported via a CERS Report within 24 hours of the event or within 24 hours of the reporting party's return to the U.S. from an international sequence.

6.     The CERS Manual requires that the flight attendants most involved in any such event complete a CERS Report.  The CERS Report should include the flight attendants' observations and as many details as possible about the event, to facilitate any eventual investigation into the event.

7.     Upon submission, the CERS Report is automatically sent to the Corporate Security Bureau in Dallas, Texas, ("**Dallas Bureau**"), and then transmitted by email to the Corporate Security region from where the CERS Report originated for investigation.  Only people with an active role, duty, or interest in the investigation and/or a supervisory role are included in this transmitted email when it is sent to the investigating region and then assigned to an Investigator.

8.     The assigned Corporate Security Investigator in that region will then review and investigate the CERS Report, and incorporate the CERS Report into his/her investigation into the incident that prompted the CERS Report.

9.     This Investigator then compiles an IRL Packet, which is then forwarded to me by the Investigator if a determination needs to be made regarding whether the passenger involved should be placed on AA's IRL.

10.     I received the IRL Packet from Corporate Security Investigator Aristides Maldonado ("**Maldonado**") which included the CERS Report filed by Flight Attendant Carlos Merino pursuant to the CERS Manual, related to Troy Clowdus ("**Clowdus**") and the incident

DocuSign Envelope ID: A4006B10-3E0A-4724-9D2D-7C8C234B453D

("**the Incident**") that occurred on AA's Flight 1303 from Miami to Mexico City on June 10, 2021 ("**the Flight**").

11.     Maldonado sent this IRL Packet to me pursuant to his duties to investigate the Incident, and I received this IRL Packet in accordance with my duty to review AA's IRL Packets and make IRL determinations regarding same.

12.     I reviewed the IRL Packet sent to me from Maldonado pursuant to my responsibilities for AA, and I made the determination to place Clowdus on AA's IRL pursuant to my duties.

13.     I did not share this IRL determination with anyone outside of AA. AA does not share its IRL with external third parties or anyone outside AA.

14.     Chris Reddig is an AA Corporate Security officer who works out of AA's Dallas Bureau.   Mr. Reddig's job duties entail receiving submitted CERS Reports automatically transmitted to the Bureau and forwarding these Reports to the region where the Report will be investigated.

15.     As stated above, CERS Reports are automatically received in the Dallas Bureau before they are transferred to the Corporate Security Investigator assigned to the relevant region.

16.     It is standard operating procedure for Corporate Security officers at the Dallas Bureau, such as Reddig, to disseminate CERS Reports to the Corporate Security Investigator assigned to the region from where the CERS Report originated.

17.     This Incident occurred in Maldonado's assigned region.  It is therefore standard procedure that he would receive the CERS Report filed by Merino related to this Incident from an officer at the Dallas Bureau, such as Reddig.  It is standard procedure that Maldonado would investigate the Incident and then transfer the IRL Packet to me for determination.

3

DocuSign Envelope ID: A4006B10-3E0A-4724-9D2D-7C8C234B453D

18.    I declare under penalty of perjury that the foregoing is true, correct and within my personal knowledge.

**DATED** on this the 5th day of August 2022.

John Kirby

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

TROY CLOWDUS,

        Plaintiff,

                           CASE NO.: 1:21-cv-23155

v.

AMERICAN AIRLINES, INC.,

        Defendant.

_____/

## DEFENDANT AMERICAN AIRLINES' ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant, AMERICAN AIRLINES, INC. ("Defendant"), by and through its undersigned counsel and pursuant to Rule 33 of the Federal Rules of Civil Procedure, responds to Plaintiff, TROY CLOWDUS' ("Plaintiff") First Set of Interrogatories as follows:

### OBJECTION TO DEFINITIONS

Defendant objects to the defined word "identify" when used in reference to a person as calling for the disclosure of the contact information for Defendant's principals and employees involved in the incident made the basis of this lawsuit. Plaintiff's counsel is prohibited from communicating with Defendant's management personnel and those involved in the incident regarding the claims in this lawsuit by Florida Rule of Professional Conduct 4-4.2, and the comments thereto. Further, Plaintiff's counsel has indicated his intention to name one of Defendant's flight attendants involved in the incident as an additional defendant. Thus, the disclosure contact information can only be calculated to assist or facilitate in the violation of Rule 4-4.2.

Defendant objects to the definition's requirement to disclose the driver's license number, date of birth and social security number of its employees as invasive of their rights to privacy, as

**EXHIBIT "B"**

(denying request for discovery of all discrimination claims, noting "a vague possibility that loose and sweeping discovery might turn up something . . . does not show . . . likely relevance that would require moving discovery beyond the natural focus of the inquiry"); *North River Ins. Co. v. Greater New York Mut. Ins. Co.*, 872 F. Supp. 1411, 1412 (E.D. Pa. 1995) (denying discovery of previous <u>similar</u> claims, since they "will necessarily involve totally different facts and circumstances," and since "such information not only is highly unlikely to have any relevance to (the claims at issue) but does not even appear reasonably calculated to lead to the discovery of admissible evidence", noting that "discovery of this material would properly be characterized as a fishing expedition, causing needless expense and burden to all concerned (such that) allowing such discovery would also run counter to the important but often neglected Rule 1 of the Federal Rules of Civil Procedure which requires that all rules shall be construed and administered to secure the just, speedy and inexpensive determination of every action.").

Defendant declines to respond to this interrogatory on the basis of the foregoing objections and is withholding responsive information on the basis of the foregoing objections.

16.    Identify who outside of Defendant's organization is given access to its no fly list and what details are they given.

**<u>ANSWER</u>**:    Defendant objects to this interrogatory as being overbroad in that it is unlimited in time having any rational or reasonable connection to the parties' plead claims and defenses. Fed.R.Civ.P. 26(b)(1). *Henderson v Holiday CVS, LLC*, 269 F.R.D. 682, 688-689 (S.D. Fla. 2010)(discovery request for relevant documents "regardless of the date of the documents . . . is rejected as unreasonable").

Defendant does not share its internal refuse list with third parties.

**CALIFORNIA ACKNOWLEDGMENT**                                    CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Orange_ }

On _Dec. 20, 2021_ before me, _Roshelly Hernandez_
      *Date*                        *Here Insert Name and Title of the Officer*

personally appeared _John Kirb_
                    *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.



ROSHELLY HERNANDEZ
Notary Public - California
Orange County
Commission # 2327898
My Comm. Expires May 9, 2024

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Place Notary Seal and/or Stamp Above*

Signature _R. Hernandez_
          *Signature of Notary Public*

───────────────── **OPTIONAL** ─────────────────
*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _U.S. District Court Verification_
Document Date: _12. 20. 2021_ _____ Number of Pages: _2_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____        Signer's Name: _____
☐ Corporate Officer – Title(s): _____    ☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General                ☐ Partner – ☐ Limited ☐ General
☐ Individual        ☐ Attorney in Fact          ☐ Individual        ☐ Attorney in Fact
☐ Trustee           ☐ Guardian or Conservator    ☐ Trustee           ☐ Guardian or Conservator
☐ Other: _____              ☐ Other: _____
Signer is Representing: _____     Signer is Representing: _____

©2019 National Notary Association

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **TROY CLOWDUS,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | **CASE NO. 1:21-cv-23155** |
| v. | : | |
| | : | |
| **AMERICAN AIRLINES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## VERIFICATION

STATE OF *California* §

COUNTY OF §  § *Orange*

BEFORE ME, the undersigned Notary Public, on this date personally appeared John Kirby, known to me to be the person whose name is subscribed hereto and, after being duly sworn by me, upon his oath deposed and stated as follows:

"My name is John A. Kirby. I am over the age of 18 years. I am competent to make this oath. I have never been convicted of a felony or crime involving moral turpitude. I have personal knowledge of the facts, statements and assertions contained herein and they are true and correct.

I am employed as the *Search Manager* of American Airlines, Inc. and as such I have authority to provide this verification on behalf of American Airlines, Inc. I have reviewed the foregoing Defendant's Answer to Plaintiff's First Set of Interrogatories in the above-referenced lawsuit. The assertions, allegations and factual statements are true and correct."

Further, affiant sayeth not.

_____
John A. Kirby

Sworn to (or affirmed) and subscribed before me by means of ☒ physical presence or ☐ online notarization, this _12_ day of _20 21_ (year), by _John Kirby_.

_California, Rochelly Hernandez_
Notary Public, State of

```
                                                    Page 1

 1              IN THE UNITED STATES DISTRICT COURT
          IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                        CIVIL ACTION
                   CASE NO.: 1:21-cv-23155
 3

 4

 5     TROY CLOWDUS,

 6            Plaintiff,

 7     vs.

 8     AMERICAN AIRLINES, INC.,

 9            Defendant.
       _____/

10

11

12

                    DEPOSITION OF TROY CLOWDUS

13

14

15        TAKEN BY:      Attorney for Defendant

16        DATE:          Tuesday, February 1, 2022

17        TIME:          Commencing 10:00 a.m.
                         To 2:00 p.m.

18

          PLACE:         Veritext Legal Solutions

19                       Zoom Videoconference

20        REPORTED BY:   Dawn Neukomm, RPR
                         Registered Professional Reporter

21                       State of Florida at Large

22

23

       Job No. CS5002471

24

25
```

**EXHIBIT "C"**

**Page 2**

1  APPEARANCES:
2
3      WILLIAM T. WOODROW, III, ESQ.
        Stone & Woodrow, LLP
4      Attorneys at Law
        250 West Main Street
5      Suite 201
        Charlottesville, Virginia  22902
6      (855) 275-7378
        (will@stoneandwoodrowlaw.com)
7
        Attorney for Plaintiff
8      Troy Clowdus
9
10
        KELLY H. KOLB, ESQ.
11    ROBERT D. PECCHIO, ESQ.
        Buchanan Ingersoll & Rooney, PC
12    Attorneys at Law
        401 East Las Olas Boulevard
13    Suite 2250
        Fort Lauderdale, Florida  33301
14    (954) 703-3944
        (kelly.kolb@bipc.com)
15
        Attorney for Defendant
16    American Airlines, Inc.
17
18
19
20
21
22
23
24
25

**Page 4**

1  EXHIBITS (continued)
2  Defendant's Exhibit No. 9          111
      (Plaintiff's AA Complaint #2)
3
    Defendant's Exhibit No. 10         137
4      (Ticket Price Differential)
5  Defendant's Exhibit No. 11         136
      (Active Miles Screenshot)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1        E X A M I N A T I O N
2                        Page
3
    Direct Examination by Mr. Kolb          5
4
    Cross-Examination by Mr. Woodrow     156
5
    Certificate of Reporter Oath        161
6
    Reporter's Deposition Certificate    162
7
    Read & Sign Letter                163
8
    Errata Sheet                    164
9
10
11        E X H I B I T S
12                        Page
13 Defendant's Exhibit No. 1          27
      (Complaint)
14
    Defendant's Exhibit No. 2          32
15    (Tickets)
16 Defendant's Exhibit No. 3          33
      (Conditions of Carriage)
17
    Defendant's Exhibit No. 4          36
18    (AAdvantage Program Terms & Conditions)
19 Defendant's Exhibit No. 5          51
      (Plaintiff's Amended Interrogatory
20    Answers)
21 Defendant's Exhibit No. 6          89
      (Plaintiff's AA Complaint)
22
    Defendant's Exhibit No. 7         108
23    (6/10/21 E-Mail from AA)
24 Defendant's Exhibit No. 8         109
      (6/22/21 E-Mail from AA)
25

**Page 5**

1  THEREUPON,
2              TROY CLOWDUS,
3  was adduced as the deponent herein, and upon first
4  being duly sworn upon oath, was questioned and
5  testified as follows:
6              DIRECT EXAMINATION
7  BY MR. KOLB:
8      Q.  Can you state your name, please, sir?
9      A.  Troy Clowdus.
10     Q.  All right.  Mr. Clowdus, my name is
11 Kelly Kolb.  I represent American Airlines in this
12 lawsuit that you filed.  I've asked you to appear
13 today, so we can discuss some of the particulars of
14 your lawsuit that concern some flights that you were
15 not allowed to board on June 10th of 2021.  Do you
16 understand who I am and why we're here today?
17     A.  Yes, sir.
18     Q.  Have you ever had your deposition taken
19 before?
20     A.  Yes.
21     Q.  And how long ago was it?
22     A.  It's probably been 15, 16 years, 10
23 , 15 years.  It's been awhile.
24     Q.  And generally what was that in connection
25 with?

2 (Pages 2 - 5)

1  in your mid 50s, would that be about right?
2      A.  If you were to what.
3      Q.  If I were to guess that you were in your mid
4  50s, would that be about right?
5      A.  Yes.  That's correct.
6      Q.  All right.  And you're not currently married;
7  is that correct?
8      A.  I'm currently divorced.
9      Q.  Do you have anyone living with you in your
10  residence?
11      A.  I have a friend that's staying with me
12  temporarily.
13      Q.  Do you have any children or siblings?
14      A.  I have no children.  I have five siblings.
15      Q.  Are they in Florida?
16      A.  Four of them are in Florida.  One is in
17  Massachusetts.
18      Q.  Have you discussed with them the
19  circumstances of your lawsuit?
20      A.  Not in detail.  None of them except one
21  sister that has a general idea that, you know, I have
22  litigation, but I have not spoken in detail with her
23  about it.
24      Q.  When's the last time you spoke with her?
25      A.  About this or in general?

1      Q.  Yes, sir.  I'm sorry.  Yeah, about the
2  lawsuit and the incident.
3      A.  Probably a few months ago.  I don't recall.
4  I tried not to talk about it with anybody to be honest.
5      Q.  Understood.  Are your parents still alive?
6      A.  Yes, they are.
7      Q.  Where are they?
8      A.  Both in Florida.
9      Q.  Have you discussed this lawsuit with them at
10  all?
11      A.  No.
12      Q.  In preparing for today, I ran across the name
13  of David Clowdus.  Is that one of your siblings?
14      A.  My older brother's name is David Clowdus,
15  yes, and my father's name is David Clowdus.
16      Q.  And what, if any, connection do they have
17  Southeast Offset?
18      A.  My older brother used to work with me at
19  Southeast Offset, but he hasn't since 2005, and 2006 I
20  think was the last time he was there.
21      Q.  Can you give me an idea of your height and
22  weight?
23      A.  I'm 5-11, and I weight 205 pounds.
24      Q.  And has your weight and height changed any
25  since June of last year?

1      A.  No.
2      Q.  All right.  What about Mr. Marino, do you
3  have any guess as to what his height and weight was
4  back in June of 2021?
5      A.  No idea.
6      MR. WOODROW:  Objection.
7      THE WITNESS:  Yeah, I have no idea.  I
8  couldn't tell you what he looked like if I saw him
9  today.
10  BY MR. KOLB:
11      Q.  Do you recall if he was in stature smaller
12  than you, the same or bigger?
13      A.  I have no idea.  I barely interacted with the
14  man, like five seconds.
15      Q.  Currently do you live in Miami Beach?
16      A.  I do, yes.
17      Q.  How long have you lived on Regal Alto
18  Terrace?
19      A.  I live on 11 Island Avenue right now.
20      Q.  How long o have you lived there?
21      A.  Well, I've owned this property for six years,
22  seven years.  I lived on Regal Alto before, but they're
23  right beside each other.  I own both properties.
24      Q.  Where were you living in 2012 (sic)?
25      A.  12?

1      Q.  Where were you living last June?
2      A.  11 Island.
3      Q.  Okay.  Did you ever serve in the military?
4      A.  Excuse me?
5      Q.  Did you ever serve in the military?
6      A.  No, I never did.
7      Q.  Can you give me a brief thumbnail sketch of
8  your education beyond high school?
9      A.  I attended a bachelor university.  I received
10  my Bachelor's Degree in Theology.  I attended briefly
11  grad school at the University of Texas for business,
12  and then I left there and started my own business.  And
13  a couple of years ago, I went back to grad school and
14  finished my Master's Degree in fine arts.
15      Q.  All right.  And where did you get your
16  Master's?
17      A.  Miami International University.
18      Q.  Did I understand you to say that you did not
19  obtain a degree from the University of Texas?
20      A.  No, I did not.  I attended one semester.
21      Q.  When was that roughly, what year; do you
22  remember?
23      A.  Yeah.  It was 2003.
24      Q.  All right.  I have a great affinity for
25  Austin.  I was born there.

4 (Pages 10 - 13)

Page 14

1    A.  Yeah?
2    Q.  While my dad was taking the bar exam, which
3  tells you probably that I was not an anticipated baby.
4    A.  I love Austin.  It's one of my favorite
5  cities.
6    Q.  Yeah.  It's very nice.  All right.  A
7  Bachelor's in fine arts and a BA in theology.  Any
8  other degrees, certifications, trade schools --
9    A.  No.
10    Q.  -- that you can recall?
11    A.  No.
12    Q.  Have you ever been arrested or convicted of
13  anything other than a moving violation?
14    A.  Never.
15    Q.  And I believe we looked briefly at your
16  social media, specifically Instagram.  We didn't see
17  any reference to this incident at all.  Have you posted
18  anything about this at all?
19    A.  Never once.  I wouldn't.  I have no interest
20  in this being ever put out there.
21    Q.  All right.  We ran across a couple of
22  lawsuits, and it's a little bit unclear to me.  There's
23  either one or two bankruptcies, and then there's a
24  lawsuit that you filed against a company called WMLJ.
25  Can you tell me I guess about WMLJ?

Page 15

1    A.  WMLJ?
2    Q.  Yeah.
3    A.  Oh, okay.  WMLJ was a contractor who took
4  $60,000 and disappeared on me.  You know, it's South
5  Florida?
6    Q.  Yes, sir.  I was going say.  Yes, sir.  Yes,
7  sir.  And at any time did you file personal
8  bankruptcy?
9    A.  I did in 2002 after 9/11.  My business went
10  into Chapter 11, reorganized, and we came out of it.
11  It was all part of that.
12    Q.  And the business you're talk about is
13  Southeast Offset?
14    A.  Yes.  Yeah.  I lost most of my revenue for
15  six months after 9/11.
16    Q.  Understood.  Other than the incident on
17  June 10th of last year, how has your experience with
18  American Airlines been over the 30 years you've been
19  flying?
20    A.  I've never had an issue.  I've always been
21  very happy.  And normally I am very pleased and
22  satisfied with my interactions with all American
23  Airlines' employees.  This is the first unfortunate
24  event.
25    Q.  All right.  Do you know anybody that works at

Page 16

1  American Airlines?
2    A.  No, I don't.  As far as on a personal level
3  as a friend.
4    Q.  Yes.  Yes, sir.
5    A.  No, I do not.
6    Q.  Do you have any experience, training, skill
7  or education in aircraft operation?
8    A.  No, I do not.
9    Q.  How about aircraft security?
10    A.  No, I do not.
11    Q.  How about handling passengers onboard an
12  aircraft?
13    A.  No, I do not.
14    Q.  All right.  Let's go through your employment
15  real quick.  You've been with Southeast Offset for
16  20 something years; is that right?
17    A.  Yes.  Yes.
18    Q.  And during that period of time, you've had
19  some other side occupations far lack of a better word?
20    A.  No, I have not.  It's been my only source of
21  employment since I was 26.
22    Q.  All right.  Were you ever involved with a
23  company called Clowdus Properties?
24    A.  Yes.  That was a real estate holding company.
25    Q.  And between what years were you involved with

Page 17

1  Clowdus Properties?
2    A.  From whenever it was incorporated until
3  whenever we shut it down.  I don't have that
4  information in front of me, but we opened it to -- we
5  opened it because the bank that we were getting a
6  property loan on it required us to do that.  They
7  didn't want for -- they wanted some -- they requested
8  that we hold it in a separate company to protect it.
9    Q.  All right.  And what was your position and
10  job duties at Clowdus Properties?
11    A.  I think I was just -- I'm trying to remember
12  how which we structured because it was so long ago.
13  I'm assuming I was the president, but I might have been
14  the officer or one of the officers.
15    Q.  And what was the business of Clowdus
16  Properties?
17    A.  It was just a holding company for the real
18  estate that Southeast Offset occupied.  It owned one
19  piece of property.  That's all it did.  Like I said, it
20  was just a legal requirement for the bank that we were
21  using.
22    Q.  Got it.  All right.  Let's talk about
23  Southeast Offset real quick.  Can you give me a
24  thumbnail sketch of what the business of Southeast
25  Offset is, what it does?

5 (Pages 14 - 17)

1    A.  I would say it's fairly accurate.  After I
2  reread it, I think there were some smaller details that
3  were left out, but, yes, it's fairly accurate.
4    Q.  All right.  Would you agree that the
5  affidavit that was signed on July 22nd of last year
6  would be a more accurate accounting of the events than
7  what your memory might be now?
8    A.  Probably -- I don't know how to answer that,
9  but, yes, I think it might be, but I don't know.
10    Q.  Okay.
11    A.  Because I mean I've thought a lot about it,
12  and as time has passed, you know, you recall certain
13  things that you didn't remember at the time.  So, no, I
14  would say my memory is better now, but --
15    Q.  Okay.  So maybe your affidavit isn't the most
16  accurate recounting of events?
17    A.  I think it's accurate.  I don't think there's
18  anything in there that's not true.  I don't know if
19  it's the most -- I think that there are things in it --
20  I think there were things that I remember now that were
21  not included in the affidavit, and it's just, you know,
22  things that I thought about.
23    Q.  Let me share my screen with you one more
24  time.
25    A.  Okay.

1    Q.  These are your amended interrogatory answers,
2  and these are dated January 12th of this year, and let
3  me scroll to Interrogatory 5.  Can you see that?
4    A.  Yes.
5    MR. KOLB:  And I'll mark these
6  interrogatories answers as Exhibit 5.
7    (Defendant's Exhibit No. 5 will so be marked
8  for identification.)
9  BY MR. KOLB:
10    Q.  And I'll summarize it here.  Interrogatory 5
11  basically asked you to describe what happened on the
12  occasion in question.  And the answer contains an
13  objection, and then later, it says here plaintiff's
14  affidavit provides a complete narrative, and plaintiff
15  has no facts to add.  Do you see that?
16    A.  Yes.
17    Q.  Now this was signed by you or submitted just
18  a few weeks ago.  Are you telling me now that your
19  affidavit might not be the most complete narrative, and
20  that you do have facts to add?
21    A.  No.
22    Q.  Okay.  You said a moment ago that some things
23  were left out of the affidavit.  Can you tell me about
24  that?
25    A.  After you read it, you realize that there

1  were, you know, thoughts that you had that you never
2  put in the narrative.  You're trying to put everything
3  in, but, you know, I don't -- to answer you question,
4  yes, I think it's the most complete response.
5    Q.  All right.  Were there drafts of this
6  affidavit sent back and forth between you and your
7  counsel before you signed it?
8    THE WITNESS:  Wil?
9    MR. KOLB:  No.
10    MR. WOODROW:  You can answer that.
11  BY MR. KOLB:
12    Q.  It's just yes or no.  Go ahead.  You can
13  answer.
14    THE WITNESS:  Wil, do I answer?
15    MR. WOODROW:  You can answer.
16    THE WITNESS:  Yes, of course, there were
17  drafts.
18  BY MR. KOLB:
19    Q.  Do you recall over what period of time those
20  drafts were exchanged?
21    A.  A week maybe.
22    Q.  All right.  So you started working on this
23  maybe the second week of July.  Okay.  Is there
24  anything that you want to add having thought about it
25  to your affidavit that would make it more complete and

1  more accurate?
2    A.  The only thing I would probably add is I put
3  in the affidavit that I verbally said what the F, and
4  when I look back, I'm not sure that those words came
5  out of my mouth.
6    Q.  Okay.
7    A.  But, you know, the one thing I didn't put in
8  the affidavit was the fact that we were both wearing
9  masks, and it's very difficult to communicate
10  accurately when you're both wearing masks.  I'm not
11  always sure what he was thinking or saying, and I'm not
12  sure that he fully understood what I was thinking or
13  saying.  I think that's the only thing I would add.
14    Q.  Okay.  All right.  What is your first
15  recollection of encountering Flight Attendant Marino on
16  June 10?
17    A.  I think I was the first person on the plane,
18  and as soon as I boarded the plane, he was standing in
19  the front galley.  And I nodded my head at him good
20  morning.  And then as I got into my aisle seat, the
21  first interaction was he said to me, you know you have
22  to put that bag in the overhead bin.  And that was
23  before I was even seated, and I just shook my head, and
24  I said yes.
25    Q.  Say that again.  You know you have to stow

Page 54

1  that bag?
2      A.  He said in somewhat of a sarcastic tone of
3  voice, you know you have to put that bag in the
4  overhead bin, and I said yes.
5      Q.  All right.  So you clearly heard and
6  understood that instruction from Mr. Marino; is that
7  correct?
8      A.  Yes.  But I always fly bulkhead almost
9  always, and my understanding from his comment was that
10  I would have to put it up there once boarding was
11  completed because in 20 something years of flying
12  business class, that's how -- I've never had a flight
13  attendant ask me to put away my stuff until they
14  completed boarding.  So what's what I assumed he was
15  saying.
16      Q.  You said a moment ago that because everyone
17  was wearing masks, you weren't sure what either of you
18  understood?
19      A.  Well --
20      Q.  Why did you have an understanding that you
21  wouldn't have to stow it until the boarding process was
22  completed?
23      A.  Just because of past experience.  Normally
24  when you're flying business class, they give you the
25  luxury of working on your electronic devices until they

Page 55

1  finish boarding.  That's always been my experience, and
2  that's what -- I mean he said you know you have to
3  store that in the overhead bin, and I shook my head
4  yes.
5      Q.  Okay.
6          MR. WOODROW:  I think we lost him.
7          MR. KOLB:  Well, that's okay.  I need to go
8  down the hall anyway.
9          MR. WOODROW:  Okay.  Do you want to take a
10  couple minute break then?
11          MR. KOLB:  Yeah, let's just take a break.
12  It's been about an hour and 20.
13          (Brief recess was taken.)
14          MR. KOLB:  Back on the record.
15  BY MR. KOLB:
16      Q.  Just before we broke, Mr. Clowdus, you said
17  that your first interaction with Mr. Marino was as you
18  boarded.  He said you're going to have to put that bag
19  up in the overhead bin.  You nodded your
20  understanding.  And your understanding was that you
21  wouldn't have to put it up until after boarding was
22  completed?
23      A.  Correct.
24      Q.  Did Mr. Marino --
25      A.  And then he stood beside me.  For most of the

Page 56

1  rest of the time, he was standing beside me interacting
2  with other passengers as they boarded.
3      Q.  Did Mr. Marino tell you that you could hang
4  onto your bag until boarding was completed, and you
5  wouldn't have to stow it until then?
6      A.  He did not say that specifically, no.
7      Q.  All right.
8      A.  But he saw me put it -- he saw me sit down
9  and set it beside my feet and then stood in the aisle
10  beside me.  So didn't say anything following it up, and
11  his exact words were you know have to -- you know
12  you know will have to put that in the overhead bin, and
13  I said, yes, of course.
14      Q.  And in your lawsuit, you allege that he was
15  acting in a loud, manic, aggressive manner and
16  exhorting passengers to move.  Can you tell me
17  specifically what you observed in Mr. Marino's conduct
18  in that regard?
19      A.  Well, it's 6:30 in the morning, and most of
20  the people getting on including myself were sleepy.
21  And he seemed to be very manic and was very loud and
22  abrasive.  And he was standing beside me in the front
23  row, and every passenger coming on as they passed him,
24  if they stood in the aisle, he would -- I don't know
25  the correct word.  It was like he was a drill sergeant

Page 57

1  instructing every person clear the aisle; clear the
2  aisle; let's go; let's go; let's go.  He was in a very
3  big rush to get everybody into the plane and in their
4  seats.
5      Q.  Do you know why that was?
6      A.  Well, I didn't know that morning, but I have
7  heard since, or I've read since that flight attendants
8  don't get paid until the cabin doors are closed, and
9  they get a bonus if international flights get to their
10  destinations on time.  So I think now looking back,
11  that he was in a big rush to get everybody seated
12  because he doesn't get paid, I'm assuming.  But, you
13  know, I don't know his mind, and that's just an
14  assumption, you know.  I don't know.
15      Q.  Where did you read that flight attendants
16  don't get paid unless the plane departs on time?
17      A.  I read it in an article when I was reading
18  about it that flight attendants' pay doesn't begin
19  because it's one of the things flight attendants
20  complained about was that they don't get paid until the
21  doors are closed.
22      Q.  Go ahead.
23      A.  And they get bonuses based on if the plane
24  gets there on time.  Now I'm speculating.  This is pure
25  speculation.

15 (Pages 54 - 57)

1    Q.  Right.  Do you recall where you saw that
2  article?
3    A.  No.
4    Q.  Do you have any personal knowledge that that
5  is, in fact, how flight attendants get paid?
6    A.  Well, I read it.  I don't know that it's
7  true, but that's what I read.  So that's my impression
8  at this moment.  Like I said, I'm just speculating.
9    Q.  Do you have any other knowledge as to why it
10  was important to get that flight out on time that
11  morning?
12   A.  No.  No.
13   Q.  Other than having --
14   A.  My screen is frozen.  Can you guys still see
15  me?
16   Q.  I can see a frozen you.
17   A.  Okay.
18   Q.  Do you want to give it a minute and see if it
19  refreshes.  There you go.
20      MR. WOODROW:  There it is.
21      MR. KOLB:  Yeah, you're good.
22  BY MR. KOLB:
23   Q.  And other than acting as a drill sergeant, is
24  there anything else that led you to believe that
25  Mr. Marino was loud, aggressive, manic or acting as if

1  he was on amphetamines?
2    A.  I don't know if he was on amphetamines.  His
3  mannerisms and his behavior was like he had either a
4  lot of coffee, or he's an extremely hyper person.  But
5  his demeanor with all the passengers, not just me, was
6  very abrasive and very aggressive.
7    Q.  How specifically?
8    A.  Just the way that he was talking to them, his
9  tone of voice and his mannerisms.  He's not friendly at
10  all.
11   Q.  What mannerisms did you observe?
12   A.  Well, it's just the way that he was moving
13  and the way that he's just very manic.  It was just his
14  body movements and the way he was moving around and the
15  way that he was talking to people.
16   Q.  Do you have any experience with amphetamines
17  yourself?
18   A.  No, sir.
19   Q.  Do you have any medical training that would
20  allow you to determine --
21   A.  No, sir.
22   Q.  -- if someone was on amphetamines?
23   A.  No, sir.  I have seen friends on
24  amphetamines.  I've seen people out on Miami that were
25  taking amphetamines.  I don't know if that counts.

1    Q.  Okay.
2    A.  But, no, I'm not a doctor, and, no, I don't
3  have any medical experience.  But it is Miami Beach,
4  and it's not uncommon.
5    Q.  Well, we're not talking about Miami Beach.
6  We're talking about an airline.
7    A.  Yes, but I believe he lives in Miami Beach.
8    Q.  Other than what you have described -- go
9  ahead.
10   A.  No.  I mean he lives in Miami Beach, I
11  believe, or he lives in Miami.  And that is not
12  something that is uncommon in this city.
13   Q.  So you think amphetamine use is common in
14  Miami Beach?
15   A.  It is.  I do believe that, yes.
16   Q.  Do you think it's common for flight
17  attendants to use amphetamines on the job?
18   A.  I have no idea.  I wouldn't know how to
19  answer that.
20   Q.  All right.  Other than what you've told me
21  already, do you have any other reason to believe that
22  Mr. Marino or any other flight attendant was on
23  amphetamines on June 10 of 2021?
24   A.  No, sir.
25   Q.  Did you interact with any other flight

1  attendants on the first flight other than Mr. Marino?
2    A.  No.  The individual that took me off, I
3  wasn't sure if -- do you know to say he's a CSM,
4  customer service manager?  But is it Mr. Fernandez?
5    Q.  Enriques?
6    A.  Enriques.  Okay.  I thought he might be a
7  flight attendant when he first interacted with me, but
8  I still don't really understand or know what his
9  position was.  But those were the only two individuals
10  I spoke to.
11   Q.  Did you see any other flight attendants on
12  the aircraft that day?
13   A.  No.  No, none.  There were none in the front
14  of the plane and none that I could see when any of this
15  happened because I did look.  I was hoping either the
16  pilot or another flight attendant would help me with
17  Mr. Marino.  I was hoping that somebody would assist
18  me.  I was really hoping for the pilot, but he never
19  came back.
20   Q.  So when you entered the aircraft, you saw
21  only one flight attendant in the galley area by
22  business class?
23   A.  Yes.
24   Q.  All right.  So when Mr. Marine told you that
25  you would have to stow your bag, I believe you

16 (Pages 58 - 61)

Page 62

1 testified earlier that you put it by your legs.  Did
2 you put it behind your legs, in between your legs and
3 the seat?
4     A.  I put it behind my left leg as I was about to
5 use -- I was about to take out my iPad to use my iPad,
6 and I never got a chance.
7     Q.  So you heard Mr. Marino's first instruction
8 that you'd have to stow the bag.  You assumed you
9 didn't have to do it right away, and you made no effort
10 to immediately comply with his instruction; is that
11 correct?
12     A.  Well, I didn't hear it as an instruction.  I
13 heard it as you will need to before we finish
14 boarding.  That's what I understood, and he never said
15 anything after that.  He stood right beside me as I set
16 it beside my leg, and he never said anything further.
17 He didn't.  So in my mind, we were both under the
18 same -- I was working under the same impression that he
19 gave me in like every other flight I've ever been on.
20 I never ever had a flight attendant require you to
21 immediately put your electronic devices away before
22 they even finish boarding, never once in my life.  And
23 I'll be honest with you.  I'm not sure that that's what
24 he was saying.  I think that he was saying you will
25 need to before we finish boarding, and that's what I

Page 63

1 think he was saying.
2     Q.  Your understanding of that not having to
3 immediately stow your carry on is something that's
4 unique to business class; correct?
5     A.  No.  It seems to be in general whether you're
6 in coach or business, but in business, they tend to
7 give you a little more latitude.  I've had business
8 class where there's been flight attendants who didn't
9 require you to even stow it until they were taxiing.
10 I've had that before.  I worked on my iPad.  I worked
11 on my laptop all the way up until we got to the
12 runway.  So it all depends on the flight attendant.
13     Q.  Correct.  And this flight attendant didn't
14 tell you that you could leave your bag out until you
15 were taxiing, did he?
16     A.  He said what I told you.  He said you know
17 you'll need to stow it, and I said yes.
18     Q.  Right.  You understood that instruction, and
19 you heard it?
20     A.  I understood that before we took off, I would
21 need to put the bag in the overhead bin.
22     Q.  But that's not what he said, is it?  He said
23 you'll need to stow that bag in the overhead bin,
24 period?
25     A.  You know you will as in, in, in the future, you

Page 64

1 will need to stove that bag.  He did not say,
2 Mr. Clowdus, or did he not say stow that bag now.  He
3 said you will need to.  That's very important,
4 Mr. Kolb.  I think it's an important distinction.  He
5 did not command me to put the bag away.  He told me you
6 will need to.
7     Q.  And you decided to take him I guess at his
8 word and put the bag behind your legs?
9     A.  Based on past experience and based on him
10 saying you will need to, I operated under the
11 assumption that he was referring to a future event.
12 And then he stood beside me with my bag at my feet and
13 never said anything further.
14     Q.  Was he looking at your bag as he stood beside
15 you while the passengers were boarding, or was he
16 looking someplace else?
17     A.  He saw me place my bag at my feet.  He saw
18 me.
19         MR. KOLB:  Objection; nonresponsive.
20 BY MR. KOLB:
21     Q.  My question was, after you placed the bag
22 behind your legs, what was Mr. Marino looking at, your
23 bag or the passengers boarding the aircraft, or do you
24 know?
25     A.  Well, he's standing right beside me, and I'm

Page 65

1 assuming he saw it, but I can't tell you.  I'm not
2 Mr. Marino, but he saw me place my bag at my feet.  He
3 was there standing beside me.
4     Q.  And then sometime later as your bag is behind
5 your legs, and you're looking at your phone with your
6 earphones, you look up, and you hear Mr. Marino again
7 asking you to stow your bag in the overhead bin; is
8 that correct?
9     A.  No.
10     Q.  What happened?
11     A.  I'm sitting in my seat.  I'm answering text
12 messages from my step-daughter.  I'm preoccupied.  I
13 feel him staring at me.  I have my earphones in.  I'm
14 not sure if he's talking to me or not.  But I look up,
15 and he's glaring at me.  I take out my earphones, and
16 he barks at me, give me the bag.  That's what
17 happened.  He used like give me the bag.  Like he was
18 extremely angry, irritated and annoyed.
19     Q.  And was there any confusion at that point as
20 to whether he wanted you to stove your bag in the
21 overhead bin immediately?
22     A.  No confusion.  He was pissed off.
23     Q.  All right.  And what did you do after you
24 heard that second clear instruction to stow your bag?
25     A.  I reached under and picked up my bag and

17 (Pages 62 - 65)

1 handed it to him.
2      Q.   All right.  Where was he when this was
3 happening?  Was he in your aisle?  Was he in the aisle,
4 or was he in the seat next to you?
5      A.   He was in the aisle.
6      Q.   And you're in the window seat?
7      A.   I'm in the window seat.
8      Q.   And are there two or three seats on your side
9 of the aircraft?
10     A.   There are two, two business class seats.
11     Q.   How much time had elapsed between
12 Mr. Marino first instructing you to stow your bag and
13 the second time he instructs you to stow your bag, if
14 you know?
15     A.   A few minutes.  I mean the honest answer is I
16 would say no more than four or five minutes.
17     Q.   Okay.
18     A.   But I don't know exactly, but four or five
19 minutes.
20     Q.   So he says give me the bag.  You pull it out
21 from behind your legs.
22     A.   My left leg, yes.
23     Q.   And you hand it to him?
24     A.   I swung it out over the passenger because the
25 business class seats are very large, and the bag is

1 very floppy.  And I picked it up, and I swung it out
2 over the seat towards him because with his tone of
3 voice, I wasn't looking at him.  It was the way he was
4 talking to me.  It was very intimidating.  Can you
5 still see me because I've lost everything on here.
6      Q.   Yeah, we've got you.
7      A.   Okay.  We're good.
8      Q.   All right.  So four to five minutes between
9 when you boarded, and he said you'll need to stow the
10 bag.  And when you looked up, you felt him staring at
11 you, and he barked give me the bag?
12     A.   Yes.
13     Q.   At that point, you swung it out over the seat
14 next to you, and I believe according to your affidavit,
15 you said you might have impacted Mr. Marino?
16     A.   I felt the bag make contact, yes.  I felt it
17 bump his arm or his leg as I was reaching out towards
18 him.
19     Q.   Your complaint says that when he asked you
20 the second time to give me the bag, you shook your head
21 in disbelief.  Can you explain why you did that?
22     A.   Because of the way -- because of him yelling
23 at me give me the bag.  I'm a grown man.  I've never
24 had somebody yell at me like that.  I'm not accustomed
25 to that in that circumstance.  It completely caught me

1 off guard.
2      Q.   How loud was he yelling, he being Mr. Marino?
3      A.   You want me to do it for you now?  I mean it
4 wasn't a scream.  It was a very elevated -- you know,
5 it was very elevated, give me the bag.
6      Q.   Was it loud enough for others in first class
7 to hear?
8      A.   Yes, absolutely, but that was the thing.
9 There was no one seated behind me at that time.  There
10 was one individual seated in 1-A, and I didn't see
11 anyone else behind me in business class.  So the only
12 other individual I saw when this event happened was the
13 individual in 1-A.
14     Q.   So you saw no one else in business class
15 other than one other person?
16     A.   Yeah.  After this happened, I looked.  When
17 he walked off in the initial encounter, he walked up
18 front.  I looked in the seat behind me to see if there
19 was someone there because I was looking for someone --
20 you know, I was looking to see if anyone one else was
21 seeing what I was seeing.  I was looking for help.  And
22 I looked across, and there was only one individual in
23 business class that I could see from my seat, but I was
24 seated.  And I looked back down the aisle, and there
25 were no flight attendants and nobody else that I could

1 see.
2      Q.   All right.  So your recollection is there
3 weren't ten people in first class?
4      A.   There was what?
5      Q.   There weren't at least ten people in first
6 class that day?
7      A.   I could not see anyone, but they hadn't
8 finished boarding.  You know, the doors were not
9 closed.  But there was no one behind us and no one
10 across except for one individual in 1-A.  That was the
11 only people that I saw, the only other passenger that I
12 say.
13     Q.   Doesn't first class board first?
14     A.   Yes.
15     Q.   But you didn't see anybody else in first
16 class when all of this happened except for 1-A?
17     A.   1-A is the only individual that I saw.  And
18 after this happened, I looked to see if he was looking
19 to see what was going on, and he was looking down at
20 his phone.
21     Q.   Okay.  So you swing the bag out over the seat
22 next to you, and you're not looking at Marino?
23     A.   Correct.
24     Q.   You're shaking your head in disbelief?
25     A.   No.  I only shook my head when he first spoke

18 (Pages 66 - 69)

Page 82

1    Q.  Did you hear him use those words?

2    A.  No, I did not.

3    Q.  All right.  You first encountered

4   Mr. Enriques after the bag had impacted Mr. Marino and

5   after you and Mr. Marino had this discussion about

6   whether you hit him or not; correct?

7    A.  Correct.

8    Q.  So at that point, all of the events that give

9   rise to this lawsuit or at least the assault, the

10   alleged assault had already occurred; correct?

11    A.  Correct.

12    Q.  Do you know where Mr. Enriques was before he

13   entered the aircraft?

14    A.  No, I do not.

15    Q.  When you overheard this conversation between

16   Mr. Enriques and Mr. Marino, do you know if anyone else

17   was present at the front conversation?

18    A.  I could not see -- I could not see

19   them.  I could only hear them.

20    Q.  All right.  And if I'm remembering right,

21   you're in the window seat, and there's a bulkhead

22   blocking your view --

23    A.  Correct.

24    Q.  -- of the galley area by the cockpit;

25   correct?

Page 83

1    A.  Correct.

2    Q.  All right.  So Mr. Enriques comes over to

3   you, and does he speak to you in your seat, or does he

4   take you out onto the jetway?

5    A.  No.  No.  I'm seated, and he comes over and

6   leans over in a very, I would say, professional and

7   courteous manner and asked if I would please step into

8   the jetway, so he could talk to me.

9    Q.  So you two go into the jetway, and what does

10   he say to you?

11    A.  He says what happened, and I told him I

12   really have no idea.  And then I asked him what

13   happened, and he said he didn't know.  And I asked him

14   if Mr. Marino acts like this every day, and he told me

15   he didn't know.  This was the first time he had ever

16   worked with him.  But he had never experienced anything

17   like this in his career.  And then I proceeded to tell

18   him, you know, that he asked for my bag, and I

19   explained to him that I accidentally bumped his arm or

20   leg, and he accused me of hitting him.  And then

21   Mr. Enriques apologized for Mr. Marino's behavior, and

22   then he spent the next 20 or 30 minutes trying to

23   assist me.

24    Q.  How would Mr. Enriques apologize for

25   Mr. Marino's behavior if he never saw it?

Page 84

1    A.  You'll have to ask Mr. Enriques.

2    Q.  I have.

3    A.  Well, I'm telling you what he said to me.

4    Q.  Your testimony is that Mr. Enriques

5   apologized.  Did he specifically apologize for

6   Mr. Marino's behavior, or are you making that

7   assumption?

8    A.  He apologized for me being removed from the

9   plane, and he apologized for the inconvenience.  To say

10   he specifically apologized for Mr. Marino, no, it

11   wasn't specifically for that.  He apologized for the

12   situation and my inconvenience.

13    Q.  Do you have any complaints regarding your

14   interactions with Mr. Enriques on the first flight?

15    A.  Oh, absolutely not.  He was extremely

16   professional and the bright spot of that morning.

17    Q.  Did you at any time overhear any

18   conversations Mr. Enriques had with the captain?

19    A.  No.

20    Q.  Do you know if Mr. Marino had the authority

21   to order you off the aircraft?

22    A.  I do not know.

23    Q.  All right.  So I take it then Mr. Enriques

24   asked you to gather your belongings and follow him back

25   to the gate podium at that point?

Page 85

1    A.  He asked me if he could speak with me, yeah.

2    Q.  Out on the jetway; right?

3    A.  Yes.  Correct.

4    Q.  And that's the conversation you told me about

5   earlier where --

6    A.  Yes.

7    Q.  -- he asked you what happened, and you said

8   you don't know?

9    A.  Yeah.

10    Q.  And he says I don't know what happened

11   either.  And then do you go back to your seat, or do

12   you wait in the jetway while this conversation is going

13   on between Marino and Enriques?

14    A.  No.  No.  No.  You're out of sequence.  Him

15   and Marino spoke in the front.  I could hear Marino

16   telling him I'm not flying with that man.  He kept

17   calling me that man.  And then Mr. Enriques came back

18   to me and asked if he could speak with me out in the

19   jetway, and I said of course.  And I got up and walked

20   out with him, and as we walked up the jetway, you know,

21   that's when the conversation I'm telling you about

22   occurred.  When we got to the top of the jetway, he

23   went on the computer and spent 15, 20 minutes getting

24   me on the next flight and helping me navigate Mexico

25   City because I had a connecting flight to Mexico City.

22 (Pages 82 - 85)

1 was going to take this. So I was concerned. Later
2 that night, I went back and forth all day about whether
3 to go, but I did not purchase another ticket until late
4 that night.
5     Q. Did anybody throughout all of these events we
6 just discussed, did anybody at American Airlines say
7 that they were going to have you charged with an
8 assault?
9     A. No.
10    Q. Did you wind up hiring a criminal defense
11 lawyer?
12    A. No, I did not.
13    Q. All right. So let's see here. Let me show
14 you this, and this looks like an E-mail from American
15 Airlines to you. It bears a Bate's label of AA0010
16 through 0011. Do you recall receiving this?
17    A. My screen is blank.
18    Q. How's that?
19    A. No. It's just a black screen.
20    Q. Well, maybe you need to refresh again.
21    A. Okay. I'll refresh again.
22    Q. Thanks.
23    A. No. I'm still not seeing it.
24        MR. KOLB: If you want to reboot your
25 computer then, and we can go off the record again for a

1 minute?
2        THE WITNESS: I'm going to completely exit
3 and then rejoin.
4        MR. KOLB: All right. See you in a couple of
5 minutes.
6        (Brief recess was taken.)
7        MR. KOLB: Let's go back on the record.
8 BY MR. KOLB:
9     Q. Let me try to share my screen again. How is
10 that?
11    A. Yes, I can see it.
12    Q. Can you tell me what this is?
13    A. It's the last correspondence I received from
14 American Airlines.
15    Q. This might be one before the last. This one
16 says they're currently conducting an internal
17 investigation. Do you see that?
18    A. Oh, yeah, you're right.
19    Q. Does this look like an E-mail you received on
20 or around June 10 of 2021 from American?
21    A. I think this is the last one based on
22 what you have determined -- no, this is the last one
23 that I received.
24    Q. All right. So I'll mark this as Exhibit 7.
25 This is an American Airlines E-mail to Mr. Clowdus

1 which is Bate stamped AA103 through 111. In this one,
2 it mentions the Conditions of Carriage. Do you see
3 that in the first paragraph?
4     A. Correct. Yes, I see it.
5        (Defendant's Exhibit No. 7 will so be marked
6 for identification.)
7 BY MR. KOLB:
8     Q. Is that right around the time you started
9 looking at the Conditions of Carriage, or was it some
10 time later?
11    A. No. This around about the time that I
12 started engaging Wil and his law firm.
13    Q. All right. Do you recall receiving an E-mail
14 on or about June 10 advising you that your flight
15 privileges had been suspended pending an investigation?
16    A. Yes, I recall that. Yes.
17    Q. Let me show you another one. Maybe I can
18 help clarify it. This E-mail is dated June 22nd. Can
19 you see that?
20    A. Yeah.
21    Q. And it starts out American Airlines has
22 completed an internal investigation. Do you see that?
23    A. Yes.
24    Q. All right. Is it this June 22nd letter, when
25 this is labeled Plaintiff's Production 3 through 4, is

1 this the final letter that you recall receiving
2 advising you that you have been permanently suspended?
3     A. Yeah, I believe this is the final letter.
4     Q. So let's go back to this one, Exhibit 7
5 marked AA10 through 11 (sic). Having looked at the
6 subsequent June 22nd E-mail, does it refresh your
7 recollection as to whether this one might have been
8 received by you on June 10 advising you that --
9     A. Yes.
10    Q. And your response to this was to try to find
11 a lawyer; is that correct?
12    A. I think I had already had been speaking -- I
13 don't remember the exact time frame, but I think I had
14 already contacted Wil's partner by then but before
15 this. But if not, it was immediately following this,
16 but I think I had already spoken to his partner prior
17 to this letter, yes.
18    Q. All right. And then sometime later on
19 June 22nd, you received this E-mail from American
20 Airlines labeled Plaintiff's production 3 through 4.
21 Can you see that?
22    A. Yes.
23        MR. KOLB: I'm going to mark this as
24 Exhibit 8.
25        (Defendant's Exhibit No. 8 will so be marked

Page 122

1 passenger?
2      MR. WOODROW: Objection.
3 BY MR. KOLB:
4    Q.  Your answer, sir?
5    A.  No answer.
6    Q.  Are you refusing to answer?
7    A.  You're asking me to speculate about something
8 that I don't -- you know, the plain language says, yes,
9 they have the authority, but that's not what happened.
10 So I don't know why you're asking me the question.
11    Q.  I'm not asking you what happened, sir.  We've
12 already been through that.  I'm asking you to read the
13 plain English.  All right?  And the question is, is
14 based on the plain English, if a passenger is reported
15 to have been disorderly, abusive or violent or refused
16 to obey instructions, the Conditions of Carriage allow
17 the airline to refuse transport; correct?
18    A.  I believe so, yes.
19    Q.  All right.  So let's get rid of that.  Let me
20 go back to the Advantage Terms, and let me make it a
21 little bigger.  I'll represent to you, sir, that
22 Exhibit 4 is the American Advantage Program Terms and
23 Conditions in effect on June 10 of 2021.  And the
24 second page, which is labeled AA0064, it says in this
25 bullet point here, it lists a number of reasons why an

Page 123

1 advantage account can be terminated, suspended, etc.
2 And it says in so many words, that your participation
3 in the program is subject to the Conditions of
4 Carriage.  Do you see that?  Let me highlight it for
5 you.
6    A.  Yes.
7    Q.  Okay.  Would you agree with me then that if a
8 passenger were to violate the American Airlines'
9 Conditions of Carriage, that would also constitute a
10 violation of the American Airlines Advantage Program
11 Terms and conditions?
12    A.  Yes.  If a passenger violates the Conditions
13 of Carriage, yes.  That's what it says.
14    Q.  And then one of the consequences of violating
15 the advantage program terms and conditions is that your
16 tickets and all accrued mileage could be forfeited, and
17 your future participation in the advantage program
18 terminated.  Do you see that?
19    A.  Yes.
20    Q.  All right.  To your knowledge, has American
21 Airlines terminated your advantage program membership?
22    A.  To my knowledge, they have not.
23    Q.  Okay.  And to your knowledge, have they
24 forfeited or voided your accrued miles?
25    A.  To my knowledge, they have not.

Page 124

1    Q.  It asks in some written discovery for you to
2 describe your damages, and I want to go through what
3 you and your counsel have provided.  Let me show you
4 this.  That's not it.  Hang on one second.  All right.
5 There we go.  Let me do it this way.  You listed a
6 number of categories of damages you're seeking in this
7 lawsuit, and I want to run through them with you.
8      MR. KOLB:  And the first, Mr. Woodrow, I'm
9 referring to the supplemental disclosures.
10 BY MR. KOLB:
11    Q.  The first category of damages is the fair
12 differential in twice monthly travel of approximately
13 $1500 a month.  Can you tell me how you calculated that
14 figure?
15    A.  The difference in fair, the cost to travel to
16 Fort Lauderdale versus to Miami, the additional time.
17    Q.  What fair difference is there between
18 Fort Lauderdale and Miami that would give rise to a
19 $1500 a month increase in airfare?
20    A.  The difference in airfare, and it varies
21 from each trip.  It varies from trip to trip, just
22 taking an average.  But I sent you an example of the
23 cost of a ticket from American versus the cost for a
24 ticket from other carriers.
25    Q.  Let me see if I find that.

Page 125

1    A.  And it can fluctuate from a few hundred to
2 even more.
3    Q.  All right.  Can you see that?
4    A.  Yep.
5    Q.  Is that what you were referring to earlier
6 about the fare difference?
7    A.  Correct.
8    Q.  This $75 for American Airlines, is that the
9 cost of cashing in miles at an American Airlines
10 ticket?
11    A.  No.  That's their straight price.  It has
12 nothing to do with using miles or anything else.
13    Q.  $75 to Cali, Columbia?
14    A.  For a one way.  And that fluctuates.  It can
15 go from $75 to $200.  It goes back and forth.
16    Q.  All right.  Other than what is shown in
17 Plaintiff's Exhibit 6 (sic), do you have any other
18 documentation to support a $1500 a month fare
19 differential?
20    A.  Well, it's not a $1500 fare difference.  It's
21 also including the transportation cost between
22 traveling to Fort Lauderdale, which is an hour away,
23 versus 15 minutes to the airport where I live.  And so
24 you have additional transportation costs.  And I can't
25 remember what else was put in there to be honest with

32 (Pages 122 - 125)

Page 146

1    MR. KOLB:  Objection; nonresponsive.
2    THE WITNESS:  Now what the damages are and
3  how they're calculated, I will leave up to the
4  attorneys and to the jury.  And if there is no -- you
5  know, if this means there's no, then I will live with
6  that.  I leave it up the jury and the attorneys.
7    MR. KOLB:  Objection; nonresponsive.
8  BY MR. KOLB:
9    Q.  My question was really directed towards your
10  component of damages that you suffered the effective
11  nullification of 170,000 reward miles.  And my question
12  is, in light of the fact that those miles are not your
13  property, can you explain to me and the jury how it is
14  you think you can sue for the loss of something which
15  was never yours?
16    A.  And I'll give you the same answer.  I leave
17  it up to the attorneys and to the jury to decide that.
18    Q.  Okay.  We talked earlier about your mental
19  anguish and emotional distress.  Has that affected your
20  daily life, your social relationships, your social life
21  at all, or is it just business?
22    A.  We covered that before.  Why are we covering
23  it again?  I don't understand why you continue asking
24  the same questions over and over.
25    Q.  Well, this is a different question.  I asked

Page 147

1  you earlier about how you could describe your anxiety,
2  and this question is how has it affected your daily
3  life?
4    A.  It has affected everything.  It affects my
5  ability to travel.  It has affected my ability to see
6  my girlfriend.  It's affected my ability to travel with
7  my friends.  So I mean it's such an ambiguous
8  open-ended question.  I don't understand the question.
9    Q.  Other than what you've told me earlier, can
10  you describe for me any other way in which your
11  emotional distress, which you claimed to have suffered,
12  has affected your daily life, your social life or your
13  relationships?
14    A.  I don't know how to answer that question.
15    Q.  You've got another component of damages where
16  you claim to have suffered a damaged reputation.  Can
17  you tell me how your reputation has been damaged?
18    A.  My reputation is everything in Miami with the
19  business community.  My biggest client is a daily legal
20  paper, and I make approximately -- I net a million
21  dollars a year.  The contractor is coming up.  My
22  reputation is everything as far as maintaining that
23  client.  And in this current environment where there
24  are legitimate flight attendants that are legitimately
25  being beat to death, to have a flight attendant falsely

Page 148

1  accuse me of something, the damage to my reputation
2  would be massive and probably will cost me millions of
3  dollars in business.  If you're going to ask me
4  immediately this moment, no, I've not lost that client,
5  not yet, but I very well could.
6    Q.  Do you have any indication if that's likely
7  to happen?
8    A.  Well, I know the client, and I know the
9  environment.
10    Q.  Are they aware of this?
11    A.  What's that?
12    Q.  Are they aware of this incident?
13    A.  No.  No one is aware of it.  I've kept this
14  completely under wraps as much as possible to avoid
15  that.
16    Q.  All right.  Do you have any knowledge that
17  American Airlines has published its report of your
18  assault on Marino and its ban of you from their airline
19  to anyone else on American Airlines?
20    A.  I have no knowledge at the moment.
21    Q.  Do you have any knowledge that other than the
22  one or two people that you've spoken in general terms
23  to about the June 10th incident and the ban, that
24  anybody else anywhere on the planet knows about these
25  events?

Page 149

1    A.  I mean I think you asked me this question
2  earlier, but again not that I'm aware of.
3    Q.  Would you agree with me that the first
4  publication of the circumstances of June 10, 2021 and
5  following occurred when you filed your lawsuit?
6    A.  I don't know that it was.  I don't know what
7  American has done.  I don't know what they've done or
8  not done.
9    Q.  Okay.
10    A.  I can't answer that question if I don't know
11  what American has done.
12    Q.  All right.  You don't have any knowledge that
13  American has published it to any third party?
14    A.  I don't have any knowledge of that.
15    Q.  My question is based on what you know.  Would
16  you agree that the first publication of the events of
17  June 10 and subsequent occurred when you filed your
18  lawsuit in federal Court in Miami?
19    MR. WOODROW:  Objection.
20  BY MR. KOLB:
21    Q.  You can answer.
22    A.  I can't answer that.
23    Q.  Why not?
24    A.  Because I don't -- I don't know what American
25  has done, and you keep speculating and say if

38 (Pages 146 - 149)

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

-----------------------x

TROY CLOWDUS,            :

          Plaintiff,  : Civil Action No.:

    -vs-              : 1:21-cv-23155-MM

AMERICAN AIRLINES INC.,:

          Defendant.   :

-----------------------x


VIDEORECORDED VIDEOCONFERENCE DEPOSITION OF

CARLOS ADAN MERINO

APPEARING REMOTELY FROM

FORT LAUDERDALE, FLORIDA

February 4, 2022

10:02 a.m.


REPORTED BY:

Renee A. McDermed, RPR

APPEARING REMOTELY FROM FLOYD, VIRGINIA

**EXHIBIT "D"**

Carlos Adan Merino
February 04, 2022

---

Page 2

```
1        R E M O T E   A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFF:
4       WILLIAM T. WOODROW, ESQUIRE
5       STONE & WOODROW LLP
6       250 West Main Street, Suite 201
7       Charlottesville, Virginia 22902
8       will@stoneandwoodrowlaw.com
9       (855) 275-7378
10
11  ON BEHALF OF DEFENDANT:
12      KELLY H. KOLB, ESQUIRE
13      BUCHANAN INGERSOLL & ROONEY
14      401 E. Las Olas Boulevard, Suite 2250
15      Fort Lauderdale, Florida 33301-4251
16      kelly.kolb@bipc.com
17      (954) 468-2300
18
19  VIDEOGRAPHER:  Darrak Lighty
20
21
22
23
24
25
```

---

Page 3

```
1                I N D E X
2   Name of Witness                        Page
3   CARLOS ADAN MERINO
4   Examination
5   By Mr. Woodrow                            4
6
7                E X H I B I T S
8           (Attached to the Transcript)
9   Exhibit                                 Page
10  Exhibit A.........................................21
11      Five pages from Customer Service Manual
12  Exhibit B.........................................36
13      CERS Manual
14  Exhibit C.........................................51
15      CERS Report
16  Exhibit D.........................................99
17      Tour Report
18
19
20
21
22
23
24
25
```

---

Page 4

```
1        R E M O T E   P R O C E E D I N G S
2        (Witness's identification verified)
3
4           VIDEOGRAPHER:  This is the remote
5   video deposition of Carlos Merino in the matter of
6   Troy Clowdus versus American Airlines.  Today's date
7   is February 4th, 2022, and the time is 10:02 a.m.,
8   New York time.  My name is Darrak Lighty with US
9   Legal Support, and I am the remote video technician.
10  The court reporter today is Renee McDermed, also
11  associated with US Legal Support.  All participants
12  will be noted on the stenographic record, and now
13  the court reporter, with a slight stipulation, will
14  swear in the witness.
15
16           CARLOS ADAN MERINO,
17      was sworn and testified as follows:
18           E X A M I N A T I O N
19
20  BY MR. WOODROW:
21      Q      Are we ready to begin?  Sorry, my bad.
22  Good morning, Mr. Merino.
23      A      Good morning, sir.
24      Q      Could you please state your full name
25  and address for the record?
```

---

Page 5

```
1       A      My name is Carlos Adan Merino, and my
2   address, I -- better not to say.  I'm just going to
3   keep it.
4       Q      Okay.  Your state -- state residence
5   is fine.
6       A      Florida and -- Miami, Florida.
7       Q      Okay.  That's -- that's good enough.
8   My name is Will Woodrow, and I'm here on behalf of
9   Troy Clowdus, a passenger that you interacted with
10  back in June of 2021.  A little bit about -- well,
11  have you ever given a deposition before?
12      A      No, sir.  This is the first time.
13      Q      Okay.
14      A      Actually.
15      Q      Okay.  Well, make sure you let me
16  finish my questions and that you fully understand
17  them before answering.  You need to give verbal
18  responses for the court reporter.  And your
19  testimony here today is given under the penalty of
20  perjury, so make sure your responses are truthful.
21  And just answer to the best of your ability.  Okay?
22      A      (Nodding head).
23      Q      Are you on any medication today that
24  might affect your testimony?
25      A      No, sir.
```

---

Carlos Adan Merino
February 04, 2022

Page 10

1  please.
2      A      Yes, sir.  While -- when we started
3  boarding, a gentleman came aboard, and I saw him
4  putting his stuff away and things.  But normally --
5  he was on the first row on First Class.  And
6  normally, when that happens is like when people
7  don't know they have to put their bags in the
8  overhead bin.  It cannot be against the wall.
9      So normally, people, they bring a lot
10  of bags, and we run out of space very easily.  So
11  the first thing I did was just to go to him and ask
12  him that we had -- we didn't have any bags at that
13  moment, and we needed to put his bag up for taxi and
14  takeoff and landing.
15      And right after that, we started --
16  the rest of the passengers came on board, the same
17  thing with the other side.  I do that all the time
18  as a courtesy for passengers.  So during the
19  boarding process, I went to check some overhead bins
20  and things.  And, again, I had to ask this passenger
21  to put his bag up in the overhead bin, which he
22  didn't.
23      And he was -- he looked kind of mad or
24  some kind of -- he was -- he boarded the plane kind
25  of mad already.  He was not in a good mood.  So by

Page 11

1  the -- by the time we were about to close the door,
2  we were some minutes before closing door, I
3  noticed -- I have to check the cabin, the First
4  Class cabin.  So I notice again that -- that his bag
5  is down there.
6      The second time was behind -- he tried
7  to hide his -- the bag right behind his leg and then
8  to avoid to put the bag up in the overhead bin.  So
9  the third time, of course, I noticed all this
10  happening.  And I said, "Sir, you need to put your
11  bag up."
12      And the guy got so mad and frustrated.
13  So by that time, he grabbed -- he grabs his -- his
14  bag and toss it up on my stomach really, really hard
15  to the point that I lost my breath.
16      So the guy was mad.  The guy was rude,
17  and I lost my breath for some seconds.  And
18  immediately I said to him, "Sir, you just hit me."
19      I was expecting some kind of a
20  reaction, like kind of an apology or something that
21  probably -- I didn't do it on purpose or something,
22  but no, he was -- he -- his answer was, like, "No, I
23  didn't."  He started laughing, and he started, like,
24  making fun of the situation.
25      And some seconds passed by because I

Page 12

1  was trying to catch my breath.  So I grabbed the
2  bag, his bag that hit me right there, and I said,
3  "Sir, you just hit me."
4      And, again, he said, "No, I didn't."
5  And he started laughing again.  And -- but he was
6  looking straight to my eyes like with a -- like --
7  like a mean, mean guy.  I didn't do anything to him,
8  but just trying to put his bag up in the overhead
9  bin.
10      So I said for the third time, "Sir,
11  you just hit me."  Nothing happened.  So I said just
12  good enough.  And he hit a flight attendant, he hit
13  me, so I went to talk to the captain.  And at that
14  time, I went to talk to the captain, I explained him
15  what happened.
16      So the captain takes the decision to
17  remove him from the plane.  He talk -- he asked me
18  to talk to the agent about it, to bring the agent
19  inside.  So what happened there, so they talk.  We
20  were all there, like, he was in the cockpit, I was
21  by the galley, and the agent was around the area.
22      So we -- sometimes we can pretty much
23  hear what we're saying.  So happened next is that he
24  comes to the -- he goes -- the agent talks to the
25  captain, and the captain tells him, asks him to

Page 13

1  remove him from the plane.  So the agent went to
2  talk to him and remove him from the plane with --
3  and then it was just kept going with the flight.
4      Q      Okay.  A couple questions.  When
5  the -- when did the agent go to talk to him?  Was
6  this after the captain asked him to remove him from
7  the flight?
8      A      Yes, sir.  That's --
9      Q      Is that the first time the agent spoke
10  with him?
11      A      Yes, sir.
12      Q      Okay.
13      A      With him, are you saying with him,
14  with the passenger?
15      Q      With the passenger, yes.
16      A      Okay.  Yes, sir.
17      Q      Okay.  So what were you looking at
18  when the -- when the bag struck you?
19      A      What was I looking at?
20      Q      Yeah.
21      A      At the passenger.
22      Q      All right.  Could you -- could you
23  tell he was going to hit you before he hit you?
24      A      The reaction was -- his reaction was
25  pretty bad.  It -- I mean, he grabbed his bag like,

Carlos Adan Merino
February 04, 2022

Page 14

1  like this.  He was mad, a lot of anger, grabbed the
2  bag, and toss it to me, but really hard.  So I never
3  expected that, but, yes, he did.
4        Q      Why -- why -- why didn't you move your
5  hand to intercept the bag?
6        A      I couldn't, sir.  It was so fast, and
7  it was so quick, and he was so mad that I couldn't
8  even put my hand in there, nothing.
9        Q      Okay.
10       A      The guy was mad.
11       Q      So I'm -- I'm confused about this,
12 this whole interaction.  Is -- is it -- is it
13 possible that Mr. Clowdus did not intend to hit you
14 with his bag full of his multi-hundred-dollar
15 sunglasses and his iPad?
16       A      I don't know, sir.
17              MR. KOLB:  Objection to form.
18              Go ahead.
19       A      I don't know, sir.
20 BY MR. WOODROW:
21       Q      Okay.  Could you see what Mr. Clowdus
22 was looking at when you were struck with the bag?
23       A      To my eyes.
24       Q      Mr. Clowdus was looking in your eyes
25 while he struck you with the bag?  Is that your

Page 15

1  testimony today?
2        A      Yes, sir.
3        Q      All right.  We're going to go to
4  Exhibit A here.  First tell me a little bit about
5  this laughing that you're claiming Mr. Clowdus did.
6  When did he do that?
7              MR. KOLB:  Objection to form.
8  BY MR. WOODROW:
9        Q      When did Mr. Clowdus laugh at you?
10       A      When I told him that he hit me.
11       Q      And how many times did you tell him
12 that he hit you?
13       A      Three times, sir.
14       Q      Three times?
15       A      Uh-huh.
16       Q      And how many times did he laugh at
17 you?
18       A      Three times, sir.
19       Q      All right.  So explain to me how --
20 how that went again.  I'm just not quite clear.  Was
21 that his response?
22       A      The response was, "No, I didn't," and
23 he hit me and -- I'm sorry, after he hit me, the
24 response was, like, "Sir, you just hit me?"
25              And he was, "No, I didn't," and he was

Page 16

1  laughing.  He was making fun of the situation.
2        Q      And what -- what did he say to make
3  fun of the situation?  Anything?
4        A      When he --
5              MR. KOLB:  Wait till he finishes.
6              THE WITNESS:  Yeah.
7              MR. KOLB:  Go ahead.
8        A      He knew what he did.
9  BY MR. WOODROW:
10       Q      Did -- how did you know he was mocking
11 you?
12       A      How -- how do I know?  How did I know?
13       Q      Did he say any words to give you the
14 impression that he was mocking you?
15       A      Well, he was mad.  He was mad, and he
16 was not following flight attendant instructions
17 since the very beginning.  And since he boarded, he
18 was already mad.  So I -- I don't know what was
19 going on with him.
20       Q      Well, you just testified that he
21 laughed at you, and I'm just -- I'm trying to
22 understand what that looked like precisely.  You
23 said, "You hit me," and he responded with what
24 exactly?
25       A      You just hit me.

Page 17

1              MR. KOLB:  Objection to form.
2  Objection, form.
3              Go ahead.
4        A      My response was, "You just hit me?"
5  Probably waiting for some kind of apology, but, no,
6  he didn't.
7              And he said, "No, I didn't," and he --
8  he was laughing.  He was making fun of the
9  situation.  He was just laughing.
10 BY MR. WOODROW:
11       Q      But he didn't say any words to make
12 fun of the situation.  You just surmised from his
13 laughter that was what he was doing?
14       A      He was laughing.  He was making fun of
15 the situation, sir, for the hit.
16       Q      Did he say anything else to you?
17       A      No, sir.  He said the same thing three
18 times.
19       Q      Okay.  Did he -- did he ever hit you
20 again?
21       A      No, sir.
22       Q      Did -- did he ever stand up and -- and
23 attempt to intimidate you or anything like that?
24       A      Just a little bit.  He was -- he did
25 kind of crunch, but that was pretty much it.

Carlos Adan Merino
February 04, 2022

Page 50

1  overhear any potential conversation between Mr.
2  Clowdus and Mr. Henriquez during the time that they
3  departed together?
4      A    No, sir.  They were outside.
5      Q    Okay.  Is it your testimony that
6  they -- they both first approached you standing in
7  front of the cockpit, passed you, and exited the
8  plane?
9      A    Correct.
10     Q    And were you looking at Mr. Henriquez
11 and Mr. Clowdus the entire time as they approached
12 and passed you?
13     A    If I hear them?  If I heard them?
14     Q    Were you looking at them?  Were you
15 facing them?
16     A    Of course.  I was standing right
17 there, sir.  That's my position.
18     Q    Okay.  Did -- did Mr. Henriquez
19 observe Mr. Clowdus getting in your face like this?
20     A    No.  He's walking out.  He's -- as I
21 told you, he's following the agent.  So the agent is
22 looking to that direction, the passenger is looking
23 to that direction, and he's passing me by like this
24 close (indicating).
25     Q    Okay.

Page 51

1          MR. WOODROW:  Let's go to Exhibit C.
2          (Exhibit C was introduced for
3  identification and attached to the transcript.)
4  BY MR. WOODROW:
5      Q    All right.  Do you recognize this
6  document, Mr. Merino?
7          MR. KOLB:  Same one?
8      A    Is this the same one we had before?
9  BY MR. WOODROW:
10     Q    No.  This is different.
11         MR. KOLB:  You're still displaying B.
12 I think -- I think if you click the tab -- there you
13 go, there you go.
14         MR. WOODROW:  It must be lagging
15 because it switched on my machine.
16         MR. KOLB:  Okay.
17         MR. WOODROW:  Sorry about that.
18 BY MR. WOODROW:
19     Q    Do you recognize this document?
20     A    Yes, sir.
21     Q    Okay.  I'd like you -- well, did you
22 review this document in -- in preparation for your
23 deposition today?
24     A    I remember writing this down.
25         MR. KOLB:  Listen to his question,

Page 52

1  please.
2      A    Sir, can you repeat the question?
3  BY MR. WOODROW:
4      Q    Did you review this document in
5  preparation for your deposition today?
6      A    Can I see what is down there?  I just
7  see this information here, but I don't know what is
8  down there, down below.
9      Q    Sure.  This is the CERS report you
10 filed subsequent to your interaction with Mr.
11 Clowdus.
12     A    I have my SERS report.  Yes, I read
13 it.
14     Q    When is the last time you read this?
15     A    A couple days ago.
16     Q    Okay.  So -- so when I asked you
17 earlier if you had reviewed any documents in
18 preparation for this deposition, you -- you answered
19 that you had not.  That wasn't accurate, was it?
20     A    Well, I just have information with me
21 in my files at home.
22     Q    Okay.  And -- and what other files did
23 you review in preparation for this deposition?
24     A    Well, to be honest with you, not that
25 many.  I had a lot of things to do.

Page 53

1      Q    Okay.  Well, I didn't ask how many.  I
2  asked what ones.
3      A    I think it's just -- was just this
4  one, sir.
5      Q    Did you review the -- the customer --
6  the CERS report that Mrs. Gray filed on your behalf?
7      A    No, sir, I hadn't -- no.  On my
8  behalf?  On my behalf?
9          MR. KOLB:  I'll object to the
10 characterization of the document.  Go ahead.
11 BY MR. WOODROW:
12     Q    Did you review the CERS report that
13 Mrs. Gray filed?
14     A    No, sir.
15     Q    Have you ever read the CERS report
16 that Mrs. Gray filed?
17     A    No, sir.
18     Q    Okay.  I'd like you to please review
19 the facts related to the event as -- as you recorded
20 them here.
21     A    Passenger asked at the beginning of
22 boarding -- you want me to read it?
23     Q    No, no, you don't have to read it out
24 loud.  Just -- just refresh yourself silently.  Let
25 me know when you're done.

Carlos Adan Merino
February 04, 2022

Page 62

1  that option to a person because it's early boarding.
2  So that's normally what I do.  Be careful with the
3  space up in the overhead bin.
4         MR. WOODROW:  Again, I move to strike.
5  BY MR. WOODROW:
6       Q      Mr. Merino, you're not answering my
7  question, and you're not focusing on it.  My
8  question is very simple.  It is not about what you
9  offered to do.  It's not about what you do when you
10  come on the plane in the morning.  It's about
11  whether or not Mr. Clowdus agreed to put his bag
12  away later after his first interaction with you.
13      A      Sir, I don't know what his intentions
14  were.  You probably need to ask him.  He probably
15  has a better memory than I do.
16      Q      Mr. Merino, we're not asking about Mr.
17  Clowdus's intentions.  We're asking about what you
18  wrote in this document right in front of us, what
19  you wrote, sir, "But he accepted to do it later."
20  That implies that he said okay, does it not?
21         MR. KOLB:  Objection, form.
22      A      Sir, are you any kind of -- are you
23  getting mad because I'm trying to pay attention to
24  what you are saying?  And with all my respect, you
25  don't need to be taking that position.  If you are

Page 63

1  asking a question, we can just keep going with the
2  normal question and answer thing, but you need --
3  you don't need to be like that.
4         What I am saying is that -- and I
5  already told you that most of the time I do that.  I
6  offer that they can probably do it later.  And that
7  was it.  Normally, that's what I say, but I don't
8  have any other recollection of that, sir.
9  BY MR. WOODROW:
10      Q      You say here, Mr. Merino, that you
11  were physically assaulted and that the company
12  should do something about it.  What did you want
13  them to do?
14      A      I don't want them to do anything.
15      Q      What did you want them to do about it?
16      A      Well, it's not just about the company.
17  It's about the federal rules, sir, and regulations.
18      Q      That's not what I asked, Mr. Merino.
19  And I'm sorry if -- if I -- if I am getting
20  frustrated, I'm trying not to, but you are
21  consistently not answering the question that I ask.
22  So please pay attention and answer the question that
23  I ask.
24      A      Well, you are assuming that I'm not
25  paying attention, sir.  That's not correct.

Page 64

1       Q      Okay.  That's a charitable assumption,
2  Mr. Merino.  I'm asking you, you say, "The company
3  should do something about it," exclamation point.  I
4  am asking you that did -- what would have satisfied
5  you at the time?  What were you hoping they should
6  do about it?
7       A      I don't know what kind of rules, sir,
8  they can apply to this situation, but the rules that
9  may apply companywise and Federal Government, they
10  should -- they should not let, not just this
11  passenger, any other passenger doing this kind of
12  behaving like that.  They shouldn't do like that,
13  those people, yes, sir.
14      Q      Do you -- do you think that banning
15  Mr. Clowdus for life from flying with American
16  Airlines was a just response to the incident that
17  you claim occurred?
18      A      I don't know.
19         MR. KOLB:  Objection, form.
20      A      I don't know, sir.
21  BY MR. WOODROW:
22      Q      Are you glad that Mr. Clowdus was
23  banned for life from flying with American Airlines?
24         MR. KOLB:  Objection to form.
25         Go ahead.

Page 65

1       A      No, sir.  I'm just doing my job and
2  I'm -- I cannot be sad, glad, or whatever.
3  BY MR. WOODROW:
4       Q      Well, that's -- that's not accurate,
5  is it?  You're entitled to have an opinion, and I'm
6  asking you your opinion.  Are you satisfied, are you
7  glad, or do you think it was too much?  I'm asking
8  your opinion.
9         MR. KOLB:  Objection.  He said he's
10  not glad; he's not sad.
11  BY MR. WOODROW:
12      Q      Okay.  You may still answer.  Your
13  lawyer does not answer for you, Mr. Merino.
14         MR. KOLB:  No, I just repeated the
15  answer he gave.  If you want him to repeat it again,
16  I guess he will.
17      A      Yes, sir, I'm not glad; I'm nod sad.
18  BY MR. WOODROW:
19      Q      If -- if Mr. Clowdus had not been
20  banned, would you have been upset?
21         MR. KOLB:  Objection, form.
22      A      Exactly, sir.
23  BY MR. WOODROW:
24      Q      Exactly nothing.  Please, disregard
25  Mr. Kolb's objections.  You must answer the

Carlos Adan Merino
February 04, 2022

Page 66

1  question, Mr. Merino.
2       A       Again, again, sir, with all my
3  respect, you don't ask -- to question me like that.
4  We have to keep some kind of respect in between the
5  two of us, if you please, because --
6       Q       Mr. Merino.
7       A       You are getting frustrated.  I'm not
8  glad; I'm nod sad.
9       Q       Mr. Merino, please, this is my
10 deposition.  Do not instruct me.
11      A       I'm not.
12      Q       I'm not upset with you.  I'm getting a
13 little frustrated, and I'm -- and I'm still being
14 respectful.  I would appreciate if you would answer
15 the question that I asked you.
16      A       Uh-huh.
17      Q       If mister -- if Mr. Clowdus had not
18 been banned from American Airlines, would you have
19 felt that American Airlines did not do something
20 about it?
21              MR. KOLB:  Objection to form.
22              THE WITNESS:  I have to answer?
23      A       I don't have anything to feel about
24 it, sir.
25

Page 67

1              BY MR. WOODROW:
2       Q       Would you have been upset if Mr.
3  Clowdus had been allowed back on the very next
4  flight?
5              MR. KOLB:  Objection to form.
6       A       I don't have anything to feel about
7  it, sir, again.
8              MR. WOODROW:  Okay.  Note that the
9  witness is being unresponsive and move to strike.
10      A       Okay.
11              MR. KOLB:  Are you doing okay?
12              THE WITNESS:  Yeah.
13              MR. KOLB:  Okay.  Keep going.
14 BY MR. WOODROW:
15      Q       Now, it was your testimony earlier
16 that you said, "You hit me, and he laughed."  And
17 you said, "You hit me, and he laughed," and you
18 said, "He hit me and he laughed"; is that correct?
19      A       No, it's not correct, sir.
20      Q       Please tell me what's incorrect about
21 that.
22      A       I told him, "You just hit me," and he
23 laughed.  And he said, "No, I didn't," three times.
24      Q       He said, "No, I didn't," three times
25 or he laughed three times?

Page 68

1       A       Sir, he laughed, and he said, "I
2  didn't."
3       Q       And how many times did he laugh?
4       A       Three times, sir.
5       Q       And after the -- the third time you
6  said, "You hit me," did he again laugh?
7       A       Yes, sir.
8       Q       Okay.
9       A       He was making fun of the situation.
10      Q       Are you aware that Mr. Henriquez was
11 at that point observing your interaction with Mr.
12 Clowdus?
13              MR. KOLB:  Objection to form,
14 misconstrues testimony.
15 BY MR. WOODROW:
16      Q       Well, mister -- mister -- Mr.
17 Henriquez testified the other day that he heard,
18 "You hit me," twice, and then he looked around the
19 corner and observed the interaction.  Are you aware
20 of that?
21              MR. KOLB:  That's a flat
22 misrepresentation of what he said, flat.
23              MR. WOODROW:  No, it's not.
24              MR. KOLB:  He said he never saw the
25 event at all.

Page 69

1              MR. WOODROW:  I didn't say he saw the
2  event.  The you-hit-me's occurred after the event.
3              MR. KOLB:  Right.
4              MR. WOODROW:  That's what I just said.
5              MR. KOLB:  I don't think that's what
6  he said, but go ahead, answer the question.  My
7  apologies.
8       A       I don't -- I'm looking at the
9  passenger, sir.  I cannot see behind me, who is
10 behind me or who is in the door by this -- by that
11 time.
12 BY MR. WOODROW:
13      Q       Okay.  Let's go down --
14      A       So probably I can ask you what's
15 behind you or what kind of clothes you have behind
16 you right now --
17      Q       Mr. Merino, Mr. Merino, this is my
18 deposition, thank you.  I'll ask you the questions.
19      A       All right.
20      Q       Let's move down.  Can you identify
21 this document?
22              MR. KOLB:  Is this still the same
23 exhibit?
24              MR. WOODROW:  This is the same
25 exhibit, Exhibit C, yes.

Carlos Adan Merino
February 04, 2022

Page 110

1     A      No, sir, none.  Just your client.
2 BY MR. WOODROW:
3     Q      In your entire career with American
4 Airlines, how many passengers have you personally
5 asked the captain to remove, if any?
6          MR. KOLB:  Objection, form.
7          MR. WOODROW:  What's the objection,
8 Kelly?
9          MR. KOLB:  You're asking him to recall
10 24 years of service.
11         MR. WOODROW:  I just said if you
12 recall.
13         MR. KOLB:  Yeah, okay.  If you recall
14 what happened in the last 24 years, let him have it.
15    A      Just your client, sir.  The best of my
16 recall, like you say.
17 BY MR. WOODROW:
18    Q      Okay.  At Mr. Clowdus's deposition, he
19 testified that that week, the incident with you
20 was -- was a really bad week and -- and Mr. Kolb
21 made a comment that might have been a throwaway that
22 that was a really bad week for you, too.  Do you
23 know why he would have said that?
24         MR. KOLB:  That's a misrepresentation
25 of the record.  I said --

Page 111

1          MR. WOODROW:  That's what you said.
2          MR. KOLB:  No, no.  I said it was a
3 bad day after he got assaulted.  Big difference.
4          MR. WOODROW:  Well, Mr. Clowdus said
5 it was a bad week, but --
6          MR. KOLB:  I'm sure it was for him
7 because it sure looked that way when he showed up on
8 the aircraft.
9 BY MR. WOODROW:
10    Q      Okay.  Is there any other reason than
11 the alleged assault that that would have been a bad
12 day or week for you, Mr. Merino?
13    A      No, sir.  Right after what happened, I
14 have to -- like I told you, I have to take care of a
15 lot of different people on the aircraft, so I have
16 to go back to my job.  I'm not focusing on one
17 passenger that hit me.  I have to focus on a lot of
18 people onboard.
19    Q      Did you know Mr. Clowdus's name at the
20 time of the incident?
21    A      No, sir.
22    Q      Okay.  When was the first that you
23 learned Mr. Clowdus's name?
24    A      Well, everything is on the -- all the
25 information about his name and everything, certain

Page 112

1 information about the flight, what I need to know is
2 on the tower.
3          MR. KOLB:  Go ahead, listen to his
4 question, and answer his question.
5    A      Can you -- you ask the question
6 again, please?
7 BY MR. WOODROW:
8    Q      When did you first learn Mr. Clowdus's
9 name?
10    A      On my working tower.
11    Q      When was that?
12    A      Right when all this -- this situation
13 was happening, sir.
14    Q      What situation?
15    A      The assault situation, sir.
16    Q      Okay.  Not the lawsuit?  You knew his
17 name before the lawsuit; is that correct?
18    A      Well, I just told you when -- when the
19 event happened, the assault happened, that's when I
20 knew his name.
21    Q      All right.  And did -- did you tell
22 anybody about this assault outside of American
23 Airlines?
24         MR. KOLB:  Objection, asked and
25 answered.

Page 113

1    A      No, sir.  I'm a professional flight
2 attendant.
3 BY MR. WOODROW:
4    Q      I'm sure you are, Mr. Merino.
5    A      Thank you.
6    Q      You testified earlier that when you
7 were struck with the bag, you -- it knocked your
8 breath out a little bit.  Tell me -- tell me more
9 about that.
10    A      I was out of breath, sir.  Has
11 somebody punched you on the -- on your stomach ever?
12         MR. KOLB:  Just answer.
13         THE WITNESS:  Yes.
14         MR. KOLB:  Okay?  All right.  Go
15 ahead.
16    A      That's exactly what happened.  He
17 punched me on the stomach, and I lost my breath.
18 BY MR. WOODROW:
19    Q      For how long did you lose your breath,
20 Mr. Merino?
21    A      For several seconds, sir.
22    Q      Okay.  Did you -- did you have any --
23 any bruises or -- or anything of that nature?
24    A      I didn't check on that time, at that
25 moment.

Aristides Maldonado
March 08, 2022

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

TROY CLOWDUS,                          :

           Plaintiff,      :   Case No.
                           1:21-CV-23155-MM
        v.                    :

AMERICAN AIRLINES, INC.,               :

           Defendants.      :
----------------------------


DEPOSITION OF ARISTIDES MALDONADO

APPEARING REMOTELY FROM

MIAMI-DADE COUNTY, FLORIDA


March 8, 2022

10:02 a.m.


REPORTED BY:
JENNIFER D'ANGELO, RPR, CCR-NJ
APPEARING REMOTELY FROM PHILADELPHIA COUNTY,
    PENNSYLVANIA

**EXHIBIT "E"**

Aristides Maldonado
March 08, 2022

Page 2

1    REMOTE APPEARANCES:
2
3        STONE & WOODROW, LLP
         BY:  WILLIAM T. WOODROW, ESQUIRE
4        will@stoneandwoodrowlaw.com
         250 West Main Street, Suite 201
5        Charlottesville, Virginia  22903
         (855) 275-7378
6            Attorney for Plaintiff
7
         BUCHANAN, INGERSOLL & ROONEY, P.C.
8        BY:  KELLY H. KOLB, ESQUIRE
         kelly.kolb@bipc.com
9        401 East Las Olas Boulevard, Suite 2250
         Fort Lauderdale, Florida  33301
10       (954) 703-3900
             Attorney for Defendant
11
12
13   ALSO PRESENT:  Troy Clowdus
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                    I N D E X
2
3    WITNESS                                   PAGE
4    ARISTIDES MALDONADO
5        BY:  Mr. Woodrow                      5
6
7
8                    - - -
9
10
11                E X H I B I T S
12   NUMBER        DESCRIPTION                  PAGE
13   Exhibit-A     IRL Packet                   40
14   Exhibit-B     E-mail                       42
15   Exhibit-C     Customer Service Manual      44
16   Exhibit-D     CRRS Reports                 53
17   Exhibit-E     Tour Report                  60
18   Exhibit-F     Customer Communication       63
19
20
21
22
23
24
25

Page 4

1    REPORTED REMOTELY FROM PHILADELPHIA COUNTY,
2        PENNSYLVANIA
3              - - -
4        THE REPORTER:  The attorneys
5    participating in this deposition acknowledge
6    that I am not physically present in the
7    deposition room and that I will be reporting
8    this deposition remotely.  They further
9    acknowledge that, in lieu of an oath
10   administered in person, the witness will
11   verbally declare his testimony in this
12   matter is under penalty of perjury.
13       The parties and their counsel
14   consent to this arrangement and waive any
15   objections to this manner of reporting.
16   Please indicate your agreement by stating
17   your name and your agreement on the record.
18       MR. WOODROW:  William Woodrow,
19   attorney for the plaintiff.  I agree to
20   that.
21       MR. KOLB:  Kelly Kolb, counsel for
22   defendant.  We agree as well.
23       THE REPORTER:  Thank you.
24       Mr. Maldonado, could you raise your
25   right hand, please?

Page 5

1        Do you swear the testimony you are
2    about to give will be the truth, the whole
3    truth, and nothing but the truth, so help
4    you God?
5        THE WITNESS:  I do.
6        ARISTIDES MALDONADO, having been
7    duly sworn, was examined and testified as
8    follows:
9        THE REPORTER:  And, Mr. Maldonado,
10   could I have the address where you are
11   currently, please?
12       THE WITNESS:  Oh, this is One
13   Biscayne --
14       MR. KOLB:  Two Biscayne Boulevard,
15   Miami, Florida, Suite 1500.
16       THE REPORTER:  Thank you.
17       You can go ahead, Mr. Woodrow.
18       MR. WOODROW:  Thank you.
19           EXAMINATION
20   BY MR. WOODROW:
21   Q.   Good morning, Mr. Maldonado.
22   A.   Good morning, sir.
23   Q.   As you heard, my name is Will Woodrow.  I'm
24   here on behalf of the plaintiff, Troy Clowdus, an
25   individual who you had occasion to investigate last

Aristides Maldonado
March 08, 2022

Page 10

1    A.    Basically it was to monitor the caterers
2    doing the -- you know, bringing the food on board
3    because at that time CBP would not allow the
4    aircraft to leave or allow the aircraft to be
5    boarded until the catering was done to avoid
6    commingling.  So we were there basically
7    representing CBP making the observation, and at that
8    time the aircraft was allowed to board as long as
9    one of us was present watching the caterer.
10   Q.    Okay.  And what does CBP stand for?
11   A.    Customs and Border Protection.
12   Q.    I see.  Okay.  And what kind of incidents
13   with passengers would you get involved in?
14   A.    Basically if we have a call regarding an
15   incident, involving a subject passenger or a
16   passenger that would not comply with the
17   instructions of the flight attendants or the agents.
18   And we would respond -- sometimes we would get the
19   call, we would respond, and sometimes it would be
20   after the fact.  We would get information that there
21   was a certain issue on a certain flight.
22   Q.    Now, would you be doing the role of a GSC or
23   would you be providing kind of the muscle in case
24   the passenger --
25   A.    Well, not really the muscle because, you

Page 11

1    know, at that time I was no longer law enforcement.
2    So it was basically to do a report to see what
3    happened, what transpired if we have to do any kind
4    of report.  But as a GSC, no.
5    Q.    Would there also be a GSC on the scene when
6    you would be responding to these reports or these
7    incidents --
8    A.    Yeah.  If it was a departing flight, yes,
9    there was supposed to be a GSC present.
10   Q.    Okay.  And how long did you do this role
11   for?
12   A.    Well, that's basically a role that has been
13   ongoing.
14   Q.    Do you still do this role?
15   A.    Yes, except for the CBP part.  That role
16   ended just before Covid back in 2020.
17   Q.    Okay.  And so what's your job title today?
18   A.    Right now, well, they change our title.
19   It's security coordinator, but it's basically doing
20   the same role.
21   Q.    And do you work under the umbrella of
22   corporate security?
23   A.    Yes.
24   Q.    Okay.  And who do you report to in corporate
25   security?

Page 12

1    A.    I report to my manager who is Kevin Crowley.
2    Q.    Okay.  And who is John Kirby?
3    A.    John Kirby is also a manager that is -- he's
4    assigned to the west coast.
5    Q.    And is he -- is he above or below Kevin
6    Crowley?
7    A.    I don't know.
8    Q.    Okay.  And as a security coordinator, what
9    do you do for AA in the course of a day's work these
10   days?
11   A.    These days, what I do is basically we get an
12   incident that happened throughout the region because
13   we're responsible -- from our area, we're
14   responsible from -- really from Georgia all the way
15   down to South America.  So any incidents that happen
16   in any airport or any flight originating from any --
17   including the Caribbean as well.  So any incidents
18   that happen in any of those regions, we're
19   responsible for.
20   Q.    And you're responsible in what sense?
21   A.    We get notifications from security
22   operations when there's an incident involving a
23   passenger.  It could be also involving an employee
24   or it could be an incident with a -- you know, with
25   a certain aircraft.  But mostly -- what we get

Page 13

1    lately is mostly incidents with disruptive
2    passengers and those are, like I said, depending on
3    the region we get those reports from security
4    operations.
5    Q.    And do you interact with any of these
6    passengers or are you a secondary --
7    A.    We actually interact with them because, like
8    I said, we get those reports.  If an incident
9    happened, let's say, in Punta Cana, Dominican
10   Republic, we get the reports.  We don't interact
11   with the passengers.  We go with whatever reports we
12   get that originate from that area.
13   Q.    And what is your -- what is your job
14   function once you get those reports?  What are you
15   doing with them?
16   A.    We're doing -- you know, we do -- we gather
17   all the reports, we actually generate our own report
18   depending on what happened.  And then we send those
19   reports, we put them in a computer system and
20   they're basically titled by whatever the incident
21   was.
22   Q.    And is the purpose of these reports to
23   assign, follow on action, be it punishment or a
24   flight ban, or is there some other purpose as well?
25   A.    It depends.  Mostly could be information,

Aristides Maldonado
March 08, 2022

Page 14

1  but it also could be depending on what the incident
2  was.  It could be related to whether a person might
3  be banned.
4  Q.      Okay.  Is that the usual thrust of these
5  reports, determining whether or not to ban a
6  passenger?
7  A.      Well, as far as determination, we don't do
8  that.  We just make the reports and they go and
9  whoever makes a determination what to do with that.
10 We just get all the information that is required.
11 Q.      And do you make a recommendation as to what
12 action should be taken?
13 A.      No, we don't make recommendations.  We just
14 get information and we just put all the facts that
15 we have available at the time.
16 Q.      Who makes the determination about what --
17 what action was taken?
18 A.      As far as determination, I don't know.  But
19 I send my reports, anything regarding to any
20 passenger, that goes to security operations.  And
21 from there, whoever makes the determination, I don't
22 know.
23 Q.      Who does it go to in security operations?
24 A.      That would be whoever the person is on duty,
25 but if it's regarding a ban that goes to John Kirby.

Page 15

1  Q.      And does that go to him because he's the
2  regional manager or because he's in charge of all
3  bans?
4  A.      As far as I know, he's the person that is in
5  charge as far as the refusals.
6  Q.      Okay.  And so he makes the final
7  determination as to whether or not the findings of
8  your report is valid?
9          MR. KOLB:  Objection.  Form.
10         THE WITNESS:  I don't know if he
11 does or not.  All I know is that the reports
12 go to him.
13 BY MR. WOODROW:
14 Q.      Okay.  Do you ever get any pushback?  When
15 you file a report, does John Kirby ever call you up
16 and question -- question your report?
17 A.      Yes, he has.
18 Q.      Give me an example, please.
19 A.      If there's probably enough sufficient
20 information regarding a passenger or maybe if there
21 was information that was not complete, he might call
22 me or send me an E-mail to ask further.
23 Q.      And does he ever ask you to go back and
24 investigate more fully?
25         MR. KOLB:  Objection.  Form.

Page 16

1          THE WITNESS:  I don't think he has
2  done that.  He usually will ask me if
3  there's anything additional, and I will tell
4  him -- I say, yes, I have more, or I don't,
5  that's all I have.
6  BY MR. WOODROW:
7  Q.      When you put together an IRL packet -- is
8  that what it's called?  An IRL packet?
9  A.      Yes.
10 Q.      Do you put all of the evidence that you
11 relied upon in that packet?
12 A.      Whatever I have available at that time, yes.
13 Everything that I have available.
14 Q.      So anything that's pertinent that you have
15 is reflected in that packet?
16 A.      Yes.
17 Q.      Okay.  So what kind of training did you
18 receive from AA to conduct these investigations?
19         MR. KOLB:  Objection.  Form.
20         THE WITNESS:  As far as training,
21 just on-the-job training.
22 BY MR. WOODROW:
23 Q.      Did you receive any -- any extra training in
24 the nature of investigations or how to conduct them?
25 A.      No.

Page 17

1  Q.      And what sort of on-the-job training did you
2  engage in?
3  A.      Basically from experienced investigators
4  that we have.
5  Q.      When you were taught to investigate for AA,
6  what was -- did they teach you -- did they teach you
7  a specific method in how they wanted you to conduct
8  investigations?
9          MR. KOLB:  Objection.  Form.
10         THE WITNESS:  Just basically to
11 gather all the information available.  And
12 when I submit the report, make sure that I
13 have complete and accurate reports so I can
14 submit it.
15 BY MR. WOODROW:
16 Q.      And when they taught you to gather all the
17 information available, what were the protocols that
18 you were led to understand that you should engage in
19 do so?
20 A.      As far as protocols, what are you referring
21 to?  What kind of protocols are you talking about?
22 Q.      Well, you said they taught you to gather all
23 the information.  How -- how were you to go about
24 gathering the information?
25 A.      Look at whatever -- you know, any witnesses,

Aristides Maldonado
March 08, 2022

Page 42

1          MR. KOLB: Objection. Form.
2          THE WITNESS: It took about a day,
3     I guess.
4 BY MR. WOODROW:
5     Q.    Okay. And then did you send this report to
6 John Kirby?
7     A.    Yes.
8          (Exhibit-B was marked for
9     identification.)
10 BY MR. WOODROW:
11    Q.    Okay. And so what I'm -- one thing I'm
12 curious about, and let me just go to Exhibit-B here.
13 This is the letter sent to Mr. Clowdus informing him
14 of his ban. What is the date at the top of this
15 letter?
16    A.    It says June 22nd.
17    Q.    Okay. So I'm curious why it would take
18 almost two weeks between the investigation being
19 completed and Mr. Clowdus being informed that he was
20 banned?
21         MR. KOLB: Objection. Form.
22         THE WITNESS: I don't know.
23 BY MR. WOODROW:
24    Q.    Okay. All right. Let's go back to the IRL
25 packet -- we're in the IRL packet. Yeah, we are.

Page 43

1     So you've already testified that the IRL
2 packet comprises every piece of evidence that you
3 relied upon in the investigation; is that correct?
4          MR. KOLB: Objection. Form.
5          THE WITNESS: Yes.
6 BY MR. WOODROW:
7     Q.    Does every CERS report pertaining to
8 the incident go into the packet?
9     A.    Every CERS report that I have available,
10 yes.
11    Q.    Okay. Now, if you had called and
12 interviewed someone or if you had E-mailed for
13 further information, would there be a record of that
14 call in the packet or a copy of that E-mail?
15    A.    Yes.
16    Q.    Okay. So how do you decide when you've
17 collected enough information?
18    A.    Once I look at the CERS reports, I saw that
19 I have what I needed, I went ahead and completed my
20 packet and sent it.
21    Q.    So if a GSC was involved with resolving the
22 factor incident, would you try to obtain the CERS
23 report of the GSC on site?
24    A.    I was not on site and I don't know as far as
25 the GSC doing a report.

Page 44

1     Q.    Well, what is the role of the GSC with
2 respect to passenger incidents?
3     A.    As far as I understand, they respond and
4 they take whatever action is necessary. In that
5 case, I believe it was removal of the passenger.
6          (Exhibit-C was marked for
7     identification.)
8 BY MR. WOODROW:
9     Q.    Well, if -- let's look at Exhibit-C, a
10 little bit about the role of the GSC and see if
11 that's something you're familiar with. Let's go
12 down to page 53, 6b(4). So this is -- what is this
13 document? Do you recognize it?
14    A.    Just what it says there. I've never seen
15 it. Customer service manual.
16    Q.    Okay. Let's see what this section's about.
17 G, customer misconduct. Do you see that?
18    A.    Yes.
19    Q.    All right. Let's go down to six. Six is
20 customer's conduct at the airport. Let's look at B,
21 escalation. Four. Could you read four out loud,
22 please?
23    A.    Yeah. It says, Contact a ground security
24 coordinator or member of management to assist you
25 with this situation. The GSC will speak with the

Page 45

1 customer and then determine whether they should
2 permit or deny boarding through a collaborative
3 discussion with the agents who were involved in the
4 incident.
5     Q.    Okay. Thank you. Now, let's go down to
6 seven. Seven is on the plane, so customer's conduct
7 on the plane. Let's look at A2 through 4. Once the
8 customer has scanned their boarding card and is
9 ON'd. Can you read two through four out loud,
10 please?
11    A.    The captain -- excuse me. The captain will
12 call for a GSC to the aircraft to assess the
13 situation with the flight attendant and captain. If
14 a GSC is unavailable, a member of management will be
15 called to the aircraft.
16         The GSC will speak with the customer in an
17 effort to resolve the issue.
18         A collaborative discussion among the
19 captain, flight attendant, and GSC or member of
20 management must take place before a customer can be
21 removed for reasons other than clear violations of
22 federal regulations.
23    Q.    Okay. Thank you. Please take a drink.
24 That was painful to listen to.
25    A.    Yes, sir.

Aristides Maldonado
March 08, 2022

Page 82

1  Q.    And what is this?
2  A.    The CERS report that was submitted by flight
3  attendant Merino.
4            MR. KOLB:  Which exhibit is this
5  for the depo?
6            MR. WOODROW:  This is Exhibit-D.
7            MR. KOLB:  I thought Gray was D.
8            MR. WOODROW:  All three of them are
9  together in one exhibit; Gray, Merino, and
10 Henriquez.
11           MR. KOLB:  Got it.  Thanks.
12 BY MR. WOODROW:
13 Q.    And is this a CERS report that you relied
14 upon in conducting your investigation?
15           MR. KOLB:  Objection.  Form.
16           THE WITNESS:  Yes.
17 BY MR. WOODROW:
18 Q.    Okay.  Same deal.  Facts related to the
19 event.  Created on 6/10/21 at 8:13.  Passenger was
20 asked at the beginning of boarding process to place
21 his bag on the OHB before we were to go out of
22 space.  Passenger got mad about it but accepted to
23 do it later.  After being finished boarding and
24 checking the cabin, I asked passenger to place his
25 bag in the OHB, even I offered to do it myself.  He

Page 83

1  was so aggressive about it, I explained the rule to
2  him about bulkhead and he grabbed his bag and
3  deliberately hit me in my stomach very hard with it.
4  I asked him, you just hit me with your bag.  And he
5  replied very aggressively, no, I didn't.  I advised
6  the captain about it immediately and because his
7  aggressively behavior it was decided to remove him
8  from the flight.  This behavior should not be
9  tolerated by AA at all.  I was physically assaulted
10 by this man and the company should do something
11 about it.
12        Okay.  We can stop right there.  As an
13 investigator, did you consider it at all unusual
14 that Mr. Gray's account was more rich in factual
15 detail than Merino's despite the fact that she
16 presumably had her own job that she was doing that
17 morning?
18           MR. KOLB:  Objection.  Form.
19           THE WITNESS:  I don't know what
20       you're saying as far as she was doing
21       another job.
22 BY MR. WOODROW:
23 Q.    Well, she was another flight attendant, was
24 she not?
25 A.    Yes, but what are you referring to?  I did

Page 84

1  not understand that question.
2  Q.    Well, did both Mr. Merino and Mrs. Gray have
3  their own jobs that they were performing that
4  morning in preparation for the airplane to depart?
5            MR. KOLB:  Objection.  Form.
6            THE WITNESS:  I don't know.
7  BY MR. WOODROW:
8  Q.    Do you have any reason to believe that
9  Mrs. Gray was for some reason shadowing Mr. Merino
10 in his duties that morning?
11           MR. KOLB:  Objection.  Form.
12           THE WITNESS:  I don't know.
13 BY MR. WOODROW:
14 Q.    Was it your belief at the time that you
15 conducted your investigation that Mrs. Gray was
16 shadowing Mr. Merino and that is how her report was
17 so flush with detail?
18           MR. KOLB:  Objection.  Form.
19           THE WITNESS:  No.
20 BY MR. WOODROW:
21 Q.    Okay.  As an investigator, did it give you
22 pause that Ms. Gray placed Mr. Clowdus as standing
23 there glaring at Merino after he hits him, but
24 Merino never claims in his report that Clowdus rose
25 from his window seat?

Page 85

1            MR. KOLB:  Objection.  Form.
2            THE WITNESS:  Can you repeat the
3        question?
4  BY MR. WOODROW:
5  Q.    We just read Mrs. Gray's report.  And in it
6  she says, After the passenger struck him and stood
7  there glaring at the number one.  Do you see that?
8  A.    Yes.
9  Q.    Okay.  And now Merino's report, does he ever
10 say that the passenger rose from his 1F window seat?
11 A.    No.
12 Q.    Did you notice that discrepancy at the time?
13 A.    I don't know if that's a discrepancy.
14 Q.    If a passenger is standing there glaring in
15 one report and he's sitting in a window seat in the
16 other, is that not a discrepancy?
17           MR. KOLB:  Objection.
18       Misrepresents the documents, argumentative.
19           THE WITNESS:  Like I said, I don't
20       know.  I wasn't there, so I don't know what
21       he might have put in there.  Maybe he forgot
22       to put it in the report.  I don't know.
23 BY MR. WOODROW:
24 Q.    But you didn't question further into the
25 possible discrepancy at the time, did you?

Aristides Maldonado
March 08, 2022

Page 98

1    decision.
2                THE WITNESS:  Like I said, I don't
3           know what Mr. Merino saw or heard because I
4           never saw that report.
5    BY MR. WOODROW:
6    Q.     Mr. Henriquez --
7    A.     Henriquez.  Sorry.  Thank you.
8    Q.     Right.  And today we did see that report;
9    correct?
10   A.     Yes.
11   Q.     And today we saw the tour report where he
12   expressed the opinion that it was really the flight
13   attendant's fault for escalating the situation;
14   correct?
15   A.     Yes.
16   Q.     And should Mr. Henriquez's opinion been also
17   included and evaluated in the decision whether or
18   not to ban Mr. Clowdus?
19               MR. KOLB:  Objection.  Form.
20               THE WITNESS:  It would go in the
21          report if I had it available, but like I
22          said the determination it was not up to me.
23   BY MR. WOODROW:
24   Q.     I understand that it was not.  And that's
25   why I'm asking you whether it should have been

Page 99

1    included such that now that you've seen it, it would
2    be the type of situation where you include it after
3    the fact?
4                MR. KOLB:  Objection.  Form.
5                THE WITNESS:  If I had it
6           available, I would have included it, yes.
7    BY MR. WOODROW:
8    Q.     And if you had it available and there was
9    not this lawsuit and you came to your attention
10   through the normal course of events, would you
11   reopen the file and include it for further
12   consideration?
13               MR. KOLB:  Objection.  Form.
14               THE WITNESS:  I would include the
15          report.  But like I said the reconsideration
16          part, I don't know.
17   BY MR. WOODROW:
18   Q.     Okay.  Are you testifying then that if you
19   had the tour report and Mr. Henriquez's CERS
20   statement after the fact, that you would include it
21   and resend it up the chain of command?
22   A.     I would have included them and just put them
23   in the report.  That's what I would have done.
24   Q.     Mm-hmm.  I understand that that's what you
25   would've done.  I'm asking you is that what you

Page 100

1    would do after the fact in the situation like we
2    discussed where sometimes you go back and try to fix
3    something that you got wrong?
4                MR. KOLB:  Objection.  Misconstrues
5           prior testimony, calls for speculation.
6                THE WITNESS:  I don't know.
7                MR. WOODROW:  Okay.  All right.
8           That's all I got.
9                MR. KOLB:  Reserve all of our
10          questions until the time of trial.  Madam
11          Court Reporter, we will read and sign.
12               THE REPORTER:  Okay.  So, Mr. Kolb,
13          you'd like a copy of the transcript?
14               MR. KOLB:  Yes.
15               (Witness excused.)
16               (The deposition concluded at
17          12:23 p.m.)
18
19
20
21
22
23
24
25

Page 101

1             C E R T I F I C A T I O N
2
3         I, JENNIFER D'ANGELO, Registered
4    Professional Reporter, do hereby certify:
5         That prior to being examined, the witness in
6    the foregoing proceedings was by me duly sworn to
7    testify to the truth, the whole truth, and nothing
8    but the truth;
9         That said proceedings were taken remotely
10   before me at the time and places therein set forth
11   and were taken down by me in shorthand and
12   thereafter transcribed into typewriting under my
13   direction and supervision;
14        I further certify that I am neither counsel
15   for, nor related to, any party to said proceedings,
16   not in anywise interested in the outcome thereof.
17        In witness whereof, I have hereunto
18   subscribed my name.
19
20                - - -
21
22   DATE: 3/29/22
23                Jennifer D'Angelo, RPR, CCR-NJ
24
25

Aristides Maldonado
March 08, 2022

Page 102

```
 1              ACKNOWLEDGEMENT OF DEPONENT

 2

 3

 4          I, ARISTIDES MALDONADO, have read the

 5   foregoing deposition given on February 8, 2022,

 6   consisting of page one to page 100 inclusive, and it

 7   is true, correct and complete to the best of my

 8   knowledge, recollection and belief, except for the

 9   corrections, if any, attached on a separate sheet

10   herewith.

11

12

13   _____

14   Aristides Maldonado

15

16

17

18

19

20

21

22

23

24

25
```

Page 103

```
 1                      ERRATA

 2   Page, Line                 Change

 3   _____

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

------------------------x

TROY CLOWDUS,                    *

      Plaintiff,          *

VS.                              *     Civil Action No.:

AMERICAN AIRLINES, INC. *     1:21-cv-23155-MM

      Defendant.         *

------------------------x

DEPOSITION OF JOHN KIRBY

APPEARING REMOTELY FROM

LOS ANGELES, CALIFORNIA

March 14, 2022

12:56 p.m.

REPORTED BY:

Dawn L. Halcisak, CLR

APPEARING REMOTELY FROM MILLERSVILLE, MARYLAND

**EXHIBIT "F"**

John Kirby
March 14, 2022

Page 2

1        R E M O T E   A P P E A R A N C E S

2

3        ON BEHALF OF PLAINTIFF, CLOWDUS:

4            WILLIAM T. WOODROW, ESQUIRE

5            PRO HAC VICE

6            STONE & WOODROW LLP

7            250 West Main Street, Suite 201

8            Charlottesville, Virginia 22902

9            (855) 275-7378

10           will@stoneandwoodrowlaw.com

11

12

13       ON BEHALF OF DEFENDANT, AMERICAN AIRLINES:

14           KELLY KOLB, ESQUIRE

15           LABOR & EMPLOYMENT PRACTICE GROUP

16           401 East Las Olas Boulevard, Suite 2250

17           Ft. Lauderdale, Florida 33301

18           (954) 703 3944 (direct)

19           kelly.kolb@bipc.com

20

21

22

Page 3

1                    I N D E X

2        Name of Witness                      Page

3        JOHN KIRBY

4        Examination

5        BY MR. WOODROW                     6, 122

6        BY MR. KOLB                           115

7

8

9                  E X H I B I T S

10               (Attached to the Transcript.)

11       Exhibit                              Page

12       No. A  IRL Packet                      32

13       No. B  Letter Ban                      38

14       No. C  Clowdus Complaint               49

15       No. D  Witness Reports                 68

16       No. E  Customer Service Manual (CSM)   59

17       No. F  Tour Report                     72

18

19

20

21

22

Page 4

1        R E M O T E   P R O C E E D I N G S

2            IT IS HEREBY STIPULATED AND AGREED that

3        the reading and signing of this deposition are

4        not waived.

5            THE REPORTER:  Good afternoon,

6        everyone.

7            The attorneys participating in this

8        deposition acknowledge that I am not physically

9        present in the deposition rooms and that I will

10       be reporting this deposition remotely.  They

11       further acknowledge that, in lieu of an oath

12       administered in person, the witness will

13       verbally declare his or her testimony in this

14       matter is under penalty of perjury.  The parties

15       and their counsel consent to this arrangement

16       and waive any objections to this manner of

17       reporting.

18           Please indicate your agreement by

19       stating your name, whom you represent, and your

20       agreement on the record, beginning with counsel

21       noticing the deposition.

22           MR. WOODROW:  William Woodrow, I

Page 5

1        represent the Plaintiff Troy Clowdus and I agree

2        to that.

3            MR. KOLB:  Kelly Kolb for the Defendant

4        American Airlines, we agree as well.

5            THE REPORTER:  Okay.  Great.

6            THE WITNESS:  John Kirby, American

7        Airlines, I agree, as well.

8            THE REPORTER:  Okay.  Great.  Thank you

9        for that.

10           And now for the witness.

11       Will the witness kindly present his or her

12       government-issued identification by holding it

13       up to the video monitor for verification?

14           (Whereupon, at 12:57 p.m., the witness

15       presents government-issued identification and

16       identity verified.)

17           THE REPORTER:  Yes.  Thank you very

18       much.  I'll give you a moment to put that down.

19       That looks like you.

20           And can I ask you to raise your right

21       hand.

22               JOHN KIRBY,

John Kirby
March 14, 2022

Page 6

1    having been duly sworn, was examined, and did
2    testify as follows:
3              THE WITNESS:  I do.
4              THE REPORTER:  Please state your name,
5    sir, and spell your name for the record.
6              THE WITNESS:  John Kirby, J-O-H-N,
7    K-I-R-B-Y.
8              THE REPORTER:  Thank you, very much.
9              Please begin, Counsel.  I'm going off
10   the video monitor, but I am here.
11             DIRECT EXAMINATION BY COUNSEL FOR
12                  PLAINTIFF, CLOWDUS
13   BY MR. WOODROW:
14        Q.   Thank you.  Good morning, Mr. Kirby.
15   My name is, Will Woodrow.  I'm here on behalf of
16   Troy Clowdus, a passenger who you had reason to
17   provide input on an investigation that was done
18   into him last year.  Let me ask you have you
19   ever given a deposition taken before?
20        A.   I have.
21        Q.   Okay.  Well, just make sure you let me
22   finish my questions.  Make sure you understand

Page 7

1    them before you answer.  The reporter needs
2    verbal responses.  And just answer to the best
3    of your ability, okay?
4         A.   Okay.
5         Q.   Are you on medication today that might
6    affect your testimony?
7         A.   No.
8         Q.   Okay.  So, from the time, if you have
9    given a deposition before, I'm sure you're
10   aware, but like when I ask you questions
11   Mr. Kolb may object.  And if he does, that's
12   just to create a record for the judge later.
13   Unless he instructions you specifically not to
14   answer, which would only be if I asked you about
15   privileged information, which I don't intend to
16   do, you just ignore the objection and answer to
17   the best of your ability, okay?
18        A.   Okay.
19        Q.   Okay.  I'm going to start just asking a
20   little bit about your background.
21             Did you go to college?
22        A.   I did.

Page 8

1         Q.   Where did you go?
2         A.   I've gone to numerous colleges both
3    in Missouri and in California.
4         Q.   Studied?
5         A.   Law degree criminal justice.
6         Q.   Okay.  And did you work in that field?
7         A.   Yep.
8         Q.   Where'd you begin?
9         A.   Well, where to begin?  So I worked
10   in the law enforcement field for
11   approximately 30 years, where I retired from
12   that field and started a career in corporate
13   security with American Airlines.
14        Q.   Okay.  What did you do in your capacity
15   in law enforcement?
16        A.   In my capacity in law enforcement, I
17   started out in patrol.  I worked in jails, I
18   worked investigations.  I spent about a third
19   of my career on the joint terrorist task
20   force working with the FBI.  I worked on
21   numerous task forces throughout my career
22   span.  And the end of my career -- toward the

Page 9

1    end of my career working with the FBI, I
2    spent time working aviation security at the
3    airports.
4         Q.   Okay.  What year did you begin with
5    American?
6         A.   2016.
7         Q.   Okay.  And what did American hire you
8    to do?
9         A.   I was hired to be the investigator
10   for American Airlines in corporate security.
11        Q.   And is that the position -- is the
12   position that you have today is that the same
13   position that they hired you in, to do?
14        A.   It was not.
15        Q.   So am I correct in understanding that
16   you began in a role similar to Mr. Maldenaldo
17   and now you have risen to be supervisor?
18        A.   I -- not exactly.  So I started out
19   in a position such as Mr. Maldenaldo as an
20   investigator.  I'm now a regional manager,
21   but not in his region.  He's in the Miami
22   region.  I'm in the L.A. region.

John Kirby
March 14, 2022

Page 10

1        (Off record discussion.)
2   BY MR. WOODROW:
3        Q.   So as the regional -- you say you are a
4   regional manager?
5        A.   That's correct.
6        Q.   What do your duties entail?
7        A.   I oversee a region that consists of
8   Chicago, all the airports near there.
9   Phoenix all those airports.  L.A. all those
10  airports, and Asia-Pacific, which basically a
11  large portion of Asia and the South Pacific.
12       Q.   And by oversee, what do your duties
13  entail?
14       A.   I oversee a group of investigators
15  who overlook my investigations for those
16  areas.
17       Q.   And what is the subject matter of those
18  investigations?  Are those just customer
19  misconduct?
20       A.   You cut out just a little bit.  Can
21  you repeat that question, please?
22       Q.   What is the subject matter of those

Page 11

1   investigations?  Are those just customer
2   misconducts or broader?
3        A.   No, it's broader.
4        Q.   What sorts of investigations do you do?
5        A.   We look at customer misconduct, we
6   deal government agencies as far as
7   interaction with the airlines and government
8   agencies, such as the CSA.  We also oversee
9   the investigations involving any employees
10  who might have done something that would be
11  against American Airlines' policies.
12       Q.   Okay.  So if an employee engages in
13  misconduct, you would investigate that, as well?
14       A.   My team would.  That's correct.
15       Q.   Okay.  And in your role today, what
16  training have you received from American
17  Airlines?
18       A.   On-the-job training from the very
19  get-go.  And other than that, we don't have a
20  whole lot of training.  We have some legal
21  training from time to time, but there is not
22  a lot of training that the company has

Page 12

1   provided regarding that.
2        Q.   Have you received any training in how
3   to conduct investigations?
4        A.   Throughout my law enforcement
5   career, I conduct hundreds and hundreds of
6   investigations.
7        Q.   American Airlines hasn't provided any
8   such training?
9        A.   I don't believe so, no.
10       Q.   Does American Airlines provide training
11  to the investigators who work for you?
12       A.   We have some training, but it's
13  not -- I don't think so.  No.  There is some
14  training that we have but it's not
15  necessarily to do our investigations.  Most
16  of folks that work for us have all got prior
17  investigative experience.
18       Q.   Okay.  Who do you report to?
19       A.   I report to a director in Dallas.
20       Q.   And what's their name?
21       A.   His name is Phil Gilbert.
22       Q.   And in the course of our

Page 13

1   investigations, do you ever have occasion to
2   interact with American's legal department?
3        A.   I do sometimes, yes.
4        Q.   And do you have a counterpart in the
5   legal department?
6        A.   Not necessarily a counterpart, no.
7        Q.   If there's noise, I apologize.  There's
8   construction going on in the suite next to mine.
9   So.
10       (Off record discussion.)
11  BY MR. WOODROW:
12       Q.   Do you ever consult with the legal
13  department before taking actions based upon
14  reports that you receive?
15       A.   I do basically let them know what
16  we're looking at, yes.
17       Q.   And do they ever provide input in how
18  they would like to see something handled?
19       A.   They sometimes ask questions, but
20  input, not necessarily.
21       Q.   As an investigator, are you cognizant
22  of assessing legal liability as a component of

John Kirby
March 14, 2022

Page 14

1  your investigation and decisions?

2      A.   Can you ask the question again,

3  please?

4      Q.   Are you cognizant of potential legal

5  liability to American Airlines as you conduct

6  investigations and decide how to proceed?

7      A.   I believe so, yes.

8      Q.   Okay.  All right.  How many

9  investigators report to you?

10     A.   Currently, five.

11     Q.   Okay.  And Mr. Maldonado is not one of

12 those investigators?

13     A.   He is not, no.

14     Q.   How is it that you had occasion to

15 review one of his reports then?

16     A.   I review all of the reports that are

17 submitted to me that deal with the internal

18 refuse list.

19          (Off record discussion.)

20 BY MR. WOODROW:

21     Q.   Okay.  So help me understand that.  Are

22 you saying that for all of American Airlines you

Page 15

1  are in charge of internal refuse list, but you

2  are a regional manager otherwise?

3      A.   Correct.

4      Q.   Okay.  So are you the individual who

5  makes the final decision on whether or not to

6  ban all customers who end up getting banned?

7      A.   I am.

8      Q.   Okay.  Now, when you're investigating

9  that allegation of a felony, do you or do you

10 instruct your investigators to take extra care

11 to determine that you get the results of the

12 investigation, correct?

13     A.   I would say yes.  It would matter if

14 it was felony or misdemeanor, though.  So all

15 of their information should be correct.

16     Q.   Okay.  So if you were to take extra

17 care in investigating a conclusion that a

18 passenger committed a felony, what might that

19 look like?

20          MR. KOLB:  Object to the form.

21          THE WITNESS:  I'm sorry?

22          MR. KOLB:  No, I've made an objection

Page 16

1  to the form of the question.  You can go ahead

2  and answer it, though.

3          THE WITNESS:  Can you please repeat the

4  question?

5  BY MR. WOODROW:

6      Q.   Sure.  If you were to take extra care

7  in an investigation, due to the fact that you

8  were the investigating the allegation of a

9  felony, what would that look like?

10     A.   Well, the investigators should

11 collect every piece of information they have

12 available to them to investigate that case.

13 And once they complete that investigation,

14 they should make a recommendation or at least

15 take that investigation and determine what

16 they need to do next.

17     Q.   Okay.  Describe to me the standard

18 protocol of an investigation into a passenger

19 incident.

20     A.   Are we talking about a passenger who

21 is suspected of something?

22     Q.   Passenger misconduct?

Page 17

1      A.   Yes.

2      Q.   Yes.

3      A.   Okay.  So the first thing that

4  happens is generally those cases go to our

5  security operations bureau in Dallas.  They

6  receive reports in Dallas that allow those

7  cases to be passed out to the correct region.

8  And that region will ensue and start an

9  investigation as to what occurred on that

10 flight or at the gate or in the airport or

11 whatever it might have taken place.

12     Q.   And do you provide any direct input

13 into those investigations?

14     A.   Normally, no.

15     Q.   And do you ever reject the recommended

16 action in the reports that you receive?

17     A.   Can you repeat that again?

18     Q.   When you receive a report, an IRL

19 packet from an investigator, do you ever reject

20 the recommended action of the investigator?

21     A.   Yes.

22     Q.   Give me an example.

John Kirby
March 14, 2022

Page 30

1  passenger PNRs?

2       A.   I don't know who all those people

3  who -- they are -- I'm sure it's a long list.

4       Q.   So once you've determined that a

5  passenger has committed an assault or some

6  other -- or for some other reason has been

7  banned, where do you document that determination

8  so that he will not be sold a ticket?

9       A.   I do not do that.  That's not part

10  of my role.

11      Q.   Do you know if a travel agency

12  attempted to purchase a ticket, on behalf of a

13  banned customer, if they would be refused?

14      A.   If they're on our internal refuse

15  list, I don't know how that process -- I

16  can't answer to that process.

17      Q.   Okay.  So you don't know at what point

18  in the process that the passenger would be

19  flagged?

20      A.   I don't.  No.

21      Q.   Okay.  So what did you do -- what did

22  you do personally in this instance when you

Page 31

1  received Mr. Maldonado's report?

2       A.   I reviewed his report and made a

3  determination that Mr. Clowdus belong on our

4  internal refuse list based on his conduct by

5  what he did to the flight on the aircraft.

6       Q.   Okay.  And what documents did you

7  review in preparation for your deposition today?

8       A.   IRL checklist that was sent to me.

9       Q.   Is that it?

10      A.   I also reviewed, with our attorney,

11  a few other documents that he showed me.

12      Q.   And what were those documents?

13      A.   One was some type of response that

14  was sent to the company, while the client --

15  your client was in the adverse cart

16  (phonetic), and I can't remember the other

17  two.

18      Q.   Okay.  When you received the report

19  from Mr. Maldenaldo, did you take any steps to

20  independently investigate that report?

21      A.   No.

22      Q.   And did anybody other than

Page 32

1  Mr. Maldonado take any steps to investigate it

2  before you made a decision to do ban

3  Mr. Clowdus?

4            MR. KOLB:  Objection to form.

5            THE WITNESS:  To my knowledge, no.

6  BY MR. WOODROW:

7       Q.   Okay.  All right.  So we're -- I'm

8  going to figure this screen sharing out here.

9  We're going to go to Exhibit A, which is the IRL

10  packet, so you should be familiar with it.

11           (KIRBY Exhibit A marked for

12  identification and attached to the transcript.)

13  BY MR. WOODROW:

14      Q.   Okay.  Just a couple of questions on

15  this.  Do you recognize this?

16      A.   Yes.

17      Q.   Okay.  Is this IRL packet that you

18  reviewed for Mr. Clowdus?

19      A.   That's a portion of it, yes.

20      Q.   Okay.  Is this the first page?

21      A.   I don't know if it's the first page

22  or what page it is.  But that's the first of

Page 33

1  what I'm looking at.

2       Q.   Okay.  Is this -- is this the first

3  page of a form that you would see when an

4  investigator completes an IRA packet?

5            What I'm saying is this:  Is this the

6  opening -- the opening page in a form that you

7  would fill out?

8       A.   It could be?  I don't always see it

9  in this typed format.

10      Q.   Okay.  Could you -- could you read at

11  the top what time this was first published?

12      A.   June 10 of 2021, at 12:29 p.m.

13      Q.   Okay.  And I'm going to go down to the

14  last page.  And is this -- is this the -- what

15  is this page?

16      A.   That is the internal refuse

17  checklist.

18      Q.   Okay.  And can you see at the bottom

19  what time this page was generated?

20      A.   June 5, 2021 at -- I'm sorry

21  June 11, 2021, at 11:24:02.

22      Q.   So this -- is it reasonable to conclude

John Kirby
March 14, 2022

Page 130

1       MR. KOLB:  Yes, ma'am.

2       THE REPORTER:  Four on the page?

3       MR. KOLB:  Yeah, a mini script is fine.

4       THE REPORTER:  Yeah.  And the exhibits

5    are going to be attached, if you can give them

6    to me.

7           (Whereupon, at 3:21 p.m., the remote

8    deposition of JOHN KIRBY was concluded.)

9                   * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 131

1               ACKNOWLEDGMENT OF DEPONENT

2       I, JOHN KIRBY, do hereby acknowledge

3    that I have read and examined the foregoing

4    testimony, and the same is a true, correct and

5    complete transcription of the testimony given by

6    me, and any corrections appear on the attached

7    Errata sheet signed by me.

8

9

10      (DATE)                  (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

Page 132

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2       I, Dawn L. Halcisak, Court Reporter and

3    Notary Public in and for the State of Maryland,

4    the officer before whom the foregoing Remote

5    Deposition was taken, do hereby certify that the

6    foregoing transcript is a true and correct

7    record of the testimony given; that said

8    testimony was taken by me stenographically and

9    thereafter reduced to typewriting under my

10   direction and that I am neither counsel for,

11   related to, nor employed by any of the parties

12   to this case and have no interest, financial or

13   otherwise, in its outcome.

14       IN WITNESS WHEREOF, I have hereunto set

15   my hand and affixed my notarial seal this 28th

16   day of March 2022.

17

18   My commission expires:

19   August 4, 2023

20

21   NOTARY PUBLIC IN AND FOR THE

22   STATE OF MARYLAND

Page 133

1              E R R A T A   S H E E T

2    IN RE:  CLOWDUS V. AMERICAN AIRLINES, INC.

3    RETURN BY:

4    =================================================

5    PAGE   LINE     CORRECTION AND REASON

6    =================================================

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      (DATE)                  (SIGNATURE)