**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO: 2021-cv-23155

TROY CLOWDUS,

    Plaintiff,

v.

AMERICAN AIRLINES, INC.,

    Defendant.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT AMERICAN AIRLINES, INC's**
**CROSS-MOTION FOR SANCTIONS**

Plaintiff TROY CLOWDUS ("Clowdus") files his Response in Opposition to Defendant American Airlines, Inc. ("AA")'s Cross-Motion for Sanctions Against Plaintiff and Plaintiff's Counsel dated August 8, 2022 [D.E. 83].

**INTRODUCTION**

This is the third time in four months that AA has moved for Sanctions against Plaintiff and/or Plaintiff's Counsel. The first Motion for Sanctions [D.E.34] was filed on May 9, 2022 and denied on May 24, 2022. [D.E. 47]. The Second Motion for Sanctions, which was styled as a Cross Motion for Sanctions and consolidated with AA's Response to Plaintiff's Motion for Sanctions, was filed on July 6, 2022. [D.E. 61]. Clowdus filed a detailed response to that Cross Motion addressing most of the points raised in AA's present filing. However, because AA did not properly file its Cross Motion as a separate document, as directed by the clerk, it was not permitted to file a Reply. *See* [D.E. 73, 75]. Pursuant to the Court's order entered on July 27, 2022, no further briefing on that Cross Motion is permitted. *See* [D.E. 75].

1

In an attempt to circumvent the court's July 27, 2022 Order bringing a close to the sanctions-related filings, AA has now filed a new Cross Motion for Sanctions ("The Second Cross Motion"), raising the same arguments that it raised in the first Cross Motion, along with a claim alleging that Clowdus violated the parties' Confidentiality Agreement because he inadvertently failed to redact the names and addresses of disclosed passengers from text messages attached as exhibits to his Response to AA's Cross-Motion. For the reasons previously stated in Clowdus's Response to AA's Cross Motion for Sanctions filed on July 18, 2022 [D.E. 66], which it adopts and incorporates by reference, as well as those herein, the Second Cross Motion should be denied.

### I. The Cross Motion for Sanctions Has Already Been Fully Briefed and Argued.

As a preliminary matter, the Second Cross Motion should be stricken because it amounts to nothing more than an impermissible attempt by AA to try and circumvent Local Rule 7.1 and this Court's July 27, 2022 order closing the briefing on this matter.

Local Rule 7.1(c)(1) governs motion practice in federal courts in this district. It provides, in relevant part:

> For all motions, except motions served with the summons and complaint, each party opposing a motion shall file and serve an opposing memorandum of law no later than fourteen (14) days after service of the motion. Failure to do so may be deemed sufficient cause for granting the motion by default. The movant may, within seven (7) days after service of an opposing memorandum of law, file and serve a reply memorandum in support of the motion, which reply memorandum shall be strictly limited to rebuttal of matters raised in the memorandum in opposition without re-argument of matters covered in the movant's initial memorandum of law. *No further or additional memoranda of law shall be filed and served without prior leave of Court.*

(emphasis added). Additionally, 7.1(c)(2) provides: "Absent prior permission of the Court, neither a motion and its incorporated memorandum of law nor the opposing memorandum of law shall exceed twenty (20) pages."

2

The present motion is nothing more than an attempt by AA to circumvent the provisions of Local Rule 7.1 and this Court's July 27, 2022 paperless order. The July 6, 2022 Cross Motion for Sanctions sought sanctions against Clowdus and his counsel for "obstruction for AA's access to previously cooperative witnesses with relevant and material knowledge through the intervention of Plaintiff's criminologist." [D.E. 61, p. 13] The Cross Motion claimed that the "undisputed" record before the Court at that time established that: 1) Hernandez-Ramirez and Espinosa [sic] initially were cooperative with AA, that Hernandez-Ramirez discontinued his cooperation with AA, that Hernandez-Ramirez changed his recollection of events with respect to hearing, among other things, the statement "You hit me," the only intervening circumstance between the time the witnesses cooperated and ceased cooperating was the intervention of "Plaintiff's criminologist," that the contact occurred while plaintiff was threatening unrepresented parties, and that Plaintiff's counsel chose "the most intimidating investigator that money could buy—one with psychological and psychiatric expertise" with "close ties" to multiple Mexican and US governmental agencies "investigating mass murders, mutilations, rapes, disappearances, human trafficking, cartel murders, etc and one with a high public profile." *Id.* at 14. In addition, the Cross Motion accused Clowdus's counsel of violating Rule 4-3.4 and ABA Model Rule 4.3. *Id.* at 15.

AA's Second Cross Motion for Sanctions, filed a month later on August 8, 2022 [D.E. 83], recites the same allegations as those contained in the original Cross Motion almost verbatim. For example, the Second Cross Motion accuses Clowdus and his counsel, based on "indisputable record proof," of "'persuading' previously cooperative favorable witnesses to discontinue cooperation with Defendants and to materially change their prior (in one instance, sworn) version of events. [D.E. 83, p. 1]. It also accuses "Plaintiff's 'criminologist'" and Plaintiff of "witness

tampering" by "persuading" Hernandez-Ramirez to change his version of what he heard "with respect to the critical issue" of "whether he heard 'you hit me'" comment, and of intimidating Hernandez-Ramirez and Espinosa by choosing "the most high profile, well known 'criminologist' investigator in Mexico—and one with close ties to the U.S. and Mexican governments in investigating mass murders, mutilations, rapes by law enforcement officers and disappearances." *Id.* at pp. 2, 4-5, 7, 10. And it accuses Clowdus's counsel of violating Rule 4-3.4 and ABA Model Rule 4.3 – the same bar rules it accuses them of violating in the first Cross Motion. *Id.* at 5, 12. Indeed, the only differences between the first and second motions are references to the text messages which Clowdus voluntarily produced to the Court, and the claim that Clowdus violated the Confidentiality Agreement the parties entered into by failing to redact the names and addresses of the first class passengers from several of those text messages. In other words, with the exception of the issue concerning the confidentiality order, everything AA argues in its Second Cross Motion for Sanctions was previously argued and briefed in its first Cross Motion for Sanctions

As AA is aware, from Clowdus's filings with the Court, Hernandez-Ramirez, Espinosa, Mr. Clowdus, and his counsel and investigators, have all agreed to testify on the issues raised in its July 6, 2022 Response and Cross Motion for Sanctions.[1] Furthermore, the Court is in possession of the translated versions of the text messages between Clowdus and his investigator.

---

[1] Clowdus and his counsel would, of course, testify live, and although the court does not have jurisdiction over non-party witnesses residing outside the United States, Hernandez-Ramirez, Espinosa, and Muriel have all agreed to testify by zoom. Notably, the same offer to have AA's Mexican counsel has not been made by AA, which has objected to providing copies of its text messages and communications with and between Hernandez-Ramirez, Espinosa, and its Mexican counsel. Nor has AA offered to use its relationship with Federico Quintana to see if he would be willing to appear remotely at an evidentiary hearing.

The Court is fully capable of reaching its own conclusions concerning whether sanctions are warranted against either party based on the documentary evidence and the testimony of these witnesses without an additional 16 pages of "supplemental briefing" consisting largely of a hyperbolic rehash of the same unsubstantiated claims against Clowdus and his counsel contained in the original Cross Motion for Sanctions. Accordingly, the Second Cross Motion for Sanctions should be stricken.

## II.     AA Has Failed to Establish an Entitlement to Sanctions.

Even if the Court allows AA to file its Second Cross Motion for Sanctions, the motion should still be denied because AA has failed to establish that it is entitled to sanctions against either Clowdus or his counsel.

### A.     There is no evidence to support the allegations of witness tampering.

As Clowdus explained in detail in his Reply to AA's Response to his Motion for Sanctions and Response to AA's Cross Motion for Sanctions, there is no evidence that Clowdus or anyone on his team improperly attempted to influence or tamper with any witnesses in this case.  *See* [D.E. 66, pp. 10-15].  However, Clowdus feels it is important to address several points AA has included in its Second Cross Motion which are important for the Court to be aware of because they either are inaccurate and/or misleading or entirely unsupported by any record evidence:

• AA implies that Hernandez-Ramirez and Espinosa stopped cooperating with AA after the May 24, 2022 hearing due to comments by the Court that AA lacked any testimony from non AA-affiliated witness, which "telegraph[ed] to Plaintiff's counsel the importance of forestalling AA's access to those witnesses." [D.E. 83, p. 1].  AA ignores the fact that

Hernandez-Ramirez and Espinosa both ceased communicating with AA several months before that on their own volition.

• AA implies that because Dr. Muriel did work for the U.S. Embassy in Mexico City, and the embassy has authority to revoke travel visas for Mexican nationals, that: (1) Muriel himself had such authority; (2) that he used that authority to threaten Hernandez-Ramirez and Espinosa to lie and change their testimony; and (3) that Clowdus and/or his attorneys facilitated or encouraged him to do so. Yet there is not <u>a shred of evidence</u> to support any of these patently false and defamatory allegations, which AA would most certainly never have made if it were not able to hide behind the litigation privilege.[2] Indeed, AA's assumption that "[t]here is *every reason to believe* the communications by Plaintiff's criminologist with these passengers were . . . improper, offensive, and misleading" is nothing more than that – an unsubstantiated assumption. (emphasis added).[3]

• AA similarly implies that because Dr. Muriel's website bills his agency as "The First and Most Prestigious Investigation Agency" in Mexico and that it "touts his major press and media coverage for his work on behalf of various Mexican governmental entities investigating mass murders and trafficking," it necessarily follows that: (1) Hernandez-Ramirez and Espinosa viewed and read his website and were aware of these facts or he informed Hernandez-Ramirez and Espinosa of these facts; and (2) that the knowledge of these facts caused them to lie and change their testimony -- or effected them in any way. Yet there is not a <u>shred of evidence</u> to support these factually unfounded allegations.

---

[2] The difference between these <u>unsubstantiated</u> allegations and the allegations forming the basis of Clowdus's Motion for Sanctions, which consist of <u>actual statements</u> made in <u>actual text messages</u> by AA's Mexican lawyers, should not be lost on the Court.

[3] Once again, AA's unsubstantiated assumptions stand in stark contrast to <u>actual evidence</u> of improper communications by AA's Mexican lawyers.

- AA maintains that because Clowdus asked Muriel to arrange to meet in person with Hernandez-Ramirez and Espinosa to interview them, rather than speak with them by phone, it meant that he wanted to strong arm them into lying and changing their testimony. There are two problems with this position: First, Clowdus could not have pressured them to change their testimony because at the time he hired Muriel, he did not know that they had already spoken with AA and that Espinosa had signed a statement. Second, there is nothing either unethical or improper about an investigator interviewing a witness in person. On the contrary, most investigators usually prefer to conduct in person interviews of witnesses because they are often able to get a better sense of whether the witness is credible. The fact that Clowdus was fearful the witnesses would be less likely to be cooperative if they were not speaking face to face in no way establishes that either Clowdus or Muriel sought to "persuade" or coerce them into giving false testimony.

- AA insists that because Clowdus's counsel filed a sworn affidavit signed by Hernandez-Ramirez about what he heard on the morning of the flight, which they maintain conflicts with the statement in his June 8, 2022 e-mail, that they "knowingly . . . offer[ed] evidence that [they knew] to be false in violation Rule 4-3.3 (4)." This assumes that: (1) Clowdus's counsel prepared and discussed the affidavit with Hernandez-Ramirez-- <u>which they did not</u>; and (2) the contents of the affidavit are false—<u>which they are not</u>; and (3) Clowdus's counsel know them to be false—<u>which they do not</u>. Hernandez-Ramirez states in his May 27, 2022 affidavit that he "heard the stewardess [sic] say to the passenger that he hit him." He also states in his June 8, 2022 e-mail that he "could not see the blow directly, *but I did see that the flight attendant was complaining about a blow.*" (emphasis added). It is unclear how Hernandez-Ramirez could have "seen" the flight attendant complaining about the blow if he did not "hear"

7

him complain about it, since the only way he would not have known what he was complaining about was if he heard him talk about it. One obvious explanation is that he used the word "seen" when what he meant to say was "heard." But in no way does the June 8, 2022 e-mail establish that Clowdus's counsel knowingly offered evidence that they knew to be false, particularly where the statement AA claims is false was sworn to in the presence of a notary.[4]

- AA states that Dr. Muriel "is unwilling to present for deposition" or produce his communications with anyone he has "personally met" with to "persuade." This is both misleading and inaccurate. The text message AA relies on to say that Dr. Muriel is "unwilling to present for deposition" was written in March, 2022 at the time he was retained by Clowdus in response to Clowdus asking him whether he would be able to testify in person if the case went to trial. Dr. Muriel never stated that he would not agree to testify remotely at an evidentiary hearing about his communications with Hernandez-Ramirez and Espinosa after AA accused him of witness tampering and strong-arming Hernandez-Ramirez and Espinosa to change their testimony. Furthermore, Dr. Muriel has never refused to produce his communications with any passengers he met with, and Clowdus offered to voluntarily swap with AA all communications between the respective litigation teams and the passengers, but AA never responded. See ex___. In any event, it seems odd that AA would raise this patently inaccurate allegation of Plaintiff's refusal to produce communications with non-party passengers as a basis for sanctions, since AA is the one that has objected to producing any communications between its Mexican law firm and

---

[4] Indeed, if AA's standard that arguably inconsistent statements are knowing lies, then AAs counsel would be guilty of violating Rule 4-3.3 (4), since Mr. Quintana's testimony is rife with inconsistencies internally and in connection with the declaration he signed about the events of that day.

any passengers (or for that matter communications between AA's Miami attorneys and its Mexican law firm "investigators" as Plaintiff has already unilaterally produced.)

Equally disingenuous is AA's statement at 7 of its Second Cross Motion that "it was the involvement of Plaintiff's "criminologist" which caused [Hernandez-Ramirez and Espinosa to retain counsel *for their protection*." (emphasis added). The statement falsely implies that Hernandez-Ramirez and Espinosa felt threatened by Dr. Muriel. Yet as the text messages between Hernandez-Ramirez and Muriel and Espinosa's affidavit's make clear, it was the overtures by AAs Mexican lawyers that caused them to feel uncomfortable. Why else would Hernandez-Ramirez voluntarily forward the unsolicited text messages from the Mexican lawyers to Muriel? Moreover, AA fails to explain how Dr. Muriel could have influenced Mr. Espinosa's testimony when Mr. Muriel's affidavit states that he has never spoken with Mr. Espinosa before.

### B. Neither Clowdus nor his counsel violated the Confidentiality Agreement.

AA alternatively argues that it is entitled to sanctions because Clowdus deliberately and maliciously violated the Confidentiality Agreement the parties entered into concerning discovery in December, 2021 ("The Agreement"). *See* D.E. 83, p. 9 ("Plaintiff's violation of the Confidentiality Agreement was intentional since he was fully aware that the information was labeled confidential and is charged with the knowledge of the existence of the Confidentiality Agreement and its terms. . . . Indeed, the public disclosure of the witness' personal contact information appears to have been a purely gratuitous act by an out-of-control litigant and his counsel"). AA is wrong for two reasons: First, in order for Clowdus to have violated the Agreement, the documents at issue had to constitute "confidential information" within the meaning of the Agreement, which they did not. Second, and more importantly, the record makes

clear that to the extent Clowdus did violate the Agreement by disclosing Confidential Information, the disclosure was clearly inadvertent.

### 1. The names and contact information of the first-class passengers were not "Confidential Information."

On December 14, 2021, the parties entered into a Confidentiality Agreement ["The Agreement"] with respect to discovery materials exchanged in this case, which was drafted by AA. *See* [D.E. 83-24]. Paragraph 3 of the Agreement defined "Confidential Information" as follows:

> Any Producing Party may designate any Discover Materials "Confidential" if such Producing Party *reasonably and in good faith believes that such Discovery Materials contain* (a) trade secret information as that term has been define under the applicable statutes and case laws; (b) confidential client information; (c) confidential operational business or financial information; (d) confidential employee information; (e) TSA or other security sensitive information; or (f) other proprietary information that would ordinarily be protected from disclosure as confidential under applicable statues, case law or industry practice, including information involving confidential matters related to the business operations of Producing Party. Confidential Discovery Materials include, without limitation, any internal manuals, operating methods or procedures. Confidential Information shall also apply to and include those portions of all pleadings, motions, deposition transcripts, discovery papers, briefs, summaries, notes, abstracts, or other materials that comprise, embody, summarize, quote, discuss, attach as exhibits or incorporate any Confidential Information. Discovery Materials designated as "Confidential" shall not be disclosed to any person or entity except in accordance with the terms, conditions, and restrictions of this Confidential Agreement. *Confidential Information shall not include information which*: (1) was, is or becomes public knowledge, not in violations of this or any other Order, (ii) *was or is acquired without obligation of confidentiality from a person not a Party to this Lawsuit and having the right to disclose same*, or (iii) was previously known to either Party prior to the execution of this Agreement.

(emphasis added).

The Agreement by its terms requires that for information to be deemed "Confidential" the party designating it as confidential must "reasonably and in good faith believe" that the information falls within one of six enumerated categories in paragraph 3. However, a cursory

review of paragraph 3 plainly demonstrates that AA cannot meet this burden. There is no credible argument that the names and contact information of the first-class passengers constitute trade secret, operational business or financial information, employee information, TSA or other sensitive security information, or other proprietary information that would be protected under applicable statutes or case law. Nor can AA argue that the names and contact information for these passengers constitutes "client information," since the passengers are not "clients" of AA's.[5]

In addition, paragraph 3 expressly states that "Confidential Information shall not include information which "was or is acquired without obligation of confidentiality from a person not a Party to this Lawsuit and having the right to disclose same." There is no evidence that AA promised the first-class passengers to keep their names and addresses confidential or that they had any independent legal obligation to do so. Nor is there any evidence that the passengers had no right themselves to disclose that information, which they obviously did since it belonged to them.[6]

Furthermore, AA cannot offer any reason why the names and addresses of the non-party witnesses in this case should constitute "confidential information," particularly where that

---

[5] While AA may attempt to argue that the confidentiality agreement was a standard, form agreement not specific to the airline industry, the reference to the TSA clearly refutes any such argument. Furthermore, to the extent that the term "client" is ambiguous in the context of the Agreement, the ambiguity must be construed against AA. *Medical Store, Inc. v. AIG Claim Serv., Inc.*, 2003 WL 25669175 (Oct. 17, 2003, S.D. Fla. 2003), at * 3 (ambiguity in term in confidentiality agreement executed by plaintiff was required to be construed against defendant, where defendant drafted the agreement); *City of Homestead v. Johnson*, 760 So.2d 80 (Fla. 2000)(an ambiguous term in a contract is to be construed against the drafter).

[6] In pointing this out, Clowdus does not seek to excuse any inadvertent failure on his part to redact the names and contact information of the passengers from the text messages attached to the Motion for Sanctions. *See* Part II, *infra*. Rather, he wishes to point out that based on the language of paragraph 3 of the Confidentiality Agreement, neither he nor his counsel were required to do, and they certainly should not be subject to sanctions for failing to do so.

information is required to be disclosed under Federal Rule 26 at the beginning of every case. Indeed, under AA's logic, defendants would be entitled to designate the names and addresses or witness in every accident or tort case involving a confidentiality agreement as confidential and require plaintiffs to petition the court to challenge that designation.  Such a rule would not only be needlessly cumbersome to plaintiffs, but it would also create additional work for the court in garden variety personal injury cases such as this one.

> **2.   Clowdus's failure to redact the information from the text messages attached to its motion was inadvertent.**

But even if the names and contact information of the first-class passengers was "Confidential Information" within the meaning of the Confidentiality Agreement, the Court should still deny AA's Second Cross Motion for Sanctions because the disclosure of this information was both limited and inadvertent.  Federal district courts, including at least one court in this district, have declined to impose sanctions on parties who have inadvertently disclosed confidential information.  *Air Turbine Technology, Inc.*, 2003 WL 26083689 (Sept. 26, 2003, S.D. Fla.), at * 1 (declining to impose sanctions against plaintiff who four translators access to protected information without first requiring them to sign non-disclosure agreements where disclosure was inadvertent and did not harm defendants); *Youngevity Int'l Corp. v. Smith*, 2019 WL 1542300 (April 9, 2019, S.D. Cal.), at 14-16 (declining twice to impose sanctions against plaintiff and their attorney for publicly filing, in three pleadings, information designed "Confidential—For Counsel Eyes Only" where defendant failed to demonstrate bad faith or specific injury or prejudice resulting from the violations and defendant and where defendant took no steps to have the documents filed under seal;  "Even if Youngevity did make improper disclosures in the few instance so which Wakaya complains in the  . . . motion, the circumstances are not sufficiently extreme as to warrant sanctions."); *Sandoz, Inc. v. United Therapeutics*

12

*Corp.*, 2020 WL 3567287 (June 30, 2020, D. New Jersey 2020), at * 7-8 (denying motion for sanctions where plaintiff inadvertently filed brief containing confidential information with court where defendants did not demonstrate any specific injury as a result of the filing and where defendant waited at least three and a half hours to notify the court by email that brief had been filed in the public record).[7]

The evidence in this case fails to establish that Clowdus's filing of the translated text messages as an exhibit to his Motion for Sanctions was anything other than inadvertent. On the contrary, the record demonstrates that Clowdus has redacted this information multiple times in connection with this same motion, [s*ee* D.E. 55-12, Ex. L, 55-15, Ex. O, 55-18, Ex. R, 55-20, Ex. T], but in the course of attempting to provide the evidence in support of his sanctions motion to the Court as quickly as possible, he failed to redact the names and contact information of the non-party passengers from the text messages. See Exhibit A, Declaration of William T. Woodrow Dated August 25, 2022. AA is unable to offer any evidence to prove otherwise, and certainly none to establish that the disclosure was "a purely gratuitous act by an out-of-control litigant and his counsel." *See* D.E. 83, p. 9.

Moreover, AA has offered no evidence that it was in any way prejudiced by the inadvertent disclosure of this information, which was buried in more than 70 pages of text messages. Nothing about the disclosure of this information is propriety or trade secret or in any way harms its ability to defend this case, nor does it place the witnesses in any physical danger. *Compare Kahn v. United States*, 2015 WL 3644628 (June 10, 2015, S.D. Fla. 2015), at * 3

---

[7] While not dispositive of the issue, and certainly not offered as a defense to the inadvertent failure to redact the names and contact information of the passengers, it is worth noting that in each of these cases, the court had entered a protective order ratifying or incorporating the provisions of the Confidentiality Agreement. No such order has been entered here.

(comparing disclosure of identities of confidential informants in criminal cases with that of "incidental witnesses"). Indeed, any argument to that effect would necessarily ring hollow, since AA waited weeks to alert the court and Clowdus that any such violation had occurred. *See Youngevity*, 2019 WL 1542300, at * 14-16; *Sandoz*, 2020 WL 3567287, at * 7-8.

## CONCLUSION

As with the original Cross Motion for Sanctions, the present motion is nothing more than an attempt by AA to distract the Court from focusing on what gave rise to the question of sanctions in the first place—namely, AAs violation of this Court's May 24, 2022 Order. Accordingly, the First and Second Cross Motions for Sanctions should be denied.

Respectfully Submitted,

/s/ William T. Woodrow III

William T. Woodrow III (*pro hac vice*)
Stone & Woodrow LLP
250 West Main St. Suite 201
Charlottesville, VA 22902
will@stoneandwoodrowlaw.com
Phone: 855-275-7378
Attorney for Plaintiff

   /s/ David H. Pollack
THE LAW OFFICE OF
DAVID H. POLLACK, LLC
Fla. Bar No. 0955840
75 Valencia Avenue, Suite 100
Coral Gables, FL   33134
Tel:  305-372-5900

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on August 26, 2022.

/s/ David H. Pollack
*Attorney for Plaintiff*