UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TROY CLOWDUS,

           Plaintiff,                              CASE NO: 2021-cv-23155

v.

AMERICAN AIRLINES, INC.,

           Defendant.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO AMERICAN AIRLINES, INC.'s
MOTION IN LIMINE TO EXCLUDE CERTAIN EVIDENCE**

    Plaintiff TROY CLOWDUS ("Clowdus"), by and through undersigned counsel, files his Response in Opposition to Defendant AMERICAN AIRLINES' ("AA") Motion *in Limine* to Exclude Certain Evidence.

**Introduction**

1. The instant matter arises from an allegation of assault against the Plaintiff by an American Airlines flight attendant, which resulted in the Plaintiff being removed from the plane and banned for life from flying with the Defendant air carrier.

2. The Plaintiff denies that he committed an assault, and he has brought an action against the Defendant for defamation per se, since assaulting a crewmember is a federal crime.

3. At the conclusion of discovery Clowdus has documentation and supporting testimony that shows he was slandered five times and libeled three times for a total of eight actionable claims of defamation *per se*.

4. Marino slandered Clowdus five times while on the plane: His exclamation "You hit me!" was heard by at least one passenger, GSC Henriquez, and allegedly (by AA) flight attendant Deon Gray.[1] Marino had a qualified privilege to repeat the defamation to both Henriquez and the Captain in the galley directly following the incident, but this privilege was defeated

---

[1] There is no qualified privilege for Henriquez and Gray to have heard this exclamation as it was not made at a proper time or place or for a proper purpose between individuals who all shared an interest in the communication. Henriquez and Gray were private citizens for the purpose of publication and hearing Merino's shouted defamation.

1

by express malice. Marino did not have a qualified privilege when he repeated the defamation to Deon Gray and asked her to lie for him by filing a false CERS report. Marino defamed Clowdus when, after the plane departed, he informed passenger Juan Ramirez that Clowdus had assaulted him.

5. Clowdus was subsequently libeled three times: Marino's CERS Report was libelous. Gray's fabricated CERS Report was libelous. And AA, through Maldonado, was libelous by following a policy of rubber-stamping the accusations of its employees for its own purposes.

### *Plaintiff's Untimely Deposition Corrections*

The Plaintiff does not contest.

### *References to Flight Attendant Merino Knowing any Passengers on the Flight*

The Plaintiff has no evidence that flight attendant Merino knows passenger Federico Quintana or his mother Angelica Cookson, though it was an initial working theory to explain what the Plaintiff perceived to be Quintana's inexplicable dishonesty. Unless evidence emerges to the contrary, the Plaintiff has no intention of making this argument.

### *References to Flight Attendant Merino Acting as if on Amphetamines*

The Plaintiff has no evidence that flight attendant Merino was on amphetamines. The Plaintiff has no intent to make gratuitous accusations, but the Plaintiff intends to ask Merino if he was on any prescription medications that morning, which could include such amphetamines as Ritalin or Adderall.

### *Any Suggestion or Argument that Flight Attendant Merino Removed Plaintiff*

It is AA who is trying to prejudice the Plaintiff's case against him with this proposed limitation that leans on form over substance and denies the practical reality of what occurred that morning. Just because Merino could not "sign" the order of removal on his own does not mean that he was not the moving force that caused him to be removed.

Clowdus has testified that he heard Merino repeatedly exclaim from the front of the plane: "I'm not flying with that man." The captain, who did not witness what occurred, acquiesced to Merino's demand. The reality of who controlled the decision to remove Clowdus

is revealed by Merino's own deposition account: Merino testified that Ground Security Coordinator Henriquez came back to make an appeal to HIM to let Clowdus back on board.

AA is intentionally being obtuse about what Henriquez obviously understood: Merino kicked Clowdus off of the plane, and if Merino had relented, he could have let him back on by going to the captain and saying he had changed his mind. AA would like to argue that everything was out of Merino's hands but that is an attempt at improperly prejudicing the reality of what occurred.

### *References to Other Passenger Incidents Involving Flight Attendant Merino*

The Plaintiff agrees that the incidents that AA proffered in discovery do not rise to the level of relevance. However, Merino's behavior towards passengers *following* the incident with Clowdus is still an appropriate line of inquiry. It may be, for example, that Merino has suffered burnout following the challenges of the COVID years, and Clowdus was the first casualty on his list. If Merino has kicked three people off in the last year, then it becomes relevant that prior to Clowdus he had not done so for 10 years.

### *Any Suggestion That the AA Flight Attendants Merino and Gray Are Social Friends or Conspired to Write Supporting CERS Reports*

Gray testified in her deposition that she has known Merino for 21-22 years, they have both had each other's personal phone numbers for years, and they interact socially on layovers. See Deposition of Deon Gray dated March 23, 2022 ("Gray Dep."), pg 10, ll. 7-16.

A pivotal question of fact in Plaintiff's case is whether Gray witnessed the incident. As argued in Plaintiff's Response to AA's Motion for Summary Judgment, there is substantial evidence that Gray did not. (At the time, AA's employee, GSC Henriquez, strongly believed that she saw nothing).[2] If Gray did not witness the incident, a jury could certainly find that she fabricated her report to help a co-worker/friend. This question is clearly a matter of contested fact for the jury.

---

[2] AA points to Henriquez's attempt to walk back in deposition from his earlier insistence that Merino "unnecessarily escalated the situation" and that all of the other flight attendants "were in the back of the plane" when the incident occurred. It is not surprising that Henriquez would have the self-interest now to do so, and a jury would be right to rely upon his earlier statements. AA points to its own employees' deposition testimony about Gray's whereabouts, but multiple passengers do not recollect her presence where she claimed to be, even though she would have been standing right smack in the middle of their sight line to the incident. Nor does any other witness support Gray's claim that Clowdus was *standing,* glaring at Merino, after the bag made contact (he was seated in the window seat the entire time.) Nor does any other testimony support Gray's claim that Clowdus was protesting angrily as he was led off the plane: every other witness testified that he complied quietly and peacefully. These are just some of the

### *Any Suggestion that Ground Security Coordinator Henriquez Observed the Assault*

AA's claim that Plaintiff's counsel has "erroneously questioned various witnesses using the presumption that the assault was observed by Henriquez" is flatly untrue, but irrelevant to argue.

Henriquez testified that he poked his head around the corner as soon as he heard Merino exclaim "you hit me!" As such, he was present in the direct aftermath of the bag making contact, at a distance of about 5 feet, and he observed the tail end of the interaction. He also observed Clowdus' demeanor and whether any other flight attendant was standing nearby, observing the incident. That is all that the Plaintiff has argued or intends to argue.

### *References to Passenger Federico Quintana Fearing Loss of His Mother's Flight Benefits*

It's surprising that AA makes this request. Magistrate Louis already spoke directly to it, when she ordered AA to turn over discovery on the benefits Quintana's family received from AA.

> THE COURT: Okay. Well, what I'm getting at is the importance of Mr. Quintana's deposition testimony at trial. He'll be the passenger, the non-AA employee, who says that he witnessed the assault, but not the defamatory statement.
>
> MR. KOLB: Correct.
>
> THE COURT: So his bias is critical.
>
> …
>
> THE COURT: Then we're back to where I was which is his bias, his motivation to lie favorably for American is very much at issue.
>
> MR. KOLB: Sure. I mean, I attempted to clarify this with Mr. Woodrow by making a proffer to him sometime ago. I put it out that Mr. Quintana has no access and no right to any AA flight benefits, pensions, health insurance, credit union information or anything else. All of that goes to his mother. I pointed out that her pension benefits are a fraction of her six figure income as a bank vice president. She will testify she doesn't need the pension. I proffered that she gets eight one-way buddy passes a year split up amongst five family members, and Mr. Quintana's never used more than one roundtrip in any year that he's ever flown on his mother's passes for a subtotal of about $800 roundtrips to Mexico City. The notion that he would perjure himself is ridiculous.
>
> THE COURT: *Sounds like an argument to the jury*, but not something that you're going to be able to preclude him from discovering.

---

facts that strongly suggest that Gray did not see what she claimed. See Plaintiff's Response to Defendant's Motion for Summary Judgment.

> …
>
> THE COURT: I appreciate that. And I, again, think that the jury will benefit from knowing that. But what Ms. Cookson and Mr. Quintana believed at the time that Mr. Quintana was deposed is different. You know, it is. Whether or not even Ms. Cookson knows it, but explained that to Mr. Quintana, I think is discoverable.

Transcript of May 24, 2022 Hearing before Magistrate Judge Lauren Louis ("Trans."), D.E. 53, p. 18, ll. 3-8; p. 19, ll. 23-25; p. 20, ll. 1-17; p. 24, ll. 8-13 (emphasis added).

The question for the jury is not so much specifically whether Quintana feared that his mother's flight benefits would be revoked if he did not cooperate, but more generally, whether the fact that he was receiving a regular benefit and flying for free influenced him in any way – he could have worried about retaliation for not cooperating (or for providing testimony helpful to Clowdus); he could have just been appreciative that AA lets him fly essentially for free and wanted to give back.

### *Any Suggestion That the Flight Attendants' Rushed Departure of the Flight Because Their Pay Commences at Push Back*

AA is flatly misstating to the Court the deposition testimony that has been taken on this subject. Flight attendant Nadege Colas testified in her deposition that this is *exactly* the case:

> Mr. Peccio: If you're not asking personal questions -- are you asking her to speak on every flight attendant that works for American Airlines, if you're not asking her to answer specifically as to her? How is she to know that answer?
>
> Mr. Woodrow: I'm asking about -- that's, again, a speaking objection, Robert. I'm asking her generally what she knows about how flight attendants are compensated, whether it's salary or hourly.
>
> Ms. Colas: Hourly.
>
> Mr. Woodrow: Hourly? Okay.
>
> Ms. Colas: Hourly.
>
> Mr. Woodrow: When does the clock start if you're -- thank you for answering that. If you're paid hourly, when does the clock start? Is it when you arrive at the airport, clear security, cabin doors close? How does it begin?
>
> Ms. Colas: I wish. After pushbacks.
>
> Mr. Woodrow: After pushbacks? Thank you for answering that.

5

See Deposition of Nadege Colas Dated April 6, 2022, Pg 34, ll. 9-25; Pg. 35, ll. 1-8.

> Flight attendant Bastos testified that performance is, in fact tied to timely departures:
>
> Mr. Woodrow: Okay. Does your performance get dinged if you don't depart on time?
>
> Mr. Bastos: If it's delayed on flight service, we get an e-mail or maybe a call from our supervisors, if the door closes late; 2, 3, 4, 5 minutes late because of flight service. In other words, bins haven't been closed, baggage is not under the seat, things like that, yeah, we get called in. Nothing happens, but we get a call. They slap our hand.

See Deposition of Fernando Bastos Dated March 28, 2022, Pg. 27, ll. 10-18.

The state of mind of the flight attendants as they rush to get the first flight of the day out on time is certainly relevant. If pay only commences at pushback, then flight attendants are working for free during the busiest moments of their day – while passengers are boarding. And if flights are delayed, later flights may get cancelled, and flight attendants won't be paid at all for the flights that don't happen.

Merino denied in deposition that timely departures were a priority,[3] but GSC Henriquez flatly contradicted him:

---

[3] Mr. Woodrow: Okay. Mr. Merino, I -- again, you're not -- you're not answering my question because I -- I was not -- I was not talking solely about the money, but in respect to performance, the question is if your planes consistently left late, would that reflect negatively upon your performance review?
 Mr. Kolb: Objection, form.
Mr. Merino: No, no, sir.
Mr. Woodrow: Okay. That seems very unlikely, Mr. Merino. I'm not trying to trick you.
Mr. Merino: No.
Mr. Kolb: Object to the sidebar. There's no question pending.
Mr. Woodrow: So do you feel -- do you feel pressure in the mornings to -- to get a plane departed on time?
Mr. Merino: Every single flight is the same thing. There is no matter if it's 6:00 in the morning or 6:00 p.m., sir.
Mr. Woodrow: Okay. And do you feel pressure that that plane needs to depart on time?
Mr. Merino: No, sir. My pressure is in another objective, not on that.
Mr. Woodrow: You--you feel no pressure that your plane gets--that the cabin gets locked and you get out on time?
Mr. Merino: No, sir.
Mr. Woodrow: Ever?
Mr. Merino: No, sir.
Mr. Woodrow: I'm asking if it's a priority.
Mr. Merino: No, sir.
Mr. Kolb: Objection, asked and answered.
Mr. Merino: Exactly.
Mr. Woodrow: I -- I -- okay. That's your answer.
See Deposition of Carlos Merino Dated February 4, 2022, Pg. 97, ll. 16-25, Pg. 98, ll. 1-25, Pg. 99, ll. 1-5

> Mr. Henriquez: I was outside the aircraft at the door, just waiting for the flight attendant to close the door.  So we were ready for departure.
>
> Mr. Woodrow:  Okay.  So you -- you were at the aircraft then at the time?
>
> Mr. Henriquez:  Yes.  The reason is it's -- we call the Right Start. It's -- some particular flights in the morning that American Airlines they want to make sure that they leave on time because that'll do the domino effect for the entire day.  So they call it the Right Starts…It has to be perfect.  So we the GSCs or the CSCs in the morning, first time in the morning, we are assigned specifically to some flights.  And I was assigned to that one particular.

See Deposition of Jose Henriquez Dated February 3, 2022, Pg. 14, ll. 5-20.

Whether Merino's hurried state of mind was influenced by wanting his pay to commence, by resentment that he was not getting paid for helping passengers board, or by feeling the pressure of a "Right Start" is a matter for the jury to consider.

### *Impeachment of Witnesses on Collateral Matters*

The Plaintiff has no intention to bring up the fact that Merino lied in his deposition about graduating from the University of Miami and also about being a news broadcaster for TV Azteca unless Merino opens the door during his testimony.

### *Any Suggestion that AA's Counsel has Sought to Bribe or Influence Any Witness*

If the Court allows into evidence the text messages from Velarde Danache attorney, Mauricio Fernandez, to passenger Juan Ramirez, then the jury will reach its own conclusions about the tenor and subtext of the communication, including whether the offer of an all-expense paid trip from Mexico to Miami constituted an attempt at improper inducement when every other deposition in the case had been taken remotely by Zoom. [4]

This question will be resolved at the evidentiary hearing on Plaintiff's motion for sanctions.

### *Evidence of the Completeness of AA's Investigation Prior to Permanently Banning Plaintiff*

The Plaintiff addresses this issue more fully in his Response to AA's Motion for Summary Judgment.  As argued therein, it is not Plaintiff's contention that the investigation was incomplete or

---

[4] Velarde text messages to Jairo Espinoza are subject to a pending motion to compel and it is unknown what they contain, though it is known that this passenger was Velarde's clear priority between the two as AA claims to believe that Espinoza had agreed to sit for deposition, whereas Ramirez had not.

otherwise negligently handled. Plaintiff contends, and believes, that there was no investigation done whatsoever, and that this was due to the deliberate policy choice of AA. Maldonado did his job as he was trained to do – that is, he rubber-stamped the accusation and processed Clowdus for future refusal to carry.[5] The Plaintiff only reached this conclusion after deposing both Maldonado and his superior, John Kirby, the individual in charge of decisions to ban passengers company-wide. Maldonado was straightforward that his job is merely to compile information – he doesn't go beyond what is sent to him, and he doesn't question the truthfulness of the reports that he is sent. He doesn't seek out the passenger's side or any potentially related passenger complaints; he doesn't conduct follow up interviews. Kirby explained that the passenger side is not sought out because "criminals lie."

Whether AA conducted any meaningful investigation of the incident – or any investigation at all – is also relevant to the question of punitive damages. Florida has recognized two methods a plaintiff may use to establish entitlement to punitive damages against a corporation: (1) vicarious liability based on the willful and malicious actions of an employee with a finding of either ratification, knowing and active participation, or gross negligence on the part of the employer; and (2) direct liability based on the willful and malicious actions a managing agent of the corporation; and (3) corporate ratification of an employee's outrageous conduct. Fla.Stat. § 768.72 (3); *Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla. 1995). With regard to the first method (i.e., vicarious liability), in order to prove entitlement to punitive damages a plaintiff must establish that: (1) the conduct of the employee upon which the vicarious liability is based was intentional or grossly negligent, and (2) either (i) the officers, directors, or managers of the employer knowingly condoned, ratified or consented to such conduct; or (ii) the employer engaged in conduct that constituted gross negligence and that contributed to the loss, damages or injury suffered by the plaintiff Fla.Stat. § 768.72 (3); *In re: Standard Jury Instructions*, 35 So.3d 666, 796 (Fla. 2010)(differentiating between the legal elements of the two theories of liability); *see also Mercury Motors, Inc. v. Smith*, 393 So.2d 545 (Fla. 1981). In appropriate cases, punitive damages may also be awarded against a corporation on the basis of a corporate policy of the corporation, even though the particular officers or agents of the corporation responsible for

---

[5] Maldonado signed his report and sent it to Kirby for endorsement at 11:24 am on June 11, 2021, less than 24 hours after he opened his "investigation." The Plaintiff received an email nearly 2 weeks later saying the investigation was complete, giving the illusion that substantive time was spent on the inquiry. See ECF #66-19, Ex. S.

that policy are not discovered or identified. *Schropp.*, 654 So.2d at 1162 (Wells, J., concurring); cmt. to Fla.Stnd.Jury.Inst. 503.1.

AA's failure to conduct a meaningful investigation of the incident – or any investigation at all—is clearly relevant to establishing that AA ratified and condoned Merino's conduct. The central claim in this case is that Merino knowingly lied when he accused Clowdus of intentionally assaulting him. If there was evidence that AA was provided with information which proved that the allegation of assault was not true and did not nothing to follow up on it or conduct any meaningful investigation of the incident, which there is, that evidence would certainly be relevant to proving that AA both ratified and condoned Merino's conduct. It also would be relevant to proving that AA was grossly negligent in the manner in which they handled the investigation. In addition, it also would be relevant in the jury's assessment of whether AA was directly liable for punitive damages based on its willful republication of the defamatory statement in the IRL report and the IRL list even though it was placed on notice that Merino's statement was likely false but made no meaningful inquiry before republishing it. *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co.*, 430 F.2d 38, 47 (5th Cir. 1970) (applying Florida law).

### *Evidence Relevant Only to Plaintiff's Dismissed Claims*

If Jon and Sam lived in a town where the local Walmart was the only place to shop without driving 100 miles for groceries and Jon went into that Walmart and (falsely) told a manager that Sam had been convicted of shoplifting so many times that his last conviction was a felony, and as a result Walmart banned Sam from ever shopping at Walmart again, then Sam would have a claim of defamation per se against Jon, and the largest component of damages that Sam could claim is that Jon made Sam's life infinitely harder by forcing Sam to drive 100 miles for groceries. Yes, Walmart has every right to decide who its customers will be, but that is irrelevant to Sam's claim for damages against Jon.

The only difference between the preceding example and the instant action is vicarious liability. The root of vicarious liability is that AA is liable for the damages *that its employee, Merino,* caused to Clowdus. AA keeps attempting to conflate its rights under the permissive removal statute or to carry whom it wishes with its accountability for the tortious defamation of its employee, which occurred while Merino was carrying out his duties for AA.

All of the damages that AA tries to claim are irrelevant are damages that Merino inflicted upon Clowdus – Merino the private individual, though also Merino the AA employee. AA is liable for the damages that Merino the private individual caused, because at the time that he did so, he was acting in his capacity as an American Airlines employee and he was engaged in the duties for which he was hired. *Doe v. Board of County Commissioners*, 815 F.Supp. 1448 (S.D. Fla. 1992)(employer liable for acts of employee committed within the course and scope of employment); *Kelly v. Donnini Enterprises,* Inc, 937 So.2d 1175 (Fla. 4th DCA 2006)(denying summary judgment on whether employer was vicariously liable for the defamatory statements of employee).

### *Suggestion of Possible Future Publication of Defamatory Material to Third Parties or Within AA*

While it is true that the potential for future publication does not establish the publication element to bring a claim, the Plaintiff is not focused upon these things to establish defamation. Rather, these elements go to potential damages and to whether AA has exacerbated the damage caused by Merino with its cavalier approach.

If AA banned Clowdus and tightly guarded the reason for the ban – only allowing non-managers to see the basic fact of the ban and not the allegation of assault, it would reflect better to the jury than if AA took no concern about branding Mr. Clowdus as a criminal to any line employee who accessed his file. AA's dogged refusal of every discovery request seeking to illuminate this question is strong evidence of the latter.

If AA agrees in six months to share its no-fly list with other airlines as Delta has vigorously lobbied to occur, Mr. Clowdus' damages balloon exponentially. AA has made no assertion that it is not considering doing so – it only has provided the non-answer that it has not done so in the past. The Plaintiff intends to call AA's corporate representative to question him on this subject. It is improper to foreclose this line of questioning until the evidence is fully adduced.

### *AA's Deplaning and/or Permanent Banning of Other Passengers on Other Flights*

While isolated examples of AA deplaning and/or permanently banning other passengers may not be probative to the Plaintiff's claim, if enough examples were shown to demonstrate a policy or habit of banning passengers without investigation, then it very much would be probative for the jury to consider the question of good faith in how AA handled and republished the defamation and, ultimately, the question of damages.

*Argument That AA is Derivatively Liable for the Flight Attendant's Alleged Malice or Resulting Punitive Damages*

AA argues that it would be improper to argue that it is vicariously liable either for damages suffered by Merino as a result of the defamatory statements made by Merino because Merino was acting outside the course and scope of his employment when he defamed Clowdus. AA's argument is contrary to Florida law.  An employee's conduct is within the scope of employment for the purpose of an employer's vicarious liability if it occurs substantially within authorized time and space limits and is activated in part by a purpose to serve the master. *Peterson v. Cisco Systems, Inc.*, 320 So.3d 972 (Fla. 2nd DCA 2021).  This includes liability for intentional torts where the employee's tortious conduct is undertaken in furtherance of the employer's interest.  *Fields v. Devereaux Foundation, Inc.*, 244 So.3d 1193 (Fla.  2nd DCA 2018);  *Perez v. Zazo,* 498 So.2d 463, 465 (Fla. 3d DCA 1986); see also, e.g., *Columbia By The Sea, Inc. v. Petty,* 157 So.2d 190, 192 (Fla. 2d DCA 1963) (holding that jury could conclude that maitre d' of restaurant acted within scope of employment when he battered customer with an ashtray during an attempt to get him to pay thirty-five-cent upcharge for roquefort salad dressing); *Jax Liquors, Inc. v. Hall*, 344 So.2d 247, 247 (Fla. 1st DCA 1976) (holding that armed security guard who removed unruly bar patron and shot him in the parking lot was within the scope of his employment despite the fact that the shooting was "entirely unnecessary to any legitimate purpose of [his] employment" because the confrontation was initiated to serve his employer's interests and escalated "with unbroken continuity" to the shooting); *Holtzman v. B/E Aerospace, Inc.,* 2008 WL 214715, at *4 (S.D. Fla. Jan. 24, 2008) ("[i]t is well settled in Florida, as elsewhere, that a corporation, just as an individual, may be liable for defamation by its employees…If the employee was an agent of the corporation acting within the scope of his employment, then the employer may be held liable.) (internal citations omitted)

There is clearly a disputed issue of material fact as to whether Merino and Gray were acting within the course and scope of their employment at the time they made their respective defamatory statements.  In addition, there is evidence to support that Maldonado was acting in the course and scope of his employment with AA when he wrote that IRL report because he was performing his job in the way that AA desired him to.

In addition, there is also evidence from which a jury could find AA vicariously liable for punitive damages based on Merino's, Gray's, and Maldonado's defamatory statements.  Florida

11

has recognized two methods a plaintiff may use to establish entitlement to punitive damages against a corporation: (1) vicarious liability based on the willful and malicious actions of an employee with a finding of either ratification, knowing and active participation, or gross negligence on the part of the employer; and (2) direct liability based on the willful and malicious actions a managing agent of the corporation; and (3) corporate ratification of an employee's outrageous conduct. Fla.Stat. § 768.72 (3); *Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla. 1995). With regard to the first method (i.e., vicarious liability), in order to prove entitlement to punitive damages a plaintiff must establish that: (1) the conduct of the employee upon which the vicarious liability is based was intentional or grossly negligent, and (2) either (i) the officers, directors, or managers of the employer knowingly condoned, ratified or consented to such conduct; or (ii) the employer engaged in conduct that constituted gross negligence and that contributed to the loss, damages or injury suffered by the plaintiff Fla.Stat. § 768.72 (3); *In re: Standard Jury Instructions*, 35 So.3d 666, 796 (Fla. 2010)(differentiating between the legal elements of the two theories of liability); *see also Mercury Motors, Inc. v. Smith*, 393 So.2d 545 (Fla. 1981). In appropriate cases, punitive damages may also be awarded against a corporation on the basis of a corporate policy of the corporation, even though the particular officers or agents of the corporation responsible for that policy are not discovered or identified. *Schropp.*, 654 So.2d at 1162 (Wells, J., concurring); cmt. to Fla.Stnd.Jury.Inst. 503.1.

  As previously explained, the central claim in this case is that Merino knowingly lied when he accused Clowdus of intentionally assaulting him. If there was evidence that AA was provided with information which proved that the allegation of assault was not true and did not nothing to follow up on it or conduct any meaningful investigation of the incident, which there is, that evidence would certainly be relevant to proving that AA both ratified and condoned Merino's conduct. It also would be relevant to proving that AA was grossly negligent in the manner in which they handled the investigation. In addition, it also would be relevant in the jury's assessment of whether AA was directly liable for punitive damages based on its willful republication of the defamatory statement in the IRL report and the IRL list even though it was placed on notice that Merino's statement was likely false but made no meaningful inquiry before republishing it. *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co.*, 430 F.2d 38, 47 (5th Cir. 1970) (applying Florida law).

*Argument That Airlines Have Made Airline Travel Unpleasant*

The jury does not need to be told what virtually every American citizen knows to be true. But it is true and probative that American Airlines flight attendants are generally less happy due to aggressive policies aimed at cutting costs and maximizing scheduling.[6] It is true that American Airlines is short-staffed as a result of these policies and others, putting even greater pressure on its remaining employees. It is true that over-worked and under-appreciated employees are more likely to lash out at the passengers they serve.

The jury will be given two conflicting narratives to explain what occurred. The Plaintiff believes Merino to be jaded and unhappy in his job and that is why he argues (and Henriquez agreed) that *Merino* over-reacted and unnecessarily escalated the incident. Merino claims exactly the opposite. The pressures placed on modern day airline employees is relevant for the jury to consider as it tries to decide who is telling the truth. If there is evidence to support it, the Plaintiff can argue it.

**Conclusion**

For the reasons argued above and furthermore dependent upon the outcome of Plaintiff's Motion for Sanctions, the Plaintiff respectfully asks the Court to deny AA's evidentiary requests.

Respectfully Submitted,

/s/ William T. Woodrow III                    /s/ David H. Pollack

William T. Woodrow III (*pro hac vice*)        THE LAW OFFICE OF
Stone & Woodrow LLP                            DAVID H. POLLACK, LLC
250 West Main St. Suite 201                    Fla. Bar No. 0955840
Charlottesville, VA 22902                      75 Valencia Avenue, Suite 100
will@stoneandwoodrowlaw.com                    Coral Gables, FL  33134
Phone: 855-275-7378                            Tel:  305-372-5900

Attorneys for Plaintiff

---

[6] See https://www.inc.com/bill-murphy-jr/american-airlines-flight-attendants-just-made-a-big-complaint-nobody-is-very-happy.html

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on August 26, 2022.

    /s/ William T. Woodrow

William T. Woodrow III (*pro hac vice*)
Stone & Woodrow LLP
250 West Main St. Suite 201
Charlottesville, VA 22902
will@stoneandwoodrowlaw.com
Phone: 855-275-7378
*Attorneys for Plaintiff*