UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 2021-cv-23155

TROY CLOWDUS,

    Plaintiff,

v.

AMERICAN AIRLINES, INC.,

    Defendant.

_____/

### PLAINTIFF'S RESPONSE TO DEFENDANT AMERICAN AIRLINES, INC.'s MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff TROY CLOWDUS ("Clowdus") files his Response in Opposition to Defendant AMERICAN AIRLINES, INC. ("AA")'s Motion for Summary Judgment. AA claims it is entitled to partial summary judgment on the portion of Clowdus's defamation claim alleging *libel per se* based on the defamatory statements contained in the CERS reports published by Carlos Merino and Deon Gray and the IRL packet.[1] Specifically, AA claims that it is entitled to summary judgment as to these statements because they are not libelous *per se*, were not published to third parties, and because they were subject to a qualified privilege. However, AA does not accurately interpret Florida law in support of many of its arguments and also ignores the fact that the record in this case is rife with conflicting evidence on each of these issues.

### INTRODUCTION

In its Motion for Summary Judgment, AA misrepresents the law of express malice as expressed by the Florida Supreme Court in *Nodar v. Galbreath*, 462 So. 2d 803 (Fla. 1984) to

---

[1] Because AAA has not sought summary judgment on the portion of the defamation count alleging slander *per se*, which involves the oral publication of the statement, "You Hit Me," by Merino to flight attendant Deon Gray, Ground Security Coordinator Jose Henriquez, or the first-class passengers, including Juan Fernandez-Ramirez, those claims are not addressed in this Response. AA likely made this choice because the Plaintiff has obtained a signed affidavit from passenger Juan Hernandez-Ramirez stating that he both heard the defamatory shout and was approached by Merino after the flight departed and told personally about the "assault." See Plaintiff's Response to Defendant's Statement of Undisputed Facts ("PSUF"), ¶66, Ex R, Ramirez Affidavit.

1

argue for application of a rigid three part test that *Nodar* articulated only for the purpose of rejecting. There is no question that, under Florida law, the presence of malice in Merino's CERS report is a disputed question of fact for the jury.

Furthermore, Gray's CERS Report was also made with express malice if it was knowingly false, but the disputed question of fact as to whether flight attendant Gray even witnessed the incident makes the question of whether or not her speech was afforded a qualified privilege in the first place a question of fact for the jury. If she was not a witness then she did not have an interest in the subject or a duty to speak, and she is not afforded the protection of a qualified privilege.

Similarly, the statements made by security coordinator Andres Maldonado in his IRL report are not subject to a qualified privilege if his "report" was not made for a purpose that creates a qualified privilege—that is to say, if he rubber-stamped the allegation of assault for *AA's purposes* and called it an investigation.

Additionally, the questions surrounding AA's Internal Refuse List (IRL), who has access to it, and the additional places that the allegation of assault is accessible are subject to a pending motion to compel (ECF No. 64) and go to the questions of damages:[2] the steps that AA takes to protect the privacy (or dignity) of its passengers. The issue is not about future publication – the Plaintiff has already satisfied the publication prong for defamation on multiple fronts, including with a passenger witness. The focus on what happened after the defamatory CERS Reports were filed and processed goes towards helping the jury decide the reasonableness of AA's actions in the context of punitive damages.

Because there are genuine issues of material fact on all of these matters which only a jury can decide, AA is not entitled to partial summary judgment on the libel *per se* portion of Clowdus's defamation claim.[3]

---

2 as does also Maldonado's failure to investigate the allegation before rubber-stamping it and sending it to Kirby

3 Many of the arguments AA raises in its Motion for Partial Summary Judgment were previously made by AA with respect to both the libel and slander per se portions of the defamation claim in its Motion to Dismiss the Amended Complaint (ECF No. 51), which remains pending. Although the legal standards governing both motions are different, inasmuch as any of the arguments overlap and are applicable here, Clowdus incorporates by reference his Response to that motion (ECF No. 54).

I.  **Legal Standard for Summary Judgment.**

Summary judgment is appropriate where there exists no genuine issue of material fact and a decision may be rendered as a matter of law. *Jones Superyacht Miami, Inc. v. M/Y Waku*, 451 F.Supp.3d 1335 (S.D. Fla. 2020); Fed.R.Civ.P. 56. A genuine issue of material fact exists when "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In assessing whether the moving party has met this burden, the Court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992).

II.  **Legal Standard for Qualified Privilege.**

   A.  **Elements of Qualified Privilege.**

The Florida Supreme Court first enunciated the concept of a qualified privilege in *Coogler v. Rhodes*, 38 Fla. 240, 248 (1897) (citing Townshend on Slander & Libel § 209 (4th ed.)), The essential elements of the qualified privilege are: (1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner. *Falic v. Legg Mason Wood Walker*, 347 F.Supp.2d 1260, 1264 (S.D. Fla. 2004); *Abraham v. Baldwin*, 52 Fla. 151, 155 (1906); *Schreidell v. Shoter*, 500 So. 2d 228, 230–31 (Fla. Dist. Ct. App. 1986)( "Where a person is so situated that it becomes right, in the interests of society, that he should tell to a third person certain facts, then, if he bona fide, and *without malice*, does tell them, it is a privileged communication." )(emphasis added); *Lundquist v. Alewine*, 397 So. 2d 1148, 1149 (Fla. Dist. Ct. App. 1981) ("The elements essential to the finding of a conditionally privileged publication are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, (5) publication in a proper manner."). Communications between a corporation and employees identified as

3

witnesses or those with an interest in the disciplinary practices of their employer and the safety and security of their workplace are ordinarily privileged. *Walter v. Jet Aviation Flight Servs., Inc.,* 2017 WL 3237375, at *5 (S.D. Fla. July 31, 2017). However, any privilege vanishes if the statement is made with malice or too wide an audience. *Johnston v. Borders*, 2018 WL 8244336 (M.D. Fla., June 19, 2018), at * 5. Furthermore, statements made to serve one's own interest rather than the interest giving rise to the qualified privilege are not privileged. *See Drennen v. Westinghouse Elec. Corp*., 328 So.2d 52 (Fla. 1st DCA 1976). And since there is "no social advantage in the publication of a deliberate lie, the privilege is lost if the defendant does not believe what he says." *Riggs v. Cain*, 406 So. 2d 1202, 1203 (Fla. Dist. Ct. App. 1981); *Mays v. Stratton*, 183 So. 2d 43, 44 (Fla. Dist. Ct. App. 1966)("A statement loses its privileged character if it is knowingly false and maliciously made for the purpose of injuring the one adversely affected thereby." ); *Drennan***,** 328 So. 2d at 55 (existence of express malice irrelevant where publication of a defamatory statement is not protected by a qualified privilege); *Falic.,* 347 F. Supp. 2d 1260, 1267 (S.D. Fla. 2004).

      a. ***Am Airlines, Inc. v. Geddes, 960 So.2d 830 (Fla. 4th DCA 2007 in Detail***

In multiple filings, AA has consistently misrepresented the ruling in *Am. Airlines, Inc. v. Geddes*, 960 So. 2d 830 (Fla. Dist. Ct. App. 2007) to the Court and it does so again in the instant filing, warranting an in-depth explanation of the ruling.

AA offers a seemingly confusing quotation from Geddes to support its contention that non-managerial employees speaking to managers or corporate executives are covered by the intra corporate communication doctrine – that is, there is no publication because it is the corporation "speaking to itself:"

> When the entity alleged to have committed the defamation is a corporation, the courts have held that statements made to corporate executive or managerial employees of that entity are, in effect, being made to the corporation itself, and thus lack the essential element of publication.

Id. At 833.

However, the proper way to understand this sentence is to first recognize that in *Geddes*, *the corporation* was being sued for defamation – corporate managers or executives were being sued for their speech, because their speech *was the corporation's speech*. The corporation

4

speaks *through corporate managers or executives*. Therefore, the corporation could not be liable for speaking to itself – other managers or executives.

AA tells the Court that this sentence means it could be *anyone* making the statement, as long as the statement is being made to the corporation, but that interpretation could not be more incorrect. *Geddes* itself clarifies a paragraph later:

> All communication *between* American executive/managerial employees are considered to be the corporation talking to itself, and, could not be the basis for any defamation claim because they lacked the essential element of publication to a third party.

*Id*. At 834.(emphasis added).

Other courts have rightly applied this ruling in *Geddes* and reaffirmed that the intra corporate communications doctrine *only* applies to communications between corporate executives and managerial employees. See *Colbert v. Anheuser-Busch, Inc.*, 2013 WL 12145017, at *3 (M.D. Fla. Mar. 5, 2013) ("All communication between corporate executive and managerial employees is considered the corporation talking to itself and cannot form the basis of a defamation claim. *American Airlines, Inc. v. Geddes*, 960 So.2d 830, 834 (Fla. 3d DCA 2007). **Further, communication between a corporation and employees identified as witnesses or those with an interest in the disciplinary practices of their employer and the safety and security of their workplace are privileged**."); *Hullick v. Gibraltar Priv. Bank & Tr. Co.*, 279 So. 3d 809, 812 (Fla. Dist. Ct. App. 2019); *Hoch v. Loren*, 273 So. 3d 56, 58 (Fla. Dist. Ct. App. 2019); *Bush v. Raytheon Co.*, 373 F. App'x 936, 941 (11th Cir. 2010);; *Tillett v. BJ's Wholesale Club, Inc.*, 2010 WL 11507322, at *3 (M.D. Fla. July 30, 2010); *Williamson v. Digital Risk, LLC*, 2018 WL 3870064, at *4 (M.D. Fla. Aug. 15, 2018); *Walter v. Jet Aviation Flight Servs., Inc.*, 2016 WL 7116641, at *1 (S.D. Fla. Dec. 7, 2016)("While Defendants have cited case law for the proposition that intra-corporate statements, such as statements between corporate officers, are not "published" statements for the purposes of defamation, **the Court is unaware of any case that stands for the proposition that a low-level employee, acting with malicious intent, cannot publish a defamatory statement by uttering that statement to corporate officers.** The authority relied upon by Defendants does not address such a situation and instead focuses on communications within a corporation between corporate officers and corporate executives. See, e.g., *Am. Airlines, Inc. v. Geddes*, 960 So. 2d 830, 833 (Fla. Dist. Ct. App. 2007))"

### B. Proof of express malice.

Where a qualified privilege does exist, in order to recover on a claim for defamation a plaintiff must prove the statement was made with express malice. *McCurdy v. Collis*, 508 So.2d 380, 382 (Fla. 1st DCA 1987); *Gibson v. Maloney*, 231 So. 2d 823, 836 (Fla. 1970). A plaintiff may establish express malice by showing that the speaker is motivated "more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege." *Nodar v. Galbreath*, 462 So. 2d 803, 10 (Fla. 1984). Express malice may be proven by the publication of a libelous statement with knowledge of its falsity. *Morgan v. Dun & Bradstreet, Inc.*, 421 F.2d 1241, 1242–43 (5th Cir. 1970); *Lewis v Evans*, 406 So. 2d 489, 493 (Fla. Dist. Ct. App. 1981)("Proof that defamation is false, and was known to be such by the publisher, certainly establishes malice in fact")(citing *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (1887)). Evidence of express malice may also be inferred from the unreasonableness of the defamer's actions and statements. *Asinmaz v. Semrau,* 42 So.3d 955, 958 (Fla. 4th DCA 2010); *McCurdy*, 508 So.2d at 382 (express malice can be proven in the absence of direct evidence by proving a series of acts "which, *in their context or in light of the totality of surrounding circumstances*, are inconsistent with the premise of a reasonable man [or woman] pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive.") (emphasis added); *Nodar*, 462 So. 2d at 810 (express malice may be inferred "from the language [of the defamatory statement] itself, or . . . proven by extrinsic circumstances."); *Colbert v. Anheuser-Busch, Inc.*, 2013 WL 12145017, at *3 (M.D. Fla. Mar. 5, 2013). When the facts and circumstances concerning the statement are conceded, a court may decide whether a communication is a privileged one, so as to require the plaintiff to prove express malice. *Colbert v. Anheuser-Busch, Inc.*, 2013 WL 12145017, at *2 (M.D. Fla. Mar. 5, 2013) (quoting *Hartley & Parker v. Copeland*, 51 So.2s 789, 790 (Fla. 1951).

### a. *Nodar v. Galbreath, 462 So. 2d 803 (Fla. 1984) in Detail*

Similar to *Geddes*, American Airlines' extensive citation and misrepresentation of *Nodar v. Galbreath*, 462 So. 2d 803 (Fla. 1984) in the instant motion to argue for the imposition of a rigid three-prong test of "ill will, hostility, and evil intent to injure" that the Plaintiff must prove to establish express malice warrants close scrutiny. In *Nodar*, the Court **was rejecting the standard** that AA expounds, not affirming it:

6

> The challenged jury instruction defined the concept of express malice as follows:
>
> It is malicious to make a false statement concerning another with ill will, hostility, or evil intention to defame and injure.
>
> Although based on the definition given in *Montgomery v. Knox*, the instruction added the disjunctive "or" which is not present in *Montgomery*. 23 Fla. at 606, 3 So. at 217. The addition of the word "or" had the effect of allowing the jury to find express malice upon a showing of any of the three elements given. **Although the Montgomery case, even without the "or," is not very enlightening about what constitutes express malice, the pertinent authorities on the subject, discussed in the text of this opinion following this footnote, show that *the gravamen of express malice is the abuse of a privileged occasion by improper motives on the part of the speaker*.** The instruction was inadequate to fully apprise the jury of what would show express malice.

Id. At 812. (emphasis added).

Nodar involved a parent who was concerned that a teacher was doing a poor job with his son. The father may have had ill will or hostility, but he had a proper interest – his son's education. *Nodar* said that the important thing is "the abuse of the privileged occasion by improper motives," not whether there is ill will or hostility. AA turns *Nodar* completely upside-down to argue otherwise.

        **C.**    **The existence of a qualified privilege is a question for the jury if the determining facts are contested.**

"When all the essential facts and circumstances are not conceded, the existence or nonexistence of the privilege should be determined by the jury from all the facts and circumstances of the case, under proper instructions of the court applicable to the case." *Id; see also Myers v. Hodges*, 53 Fla. 197, 218, 44 So. 357, 364 (1907)(" [I]f the court decides there is any evidence in the language of the publication itself (intrinsic evidence), or in the circumstances of its publication, from which a want of good faith or a bad intent (malice) on the part of the publisher may be inferred, it then becomes the duty of the court to submit to the jury, with appropriate instructions, and as a question of fact for their determination, whether in making the publication the publisher acted in good faith or otherwise").

Whether a statement is protected by a qualified privilege is a question of law for the court to decide only if the circumstances surrounding the communication are undisputed or so clear under the evidence as to be unquestionable. *Falic v. Legg Mason Wood Walker*, 347 F.Supp.2d

1260, 1264 (S.D. Fla. 2004). Summary judgment appropriate is "rarely appropriate" in a defendant's favor where the existence of a qualified privilege for a defamatory statement is controverted. *Glynn v. City of Kissimmee*, 383 So. 2d 774, 776 (Fla. Dist. Ct. App. 1980); *accord, Shafran v. Parrish*, 787 So.2d 177, 180 (Fla. 2nd DCA 2001) ("Generally, whether a qualified privilege exists is a mixed question of law and fact, and it is a 'rare occasion' that the issue should be addressed as a matter of law."). The burden of proving the existence of a qualified privilege rests with the defendant. *Glynn*, 388 So.2d. at 776.

Likewise, the issue of whether a defendant has exceeded or abused the privilege is for the jury to determine unless the acts are uncontroverted. *Axelrod v. Califano*, 357 So. 2d 1048, 1051–52 (Fla. Dist. Ct. App. 1978); *Nowik v. Mazda Motors of America (East) Inc.*, 523 So.2d 769, 771 (Fla. 1st DCA 1988); *Colbert,* 2013 WL 12145017, at *2; *McCurdy,* 508 So.2d at 382. *Glynn*, 383 So. 2d at 776 (material questions of fact as to whether the statements were made with malice or to too wide an audience precluded summary judgment.)

> III. **There is a genuine issue of material fact as to whether Merino abused the privilege when he filed his CERS Report.**

Clowdus does not dispute that Merino had a qualified privilege to file a CERS Report by virtue of his direct involvement in an incident with a passenger. However, there is no question on the evidence in this record that a genuine issue of material fact exists as to whether Merino abused the privilege by maliciously accusing Clowdus of assaulting him onboard an airline, which is a federal offense, when he knew the allegation was untrue.

Merino stated in his CERS report that Clowdus grabbed his bag "and deliberately hit me in the stomach with it very hard with it! I asked him [sic] You just hit me with your bag and he replied very aggressively NO I DIDN'T." PSUF, ¶34, Ex. L. He further stated that "I was fisically [sic] assaulted by this man *and the company should do something about it*." (emphasis added). *Id.* However, Clowdus testified that when he attempted to apologize to Merino, which is inconsistent with an intentional assault, Merino refused to listen and simply responded, "I don't care." PSUF, ¶46, Clowdus Dep., Pg. 76, ll. 1-6. Merino also testified that when Henriquez told Merino after he removed Clowdus from the plane that Clowdus had not intended to hit him, Merino told him simply, "He didn't apologize" and "The decision has been made." PSUF ¶40, Ex. M, Merino Dep., Pg. 28, ll. 6-25, Pg. 29, ll. 1-2. Merino knew at the time he

8

wrote the CERS report that he was accusing Clowdus of a felony and demanding that the company take action against him.  PSUF ¶36, Ex. M, Merino Dep., Pg. 73, ll. 9-15.  Furthermore, it is uncontested that Merino never sought or requested any medical attention or reported that he was assaulted to the police or the FAA.  A jury could conclude based on this evidence that Merino knew at the time he filed his CERS report claiming Clowdus had intentionally assaulted him that the statement was false, but that he chose to publish it anyway.  A knowing false statement equals express malice.  *Full Stop*.

There is also sufficient evidence from which a jury could conclude that Merino's primary motive in filing the CERS report stating that he had been assaulted was to harm Clowdus, rather than out of genuine concern for his safety or the safety of the other passengers.  *See Nodar*, 462 So.2d at 810.  Merino testified that he repeatedly asked Clowdus to place his bag in the overhead bin, but that Clowdus ignored him.  PSUF, Ex. L, Merino CERS Report.   He also testified that Clowdus "laughed mockingly" at him when the bag made contact with his body, and that Clowdus refused to apologize.  PSUF ¶66, Ex. M, Merino Dep., Pg. 67, ll. 15-Pg. 68, ll. 9; ¶40, Ex. M, Merino Dep., Pg. 28, ll. 6-25, Pg. 29, ll. 1-2.  In addition, Merino urged AA in his CERS report to take action against Clowdus.  PSUF, Ex. L, Merino CERS Report.  A jury could conclude from this evidence that Merino's primary motive in making the false statement was not concern for passenger safety, but to get back at Clowdus for ignoring his instructions and refusing to apologize after he accidentally hit him.

Furthermore, a jury could easily find Merino's description of the events that morning to be not credible.  Merino testified he was not rushed to get the plane in the air that morning, even though there was evidence from other flight attendants that flight attendants were not paid until the plane "pushed back."  PSUF, ¶47, Ex. M, Merino Dep., Pg. 97, ll. 17 – Pg. 99, ll. 5; ¶48, Ex. V, Colas Dep., Pg. 34, ll. 1 – Pg. 35, ll. 8.  Flight attendants do receive reprimands for late departures due to cabin service. PSUF ¶49, Ex. W, Bastos Dep., Pg. 27, ll. 10-18.  And the first flight of the day needed to be "perfect" because all other flights after went like dominos.  PSUF ¶50, Ex. C, Henriquez Dep., Pg. 14, ll. 2-20.  Merino also testified that Clowdus was angry from the moment he got on the plane, that he hit him so hard with the bag that it "knocked the wind out of [him]," that Clowdus repeatedly laughed mockingly at Merino after hitting him, that he half-stood menacingly as a follow-up to the hit, and that he got in his face angrily as he exited the plane, even though his description of what occurred was at odds with the testimony of other

9

witnesses. PSUF ¶¶s 42-45, 66, Ex. M, Merino Dep., Pg. 10, ll. 23-25; Pg. 113, ll. 6-17; Pg. 17, ll. 22 – Pg. 19, ll. 10; Pg. 117, ll. 20 – Pg. 118, ll. 2; Pg. 67, ll. 15-Pg. 68, ll. 9. Furthermore, Merino never made any of these accusations to Henriquez at the time that Henriquez spoke with him. He just shrugged "he didn't apologize."

AA argues that Clowdus cannot prove express malice *as a matter of law* because he did not know Merino prior to the flight and only interacted with him for a few minutes. But this conclusion is both based upon a flawed reading of *Nodar*, as argued *supra,* and a flawed understanding of malice. Anyone who has experienced road rage knows that perfect strangers can exhibit murderous malice at the drop of a dime. A jury could conclude based on the evidence in the record that Merino felt disrespected and belittled when Clowdus did not immediately respond to his directions and accidentally hit him, and instead of handling the situation in a professional manner, chose to abuse his power as a flight attendant and punish Clowdus by causing him to lose his ability to fly with AA in the future.

The question of whether Merino lied about being assaulted is the crux of the entire action. It is ludicrous for AA to claim that this should be decided as a matter of law by the Court. Clearly it is in contention and for the jury – both determinations are part of the same package. A jury could reasonably conclude based on the evidence in the record that Merino knew that he had not been assaulted when the incident occurred, but he lied about it in his report to punish the Plaintiff for angering him.

> **IV.    There is a genuine issue of material fact as to whether Gray had a qualified privilege to publish the statement that Clowdus assaulted Merino in her CERS Report.**

In order for the statement in Gray's CERS Report accusing Clowdus of assaulting Merino to be privileged, she had to have made it in good faith and on a proper occasion. *Falic*, 347 F.Supp.2d at 1264. However, there is significant evidence that Gray did not actually witness the incident, even though she filed a CERS Report claiming to have done so, and that she therefore had no corresponding interest in or duty to report it. Furthermore, if a jury finds that she lied, and in fact was not a witness, then she was masquerading as a person who was required to file a report, but she was actually situated similarly to the other flight attendants on the plane who did not file reports because it was not a proper occasion for them to speak and they had no proper interest in speaking.

There is evidence from which a jury could conclude that Gray did not file the CERS report in good faith. Gray testified in her deposition that she was standing directly behind Merino – between rows two and three – when the incident occurred and that she backed up to stand between rows 3 and 4 when Henriquez came and escorted Clowdus off the plane. PSUF ¶23, Ex. E, Gray Dep., Pg. 59, ll. 13-20; Pg. 11, ll. 15-Pg. 12, ll. 10. However, the ground security coordinator (Henriquez) who entered the plane as soon as he heard Merino shout "You hit me!" testified that he did not see her there and he later disputed the credibility of any flight attendant witness statements to his supervisor, saying that he was closest, and the flight attendants were all in the back of the plane at the time. PSUF ¶21, Ex. C, Henriquez Dep., pg. 15:5-9; Ex. I, Tour Report. Additionally, the passengers seated in seats 3A, 3B, and 4A were either deposed or provided an affidavit. None of them remember Gray being there when the incident occurred, even though she would have directly impeded (partially or fully) their diagonal sight line to the interaction between Merino and Clowdus in 1F. PSUF, ¶20, Ex. F, Quintana Dep., Pg. 28, ll. 10-12, Pg. 108, ll. 2-20; Ex. G, Kim Dep., Pg. 7, ll. 3-15, Pg. 32, ll. 18-25, Pg. 33, ll. 1; Ex. H, Espinoza Affidavit. Clowdus was also adamant that when he looked all around for assistance from another flight attendant after Merino stormed off, there were none to be seen – certainly none just standing there almost within arm's reach. PSUF ¶22, Ex. J, Clowdus Dep., Pg. 68, ll. 14-25, Pg. 69, ll. 1.

In addition, there are numerous other inconsistencies in Gray's testimony regarding Clowdus's demeanor and appearance that morning that cast doubt on her truthfulness. For instance, Gray stated in her CERS Report that Clowdus *stood there* "glaring at [Merino]" after he intentionally hit him with his bag. PSUF ¶16, Ex. D, Gray CERS Report. Yet the majority of the witnesses who testified placed Clowdus in the window seat during the entire incident.[4] PSUF ¶18, Ex. F, Quintana Dep., Pg. 61, ll. 7-12; Ex. G, Kim Dep., Pg. 17, ll. 19-24; Ex. H, Espinoza Affidavit. Similarly, Gray described Clowdus's bag as a hard-sided briefcase, when it was actually floppy and formless leather, and described Clowdus as wearing a business suit when he was wearing jeans and a t-shirt. PSUF ¶¶s 29-32, Ex. E, Gray Dep., Pg. 31, ll. 17 – Pg. 33, ll. 17; Pg. 81, ll. 13 – Pg. 82, ll. 12; Ex. J, Clowdus Dep., Pg. 66, ll. 24 – Pg. 67, ll. 1; Pg. 48,

---

[4] Gray (and Merino) tried to reconcile this discrepancy in deposition by both saying that Clowdus half-stood and then quickly sat back down. A jury could easily decide that this convenient adjustment and harmony was the product of improper coaching.

ll. 23 – Pg. 49, ll. 20; Ex. S, Declaration of Troy Clowdus dated August 26, 2022.  She also testified that Clowdus was angry throughout the interaction and that he was led off the plane angrily protesting that "he didn't do it" and "he didn't do anything."  PSUF ¶24, Ex. E, Gray Dep., Pg. 34, ll. 16-19, Pg. 42, ll. 6-21, Pg. 43, ll. 1-9, Pg. 92, ll. 14-18.  However, Henriquez, who accompanied Clowdus off the plane, testified that he rebooked Clowdus on a later flight because Clowdus seemed confused but otherwise peaceful, calm, and compliant.  PSUF ¶28, ¶39, Ex. C, Henriquez Dep., Pg. 20, ll. 25, Pg. 21, ll. 1-16; Pg. 86, ll. 16-25; Pg. 87, ll. 1-2; Pg. 100, ll. 13-18.   Henriquez's testimony on this point was corroborated by at least three other passengers, who testified that Clowdus exited the plane calmly and without a word.  PSUF ¶¶s 25-26, Ex. F, Quintana Dep., Pg. 21, ll. 1-4, Pg. 86, ll. 10-21; Ex. K, Keizer Dec., Ex. R, ¶7; Ex G, Kim Dep., Pg. 8, ll. 9-25; Ex. R, Ramirez Affidavit; Ex. H, Espinoza Affidavit.

      In sum, a jury could easily conclude based on the number and nature of inconsistencies in Gray's testimony, coupled with her friendship with Merino, that the statements in her CERS report that she witnessed Clowdus assault Merino was a complete fabrication, and that she never actually witnessed any assault.[5]  A jury could also conclude based on the evidence in the record that she fabricated this statement to help Merino, in which case she case the statement would not be privileged.  *See Drennen*, 328 So.2d at 52.

### V. There is a genuine issue of material fact as to whether Maldonado abused the privilege by accusing Clowdus of assaulting Merino in the IRL report without conducting an investigation.

      AA maintains that the statement written by Maldonado in the IRL report that Clowdus "physically assaulted" is subject to a qualified privilege because it constitutes an intra-corporate communication.  AA is wrong.

      The Eleventh Circuit has held that where a person has published a false statement and information thereafter comes to him from a reliable source which would put a reasonable person on inquiry as to the truth of such statement, and instead of making such inquiry he willfully republishes the false statement, the repetition of the defamation is strong evidence of malice.  *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co.*, 430 F.2d 38, 47 (5th Cir. 1970) (applying

---

[5] If not for the Plaintiff's desire to make legally precise arguments, it could also and more easily be framed that Gray had a privilege and there is a jury question as to whether she lied and lost the privilege.

Florida law). [6] Courts in other jurisdictions have likewise held that the failure of a corporation to investigate an allegation before disseminating it throughout the organization constitutes an abuse of the privilege or undermines the formation of the privilege itself. *See Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 380–81 (Minn. 1990) ("The facts here indicate that no investigation occurred to substantiate the charges that Wirig had stolen merchandise. The managerial personnel who repeated the accusations simply believed their sources without further investigation…Therefore, we hold as a matter of law that Kinney did not enjoy a qualified privilege."): see also *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 156 Ill. 2d 16, 30, 619 N.E.2d 129, 135–36 (1993) ("Thus, an abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties.") (emphasis added).

There is more than sufficient evidence to establish that Maldonado failed to conduct the most rudimentary investigation of the incident between Clowdus and Merino and he did so to serve a purpose other than maintaining air safety. Maldonado did not call or email either Merino or Gray for more information. PSUF ¶54, Ex. O, Maldonado Dep., Pg. 43, ll. 11-15; Ex. T, IRL Packet. He also did not call or email Henriquez for more information or obtain a copy of Henriquez's CERS Report or the extremely damning Tour Report that Henriquez gave to his supervisor. PSUF ¶¶s 59-60, Ex. I, Tour Report; Ex. O, Maldonado Dep., Pg. 62, ll. 4-18; Pg. 54, ll. 14 – Pg. 57, ll. 10. Perhaps most importantly, AA never provided him with Clowdus's two customer complaints, which contained relevant – and exonerating—information, and he never called or emailed Clowdus or obtain them PSUF ¶53, Ex. O, Maldonado Dep., Pg. 66, ll. 7-25; Pg. 67, ll. 1-16.[7] In addition, Maldonado completed and finalized his "investigation" within less than 24 hours of receiving the reports from Merino and Gray, even though AA waited

---

[6] The Eleventh Circuit recognizes that Fifth Circuit decisions rendered prior to September 30, 1981 are binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)

[7] Maldonado had no explanation for why any of this missing evidence did not make its way to him. PSUF ¶¶s53-54, Ex. O, Maldonado Dep., Pg. 66, ll. 7-25; Pg. 67, ll. 1-16; Pg. 43, ll. 11-15; Ex. T, IRL Packet.

13

nearly two weeks before informing Clowdus that "the investigation was complete" and that he was banned.  PSUF ¶¶s63-64,  Ex. T, IRL Packet; Ex. U, AA emails.[8]

Moreover, neither Maldonado nor John Kirby, the highest security officer in the AA organization responsible for every action taken against passengers company-wide, could provide a single example of an incident where a passenger was vindicated after being accused by an employee or of ever "catching" an employee in a lie about a passenger.  Kirby insisted that passengers could provide a defense or appeal AAs decision by responding to the email telling them they were being investigated.  PSUF ¶56, Ex. P, Kirby Dep., Pg. 25, ll. 20 – Pg. 28, ll. 4; Pg. 107, ll. 11 – Pg. 109, ll. 14.  However, when shown the email sent to Clowdus which stated at the top "do not respond to this email," he had no answer.  PSUF ¶57, Ex. U, AA Emails.  In addition, Kirby testified that the passenger's side of the story is not considered because "criminals lie." PSUF¶58, Ex. P, Kirby Dep., Pg. 92, ll. 5-22; Pg. 93, ll. 1-21.  51. Kirby testified that AA does not provide its "investigators" with training in investigation.  PSUF ¶51, Ex. P, Kirby Dep., Pg. 12, ll. 2-17.  In fact, Maldonado did not claim to be an investigator in his deposition, stating that his job title was security coordinator, and his job was to simply collect information and pass it on.  PSUF ¶52, Ex. O, Maldonado Dep., Pg. 12, ll. 8 – Pg. 13, ll. 21; ¶69, Ex. O, Maldonado Dep., Pg. 11, ll. 17-Pg. 12, ll. 1.

A jury could reasonably conclude from this testimony that Henriquez's report was not sent to him because it conflicted with the clear decision to ban Clowdus or because AA had a *de facto* policy to do so.  It also could conclude that AA failed to conduct even a minimal investigation of the incident to determine who was telling the truth, and that Maldonado merely took the two CERS Reports that were sent to him, summarized them, and forwarded the report to Kirby, who rubber stamped it.  And it could conclude that despite having a reasonable basis to question the veracity of Merino's and Gray's reports, it chose to willfully ignore the significant discrepancies they presented in order to appease its flight crew.[9] *Diplomat Elec.,* 430 F.2d at 47;

---

[8] A jury could infer that this time discrepancy is likely due to an AA policy making it appear that a true investigation was conducted.

[9] The statements in Gray's and Merino's CERS reports could not have sent a clearer message to AA: "The company needs to support & protect their crews.  If the company keeps refusing to prosecute these violent offenders, then the crews will be left with no choice but to do it ourselves!"  PSUF ¶¶s 34-35, Ex. L, Merino CERS Report; Ex. D, Gray CERS Report.  A jury

*Riggs,* 406 So. 2d at 1203 ("Certainly no reasons of policy can be found for conferring immunity upon the foolish and reckless defamer who blasts an innocent reputation without making any attempt to verify his statements; but on the other hand there are occasions on which it may be entirely proper to give information of a rumor or a mere suspicion, as such, without any belief or any reason to believe that it represents the truth. Probably the best statement of the rule is that *the defendant is required to act as a reasonable man under the circumstances, with due regard to the strength of his belief, the grounds that he has to support it, and the importance of conveying the information*")(emphasis added); *Wirig*, 461 N.W.2d at 380–81; *Kuwik*, 619 N.E.2d at 135–36.

      Nevertheless, AA (thus Maldonado) had knowledge that should have put Maldonado on inquiry as to the truth of what he was republishing, but he published it anyway. See Diplomat., 430 F.2d at 47 (5th Cir. 1970)("Where a person has published a false statement and information thereafter comes to him from a reliable source which would put a reasonable person on inquiry as to the truth of such statement, and instead of making such inquiry he willfully republishes the false statement, the repetition of the defamation is strong evidence of malice.")(emphasis added): see also supra Sultan v. Walgreen Co., 324 So. 3d 563, 564 (Fla. Dist. Ct. App. 2021). Hence there is strong evidence of Maldonado's (AA's) bad faith prior to the creation of a qualified privilege.

      When Plaintiff filed his Complaint, AA would have finally gathered all relevant documents as part of assessing the lawsuit. AA would have read the Tour Report and learned that Henriquez (its ground security coordinator that day) had sided with Clowdus and believed the flight attendants were at fault. Good faith would have been to go straight to Henriquez and ask him his assessment – see if it made sense to take the path of conciliation. But Henriquez wasn't contacted by AA until shortly before his deposition months later. In the beginning, all Clowdus wanted was to be allowed to fly again. He was not seeking damages. He was a loyal customer of more than 30 years who regularly bought business class tickets and had never had the slightest problem or complaint against him in all his years flying. AA chose the path of costly litigation because AA had its own purposes to maintain.

---

could easily conclude from this statement that AA had a greater interest in supporting its flight crew, regardless of the truth, than in conducting a legitimate investigation.

A jury could conclude that AA's failure to investigate was not the result of mere negligence, but an intentional decision to look the other way in order to keep its work force happy. *See Drennen,* 328 So.2d at 52. The moment Merino made his charge, Clowdus' lifetime ban was assured. Two very important interests for AA immediately superseded any legitimate interest AA had in determining whether the incident occurred as reported and whether the passenger was a safety threat to be banned. First, it was far more important to AA that its actions supported employee morale. AA didn't care whether Clowdus was innocent, Clowdus had become a pawn to deliver a message: We protect our employees.[10]

The jury could also conclude that the even more fundamental reason why AA had no interest in conducting a good faith investigation is that AA derived only potential liability from doing so. Maybe three times out of four, employees take action against passengers and the passengers rightly deserve it, but some percentage of the time the employee will be the bad actor who has used his position and authority to abuse the passenger in some way. Likely the damage is done: the passenger was arrested, his trip was ruined, he was humiliated in front of fellow passengers, etc. Probably unhappy, probably considering a lawsuit. AA has zero interest in getting to the truth in that situation – to build the case for the other side. AA first and foremost as a corporation is concerned with limiting liability: so AA goes through the show of conducting an internal investigation for a proper purpose and then concludes that the passenger was at fault. Thus, AA has a stronger defense if a lawsuit comes to pass. *Defamatory communications made while engaging in this charade are not privileged.* The facts showing that AA conducted no investigation, coupled with the deposition testimony of its "investigators" provide more than speculative evidence that AA does not deserve a privilege for its communication and a jury can easily decide this to be the case. Maldonado's summary and republication of Merino and Gray's defamatory CERS Reports was defamatory per se and it was not privileged.

### VI. AA is Vicariously Liable for Merino and Gray's Defamation of the Plaintiff

AA's argument against vicarious liability is entirely unsupported by Florida law. There is no doubt that if a jury finds that Clowdus was defamed by either Merino or Gray that

---

10 This motive would certainly have been exacerbated by the mask fatigue and frayed tempers experienced by both flight attendants and passengers alike due to the COVID 19 restrictions.

American Airlines is vicariously liable.[11] Both were acting squarely within the scope of their employment during the incident and its aftermath. See *Valeo v. E. Coast Furniture Co.*, 95 So. 3d 921, 925 (Fla. Dist. Ct. App. 2012); see also *Holtzman v. B/E Aerospace, Inc.,* 2008 WL 214715, at *4 (S.D. Fla. Jan. 24, 2008) ("[i]t is well settled in Florida, as elsewhere, that a corporation, just as an individual, may be liable for defamation by its employees…If the employee was an agent of the corporation acting within the scope of his employment, then the employer may be held liable.) (internal citations omitted).

The only case cited by AA in support of its argument against liability reaffirms both that this is not a question for summary judgment and that AA is liable. *City of Miami v. Simpson*:

> The liability of a master can arise in such instances only when the act of the servant is done within the real or apparent scope of the master's business. The master's liability does not arise when the servant steps aside from his employment to commit the tort or does the wrongful act to accomplish some purpose of his own. If the tort is activated by a purpose to serve the master or principal, then he is liable. Otherwise, he is not. These generally are the rules applicable to private corporations which we adopt as controlling the liability of municipal corporations…
>
> *Generally, the question whether the employee was acting within the scope of his employment should be deposited with the jury for resolution.*

172 So. 2d 435, 437 (Fla. 1965)(emphasis added).

### VII. The CERS Reports Written by Merino and Gray are Defamatory Within the "Four Corners" of the Documents.

AA argues that it is entitled to summary judgment because the statements in the CERS reports are not defamatory within the "four corners" of the documents. AA has consistently misinterpreted the "four corner" doctrine of libel in Florida to wrongly argue that a libelous statement should be considered alone and without "context" as well as without "innuendo,"[12] but the very case that AA cites in support of this misguided proposition explicitly considers the context of the allegedly defamatory Facebook post involved. See *Aflalo v. Weiner*, 2018 WL 3235529, at *4 (S.D. Fla. July 2, 2018) ("Plaintiff has failed to convincingly plead that the Statement, or the circumstances surrounding it (i.e., the parties involved, the medium chosen, the

---

[11] AA is directly liable for Maldonado's defamation because he was performing his job in the way that AA desired him to do so.

12 The "Four Corners Doctrine" deals only with innuendo and the perception of the "common mind." See e.g. *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953).

17

words used), engender the type of hatred, distrust, ridicule, contempt or disgrace that is required to succeed under this prong.")

Fortunately, it is not necessary to re-tread that ground in the instant motion. Both Merino and Gray unambiguously accuse the Plaintiff of felony assault in their reports, establishing an unquestionable basis for a defamation per se claim. Merino writes: "I was physically assaulted by this man and the company needs to do something about it!"[13] Gray writes: "No form of assault is acceptable on the crew!!!" and "If the company keeps refusing to prosecute these violent offenders, the crew will be left with no choice but to do it ourselves!" and "The FAA will be notified by us."[14] As such, there is no question as to whether the contents of the written statements are defamatory per se – only whether the defamation is protected by a qualified privilege and, if so, whether the privilege has been defeated by the contamination of express malice in the publication.

## CONCLUSION

For all the foregoing reasons, AA's Motion for Partial Summary Judgment should be denied.


Respectfully Submitted,

/s/ William T. Woodrow III                          /s/ David H. Pollack

William T. Woodrow III (*pro hac vice*)      THE LAW OFFICE OF
Stone & Woodrow LLP                              DAVID H. POLLACK, LLC
250 West Main St. Suite 201                      Fla. Bar No. 0955840
Charlottesville, VA 22902                           75 Valencia Avenue, Suite 100
will@stoneandwoodrowlaw.com             Coral Gables, FL  33134
Phone: 855-275-7378                                 Tel:  305-372-5900

Attorneys for Plaintiff

---

[13] PSUF, ¶34, Ex. L, Merino CERS Report.
[14] PSUF, ¶35, Ex. D, Gray CERS Report.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on August 26, 2022.

    /s/ William T. Woodrow

William T. Woodrow III (*pro hac vice*)
Stone & Woodrow LLP
250 West Main St. Suite 201
Charlottesville, VA 22902
will@stoneandwoodrowlaw.com
Phone: 855-275-7378
*Attorneys for Plaintiff*