Page 1

1              IN THE UNITED STATES DISTRICT COURT
            IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA
2                          CIVIL ACTION
                     CASE NO.: 1:21-cv-23155
3

4

5     TROY CLOWDUS,
6              Plaintiff,
7     vs.
8     AMERICAN AIRLINES, INC.,
9              Defendant.
      _____/
10

11

12

                    DEPOSITION OF TROY CLOWDUS
13

14

15        TAKEN BY:      Attorney for Defendant
16        DATE:          Tuesday, February 1, 2022
17        TIME:          Commencing 10:00 a.m.
                         To 2:00 p.m.
18
          PLACE:         Veritext Legal Solutions
19                       Zoom Videoconference
20        REPORTED BY:   Dawn Neukomm, RPR
                         Registered Professional Reporter
21                       State of Florida at Large
22

23
         Job No. CS5002471
24

25

Page 2

```
 1          APPEARANCES:

 2

 3               WILLIAM T. WOODROW, III, ESQ.
                 Stone & Woodrow, LLP

 4               Attorneys at Law
                 250 West Main Street

 5               Suite 201
                 Charlottesville, Virginia  22902

 6               (855) 275-7378
                 (will@stoneandwoodrowlaw.com)

 7
                 Attorney for Plaintiff

 8               Troy Clowdus

 9

10
                 KELLY H. KOLB, ESQ.

11               ROBERT D. PECCHIO, ESQ.
                 Buchanan Ingersoll & Rooney, PC

12               Attorneys at Law
                 401 East Las Olas Boulevard

13               Suite 2250
                 Fort Lauderdale, Florida  33301

14               (954) 703-3944
                 (kelly.kolb@bipc.com)

15
                 Attorney for Defendant

16               American Airlines, Inc.

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1              E  X  A  M  I  N  A  T  I  O  N
 2                                                 Page
 3
     Direct Examination by Mr. Kolb                   5
 4
     Cross-Examination by Mr. Woodrow               156
 5
     Certificate of Reporter Oath                   161
 6
     Reporter's Deposition Certificate              162
 7
     Read & Sign Letter                             163
 8
     Errata Sheet                                   164
 9
10
11                    E  X  H  I  B  I  T  S
12                                                 Page
13   Defendant's Exhibit No. 1                       27
         (Complaint)
14
     Defendant's Exhibit No. 2                       32
15       (Tickets)
16   Defendant's Exhibit No. 3                       33
         (Conditions of Carriage)
17
     Defendant's Exhibit No. 4                       36
18       (AAdvantage Program Terms & Conditions)
19   Defendant's Exhibit No. 5                       51
         (Plaintiff's Amended Interrogatory
20       Answers)
21   Defendant's Exhibit No. 6                       89
         (Plaintiff's AA Complaint)
22
     Defendant's Exhibit No. 7                      108
23       (6/10/21 E-Mail from AA)
24   Defendant's Exhibit No. 8                      109
         (6/22/21 E-Mail from AA)
25
```

                                                        Page 4

1    EXHIBITS (continued)

2    Defendant's Exhibit No. 9                    111
            (Plaintiff's AA Complaint #2)

3

     Defendant's Exhibit No. 10                   137

4          (Ticket Price Differential)

5    Defendant's Exhibit No. 11                   136
            (Active Miles Screenshot)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1    THEREUPON,

2                        TROY CLOWDUS,

3    was adduced as the deponent herein, and upon first

4    being duly sworn upon oath, was questioned and

5    testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. KOLB:

8         Q.   Can you state your name, please, sir?

9         A.   Troy Clowdus.

10        Q.   All right.  Mr. Clowdus, my name is

11   Kelly Kolb.  I represent American Airlines in this

12   lawsuit that you filed.  I've asked you to appear

13   today, so we can discuss some of the particulars of

14   your lawsuit that concern some flights that you were

15   not allowed to board on June 10th of 2021.  Do you

16   understand who I am and why we're here today?

17        A.   Yes, sir.

18        Q.   Have you ever had your deposition taken

19   before?

20        A.   Yes.

21        Q.   And how long ago was it?

22        A.   It's probably been 15, 16 years, 10

23   , 15 years.  It's been awhile.

24        Q.   And generally what was that in connection

25   with?

Page 6

```
 1        A.   Civil matters with my business, civil
 2   litigations.
 3        Q.   Was that a loan of some kind?
 4        A.   No.  You know, when you run a business, you
 5   sometimes have legal issues, and it comes up.  It's
 6   basically contractual stuff.
 7        Q.   Which business did that concern?
 8        A.   Southeast Offset.
 9        Q.   All right.  Well, as you may or may not
10   remember from 10 or 15 years ago, you're under oath
11   today just as if you were in court in front of a judge
12   and a jury.  Do you understand that?
13        A.   Yes, I do.
14        Q.   And if you don't understand one of my
15   questions, please ask me to repeat it or clarify, and
16   I'll do the best I can.  Okay?
17        A.   No problem.
18        Q.   Otherwise, I'm going assume you understood my
19   question, and your answer was full and complete and
20   truthful; is that fair?
21        A.   Yes.
22        Q.   All right.  If you need to take a break at
23   any time, let me know.  I don't intend to let this last
24   too long.  I know you're a busy man as is your lawyer.
25   Are you on any medications today would keep you from
```

Page 7

1    giving full and complete and honest answers?

2        A.   No, sir.

3        Q.   Back in the before times, we used to do this

4    across the conference room table face to face.

5        A.   Yes.

6        Q.   Things have changed a bit.

7        A.   Yeah.  I prefer this.

8        Q.   Yeah, I do as well.  And when we were face to

9    face, a lawyer sitting in my chair could make sure that

10   the lawyer sitting in Mr. Woodrow's chair wasn't

11   whispering answers in your ear.

12       A.   Yes.

13       Q.   You can't do that right now.  And so what I

14   need to do is ask you to turn off your cell phone and

15   any other devices that aren't necessary for you to

16   attend this zoom, so I can make sure you're not getting

17   any coaching on the side.  Is that okay?

18       A.   Absolutely.

19           THE WITNESS:  Wil, is that okay?

20           MR. WOODROW:  Well, yeah.  You may have to

21   turn it back on during the break, and that's fine.

22           THE WITNESS:  Okay.

23   BY MR. KOLB:

24       Q.   Absolutely.  All right.  Can you confirm for

25   me, sir, that you've turned off your phone and any

```
                                           Page 8
 1     other apps on your laptop that are not necessary for
 2     attending this zoom deposition?
 3          A.   Yes.  I'm on my iPad, but I understand.
 4          Q.   All right.  And I'll ask you to leave them
 5     off throughout the deposition; is that fair?
 6          A.   No problem.
 7          Q.   You're represented by counsel here today,
 8     Mr. Woodrow.  Approximately when did you engage his law
 9     firm?
10          A.   Approximately a week after the incident.  I
11     think I spoke with him four to five days afterwards.
12          Q.   Okay.
13          A.   I'd have to look it up to give you the exact
14     date.
15          Q.   That's all right.  I just wanted an
16     approximation.  And don't disclose anything that you
17     and he discussed.  Okay?  I'm not going there.  I'm not
18     entitled to it.
19          A.   Okay.
20          Q.   How is it that you came to know of
21     Mr. Woodrow and his law firm about a week after the
22     incident?
23          A.   Immediately after the incident after I found
24     out that I was accused of assaulting the flight
25     attendant, Mr. Marino, I first starting researching
```

Page 9

```
 1    criminal attorneys because I assumed I would be
 2    criminally liable.  And then following that research
 3    and speaking to my corporate attorney, I started
 4    looking around for legal representation that had some
 5    experience with airlines.
 6         Q.   Okay.
 7         A.   And that's when I found Wil and his law firm.
 8         Q.   All right.  And was that basically an
 9    Internet search?
10         A.   Basically Internet, yes.
11         Q.   And who is your corporate attorney?
12         A.   It is Kirt De Leon.
13         Q.   Is he down in Miami?
14         A.   It's D-e L-e-o-n.  Yes, he's in Miami.
15         Q.   Thanks.  What o have you done to prepare for
16    your deposition today, sir?
17         A.    I reviewed my affidavit and reviewed my
18    complaint to American Airlines.
19         Q.   Anything else that you reviewed?
20         A.   No.  That's all.
21         Q.   Other than meeting or speaking with
22    Mr. Woodrow, did you meet or speak with anybody in
23    preparation for your deposition?
24         A.   No, I did not.
25         Q.   All right.  If I were to guess that you were
```

1    in your mid 50s, would that be about right?

2          A.   If you were to what.

3          Q.   If I were to guess that you were in your mid

4    50s, would that be about right?

5          A.   Yes.  That's correct.

6          Q.   All right.  And you're not currently married;

7    is that correct?

8          A.   I'm currently divorced.

9          Q.   Do you have anyone living with you in your

10   residence?

11         A.   I have a friend that's staying with me

12   temporarily.

13         Q.   Do you have any children or siblings?

14         A.   I have no children.  I have five siblings.

15         Q.   Are they in Florida?

16         A.   Four of them are in Florida.  One is in

17   Massachusetts.

18         Q.   Have you discussed with them the

19   circumstances of your lawsuit?

20         A.   Not in detail.  None of them except one

21   sister that has a general idea that, you know, I have

22   litigation, but I have not spoken in detail with her

23   about it.

24         Q.   When's the last time you spoke with her?

25         A.   About this or in general?

Page 11

1          Q.   Yes, sir.  I'm sorry.  Yeah, about the

2     lawsuit and the incident.

3          A.   Probably a few months ago.  I don't recall.

4     I tried not to talk about it with anybody to be honest.

5          Q.   Understood.  Are your parents still alive?

6          A.   Yes, they are.

7          Q.   Where are they?

8          A.   Both in Florida.

9          Q.   Have you discussed this lawsuit with them at

10    all?

11         A.   No.

12         Q.   In preparing for today, I ran across the name

13    of David Clowdus.  Is that one of your siblings?

14         A.   My older brother's name is David Clowdus,

15    yes, and my father's name is David Clowdus.

16         Q.   And what, if any, connection do they have

17    Southeast Offset?

18         A.   My older brother used to work with me at

19    Southeast Offset, but he hasn't since 2005, and 2006 I

20    think was the last time he was there.

21         Q.   Can you give me an idea of your height and

22    weight?

23         A.   I'm 5-11, and I weight 205 pounds.

24         Q.   And has your weight and height changed any

25    since June of last year?

Page 12

1          A.   No.

2          Q.   All right.  What about Mr. Marino, do you

3     have any guess as to what his height and weight was

4     back in June of 2021?

5          A.   No idea.

6               MR. WOODROW:  Objection.

7               THE WITNESS:  Yeah, I have no idea.  I

8     couldn't tell you what he looked like if I saw him

9     today.

10    BY MR. KOLB:

11         Q.   Do you recall if he was in stature smaller

12    than you, the same or bigger?

13         A.   I have no idea.  I barely interacted with the

14    man, like five seconds.

15         Q.   Currently do you live in Miami Beach?

16         A.   I do, yes.

17         Q.   How long have you lived on Regal Alto

18    Terrace?

19         A.   I live on 11 Island Avenue right now.

20         Q.   How long o have you lived there?

21         A.   Well, I've owned this property for six years,

22    seven years.  I lived on Regal Alto before, but they're

23    right beside each other.  I own both properties.

24         Q.   Where were you living in 2012 (sic)?

25         A.   12?

Page 13

1      Q.    Where were you living last June?

2      A.    11 Island.

3      Q.    Okay.  Did you ever serve in the military?

4      A.    Excuse me?

5      Q.    Did you ever serve in the military?

6      A.    No, I never did.

7      Q.    Can you give me a brief thumbnail sketch of

8   your education beyond high school?

9      A.    I attended a bachelor university.  I received

10  my Bachelor's Degree in Theology.  I attended briefly

11  grad school at the University of Texas for business,

12  and then I left there and started my own business.  And

13  a couple of years ago, I went back to grad school and

14  finished my Master's Degree in fine arts.

15     Q.    All right.  And where did you get your

16  Master's?

17     A.    Miami International University.

18     Q.    Did I understand you to say that you did not

19  obtain a degree from the University of Texas?

20     A.    No, I did not.  I attended one semester.

21     Q.    When was that roughly, what year; do you

22  remember?

23     A.    Yeah.  It was 2003.

24     Q.    All right.  I have a great affinity for

25  Austin.  I was born there.

1        A.    Yeah?

2        Q.    While my dad was taking the bar exam, which

3    tells you probably that I was not an anticipated baby.

4        A.    I love Austin.  It's one of my favorite

5    cities.

6        Q.    Yeah.  It's very nice.  All right.  A

7    Bachelor's in fine arts and a BA in theology.  Any

8    other degrees, certifications, trade schools --

9        A.    No.

10        Q.    -- that you can recall?

11        A.    No.

12        Q.    Have you ever been arrested or convicted of

13    anything other than a moving violation?

14        A.    Never.

15        Q.    And I believe we looked briefly at your

16    social media, specifically Instagram.  We didn't see

17    any reference to this incident at all.  Have you posted

18    anything about this at all?

19        A.    Never once.  I wouldn't.  I have no interest

20    in this being ever put out there.

21        Q.    All right.  We ran across a couple of

22    lawsuits, and it's a little bit unclear to me.  There's

23    either one or two bankruptcies, and then there's a

24    lawsuit that you filed against a company called WMLJ.

25    Can you tell me I guess about WMLJ?

Page 15

1      A.   WMLJ?

2      Q.   Yeah.

3      A.   Oh, okay.  WMLJ was a contractor who took

4  $60,000 and disappeared on me.  You know, it's South

5  Florida?

6      Q.   Yes, sir.  I was going say.  Yes, sir.  Yes,

7  sir.  And at any time did you file personal

8  bankruptcy?

9      A.   I did in 2002 after 9/11.  My business went

10  into Chapter 11, reorganized, and we came out of it.

11  It was all part of that.

12     Q.   And the business you're talk about is

13  Southeast Offset?

14     A.   Yes.  Yeah.  I lost most of my revenue for

15  six months after 9/11.

16     Q.   Understood.  Other than the incident on

17  June 10th of last year, how has your experience with

18  American Airlines been over the 30 years you've been

19  flying?

20     A.   I've never had an issue.  I've always been

21  very happy.  And normally I am very pleased and

22  satisfied with my interactions with all American

23  Airlines' employees.  This is the first unfortunate

24  event.

25     Q.   All right.  Do you know anybody that works at

Page 16

```
 1    American Airlines?
 2         A.   No, I don't.  As far as on a personal level
 3    as a friend.
 4         Q.   Yes.  Yes, sir.
 5         A.   No, I do not.
 6         Q.   Do you have any experience, training, skill
 7    or education in aircraft operation?
 8         A.   No, I do not.
 9         Q.   How about aircraft security?
10         A.   No, I do not.
11         Q.   How about handling passengers onboard an
12    aircraft?
13         A.   No, I do not.
14         Q.   All right.  Let's go through your employment
15    real quick.  You've been with Southeast Offset for
16    20 something years; is that right?
17         A.   Yes.  Yes.
18         Q.   And during that period of time, you've had
19    some other side occupations far lack of a better word?
20         A.   No, I have not.  It's been my only source of
21    employment since I was 26.
22         Q.   All right.  Were you ever involved with a
23    company called Clowdus Properties?
24         A.   Yes.  That was a real estate holding company.
25         Q.   And between what years were you involved with
```

Page 17

1    Clowdus Properties?
2        A.    From whenever it was incorporated until
3    whenever we shut it down.  I don't have that
4    information in front of me, but we opened it to -- we
5    opened it because the bank that we were getting a
6    property loan on it required us to do that.  They
7    didn't want for -- they wanted some -- they requested
8    that we hold it in a separate company to protect it.
9        Q.    All right.  And what was your position and
10   job duties at Clowdus Properties?
11       A.    I think I was just -- I'm trying to remember
12   how which we structured it because it was so long ago.
13   I'm assuming I was the president, but I might have been
14   the officer or one of the officers.
15       Q.    And what was the business of Clowdus
16   Properties?
17       A.    It was just a holding company for the real
18   estate that Southeast Offset occupied.  It owned one
19   piece of property.  That's all it did.  Like I said, it
20   was just a legal requirement for the bank that we were
21   using.
22       Q.    Got it.  All right.  Let's talk about
23   Southeast Offset real quick.  Can you give me a
24   thumbnail sketch of what the business of Southeast
25   Offset is, what it does?

Page 18

1      A.   We're a printing company.  We used to print

2   newspapers.  We printed the Financial Times, The

3   Christian Science Monitor.  I do printing for The

4   Miami Herald, The Sun Sentinel.  And I print

5   practically every community newspaper in the South

6   Florida area and a few legal papers, The Daily Business

7   Review.  I print that.  So it's community papers and

8   magazines and periodicals across the Caribbean Islands

9   and all across South Florida.

10      Q.   The Caribbean and South Florida.  And how

11   about in Latin America and South American as well?

12      A.   No.

13      Q.   No?

14      A.   I do not print for down there.  I used to,

15   but not any -- I used to print The Financial Times and

16   fly them every day to South America.

17      Q.   Okay.  How many employees does Southeast

18   Offset have?

19      A.   Approximately 20.

20      Q.   Do you have a printing plant here in

21   South Florida?

22      A.   Yes.

23      Q.   Where is that located?

24      A.   In Miami Gardens.  Actually, it's Miami.

25   Yeah, it's Miami Gardens.  Do you need the address?

1      Q.    No, sir.

2      A.    Okay.

3      Q.    Other than yourself, who are the other

4    principles of Southeast Offset?

5      A.    Allen Brice.

6      Q.    All right.  So I understand you're CEO.  Who,

7    if anyone, do you answer to at Southeast Offset?

8      A.    Nobody except I have a partner, and he and I

9    are 50/50.

10      Q.    Is that Mr. Brice?

11      A.    Yes.

12      Q.    What specifically are your duties with

13    Southeast Offset?

14      A.    I run the operational side, everything to do

15    with the manufacturing and management of the day-to-day

16    operations.

17      Q.    All right.  The majority of your day is spent

18    in Miami Gardens at the production facility?

19      A.    Yes.  Well, I mean I do a lot of stuff

20    on-line now, but I'm not physically present there every

21    day.

22      Q.    All right.  Was your travel on June 10th of

23    last year to Mexico City, was that in any way related

24    to your Southeast Offset business?

25      A.    No, it was not.

Page 20

```
 1        Q.   What was the purpose of that travel?
 2        A.   I was visiting.  I was visiting a friend who
 3   was celebrating her 60th birthday.
 4        Q.   Do you have occasion to regularly travel to
 5   Latin America and South America?
 6        A.   Yes, several times a month.  Yes.
 7        Q.   And what's the purpose of that travel?
 8        A.   Initially I met a girl a few years ago, a
 9   woman, to develop the relationship.  And then as that
10   relationship developed, I started looking for business
11   opportunities and investment opportunities, so I could
12   be closer to her and her family.  That's part of the
13   reason.
14        Q.   Did you find those business opportunities
15   down there?
16        A.   I was looking at them, but I put everything
17   on hold at the moment.  My only travel at the moment is
18   just to visit her, but given this situation, I've been
19   very reluctant to pursue anything else.
20        Q.   All right.  If I'm understanding, your travel
21   to South America or Latin America --
22        A.   Right.
23        Q.   -- you're principally linked to Mexico City?
24        A.   No.  No.  No.  Mexico City was --
25        Q.   The birthday.
```

Page 21

1        A.    -- a one time thing.  I was traveling to

2    Panama, Columbia -- primarily Columbia, Panama,

3    Costa Rica and that general vicinity.

4        Q.    And all that travel was related to this

5    relationship with the woman you met?

6        A.    No.  The travel was looking for real estate

7    investments and/or business opportunities primarily in

8    the past year --

9        Q.    Correct.

10        A.    -- intertwined with visiting her.  And

11    oftentimes she would travel to meet me in Panama or

12    Costa Rica or wherever I was going.  She lives in

13    Cali.  So when I go to Cali, it's to see her.  When I'm

14    traveling anywhere else, it was looking at real estate

15    investments.

16        Q.    Have you discussed with this woman in Cali,

17    the circumstances of this lawsuit?

18        A.    No, I've not.  She doesn't know the

19    circumstances.  She knows that I can't fly American.

20    She knows that I'm limited on the airlines that I can

21    fly on.

22        Q.    All right.  And what specifically have you

23    told her about that?

24        A.    I specifically just said that I had

25    difficulty with American, and I couldn't fly with

Page 22

1   them.  I needed to fly with a different airline.  I
2   never got into the specifics.
3         Q.   Prior to June 10th, how frequently were you
4   visiting -- I'll call her a girlfriend.
5         A.   Right, my significant partner, yeah.
6         Q.   Significant other, yeah.  Prior to June 10th,
7   how frequently were you visiting her?
8         A.   Probably two to three times a month.  You
9   know, with Covid, it was always a mission with Covid
10  because you never knew when things were going to
11  change.  So that was always the limiting factor was
12  what rules were going to change and what limitations
13  there were and when you could get in and when you
14  couldn't get out, etc.  So it was often as I possibly
15  could, two to three times a month.
16        Q.   And since June of last year, how frequent are
17  your visits with her?
18        A.   I've cut it back.  I told Wil about this.  I
19  had a very bad incident when I went to Cali because of
20  this, and it made me extremely nervous to fly.  And I
21  can tell you the details, if you'd like, but it's what
22  really impacted my frequency.  I went to London, and
23  while I was in London, my passport was slightly
24  damaged.  There were pages torn.  And I tried to get it
25  replaced, and because of the Covid, the passport

Page 23

1    offices are closed.  So I flew to Panama, and I had no

2    problem.  I flew to Cali, and I had no problem.  The

3    third time I went to Cali, the immigration officer took

4    my passport and wouldn't give it back to me.  He said

5    it was damaged, and I wouldn't be allowed in the

6    country.  And they put me in an office and said you

7    have to get on the next flight back to the

8    United States.  And the only airline for the next three

9    days flying from Cali to the United States was American

10   because American has pretty much a monopoly going to

11   South America.  So I was sitting there locked in an

12   office with the damaged passport and calling my office

13   manager to see about getting a private jet to fly me

14   home.  And since that point, I'm really limited.  I

15   mean I got my passport repaired, but it still made me

16   nervous because, you know, it's a South American

17   Country.  And it's made me real cognizant of the fact

18   that my options are limited if anything happens, and

19   it's a little bit scary.

20        Q.   How long were you stuck in Cali on that

21   occasion?

22        A.   Well, thankfully on that day, I sat there in

23   that office for like four hours, and then a supervisor

24   came in and took a look at it and stamped it and let me

25   in.  But, you know, I wasn't expecting that to happen.

1    Q.   All right.  What airlines are you flying to

2  Cali now?

3    A.   The only airlines that fly direct right now

4  are Spirit.  If you fly anyone else, it's twice as much

5  money, and you have to connect through multiple cities.

6    Q.   So you were ultimately able to get into Cali,

7  got your passport, came back to the U.S., got your

8  passport fixed up, I guess.  You got it reissued?

9    A.   No.  You can't get in the passport office.

10  No.  I hand repaired it myself.  I basically sewed it

11  back together and superglued it.

12    Q.   All right.

13    A.   So I still have a damaged passport, but it's

14  not as noticeable as it was before.  So I just cross my

15  fingers when I go in because if you've ever flown to

16  South America, not to get off on a sidetrack, but a lot

17  of times, the immigration officers are not the

18  friendliest to American males flying to Columbia.  They

19  can be very hostile.

20    Q.   All right.  I've flown to El Salvador a few

21  times.

22    A.   Yeah.

23    Q.   So your principle concern on that occasion

24  was your passport getting lifted.  That ultimately got

25  fixed after a few hours.  And then you were concerned

Page 25

1    also that there weren't a lot of flights out of Cali?

2          A.    Yeah.   There were none.

3          Q.    But you have identified Spirit as an

4    alternative; is that correct?

5          A.    It is the only alternative if, you know,

6    flying Spirit Airlines is considered an alternative

7    with flying on a plastic seat with no business class

8    and no WIFI.   But yeah, it can get you there, but they

9    don't have the frequency of flights.   They don't fly

10   every day, and I have to fly from Fort Lauderdale, you

11   know, versus flying out of MIA.   And you have very few

12   options as far as flights, and it's actually more

13   money.

14         Q.    All right.   Something that I want to touch on

15   in a minute is how you come up with these estimates for

16   the increase cost of travel.   So back to my original

17   question, since June of last area, how frequently are

18   you visiting your girlfriend in Cali?

19         A.    It depends on the month, but it's about twice

20   a month, I think.

21         Q.    Let's see where I want to go here.   So the

22   travel that we've been speaking of down to Panama,

23   Columbia and Costa Rica has nothing to do with

24   Southeast Offset; is that correct?

25         A.    Nothing.

Page 26

1      Q.   As you look for these business opportunities

2   and real estate investments down there, o have you set

3   up a separate company to pursue those opportunities?

4      A.   Not yet, but I will.

5      Q.   So as it stands right now, other than keeping

6   an eye out for real estate investments, there's no hard

7   and fast business purpose for your travel down to these

8   three countries; is that correct?

9      A.   Not hard and fast.  It's to go and look

10  at -- when I've been there, I've looked at real estate

11  in every place, and I've met with Realtors and met with

12  people and attorneys to look at the process of

13  purchasing.  And I can provide documentation for that.

14     Q.   All right.  So all these travel expenses down

15  there that we've been talking about, those are travel

16  expenses that you're just eating as Troy Clowdus until

17  this separate company is set up?

18     A.   Yeah, but prior -- yes, but a lot of the

19  travel prior to this happening, I was using miles quite

20  often.  So it wasn't really an expense.  It was just

21  using my miles.

22     Q.   In your Southeast Offset business, how do you

23  folks bill your clients?  Without getting into any

24  proprietary information, is it flat-fee jobs, per page,

25  hourly basis, what?

1        A.    No.   No.   It's flat fee.   And basically they

2    come to us, and we give them a cost estimate for doing

3    their particular job.   And then typically we sign a

4    contract, and then, you know, typically we print,

5    invoice them for whatever they required, and hope they

6    pay us.

7        Q.    Right.   In connection with your Southeast

8    Offset business, have you ever had an occasion to bill

9    your time on an hourly basis to a client?

10       A.    No.   No.   I have to think about that.   Not

11   that I can remember.   Let's put it that way.   Not that

12   I can recall.

13       Q.    In the last five years, have you had occasion

14   to bill your time on an hourly basis to anyone?

15       A.    Not that I can recall.

16       Q.    And have you had occasion in the last five

17   years to track your hours of work for any purpose?

18       A.    No.

19       Q.    In your complaint -- let me see if I can find

20   it here.   I'm going to share my screen with you, and

21   I'll mark this as Exhibit 1.   Can you see that?

22       A.    Yes.

23             (Defendant's Exhibit No. 1 will so be marked

24   for identification.)

25   BY MR. KOLB:

Page 28

1      Q.    Is this the complaint you said you reviewed

2   in preparation for your deposition?

3      A.    Yes.

4      Q.    I want to take you down to the section

5   entitled as and for a fourth cause of action for breach

6   of contract.   Do you see that?

7      A.    Yes.

8      Q.    All right.   As I read this, and correct me if

9   I'm wrong, the contract that's the subject of this

10   claim is your ticket; is that right?

11            THE WITNESS:   Wil?

12   BY MR. KOLB:

13      Q.    No.   He doesn't want to answer that.

14      A.    It's beyond my pay grade.

15      Q.    Do you have an understanding of what contract

16   is the subject of this count in Paragraph 67 to 72 of

17   your complaint?

18      A.    I mean I don't really understand the

19   question, and I don't understand -- I mean I'm not

20   fluent on contracts with airlines and tickets and how

21   the two interact.   So I'm hesitant to say yes or no.

22      Q.    And let me maybe rephrase it and try to make

23   it a little simpler.   It's says here in Paragraph 69

24   that you paid for your ticket.   Do you see that?

25      A.    Yes.

1      Q.   And that you complied with every provision in

2   the contract and took no action triggering any

3   exception to the contract in Paragraph 70.  Do you see

4   that?

5      A.   Yes.

6      Q.   Can you tell me --

7           MR. WOODROW:  Let me just object to this

8   inasmuch as you're asking him for any legal

9   conclusions.

10          MR. KOLB:  That's fine.  I would appreciate

11   you not making speaking objections.

12   BY MR. KOLB:

13      Q.   Can you tell me what contract is the basis of

14   those allegations?  Is it the ticket or something

15   else?

16      A.   I don't know how to answer the question.

17      Q.   So if I was to ask you what provisions you

18   believe you complied with in the contract, you wouldn't

19   have any personal knowledge of that either, would you?

20      A.   Well, I complied with everything that was

21   asked of me by everyone at American Airlines, and I did

22   nothing that wasn't asked or required as I understood

23   it.

24      Q.   Okay.

25      A.   So I don't know if that answers your

1      question, but that's how I understood that.

2              MR. KOLB:  It does not.  I'll object as

3      nonresponsive and move to strike.

4      BY MR. KOLB:

5          Q.   My question is, in this lawsuit that you

6      filed against American Airlines, you said you complied

7      with every provision in the contract.  You told me

8      you're not sure what contract that is, and I assume you

9      don't know what terms you complied with in that

10     contract?

11         A.   Well, I think you're asking me to get into

12     the legal side of it, and from what I understand of the

13     contract is that you're to wear your seat belt, wear

14     your mask, and do what the flight attendants ask you.

15     If that's the contract, then, yes, I complied with it.

16     Everything that was asked of me, and everything that

17     was required that I understood for flying with an

18     airline, American and any other, I complied with and

19     honored my end of the contract.

20         Q.   And what contract is that specifically?

21         A.   I'm assuming -- I hate to say assume.  I mean

22     are you asking me to give you a full understanding of

23     what the contract is?  When you get your ticket, and it

24     has a five-page legal attachment to it saying this is a

25     contract, and you're supposed to understand every legal

Page 31

1    implication of that?

2         Q.   No, sir.  We'll go through that in a minute.

3    I'm trying to take this at a 10,000 foot level and

4    simply ask, Paragraph 67 through 72 say that you

5    complied with some contract, and American violated it.

6    And I'm just trying to see if you can help me identify

7    what contract is the subject of this particular?

8         A.   Well, when you buy a ticket and ask an

9    airline to fly you somewhere, is that not a contract?

10        Q.   Is that your answer, that it's the ticket?

11        A.   When you purchase a ticket, and you pay for

12   it, and they agree to fly you somewhere, I think that's

13   a contract.

14        Q.   All right.  So then let me stop sharing

15   that.  Where is this?  And hang on one second.  I

16   apologize.  Here we go.  Let me share my screen again

17   with you.  And I'm going to show you what Mr. Woodrow

18   has produced.  Can you see what's on the screen there?

19        A.   I can.

20        Q.   I'll represent to you these are the tickets

21   that have been produced in the lawsuit by Mr. Woodrow,

22   and I'll give you a Bate's range here in one second for

23   the record.  This is Plaintiff's Bate 05 for the

24   record, and I'll make these tickets Exhibit 2 to the

25   deposition.

Page 32

```
 1              These are the tickets that were issued to you

 2      for flying on June 10th of last year that are the

 3      subject of this lawsuit?

 4          A.   Yes.  Yes.

 5              (Defendant's Exhibit No. 2 will so be marked

 6      for identification.)

 7      BY MR. KOLB:

 8          Q.   And these are the tickets that are the

 9      subject of that Count 4 that we were just discussing a

10      moment ago in your complaint; is that correct?

11          A.   Yes.

12          Q.   All right.  It says at the top left corner of

13      one of these, it says passenger ticket and baggage

14      check, and then underneath it, it says subject to

15      conditions of contract.  Do you see that?

16          A.   Yes, I see it.

17          Q.   Have you ever had occasion to read the

18      conditions of contract that are part of your ticket?

19          A.   No, never in my life prior to this.

20          Q.   You've read it since?

21          A.   I've gone over it.  I wouldn't say I've read

22      it in great detail.  Wil has talked to me about it and

23      discussed it.

24          Q.   Don't go there.  All right?

25          A.   Okay.  I'm just giving you an honest answer.
```

Page 33

1          Q.   No.   I appreciate it.   And you can tell me

2     you had a conversation, but I don't want to hear what

3     the conversation was.   Okay?

4          A.   Okay.   We had a conversation.

5          Q.   All right.   Good enough.   Thank you.   So let

6     me stop sharing that, and let me get to -- where is it?

7     Let me show this to you.   Can you see that, sir.

8          A.   Yes, I can see it.

9          Q.   It's titled Conditions of Carriage?

10         A.   Yes.

11         Q.   Is that what you were sort of kind of reading

12    through that you mentioned just a moment ago?

13         A.   Yes.

14              MR. KOLB:   I'll mark this as Exhibit 3.

15              (Defendant's Exhibit No. 3 will so be marked

16    for identification.)

17    BY MR. KOLB:

18         Q.   Was there any particular part of these

19    conditions of carriage that you were focussed on after

20    you filed this lawsuit, and you were reviewing the

21    conditions of carriage?

22         A.   No.

23         Q.   All right.   Why did you have an occasion to

24    start reading through the conditions of carriage?

25         A.   Because I was removed from a flight saying

Page 34

1    that I didn't comply with the conditions of carriage.

2         Q.   So you would agree with me though that the

3    conditions of carriage are incorporated into your

4    ticket, and those two documents constitute a contract

5    for your travel; correct?

6         A.   Correct.

7         Q.   It used to be a lot easier when you could

8    just push the papers across the table.  I apologize.

9         A.   Yes.

10        Q.   Let me show this one to you.  This is back on

11   your complaint again.  Can you see that?

12        A.   Yes.

13        Q.   All right.  So we're in your complaint, and

14   here we're looking at Paragraph 73 through 80.  And

15   this is a fifth cause of action for breach of

16   contract.  Let me ask you to just read this real quick

17   because I'm going to ask you basically the same

18   questions about what contract is this about.  Can you

19   still read that, or is it too small?

20        A.   Yes, I can read it.

21        Q.   Let me just give you a minute to read it, and

22   then I'll kind of ask you the same questions.

23        A.   Yes.

24        Q.   All right.  Can you tell me what contract

25   this claim pertains to?  Let me see if I can help you

1  out.  This fifth cause of action deals with, and I'm

2  summarizing, what you contend to be American's

3  violation of its loyalty program.  Do you see that in

4  Paragraph 74?

5       A.   Yes.

6       Q.   Is that the American Advantage Program?

7       A.   Yes.

8       Q.   And have you ever had an occasion to read the

9  terms and conditions of the American Airlines Advantage

10 Program that's the subject of this fifth cause of

11 action?

12      A.   Prior to this, no.

13      Q.   And after this, have you had an occasion to

14 read the terms of the American Airlines Advantage

15 Program?

16      A.   No.  I relied on my attorney to do that.

17      Q.   Fair enough.  Have you ever skimmed through

18 or seen the American Airlines Advantage Program terms

19 and conditions?

20      A.   I mean I've seen it.  I've never read it in

21 detail.

22      Q.   Okay.

23      A.   I don't think anybody does.  It's like a

24 credit card agreement.  Does anybody read those?

25      Q.   Only lawyers.

Page 36

```
 1       A.   Yeah, exactly.  That's why you pay your
 2   lawyer.
 3       Q.   Let me show you this one.  Can you see that?
 4       A.   Yes.
 5       Q.   Can you confirm for the record this is -- and
 6   it's 9 pages.  I'll scroll through it.  This is the
 7   American Airlines Advantage Program Terms and
 8   Conditions that we produced to your counsel.
 9       A.   You're asking me to -- what are you asking
10   me, if this is the contract that I am supposed to have
11   read?  I can't tell you if it is or it isn't.
12            MR. KOLB:  Let me mark this as Exhibit 4.
13            (Defendant's Exhibit No. 4 will so be marked
14   for identification.)
15   BY MR. KOLB:
16       Q.   Can read the title of this document which
17   begins at Bate Stamp AA63 and ends at Bate Stamp 71.
18       A.   Can I read it?
19       Q.   Yeah.
20       A.   Do you want me to read it now?
21       Q.   Yes, sir, please, just the title.
22       A.   Oh, just the title?
23       Q.   Yeah.
24       A.   Do you want me to read it out loud?
25       Q.   Yes.
```

```
 1        A.   AAadvantage Terms and Conditions updated
 2    June 30 of 2020; AAdvantage Program Reservation of
 3    Rights.
 4        Q.   All right.  Is this the contract that's the
 5    subject of the fifth count in your complaint?
 6        A.   I don't know.
 7        Q.   And I'm going to go back to the complaint.
 8    In the fifth cause of action, it talks about the
 9    loyalty program, and in Paragraph 75, it says that you
10    complied with every requirement of the program, and you
11    didn't violate any provisions of the program contract.
12    Do you see that allegation in Paragraph 75?
13        A.   Yes, I see that.
14        Q.   Can you tell me what conditions that you
15    complied with in the program contract?
16            MR. WOODROW:  Objection.
17    BY MR. KOLB:
18        Q.   If you don't know, just say you don't know.
19            THE WITNESS:  Wil, do I answer after you
20    object?  Yes?  No?  I don't know if this is the
21    contract, and I don't know if this is what's --
22    BY MR. KOLB:
23        Q.   Let me try to summarize.  For this fifth
24    cause of action which discusses and accuses American
25    Airlines of violating its loyalty program, you're not
```

Page 38

1   sure what contract this pertains to, and you're not

2   sure how to answer if you complied with any terms of

3   contract; is that a fair summary?

4          A.   Well, a fair summary would be that I hired my

5   attorney to look at the contract and told him the facts

6   of the case, and then he wrote this up.  And that's how

7   I understand it.  So whether or not this is the correct

8   contract or how to interpret it is beyond my pay

9   grade.

10         Q.   Did you read this complaint before it was

11  file?

12         A.   I did.

13         Q.   Did you ask any questions about what all this

14  meant?

15         A.   I told him the facts of the case.

16              MR. WOODROW:  Objection.

17              THE WITNESS:  Okay.

18  BY MR. KOLB:

19         Q.   Did you authorize your counsel to file this

20  lawsuit?

21         A.   Of course, I did.

22         Q.   After reading the complaint that you were

23  sent, the complaint that we're looking at here as

24  Exhibit 1; correct?

25         A.   That's correct.

Page 39

 1          Q.   Did you ever raise any concerns that you did

 2     not understand what was in the complaint?

 3               MR. WOODROW:   Objection.   You're asking for

 4     privileged information.

 5     BY MR. KOLB:

 6          Q.   Was there ever a discussion with your counsel

 7     about the allegations in the complaint?

 8          A.   Yes.

 9               MR. WOODROW:   Objection again.

10               MR. KOLB:   I'm not asking for the substance

11     of anything.   It's a yes or no question.   The fact of a

12     conversation is not privileged.

13               MR. WOODROW:   When you're asking for a

14     detailed explanation of what the conversation was

15     about, yeah, that's privileged.

16               MR. KOLB:   That's not what I asked,

17     Mr. Woodrow.   I asked did he have a conversation.   The

18     fact of a conversation is not privileged.

19               MR. WOODROW:   Do you have a conversation

20     about X, Y, Z is privileged.

21               MR. KOLB:   About the complaint?   All right.

22     BY MR. KOLB:

23          Q.   Let me try to sum it up again.   For this

24     fifth cause of action, you're not sure what contract is

25     at issue.   That's your lawyer's job.   And you're not

Page 40

```
 1   sure what conditions you complied with.  That's your

 2   lawyer's job.  Is that a fair summary of your

 3   testimony?

 4        A.   No.

 5        Q.   All right.  Please explain or clarify.

 6        A.   I conveyed to my attorney the facts of the

 7   events that happened that day, and I trusted him to

 8   file the complaint as he saw fit to do so.

 9        Q.   Well, as I'm sure your lawyer told you, this

10   is my opportunity to ask you questions about the

11   lawsuit that you filed.  I can't depose your lawyer.

12        A.   Yes.

13        Q.   You're the only person that I can ask about

14   the facts of this lawsuit.  And in this fifth cause of

15   action, you're alleging a breach of contract.  You

16   don't know what contract is at issue; is that correct?

17        A.   My attorney looked at the contract.  I told

18   him the facts, and he said American is in breach of the

19   contract.

20             MR. KOLB:  Objection; nonresponsive.

21   BY MR. KOLB:

22        Q.   My question was, you don't know what contract

23   is at issue in this fifth cause of action, do you?

24        A.   I don't know how to answer that question.

25   That's the honest answer.  I really don't understand
```

Page 41

1  was you're asking me.  I don't understand it.

2      Q.   The claim says breach of contract.  What

3  contract are you talking about here?

4      A.   The contract that when you buy a ticket, or

5  you pay somebody to provide a service, and then they

6  don't provide that service, they breach their

7  contract.  They took your money, and they didn't

8  provide a service.

9      Q.   But what contract is the subject of this

10  fifth cause of action?

11         MR. WOODROW:  I'm going to object again.

12  This has been asked and answered.

13         MR. KOLB:  I don't think he's answered it.

14         MR. WOODROW:  Well, he's done his best.

15  You're calling for speculation, so just move along.

16         MR. KOLB:  Speculation?  He filed a lawsuit

17  in Federal Court, and he doesn't know the specifics of

18  the claims?

19         MR. WOODROW:  He's not a lawyer, Kelly.  Just

20  move on.

21         MR. KOLB:  I recognize that.

22  BY MR. KOLB:

23      Q.   It says here that the defendant -- I'm

24  looking at Paragraph 77.  The defendant took valuable

25  benefits from Mr. Clowdus with no justifiable reason.

Page 42

1    Do you see that?

2         A.    Are you asking me?

3         Q.    Yes.

4         A.    Yes, I see that.

5         Q.    And just before that, it says in breach of

6    its loyalty program contract.  Is the contract, the

7    loyalty program contract that's the subject of this

8    lawsuit, the Advantage Terms and Conditions that we

9    have marked as Exhibit 4, or is it a different

10   contract?

11        A.    I think you've asked me this like three

12   times, and I've given you the same answer.

13        Q.    Which is what?

14        A.    Which is I relied on my attorney to file this

15   lawsuit based on the contract that he said that we had.

16        Q.    All right.

17        A.    That's what I did.  So you're asking me to

18   look at a piece of paper you're putting up on-line that

19   I don't know if this is the contract or not the

20   contract because I don't have access to all the

21   paperwork from American Airlines.  I know that I am

22   part of a loyalty program where I spent X amount of

23   money, and I get benefits from that, and I've been cut

24   off from that.  I no longer can use that to buy

25   personal tickets for myself, and that was worth a great

Page 43

1    deal of money to me.  And I would say that my entire

2    traveling life was built around that with American

3    Airlines.  It has been for a great number of years, and

4    that's no longer accessible to me now. *

5              MR. KOLB:  Objection; nonresponsive, move to

6    strike.  I'll ask the court reporter to put a star by

7    this soliloquy, and I'll take it up with the

8    Magistrate.

9    BY MR. KOLB:

10        Q.   In your lawsuit, you're claiming you suffered

11   emotional distress and mental anguish as a result of

12   the events on June 10th?

13        A.   Yes.

14        Q.   Can you describe for me the emotional

15   distress and mental anguish that's the subject of your

16   claims?

17        A.   Well, the day after when I flew to Mexico, I

18   was having panic attacks every time I went into the

19   airport.  I was expecting to be arrested because I've

20   been accused of a federal crime, falsely accused.  When

21   I landed in Mexico City, and I was waiting for my

22   connecting flight in Mexico City, they called my name

23   over the intercom in Spanish.  And I had almost a

24   breakdown because I thought I might be arrested in

25   Mexico City only to find out that they had upgraded me

Page 44

1     to business class.  But in the meantime while I'm

2     waiting, I'm having a breakdown at the counter because

3     I'm thinking I'm in Mexico City, and I might get

4     detained or arrested or kicked off a flight, and now

5     I've got to figure out how to get back to Miami.

6          Q.   Okay.  Go ahead?

7          A.   Each time I go to the airport now, every time

8     I go through security, there's an anxiety attack

9     because I don't know if you've ever been accused of a

10    Federal crime before, but it is fairly serious.

11         Q.   Well, it's been now eight months since this

12    incident.  Do you realistically believe you're still

13    going to be charged with a crime?

14         A.   No.  But for the first few months after that,

15    yes, and it still triggers me every time I go through

16    security.  But not like it did back then, but, yes, it

17    has diminished slowly over time, but it still gives me

18    anxiety every time.  And I have anxiety every time I

19    sit on a plane, and I have a flight attendant start to

20    talk to me.

21         Q.   Describe the anxiety you've experienced

22    because of this.

23         A.   It's just anxiety.  Anxiety, that describes

24    it.  It's anxiety.  It's a feeling of panic of what's

25    going to happen.

Page 45

```
1        Q.   On June 10th as you were deplaned on these
2    two flights, did any American Airlines employee ever
3    touch you?
4        A.   No.
5        Q.   As I understand it, you've not sought any
6    treatment for these panic attacks or anxiety and not
7    seen a medical professional; is that correct?
8        A.   No.  No, I have not.  No, I have not.
9        Q.   It's correct that you have not?  Sorry.
10       A.   Yes.  That is correct, I have not.
11       Q.   Okay.  Thank you.  At any time in the last
12   five-year period prior to June 10th of last year, had
13   you suffered panic attacks or anxiety for any reason?
14       A.   Prior to this?
15       Q.   Yeah.
16       A.   Yes.  When I got divorced, I experienced
17   anxiety attacks.
18       Q.   So you experienced panic attacks when you
19   flew to Mexico City.  How long ago after June 10th?
20       A.   The following day.
21       Q.   The following day.
22       A.   June 11th.
23       Q.   And what airline did you fly?
24       A.   Aeromexico.
25       Q.   All right.  You had anxiety the following
```

Page 46

1    day.  Anxiety each time you go through the TSA security

2    and anxiety each time a flight attendant speaks with

3    you.  Any other --

4         A.   I'll give you one example.  On the Aeromexico

5    flight the following day, there was little girl sitting

6    next to me wearing earphones.  And the pilot came on to

7    make an announcement, and the little girl didn't take

8    her earphones out, and the flight attendant started

9    yelling at her.  I broke out into a cold sweat.  So

10   it's like every time a flight attendant gets angry or

11   gets cross with somebody, I start sweating.  So, yeah,

12   it's had a huge impact.  But I don't talk to anybody

13   about it, and outside of Wil, I've never spoken to

14   anybody about it.

15        Q.   All right.  And if I'm understanding you

16   correctly, the anxiety has dissipated over time?

17        A.    It has, yes.  I still have it, but it's not

18   as crippling as it was in the immediate aftermath.  I

19   found it extremely difficult to even go to the airport

20   for several months.

21        Q.   But you're nevertheless able to travel twice

22   a month roughly after June 10th?

23        A.    No.  I traveled a lot less.  But I had to

24   choose do I let this completely shut my life down, or

25   do I just push through it.

Page 47

1       Q.   But it has not reached the point where you

2   believe that you need some sort of treatment or

3   evaluation by a mental health professional; is that

4   correct?

5       A.   I considered it multiple times, but, no, I

6   never did go specifically to treat it.

7       Q.   When you were going through your divorce and

8   suffered your anxiety, did you seek treatment or

9   evaluation at that time?

10      A.   I was seeing a marriage therapist at the

11  time, yes, and I spoke to her about it.

12      Q.   Okay.  Other than the anxiety, can you

13  provide any other description for the emotional

14  distress and mental anguish you're claiming as a result

15  of the incidents that made the basis for this lawsuit?

16      A.   Well, I gave you two of the biggest ones.  I

17  mean in Mexico City, any time a flight attendant raises

18  their voice or is aggressive or abrasive, and when I

19  was in Cali, and Immigration wouldn't let me in, and I

20  was looking at being stranded.  Yeah, those are some of

21  the biggest ones.

22      Q.   On June 10th of last year, were you suffering

23  from any mental or physical conditions that would have

24  impacted your decision-making abilities?

25      A.   No.

Page 48

1     Q.   Do you have any current plans to seek any

2   care or treatment or evaluation for the anxiety that

3   you attribute to the incidents that make the basis of

4   this lawsuit?

5     A.   Not presently, no.

6     Q.   Any other problems that you relate, you know,

7   physical or emotional, that you relate to this incident

8   that you can describe for me?

9     A.   Not at the present, no.

10    Q.   All right.  I mean I take it you were never

11  able to attend the birthday party in Mexico City; is

12  that correct?

13    A.   No.  I flew the next day there.

14    Q.   The next day.

15    A.   But I mean this incident did pretty much

16  destroy my weekend, but --

17    Q.   Let me tell you that Flight Attendant Marino

18  didn't have a great week either.

19    A.   I could tell.

20    Q.   On June 10, you had a carry-on bag with you;

21  correct?

22    A.   Correct.  Yes.

23    Q.   Do you have any recollection about what the

24  approximate weight and dimensions were of the bag?

25    A.   It's a small leather satchel.  I have it here

1    if you want to see it.

2        Q.   Sure, please?

3        A.   One moment.

4            MR. WOODROW:  Did you say that I could tell

5    him that Flight Attendant Marino didn't have a good

6    week either?

7            MR. KOLB:  That I can tell you.

8            MR. WOODROW:  I mean did you say I

9    personally, me?

10           MR. KOLB:  No.  No.  No.  No.  No.

11           MR. WOODROW:  Oh, okay.

12   BY MR. KOLB:

13       Q.   Do you know what the approximate weight was

14   on June 10 with all the stuff you had in there?

15       A.   I had a small Ipad, a pair of sunglasses and

16   I think maybe a T-shirt, two to three pounds.

17       Q.   All right.

18       A.   I mean I could weigh it for you, but it's not

19   much.  But it's very flimsy as you can see, and it has

20   a long strap.

21       Q.   In one of your interrogatory answers, and I

22   can pull it up, if you want, you had said that instead

23   of giving a detailed narrative of what happened on

24   June 10, your affidavit is the most accurate recounting

25   of what happened that day.  Is that still your belief?

Page 50

1      A.   I would say it's fairly accurate.  After I
2  reread it, I think there were some smaller details that
3  were left out, but, yes, it's fairly accurate.
4      Q.   All right.  Would you agree that the
5  affidavit that was signed on July 22nd of last year
6  would be a more accurate accounting of the events than
7  what your memory might be now?
8      A.   Probably -- I don't know how to answer that,
9  but, yes, I think it might be, but I don't know.
10     Q.   Okay.
11     A.   Because I mean I've thought a lot about it,
12 and as time has passed, you know, you recall certain
13 things that you didn't remember at the time.  So, no, I
14 would say my memory is better now, but --
15     Q.   Okay.  So maybe your affidavit isn't the most
16 accurate recounting of events?
17     A.   I think it's accurate.  I don't think there's
18 anything in there that's not true.  I don't know if
19 it's the most -- I think that there are things in it --
20 I think there were things that I remember now that were
21 not included in the affidavit, and it's just, you know,
22 things that I thought about.
23     Q.   Let me share my screen with you one more
24 time.
25     A.   Okay.

Page 51

1        Q.   These are your amended interrogatory answers,

2   and these are dated January 12th of this year, and let

3   me scroll to Interrogatory 5.  Can you see that?

4        A.   Yes.

5             MR. KOLB:  And I'll mark these

6   interrogatories answers as Exhibit 5.

7             (Defendant's Exhibit No. 5 will so be marked

8   for identification.)

9   BY MR. KOLB:

10       Q.   And I'll summarize it here.  Interrogatory 5

11  basically asked you to describe what happened on the

12  occasion in question.  And the answer contains an

13  objection, and then later, it says here plaintiff's

14  affidavit provides a complete narrative, and plaintiff

15  has no facts to add.  Do you see that?

16       A.   Yes.

17       Q.   Now this was signed by you or submitted just

18  a few weeks ago.  Are you telling me now that your

19  affidavit might not be the most complete narrative, and

20  that you do have facts to add?

21       A.   No.

22       Q.   Okay.  You said a moment ago that some things

23  were left out of the affidavit.  Can you tell me about

24  that?

25       A.   After you read it, you realize that there

Page 52

```
1   were, you know, thoughts that you had that you never
2   put in the narrative.  You're trying to put everything
3   in, but, you know, I don't -- to answer you question,
4   yes, I think it's the most complete response.
5        Q.   All right.  Were there drafts of this
6   affidavit sent back and forth between you and your
7   counsel before you signed it?
8             THE WITNESS:  Wil?
9             MR. KOLB:  No.
10            MR. WOODROW:  You can answer that.
11  BY MR. KOLB:
12       Q.   It's just yes or no.  Go ahead.  You can
13  answer.
14            THE WITNESS:  Wil, do I answer?
15            MR. WOODROW:  You can answer.
16            THE WITNESS:  Yes, of course, there were
17  drafts.
18  BY MR. KOLB:
19       Q.   Do you recall over what period of time those
20  drafts were exchanged?
21       A.   A week maybe.
22       Q.   All right.  So you started working on this
23  maybe the second week of July.  Okay.  Is there
24  anything that you want to add having thought about it
25  to your affidavit that would make it more complete and
```

Page 53

1    more accurate?

2         A.   The only thing I would probably add is I put

3    in the affidavit that I verbally said what the F, and

4    when I look back, I'm not sure that those words came

5    out of my mouth.

6         Q.   Okay.

7         A.   But, you know, the one thing I didn't put in

8    the affidavit was the fact that we were both wearing

9    masks, and it's very difficult to communicate

10   accurately when you're both wearing masks.  I'm not

11   always sure what he was thinking or saying, and I'm not

12   sure that he fully understood what I was thinking or

13   saying.  I think that's the only thing I would add.

14        Q.   Okay.  All right.  What is your first

15   recollection of encountering Flight Attendant Marino on

16   June 10?

17        A.   I think I was the first person on the plane,

18   and as soon as I boarded the plane, he was standing in

19   the front galley.  And I nodded my head at him good

20   morning.  And then as I got into my aisle seat, the

21   first interaction was he said to me, you know you have

22   to put that bag in the overhead bin.  And that was

23   before I was even seated, and I just shook my head, and

24   I said yes.

25        Q.   Say that again.  You know you have to stow

Page 54

1    that bag?

2        A.   He said in somewhat of a sarcastic tone of

3    voice, you know you have to put that bag in the

4    overhead bin, and I said yes.

5        Q.   All right.  So you clearly heard and

6    understood that instruction from Mr. Marino; is that

7    correct?

8        A.   Yes.  But I always fly bulkhead almost

9    always, and my understanding from his comment was that

10   I would have to put it up there once boarding was

11   completed because in 20 something years of flying

12   business class, that's how -- I've never had a flight

13   attendant ask me to put away my stuff until they

14   completed boarding.  So what's what I assumed he was

15   saying.

16       Q.   You said a moment ago that because everyone

17   was wearing masks, you weren't sure what either of you

18   understood?

19       A.   Well --

20       Q.   Why did you have an understanding that you

21   wouldn't have to stow it until the boarding process was

22   completed?

23       A.   Just because of past experience.  Normally

24   when you're flying business class, they give you the

25   luxury of working on your electronic devices until they

Page 55

1    finish boarding.  That's always been my experience, and

2    that's what -- I mean he said you know you have to

3    store that in the overhead bin, and I shook my head

4    yes.

5         Q.   Okay.

6              MR. WOODROW:  I think we lost him.

7              MR. KOLB:  Well, that's okay.  I need to go

8    down the hall anyway.

9              MR. WOODROW:  Okay.  Do you want to take a

10   couple minute break then?

11             MR. KOLB:  Yeah, let's just take a break.

12   It's been about an hour and 20.

13                  (Brief recess was taken.)

14             MR. KOLB:  Back on the record.

15   BY MR. KOLB:

16        Q.   Just before we broke, Mr. Clowdus, you said

17   that your first interaction with Mr. Marino was as you

18   boarded.  He said you're going to have to put that bag

19   up in the overhead bin.  You nodded your

20   understanding.  And your understanding was that you

21   wouldn't have to put it up until after boarding was

22   completed?

23        A.   Correct.

24        Q.   Did Mr. Marino --

25        A.   And then he stood beside me.  For most of the

1    rest of the time, he was standing beside me interacting

2    with other passengers as they boarded.

3         Q.   Did Mr. Marino tell you that you could hang

4    onto your bag until boarding was completed, and you

5    wouldn't have to stow it until then?

6         A.   He did not say that specifically, no.

7         Q.   All right.

8         A.   But he saw me put it -- he saw me sit down

9    and set it beside my feet and then stood in the aisle

10   beside me.  So didn't say anything following it up, and

11   his exact words were you know you have to -- you know

12   you know will have to put that in the overhead bin, and

13   I said, yes, of course.

14        Q.   And in your lawsuit, you allege that he was

15   acting in a loud, manic, aggressive manner and

16   exhorting passengers to move.  Can you tell me

17   specifically what you observed in Mr. Marino's conduct

18   in that regard?

19        A.   Well, it's 6:30 in the morning, and most of

20   the people getting on including myself were sleepy.

21   And he seemed to be very manic and was very loud and

22   abrasive.  And he was standing beside me in the front

23   row, and every passenger coming on as they passed him,

24   if they stood in the aisle, he would -- I don't know

25   the correct word.  It was like he was a drill sergeant

Page 57

1    instructing every person clear the aisle; clear the

2    aisle; let's go; let's go; let's go.  He was in a very

3    big rush to get everybody into the plane and in their

4    seats.

5         Q.   Do you know why that was?

6         A.   Well, I didn't know that morning, but I have

7    heard since, or I've read since that flight attendants

8    don't get paid until the cabin doors are closed, and

9    they get a bonus if international flights get to their

10   destinations on time.  So I think now looking back,

11   that he was in a big rush to get everybody seated

12   because he doesn't get paid, I'm assuming.  But, you

13   know, I don't know his mind, and that's just an

14   assumption, you know.  I don't know.

15        Q.   Where did you read that flight attendants

16   don't get paid unless the plane departs on time?

17        A.   I read it in an article when I was reading

18   about it that flight attendants' pay doesn't begin

19   because it's one of the things flight attendants

20   complained about was that they don't get paid until the

21   doors are closed.

22        Q.   Go ahead.

23        A.   And they get bonuses based on if the plane

24   gets there on time.  Now I'm speculating.  This is pure

25   speculation.

Page 58

1      Q.    Right.  Do you recall where you saw that
2   article?
3      A.    No.
4      Q.    Do you have any personal knowledge that that
5   is, in fact, how flight attendants get paid?
6      A.    Well, I read it.  I don't know that it's
7   true, but that's what I read.  So that's my impression
8   at this moment.  Like I said, I'm just speculating.
9      Q.    Do you have any other knowledge as to why it
10   was important to get that flight out on time that
11   morning?
12      A.    No.  No.
13      Q.    Other than having --
14      A.    My screen is frozen.  Can you guys still see
15   me?
16      Q.    I can see a frozen you.
17      A.    Okay.
18      Q.    Do you want to give it a minute and see if it
19   refreshes.  There you go.
20            MR. WOODROW:  There it is.
21            MR. KOLB:  Yeah, you're good.
22   BY MR. KOLB:
23      Q.    And other than acting as a drill sergeant, is
24   there anything else that led you to believe that
25   Mr. Marino was loud, aggressive, manic or acting as if

Page 59

1    he was on amphetamines?

2         A.   I don't know if he was on amphetamines.  His

3    mannerisms and his behavior was like he had either a

4    lot of coffee, or he's an extremely hyper person.  But

5    his demeanor with all the passengers, not just me, was

6    very abrasive and very aggressive.

7         Q.   How specifically?

8         A.   Just the way that he was talking to them, his

9    tone of voice and his mannerisms.  He's not friendly at

10   all.

11        Q.   What mannerisms did you observe?

12        A.   Well, it's just the way that he was moving

13   and the way that he's just very manic.  It was just his

14   body movements and the way he was moving around and the

15   way that he was talking to people.

16        Q.   Do you have any experience with amphetamines

17   yourself?

18        A.   No, sir.

19        Q.   Do you have any medical training that would

20   allow you to determine --

21        A.   No, sir.

22        Q.   -- if someone was on amphetamines?

23        A.   No, sir.  I have seen friends on

24   amphetamines.  I've seen people out on Miami that were

25   taking amphetamines.  I don't know if that counts.

Page 60

1        Q.    Okay.

2        A.    But, no, I'm not a doctor, and, no, I don't

3    have any medical experience.  But it is Miami Beach,

4    and it's not uncommon.

5        Q.    Well, we're not talking about Miami Beach.

6    We're talking about an airline.

7        A.    Yes, but I believe he lives in Miami Beach.

8        Q.    Other than what you have described -- go

9    ahead.

10        A.    No.  I mean he lives in Miami Beach, I

11    believe, or he lives in Miami.  And that is not

12    something that is uncommon in this city.

13        Q.    So you think amphetamine use is common in

14    Miami Beach?

15        A.    It is.  I do believe that, yes.

16        Q.    Do you think it's common for flight

17    attendants to use amphetamines on the job?

18        A.    I have no idea.  I wouldn't know how to

19    answer that.

20        Q.    All right.  Other than what you've told me

21    already, do you have any other reason to believe that

22    Mr. Marino or any other flight attendant was on

23    amphetamines on June 10 of 2021?

24        A.    No, sir.

25        Q.    Did you interact with any other flight

Page 61

1    attendants on the first flight other than Mr. Marino?

2         A.   No.   The individual that took me off, I

3    wasn't sure if -- do you know to say he's a CSM,

4    customer service manager?   But is it Mr. Fernandez?

5         Q.   Enriques?

6         A.   Enriques.   Okay.   I thought he might be a

7    flight attendant when he first interacted with me, but

8    I still don't really understand or know what his

9    position was.   But those were the only two individuals

10   I spoke to.

11        Q.   Did you see any other flight attendants on

12   the aircraft that day?

13        A.   No.   No, none.   There were none in the front

14   of the plane and none that I could see when any of this

15   happened because I did look.   I was hoping either the

16   pilot or another flight attendant would help me with

17   Mr. Marino.   I was hoping that somebody would assist

18   me.   I was really hoping for the pilot, but he never

19   came back.

20        Q.   So when you entered the aircraft, you saw

21   only one flight attendant in the galley area by

22   business class?

23        A.   Yes.

24        Q.   All right.   So when Mr. Marine told you that

25   you would have to stow your bag, I believe you

1  testified earlier that you put it by your legs.  Did

2  you put it behind your legs, in between your legs and

3  the seat?

4       A.   I put it behind my left leg as I was about to

5  use -- I was about to take out my iPad to use my iPad,

6  and I never got a chance.

7       Q.   So you heard Mr. Marino's first instruction

8  that you'd have to stow the bag.  You assumed you

9  didn't have to do it right away, and you made no effort

10  to immediately comply with his instruction; is that

11  correct?

12       A.   Well, I didn't hear it as an instruction.  I

13  heard it as you will need to before we finish

14  boarding.  That's what I understood, and he never said

15  anything after that.  He stood right beside me as I set

16  it beside my leg, and he never said anything further.

17  He didn't.  So in my mind, we were both under the

18  same -- I was working under the same impression that he

19  gave me in like every other flight I've ever been on.

20  I never ever had a flight attendant require you to

21  immediately put your electronic devices away before

22  they even finish boarding, never once in my life.  And

23  I'll be honest with you.  I'm not sure that that's what

24  he was saying.  I think that he was saying you will

25  need to before we finish boarding, and that's what I

Page 63

1    think he was saying.

2         Q.    Your understanding of that not having to

3    immediately stow your carry on is something that's

4    unique to business class; correct?

5         A.    No.   It seems to be in general whether you're

6    in coach or business, but in business, they tend to

7    give you a little more latitude.   I've had business

8    class where there's been flight attendants who didn't

9    require you to even stow it until they were taxiing.

10   I've had that before.   I worked on my iPad.   I worked

11   on my laptop all the way up until we got to the

12   runway.   So it all depends on the flight attendant.

13        Q.    Correct.   And this flight attendant didn't

14   tell you that you could leave your bag out until you

15   were taxiing, did he?

16        A.    He said what I told you.   He said you know

17   you'll need to stow it, and I said yes.

18        Q.    Right.   You understood that instruction, and

19   you heard it?

20        A.    I understood that before we took off, I would

21   need to put the bag in the overhead bin.

22        Q.    But that's not what he said, is it?   He said

23   you'll need to stow that bag in the overhead bin,

24   period?

25        A.    You know you will as in, in the future, you

Page 64

1    will need to stove that bag.  He did not say,

2    Mr. Clowdus, or did he not say stow that bag now.  He

3    said you will need to.  That's very important,

4    Mr. Kolb.  I think it's an important distinction.  He

5    did not command me to put the bag away.  He told me you

6    will need to.

7         Q.   And you decided to take him I guess at his

8    word and put the bag behind your legs?

9         A.   Based on past experience and based on him

10   saying you will need to, I operated under the

11   assumption that he was referring to a future event.

12   And then he stood beside me with my bag at my feet and

13   never said anything further.

14        Q.   Was he looking at your bag as he stood beside

15   you while the passengers were boarding, or was he

16   looking someplace else?

17        A.   He saw me place my bag at my feet.  He saw

18   me.

19             MR. KOLB:  Objection; nonresponsive.

20   BY MR. KOLB:

21        Q.   My question was, after you placed the bag

22   behind your legs, what was Mr. Marino looking at, your

23   bag or the passengers boarding the aircraft, or do you

24   know?

25        A.   Well, he's standing right beside me, and I'm

Page 65

1    assuming he saw it, but I can't tell you.  I'm not

2    Mr. Marino, but he saw me place my bag at my feet.  He

3    was there standing beside me.

4         Q.   And then sometime later as your bag is behind

5    your legs, and you're looking at your phone with your

6    earphones, you look up, and you hear Mr. Marino again

7    asking you to stow your bag in the overhead bin; is

8    that correct?

9         A.   No.

10        Q.   What happened?

11        A.   I'm sitting in my seat.  I'm answering text

12   messages from my step-daughter.  I'm preoccupied.  I

13   feel him staring at me.  I have my earphones in.  I'm

14   not sure if he's talking to me or not.  But I look up,

15   and he's glaring at me.  I take out my earphones, and

16   he barks at me, give me the bag.  That's what

17   happened.  He used like give me the bag.  Like he was

18   extremely angry, irritated and annoyed.

19        Q.   And was there any confusion at that point as

20   to whether he wanted you to stove your bag in the

21   overhead bin immediately?

22        A.   No confusion.  He was pissed off.

23        Q.   All right.  And what did you do after you

24   heard that second clear instruction to stow your bag?

25        A.   I reached under and picked up my bag and

Page 66

1    handed it to him.

2         Q.   All right.  Where was he when this was

3    happening?  Was he in your aisle?  Was he in the aisle,

4    or was he in the seat next to you?

5         A.   He was in the aisle.

6         Q.   And you're in the window seat?

7         A.   I'm in the window seat.

8         Q.   And are there two or three seats on your side

9    of the aircraft?

10        A.   There are two, two business class seats.

11        Q.   How much time had elapsed between

12   Mr. Marino first instructing you to stow your bag and

13   the second time he instructs you to stow your bag, if

14   you know?

15        A.   A few minutes.  I mean the honest answer is I

16   would say no more than four or five minutes.

17        Q.   Okay.

18        A.   But I don't know exactly, but four or five

19   minutes.

20        Q.   So he says give me the bag.  You pull it out

21   from behind your legs.

22        A.   My left leg, yes.

23        Q.   And you hand it to him?

24        A.   I swung it out over the passenger because the

25   business class seats are very large, and the bag is

1    very floppy.  And I picked it up, and I swung it out

2    over the seat towards him because with his tone of

3    voice, I wasn't looking at him.  It was the way he was

4    talking to me.  It was very intimidating.  Can you

5    still see me because I've lost everything on here.

6         Q.    Yeah, we've got you.

7         A.    Okay.  We're good.

8         Q.    All right.  So four to five minutes between

9    when you boarded, and he said you'll need to stow the

10   bag.  And when you looked up, you felt him staring at

11   you, and he barked give me the bag?

12        A.    Yes.

13        Q.    At that point, you swung it out over the seat

14   next to you, and I believe according to your affidavit,

15   you said you might have impacted Mr. Marino?

16        A.    I felt the bag make contact, yes.  I felt it

17   bump his arm or his leg as I was reaching out towards

18   him.

19        Q.    Your complaint says that when he asked you

20   the second time to give me the bag, you shook your head

21   in disbelief.  Can you explain why you did that?

22        A.    Because of the way -- because of him yelling

23   at me give me the bag.  I'm a grown man.  I've never

24   had somebody yell at me like that.  I'm not accustomed

25   to that in that circumstance.  It completely caught me

Page 68

1    off guard.

2         Q.   How loud was he yelling, he being Mr. Marino?

3         A.   You want me to do it for you now?  I mean it

4    wasn't a scream.  It was a very elevated -- you know,

5    it was very elevated, give me the bag.

6         Q.   Was it loud enough for others in first class

7    to hear?

8         A.   Yes, absolutely, but that was the thing.

9    There was no one seated behind me at that time.  There

10   was one individual seated in 1-A, and I didn't see

11   anyone else behind me in business class.  So the only

12   other individual I saw when this event happened was the

13   individual in 1-A.

14        Q.   So you saw no one else in business class

15   other than one other person?

16        A.   Yeah.  After this happened, I looked.  When

17   he walked off in the initial encounter, he walked up

18   front.  I looked in the seat behind me to see if there

19   was someone there because I was looking for someone --

20   you know, I was looking to see if anyone one else was

21   seeing what I was seeing.  I was looking for help.  And

22   I looked across, and there was only one individual in

23   business class that I could see from my seat, but I was

24   seated.  And I looked back down the aisle, and there

25   were no flight attendants and nobody else that I could

Page 69

```
 1    see.
 2         Q.   All right.  So your recollection is there
 3    weren't ten people in first class?
 4         A.   There was what?
 5         Q.   There weren't at least ten people in first
 6    class that day?
 7         A.   I could not see anyone, but they hadn't
 8    finished boarding.  You know, the doors were not
 9    closed.  But there was no one behind us and no one
10    across except for one individual in 1-A.  That was the
11    only people that I saw, the only other passenger that I
12    say.
13         Q.   Doesn't first class board first?
14         A.   Yes.
15         Q.   But you didn't see anybody else in first
16    class when all of this happened except for 1-A?
17         A.   1-A is the only individual that I saw.  And
18    after this happened, I looked to see if he was looking
19    to see what was going on, and he was looking down at
20    his phone.
21         Q.   Okay.  So you swing the bag out over the seat
22    next to you, and you're not looking at Marino?
23         A.   Correct.
24         Q.   You're shaking your head in disbelief?
25         A.   No.  I only shook my head when he first spoke
```

Page 70

1    to me, and it was more like just a shake of disbelief

2    just like I'm doing now.

3          Q.   And you turned away from Mr. Marino because

4    why?

5          A.   He was yelling at me.

6          Q.   Any other reason that you weren't looking at

7    Mr. Marino as you handed him your bag?

8          A.   The primary reason was the way he was

9    speaking to me.  I mean I just -- you know, I don't

10   know if you've ever had someone yelling at you or

11   talking to you in a demeaning voice, but it's

12   difficult.  I'm not a confrontational person.  It's not

13   something that -- I find it very unpleasant.  And it

14   was also 6:30 in the morning, and, you know, you're not

15   fully awake at 6:30 in the morning.

16         Q.   Other than Mr. Marino in your words yelling,

17   was there any reason that you did not look at him when

18   you moved your bag in his direction?

19         A.   Well, I had been on my phone, and I was still

20   working on my phone when this happened, so the

21   combination of the two.

22         Q.   What would have prevented you from putting

23   your phone down and looking at Mr. Marino as you handed

24   the bag to him?

25         A.   Nothing would have prevented me.

Page 71

1      Q.   Other than in your words yelling at you to
2    give me the bag, did Mr. Marino say anything else to
3    you at this point?
4      A.   Well, yeah, there were a number of things he
5    said to me over the next few moments.  Are you talking
6    about before I handed him the bag?  No.
7      Q.   Yes, sir.  Yes, sir.
8      A.   Before I handed him the bag, no, there was
9    nothing.  That was the only words out of his mouth.
10     Q.   Were you seated when you moved the bag
11   towards Mr. Marino, or were you standing up?
12     A.   I was seated.  I never left my seat until
13   Mr. Enrigues came back and spoke to me.
14     Q.   Did you make any effort to stand up to
15   facilitate moving the bag towards Mr. Marino?
16     A.   No, I did not.
17     Q.   Did you move it towards Mr. Marino with one
18   hand or two hands?
19     A.   One hand.  In my right hand was my cell
20   phone.  I picked up the bag with my left hand and swung
21   it out and extended it towards him.  And it never left
22   my hand.
23     Q.   Say again?
24     A.   The bag never left my hand.
25     Q.   Okay.  And so if the bag impacted Mr. Marino,

Page 72

```
 1   do you have any knowledge or recollection as to where
 2   it hit him?
 3        A.   No, I do not have direct knowledge.  I didn't
 4   see it.  I assumed it was either his arm or his side,
 5   and I wasn't sure if it was the strap or the corner of
 6   the bag.  But I did feel it make contact with him, but
 7   it wasn't -- you know, I thought he was taking it from
 8   my hand.  I thought he was taking the bag from me.
 9        Q.   But you weren't looking at him, so you had no
10   way of knowing that, would you?
11        A.   No.  At that particular moment, no, I don't
12   know, but when I looked up, his hands were -- he had
13   both of his hands up in the air.
14        Q.   All right.  So you're looking away.  What
15   were you looking at as you moved the bag towards
16   Mr. Marino?
17        A.   I looked back down at my phone.
18        Q.   And the boarding process is still going on
19   during all of this?
20        A.   Yes.  Yep.
21        Q.   It's your testimony that they were not about
22   to close the cabin doors?
23        A.   No.  Nope.
24        Q.   So you feel the bag impact Mr. Marino
25   somewhere, and what happened next?
```

1      A.   I looked up because I was still holding the

2   bag, and he didn't take it.  I thought he was taking

3   it.  I looked up to see why, and he had both of his

4   hands up in the air.  And his face, what I could see of

5   it and his eyes, he was glaring at me, and then he

6   erupted and exclaimed in an extremely loud voice that

7   you hit me.

8      Q.   And from your recollection, did he say that

9   loud enough for everybody in first class to hear as

10   well?

11      A.   I don't know if everybody in first-class, but

12   anybody seated around us within one or two rows should

13   have heard it, if they were paying attention.  But like

14   I said, the only person I saw was the person behind me,

15   the passenger behind me.

16      Q.   Right.  At any point, did Mr. Marino use any

17   curse words with you?

18      A.   No.  No.

19      Q.   What was your reaction when Mr. Marino had

20   his hands up and said you hit me?

21      A.   I was stunned, and I just sat there holding

22   my bag out.  And then he said it again, and my first

23   reaction was, no, I'm handing you my bag.  And then he

24   said you hit me again, and I was like what is wrong

25   with you, you know, because this whole build-up of the

Page 74

1   way he had been behaving all morning and the way he had

2   been talking to people, my first reaction was something

3   is wrong with this guy.  And then he explained again

4   you hit me, and then I started to apologize, but he

5   walked off before I could tell -- I was going to say

6   I'm sorry for whatever just happened, but he walked off

7   before I could get the words out.

8        Q.   So you tried to apologize.  Let me see if

9   I've got this straight.  You're looking at your phone.

10  You take your bag with your left hand, and you move it

11  across the empty seat next to you.  You feel it hit

12  something.  It had to have been Marino.  You're not

13  sure where it hit him.  Marino then says you hit me.

14       A.   Hit is a strong word, but --

15       Q.   Impact?

16       A.   But I felt it bump him.  Yeah, I felt it bump

17  his arm or his leg, and I thought he was taking the

18  bag.

19       Q.   Well, you can't know where you hit him

20  because you were looking at your phone; right?

21       A.   That's what I said.  I thought it was either

22  his arm or his side.  I wasn't sure if it was the bag

23  or the strap.  I don't know.

24       Q.   You don't know where the bag impacted

25  Mr. Marino; correct?

Page 75

1          A.    No, I do not know.

2          Q.    And I believe you said you're not sure if you

3    used the F word at this point earlier.  And then

4    Mr. Marino then starts walking towards the cabin; is

5    that correct, towards the cockpit?

6          A.    After the last you hit me, he then spun and

7    went to the front of the plane.

8          Q.    Okay.  And do you know what happened up

9    there?

10         A.    I assumed he was going to talk to the pilot

11   or somebody else.  I don't know.  No, I don't know.  I

12   couldn't see him.

13         Q.    You don't know who he spoke with; correct?

14         A.    No, I don't know.  I was hoping it was the

15   pilot.  I was hoping the pilot would come back.  But I

16   don't know, and I never spoke to the pilot.

17         Q.    And you didn't hear Mr. Marino's conversation

18   with whoever he spoke with towards the cockpit;

19   correct?

20         A.    Not the initial one, but the second time,

21   yes.

22         Q.    Which second time are you talking about?

23         A.    Well, after the initial encounter, he then

24   came back a few seconds later, and as soon as he came

25   back, I immediately tried to apologize and DE-ESCALATE

1    the situation.  And I said excuse me.  I apologize.

2    And he put his hand up and waved his finger at me, and

3    before I could say I'm sorry for whatever happened, he

4    waved his finger at me and said I don't care.  And his

5    exact tone was I don't care.  You are not flying on my

6    plane.  That's how he said it.

7        Q.   All right.

8        A.   And then he spun, and he left and went back

9    up front.  And then a few seconds later, I heard him

10   speaking to someone.

11       Q.   And did you overhear that conversation?

12       A.   I overheard Mr. Marino.  I could not hear who

13   he was speaking to.  I know now that it was

14   Mr. Enriques, but at the time, I didn't know who it

15   was.  But I could very clearly hear Mr. Marino because

16   he was very loud.

17       Q.   When you tried to apologize, what did you try

18   to apologize for?

19       A.   I was attempting just to diffuse it because

20   he was so angry, and he was so upset.  I was trying to

21    -- you know, I hadn't hit him, and it wasn't

22   intentional.  And I was trying to explain to him, look,

23   I'm sorry.  It wasn't intentional.  And whatever

24   happened was accidental, and can we just calm down,

25   please, is what I was attempting to do, but he didn't

Page 77

1   allow it.

2       Q.   All right.  So you're saying that with your

3   eyes on your phone, and you're moving your bag towards

4   the flight attendant who said give me the bag?

5       A.   And he said give me the bag.

6       Q.   And your bag impacted Mr. Marino somewhere

7   while --

8       A.   Yes.

9       Q.   -- you're not looking at him, and your

10  testimony is that was an accident?

11      A.   It was purely accidental, completely

12  unintentional.

13      Q.   And your testimony is that you were not

14  looking directly at Mr. Marino when you moved the bag

15  towards him; correct?

16      A.   Correct.

17      Q.   And your testimony is that you did not throw

18  the bag at Mr. Marino; correct?

19      A.   No.  My bag never left my hand.  It was in my

20  hand the entire time.

21      Q.   And your testimony is that you did not laugh

22  at Mr. Marino after the bag impacted him; correct?

23      A.   Absolutely not.  Absolutely not.  When he

24  yelled at me that you hit me, I was scared.  I was very

25  scared of him.

Page 78

1      Q.   And your testimony is that when all of this

2   was going on, there was only two people in first class

3   and no other flight attendants; correct?

4      A.   There were absolutely no other flight

5   attendants.  I can't tell you if there were other

6   people in first class.  All I could tell you is I could

7   only see one other person, but business class seats

8   are -- you know, you're sitting in one.  It's not easy

9   to see over the seats, so I can't tell you definitively

10   who else was there.  But in the row behind me, there

11   was no one seated, and there was no one in the seat

12   beside me and no one in the aisle seat across from me.

13   I only saw one passenger in 1-A.  That's all I could

14   see from my vantage point, and there definitely was no

15   other flight attendants around.

16      Q.   And you have no knowledge as to what

17   Mr. Marino told the captain; correct?

18      A.   None.

19      Q.   Do you have any knowledge as to who made the

20   decision that you would be deplaned?

21      A.   I have no knowledge.

22      Q.   Did you ever ask to speak with the captain?

23      A.   I did not.  I regret it now, but I don't know

24   that it would have made any difference.  I assumed that

25   the captain would come back to speak to me because I

Page 79

1    assumed that it was the captain that made the

2    decision.  But to answer your question, no, I did not.

3         Q.   All right.  Do you have any knowledge as to

4    what information the captain had when the decision was

5    made to deplane you from the aircraft?

6         A.   I have no knowledge.

7         Q.   Do you have any facts, proof or evidence that

8    you were ordered off the aircraft for any reason other

9    than your failure to comply with the flight attendant's

10   instructions to stow your bag?

11        A.   Well, I was told by the individual who moved

12   me on the second flight, that I was removed for

13   assaulting a flight attendant.  No one said anything

14   about failure to comply.

15        Q.   I'm not talking about the second flight.

16   We'll get there.  I'm talking the first one.

17        A.   Okay.

18        Q.   Do you have any knowledge --

19        A.   On the first flight, no one told me

20   anything.  Mr. Enriques when he came back asked to

21   speak with me in the jetway, and I said okay, and I got

22   up and walked off.  And he asked me to bring my bags

23   with me, and so I brought my bags.  And he asked me

24   what happened, and I said I had no idea.  And he told

25   me that he didn't know what happened.  He told me he

Page 80

1    tried to talk Mr. Marino down, and he could not.  He

2    apologized.  And he told me that he had never

3    experienced anything like this in his entire career,

4    but he did not give me a reason.  He didn't tell me why

5    Mr. Marino wanted me removed.  He just apologized to me

6    for Mr. Marino's behavior.

7             MR. KOLB:  Objection; nonresponsive; move to

8    strike.

9    BY MR. KOLB:

10        Q.   As you were being deplaned by Mr. Enriques,

11   did you have any personal knowledge as to why you were

12   being deplaned?

13        A.   No.

14        Q.   Did Mr. Enriques tell you why you were being

15   deplaned?

16        A.   Mr. Enriques indicated to me he didn't know

17   why I was.

18        Q.   Okay.  So then as you're leaving the first

19   aircraft, you have no knowledge as to why you were

20   being deplaned; is that correct?

21        A.   None.

22        Q.   Did you subsequently find out from any other

23   source why you were deplaned from the first aircraft?

24        A.   The individual that removed me from the

25   second flight told me it was because I assaulted a

Page 81

1     flight attendant.

2         Q.   Was that an explanation as to why you were

3     being removed from the second flight or the first

4     flight?

5         A.   He told me that the flight attendant that

6     morning reported I assaulted him.

7         Q.   And that was in connection with your removal

8     from the second flight; correct?

9         A.   Correct.

10        Q.   So Mr. Marino goes up to the cockpit twice.

11        A.   Well, I don't know that he went to the

12    cockpit.  He went to the front of the plane.  I don't

13    know who he talked to.  The second time, I heard him in

14    the front galley speaking to Mr. Enriques.

15        Q.   And what did you overhear of that

16    conversation?

17        A.   I could not hear Mr. Enriques, but I could

18    hear Mr. Marino say multiple times I will not fly with

19    that man.  I will not fly with him.  So I took it from

20    the conversation that Mr. Enriques was trying to calm

21    him down and de-escalate the situation and smooth

22    things out, and Mr. Marino refused.  The gist of the

23    conversation that I took from it was that either you

24    take him off the plane, or I'm not flying, one or the

25    other.

Page 82

1     Q.   Did you hear him use those words?

2     A.   No, I did not.

3     Q.   All right.  You first encountered

4  Mr. Enriques after the bag had impacted Mr. Marino and

5  after you and Mr. Marino had this discussion about

6  whether you hit him or not; correct?

7     A.   Correct.

8     Q.   So at that point, all of the events that give

9  rise to this lawsuit or at least the assault, the

10 alleged assault had already occurred; correct?

11    A.   Correct.

12    Q.   Do you know where Mr. Enriques was before he

13 entered the aircraft?

14    A.   No, I do not.

15    Q.   When you overheard this conversation between

16 Mr. Enriques and Mr. Marino, do you know if anyone else

17 was present at the front conversation?

18    A.   No.  I could not see -- I could not see

19 them.  I could only hear them.

20    Q.   All right.  And if I'm remembering right,

21 you're in the window seat, and there's a bulkhead

22 blocking your view --

23    A.   Correct.

24    Q.   -- of the galley area by the cockpit;

25 correct?

Page 83

1      A.    Correct.

2      Q.    All right.  So Mr. Enriques comes over to

3  you, and does he speak to you in your seat, or does he

4  take you out onto the jetway?

5      A.    No.  No.  I'm seated, and he comes over and

6  leans over in a very, I would say, professional and

7  courteous manner and asked if I would please step into

8  the jetway, so he could talk to me.

9      Q.    So you two go into the jetway, and what does

10  he say to you?

11      A.    He says what happened, and I told him I

12  really have no idea.  And then I asked him what

13  happened, and he said he didn't know.  And I asked him

14  if Mr. Marino acts like this every day, and he told me

15  he didn't know.  This was the first time he had ever

16  worked with him.  But he had never experienced anything

17  like this in his career.  And then I proceeded to tell

18  him, you know, that he asked for my bag, and I

19  explained to him that I accidentally bumped his arm or

20  leg, and he accused me of hitting him.  And then

21  Mr. Enriques apologized for Mr. Marino's behavior, and

22  then he spent the next 20 or 30 minutes trying to

23  assist me.

24      Q.    How would Mr. Enriques apologize for

25  Mr. Marino's behavior if he never saw it?

Page 84

1          A.    You'll have to ask Mr. Enriques.

2          Q.    I have.

3          A.    Well, I'm telling you what he said to me.

4          Q.    Your testimony is that Mr. Enriques

5    apologized.  Did he specifically apologize for

6    Mr. Marino's behavior, or are you making that

7    assumption?

8          A.    He apologized for me being removed from the

9    plane, and he apologized for the inconvenience.  To say

10   he specifically apologized for Mr. Marino, no, it

11   wasn't specifically for that.  He apologized for the

12   situation and my inconvenience.

13         Q.    Do you have any complaints regarding your

14   interactions with Mr. Enriques on the first flight?

15         A.    Oh, absolutely not.  He was extremely

16   professional and the bright spot of that morning.

17         Q.    Did you at any time overhear any

18   conversations Mr. Enriques had with the captain?

19         A.    No.

20         Q.    Do you know if Mr. Marino had the authority

21   to order you off the aircraft?

22         A.    I do not know.

23         Q.    All right.  So I take it then Mr. Enriques

24   asked you to gather your belongings and follow him back

25   to the gate podium at that point?

Page 85

```
 1        A.   He asked me if he could speak with me, yeah.

 2        Q.   Out on the jetway; right?

 3        A.   Yes.  Correct.

 4        Q.   And that's the conversation you told me about

 5   earlier where --

 6        A.   Yes.

 7        Q.   -- he asked you what happened, and you said

 8   you don't know?

 9        A.   Yeah.

10        Q.   And he says I don't know what happened

11   either.  And then do you go back to your seat, or do

12   you wait in the jetway while this conversation is going

13   on between Marino and Enriques?

14        A.   No.  No.  No.  You're out of sequence.  Him

15   and Marino spoke in the front.  I could hear Marino

16   telling him I'm not flying with that man.  He kept

17   calling me that man.  And then Mr. Enriques came back

18   to me and asked if he could speak with me out in the

19   jetway, and I said of course.  And I got up and walked

20   out with him, and as we walked up the jetway, you know,

21   that's when the conversation I'm telling you about

22   occurred.  When we got to the top of the jetway, he

23   went on the computer and spent 15, 20 minutes getting

24   me on the next flight and helping me navigate Mexico

25   City because I had a connecting flight to Mexico City.
```

1    And I was concerned about missing the flight.  And he

2    was showing me how to get through customs and

3    immigration in Mexico City because he was familiar with

4    that airport.

5         Q.   When you were deplaning from the first

6    flight, where was Mr. Marino?

7         A.   He was in the galley-way --

8         Q.   Okay.

9         A.   -- with his back to me.

10        Q.   Did you have any encounter with Mr. Marino as

11   you were being escorted out of the aircraft?

12        A.   None.  He had his back turned towards me.

13        Q.   Did you say anything to anyone as you were

14   being escorted out of the aircraft?

15        A.   Absolutely not, nothing.

16        Q.   All right.  Then Enriques gets you rebooked

17   on the second flight, and what happens after that?

18        A.    He walked me through Mexico City and gets me

19    -- well, he puts me on stand-by because the plane was

20   full, but he said he would make sure I got on the

21   flight.  He had me first on the list on stand-by.  He

22   said that he was going to monitor it, and the first

23   seat that came open, he was going to grab it.  And then

24   he told me he was working another flight three gates

25   down, and when that flight to Mexico City boarded, he

Page 87

1     would come down and meet me.  And I said thank you very

2     much.  And I asked him if I should file a complaint

3     against Mr. Marino, and he said, no, it wasn't

4     necessary.  He was going to do that for me.  But he

5     said if you want to anyway, here's where you do it, and

6     here's the flight attendant's name, Carlos Marino.  And

7     I said, okay, thank you very much, and then I went

8     upstairs.  And when I went upstairs, I spoke to the

9     customer service agents at American Airlines in the

10    lounge, and I told them what happened.  And they were

11    adamant that I file a complaint against Mr. Marino, so

12    they assisted me in doing that.

13         Q.   All right.  Did Mr. Enriques tell you that he

14    was going to file a report or a report against

15    Mr. Marino?

16         A.   He said he was going to file a report.  He

17    didn't say against Mr. Marino or anything else, but he

18    said in essence he was going to take care of it.  He

19    would file a report, and he knew all the facts from

20    what I told him.

21         Q.   And all he knew was the facts from what you

22    told him; correct?

23              MR. WOODROW:  Objection.

24              THE WITNESS:  I'm assuming that he had spoken

25    to Mr. Marino and had a general idea of what had

Page 88

1    occurred because he had interacted with Mr. Marino and

2    then had tried talk to Mr. Marino into not being so, I

3    don't know, out of control.  And then when he couldn't

4    do that, he then took care of me, and he said he would

5    file a report.

6    BY MR. KOLB:

7        Q.   Other than hearing Mr. Marino say I will not

8    fly with that man, do you have any personal knowledge

9    that Mr. Marino told Mr. Enriques any details about the

10   incident that's the basis of this lawsuit?

11       A.   No.  My general impression was that -- my

12   general impression was that Mr. Enriques -- no, I

13   don't.

14       Q.   And do have any personal knowledge that

15   Mr. Marino's statement I will not fly with that man was

16   made to Mr. Enriques as opposed to the captain?

17       A.   Yeah.  I couldn't see, so I can't --

18       Q.   Your answer is I don't know?

19       A.   I don't know.  I couldn't see.  I was seated

20   next to the window, and I couldn't see.

21       Q.   So how much time was there between your

22   deplaning from the first flight and you begin to board

23   the second; do you remember?

24       A.   I think it was like two hours.

25       Q.   And you're up in Admiral's Club or where

Page 89

1    during these two hours?

2         A.   Yes.  Yes.

3         Q.   And that's where you filled out your first

4    complaint on line with American Airlines?

5         A.   Correct.

6         Q.   Let me pull that up for you. This will be

7    Exhibit 6.

8         A.   I can't see anything.  Do I need to refresh?

9         Q.   No.  No.  I'll give it you in one second.

10        A.   And I can't see it.  I can't see you guys.

11        Q.   Hang on one second.  Let me see if I can

12   share my screen

13             MR. WOODROW:  I think what he's saying is

14   that his machine is frozen.

15             MR. KOLB:  Okay.

16             THE WITNESS:  Yeah, I can see it now.

17   BY MR. KOLB:

18        Q.   Okay.  Cool.  I mean if you're frozen again,

19   let me know, and we can take another break?

20        A.   Okay.

21        Q.   We're getting towards the end now.  I

22   appreciate your patience.

23        A.   I see a black screen.  I hear you, but I can

24   see the complaint.  It just came on.

25             (Defendant's Exhibit No. 6 will so be marked

Page 90

1    for identification.)

2    BY MR. KOLB:

3        Q.   So what I'm showing you has a Bate's label at

4    the bottom right of AA096.  The title is Customer

5    Contact Information as Received from AA.com dated

6    June 10 of 2021.  Is this the first complaint you filed

7    regarding the June 10 incident while you in between

8    Flight 1 and Flight 2?

9        A.   Yes.

10       Q.   Let me make sure I'm showing it all to you.

11   So it says here Carlos Marino.  After the last

12   passenger boarded, he asked me to give him my leather

13   briefcase and store it in the overhead.  Do you see

14   that, what I've highlighted?

15       A.   Yes.  Yes.

16       Q.   Didn't you testify earlier that while this

17   was going on, the boarding process was still underway?

18       A.   Yes.

19       Q.   Is this part of your complaint then

20   incorrect?

21       A.   Yes.  I mean I wrote this at 6:45 in the

22   morning, and I didn't -- you know, I was -- I don't

23   know if the last passenger boarded or not.  The doors

24   were still open, and I don't know where we were.  But I

25   assumed at this point that we were towards the end of

Page 91

1    the boarding process.

2         Q.   Well, you completed this report about 15

3    minutes after these events occurred?

4         A.   Yep.

5         Q.   And you're telling American that all these

6    events occurred after the last passengers were boarded,

7    and you were asked to give your leather briefcase to

8    store overhead.  Do you have a clear recollection --

9         A.   Yes.

10        Q.   -- one way or the other as to whether

11   boarding had completed when the events we previously

12   discussed went down?

13        A.   Yeah.  I don't know if boarding was completed

14   or not.  The door was still open.

15        Q.   Okay.  Now this complaint mentions that it

16   looks like just one instruction to hand over the

17   briefcase because then you say you reached down and

18   handed it to him.  It doesn't mention the first

19   instruction from Mr. Marino to store your bag, does it?

20        A.   No, this does not.

21        Q.   And so --

22        A.   But he didn't instruct me.  He did not

23   instruct me to stove it in the first one.  He told me I

24   would need to.  I know you're wanting to latch on to

25   that, but that's not -- he did not tell me to put my

```
1    bag away.  He told me I would need to.
2         Q.   So he was just engaging in idle chit-chat
3    when he said you would need to show your bag?
4              MR. WOODROW:  Objection.
5              THE WITNESS:  I believe he was advising me.
6    BY MR. KOLB:
7         Q.   Well, your complaint doesn't reference him
8    advising you that you would need to stow your bag, does
9    it?
10        A.   No.
11        Q.   It skips to the last instruction where things
12   went bad; right?
13        A.   Correct.
14        Q.   And if this was done 15 minutes after the
15   fact, can you explain the discrepancies we've just
16   justified?
17        A.   I just explained them.
18        Q.   Why does this complaint not reference
19   Mr. Marino's first advisory to you that you would need
20   to store your bag?
21        A.   Because I did not know.  I was writing in
22   generalities because I was advised to let American know
23   about Mr. Marino in case he's having this behavior with
24   other passengers.  That was my entire purpose.  I
25   wasn't trying to be completely totally accurate and
```

Page 93

1   specific.  I did not realize I was going to be going

2   into a court of law, or that this was going to be a

3   legal document.  I was just trying to give a general

4   idea of what occurred.  Just like it says in here, that

5   the other flight attendant, I was referring to,

6   Mr. Enriques, and speaking in general about the

7   customer service people.  The only flight attendant I

8   interacted with was Mr. Marino on the plane.  But in

9   this complaint, I was just speaking in general terms to

10  make them aware of the fact that Mr. Marino was a

11  problem employee.  That's what I was trying to convey.

12      Q.   And you weren't concerned with the accuracy

13  of your complaint that American had a problem employee;

14  is that your testimony?

15      A.   No, I wasn't concerned about being -- you

16  know, I wasn't thinking about being specific to the

17  minutiae of the details.  I was more concerned with

18  making them aware of the fact that they had a problem

19  employee that had just kicked me off of a flight.

20          MR. KOLB:  Objection; nonresponsive.

21  BY MR. KOLB:

22      Q.   Do you have any personal knowledge that

23  Mr. Marino kicked you off a flight?

24      A.   Well, he's the one that accused me, and he's

25  the one that went to Mr. Enriques.  And so I'm assuming

Page 94

1     that he's the one that kicked me off.

2         Q.   My question, sir, was --

3         A.   If he hadn't done that, I would still be on

4     the plane.

5         Q.   My question, sir, was do you have any

6     personal knowledge that Mr. Marino kicked you off the

7     flight or had the authority to do so?

8         A.   I have no personal knowledge, no.

9         Q.   Do you have any personal knowledge that

10    Mr. Enriques kicked you off the flight or had any

11    authority to do so?

12        A.   Well, Mr. Enriques told me that he tried to

13    keep me on the flight.

14        Q.   And did he tell you why --

15        A.   And that he would put me on the next flight.

16        Q.   Did he tell you why it wasn't possible to

17    keep you on the flight?

18        A.   He did not.  No.  No, not specifically, but

19    he told me that he attempted to dissuade Mr. Marino,

20    and Mr. Marino refused.  So, you know, by implication,

21    he's implying that it was Mr. Marino, so he blames

22    Mr. Marino for it.

23        Q.   All right.  But again that would assume that

24    Mr. Marino has got the authority to deplane you;

25    correct, with all these assumptions you're making?

1        A.   Mr. Enriques said it was Mr. Marino, and I

2    never spoke to a pilot.  And Mr. Marino came back and

3    said you are not flying on my plane.  I think that's a

4    pretty safe assumption that -- you know, I don't know

5    what American Airlines -- I don't know in American

6    Airlines who has authority and who doesn't, but

7    Mr. Marino said he had the authority.

8        Q.   Did Mr. Enriques tell you that Mr. Marino

9    kicked you off the first flight?

10       A.   Not in those specific words, but yes.

11       Q.   What does that mean?

12       A.   That means he didn't use those exact words.

13   He said Mr. Marino -- he tried to talk to Mr. Marino

14   into changing his behavior, and he could not.  And that

15   because of that, he needed to put me on the next

16   flight, and it was Mr. Marino's fault.  So did he say

17   Mr. Marino had the exact legal authority to do that,

18   no, but he did not say it was the pilot.  He did not

19   say it stay was him.  He said it was because of

20   Mr. Marino.

21            MR. KOLB: Objection; nonresponsive.

22            THE WITNESS:  And the pilot never came back

23   and spoke to me.

24            MR. WOODROW:  And I object, too.  You've

25   camped on this for awhile, Kelly.  You got what you're

Page 96

1    going to get.

2            MR. KOLB:  You can instruct him not to

3    answer, or you can keep your mouth shut.

4            MR. WOODROW:  I'm not instructing him

5    anything.  I'm saying asked and answered.

6            MR. KOLB:  All right.  That's a coaching

7    objection.

8            MR. WOODROW:  No, it's not.

9            MR. KOLB:  Now we can finish this in front of

10   a Federal Magistrate, if that's your preference.

11           MR. WOODROW:  Don't start with the threats,

12   Kelly.

13           MR. KOLB:  It's not a threat.  It's a

14   promise.  There's a big difference.

15           MR. WOODROW:  Oh, I love promises.

16           MR. KOLB:  What will it be?  What will it

17   be?  Are you going to continue to coach the witness, or

18   are we going to finish this --

19           MR. WOODROW:  Carry on with your deposition

20   and stop harassing my witness.

21           MR. KOLB:  If you think I'm harassing your

22   witness, shut the deposition down and do something

23   about it.

24           MR. WOODROW:  You just stop doing it and

25   carry on.

Page 97

```
 1   BY MR. KOLB:
 2       Q.   Your testimony, sir, was that this complaint
 3   wasn't generated to be completely accurate.  Do you
 4   recall telling me that?
 5       A.   Yes.
 6       Q.   All right.  And we pointed out a couple of
 7   inaccuracies.  It fails to identify the first advice
 8   from Mr. Marino to store your bag; correct?
 9       A.   It did not include Mr. Marino advising me
10   that I would need to store my bag.  No, it does not.
11       Q.   And contrary to your testimony earlier today,
12   it says that the boarding process had completed;
13   correct?
14       A.   Yes.  That's correct.
15       Q.   All right.  And it doesn't state that when
16   you reached down and handed your bag to Mr. Marino, you
17   weren't looking at it; correct?
18       A.   No, it doesn't say that.  But I would ask
19   you.  Have you ever filled out a customer complaint on
20   American Airline's website.
21       Q.   Sir, this is not your chance to ask
22   questions.  This is my chance.
23       A.   Okay.  Well, I'm explaining to you they don't
24   give you a lot of opportunities to edit or revise or
25   review.  It's a little tiny screen with a hundred
```

Page 98

```
 1   character limit, and then you send it off into a black
 2   hole.  So it's not like you can review it or edit it or
 3   anything.
 4        Q.   You had two hours to put this together,
 5   didn't you?
 6        A.   I'm in an airport trying to get ready for the
 7   next flight.
 8            MR. KOLB:  Objection; nonresponsive.
 9            THE WITNESS:  No, I didn't have two hours.
10   BY MR. KOLB:
11        Q.   You had two hours in the Advantage Club to
12   generate this complaint; correct?
13        A.   No.  I probably had about 30 minutes.
14        Q.   30 minutes to generate a dozen lines?
15        A.   30 minutes in a small screen on American
16   Airlines' web page that you have to spend 10 minutes to
17   find.  And that's why they had to assist me to find the
18   complaint, and there's no ability to edit, revise,
19   review or even until you send it to us, oh, what, last
20   week?  I hadn't even seen what I had written.
21        Q.   But you wrote it, and it was sent at
22   5:48 which was -- when was your next flight, two hours
23   later?  It was 9:00 in the morning; right?
24        A.   If you say so.
25        Q.   Well, you told me earlier it was two hours in
```

Page 99

1  between flights, and I understand it's 30 minutes.  How

2  much time did you have to --

3          A.   You have to walk from the gate to the

4  Admiral's Club.  You then have to get checked in.  You

5  then have to find the website after you've spoken to

6  the customer service agent.  You then have to -- you

7  know, you're sitting there on your laptop trying to

8  find the web page because American's complaint place is

9  impossible to find.  And then you have to get back down

10  to the gate, so no, it wasn't two hours in between

11  flights.  I didn't have two hours to compose, edit,

12  revise and review.  You know, I was told to file the

13  complaint by the customer service agents because this

14  was a problem employee.  That was it.  I wasn't to

15  defend myself.  It was to make American aware that they

16  had a flight attendant who was abusing passengers.

17  That was the entire purpose, and I did the best I could

18  under the circumstances.

19          Q.   What customer service agent told you that

20  Mr. Marino was a problem employee?

21          A.   All three gasped when I told them what

22  happened, and all three told me you need to file a

23  complaint, so they are aware of this flight attendant.

24              MR. KOLB:  Objection nonresponsive.

25  BY MR. KOLB:

Page 100

1          Q.   My question, sir, was who told you

2     Mr. Marino was a --

3          A.   All three --

4          Q.   All three who?

5          A.   All three customer service people at American

6     Airlines in the lounge that morning.  We've asked you

7     for their names.  You've never given them to us.  I

8     don't know their names.

9          Q.   How would they know he was a problem employee

10    not knowing who he is?

11         A.   You'd have to ask them.  I told them what

12    happened.  They told me file a complaint.

13         Q.   So let's talk about the second flight.

14    You're boarding on the second flight.  Any problems

15    boarding?

16         A.   No.  Mr. Enriques met me at the gate, walked

17    me to the very front of the jetway and made sure I was

18    the first one on the plane.

19         Q.   All right.

20         A.   The customer service agents that we don't who

21    their names are were the ones that got me the boarding

22    pass.  They monitored that plane.  And as soon as a

23    seat became available, they grabbed it and brought it

24    to me.  And then he met me at the gate and made sure I

25    was the first one that boarded.

Page 101

1      Q.   Okay.  And then you're on the aircraft, and

2   then one or more AA personnel approach you on the

3   second flight.  Tell me what happens then.

4      A.   They finished boarding, I believe, but I'm

5   not positive because I'm not in the front.  I believe

6   they had shut the doors or right on the verge of

7   shutting the doors when three individuals came on that

8   were in suits and ties and came back to my aisle.  At

9   first they thought the person across from me was me,

10  and they asked that person to follow them off.  And I

11  heard them say my name, and I interrupted them and

12  said, no, that's me.  They surrounded me and said you

13  need to get off the plane.

14     Q.   Do you recall --

15     A.   So I stood up.

16     Q.   Can you describe them at all, their sex,

17  race, anything like that?

18     A.   There was three men.

19     Q.   All right.  And you said they were wearing

20  suits and ties.  Was it a normal business suit?  Was it

21  a uniform?

22     A.   They did not look like American Airlines

23  employees.  And he informed me that he was head of

24  security for American Airlines at Miami International

25  Airport.  He said you need to follow me off the plane.

Page 102

1     Q.   And you picked up your items and left that
2  aircraft; correct?
3     A.   I picked up my items, and I followed him.  He
4  was in front of me and, the other two individuals were
5  behind me.
6     Q.   Any complaints with their treatment of you at
7  that time?
8     A.   No, not at all.  I mean it scared me.  I was
9  scared.  I thought I was being arrested.
10     Q.   Did they tell you that you were under arrest?
11     A.   No, they did not.
12     Q.   Did any of these three male personnel touch
13  you on this occasion?
14     A.   No, not at all.  When we got to the --
15     Q.   Go ahead.  I'm sorry.
16     A.   No.  When we got to the top of the jetway,
17  the individual who said that he was the head of
18  security informed me that on the earlier flight, it had
19  been reported that I had assaulted the flight
20  attendant.  He asked me what had happened, and I told
21  him what happened.  After he heard what I said, he told
22  me it sounds like it was a misunderstanding.  This
23  should be cleared up in the next few days, and you
24  should be able to fly within the next few days.  But
25  for the meantime, you can't fly on American.  You'll

Page 103

1    need to make alternative arrangements until this matter

2    is cleared up.

3              MR. KOLB:  All right.  Let me ask you for

4    another five-minute break, if we could.

5              THE WITNESS:  You need another five-minute

6    break?

7              MR. KOLB:  Yeah.  We're almost done.  Hang in

8    there.

9              THE WITNESS:  Okay.

10              (Brief recess was taken.)

11              MR. KOLB:  Back on the record.

12   BY MR. KOLB:

13        Q.   All right.  So three individuals ask you to

14   leave the second aircraft.  And the gentleman who said

15   he was head of security for AA Miami speaks to you out

16   in the gate area; is that correct?

17        A.   Yes.  Yes.  That's correct.

18        Q.   And he said we've had to deplane you because

19   there's a report that you assaulted a flight attendant?

20        A.   Correct.

21        Q.   And then what did you tell him in response to

22   that?  I think I missed it.

23        A.    I conveyed to him what I just told you, that

24   he asked me for my bag, and when I handed it to him, I

25   accidentally bumped him with my bag.  And I said he got

Page 104

1    angry and accused me of hitting him, and I said I tried

2    to apologize, and he didn't care.  It didn't matter to

3    him.

4         Q.   And this head of security then says it sounds

5    like a misunderstanding.  We should be able wrap this

6    up, and you'll be able to fly again soon?

7         A.   He said it sounds like a misunderstanding.

8    He asked me did I file a complaint, and I said yes.  He

9    said that's good.  The fact that you filed a complaint

10   for your second flight is good.  The fact that you are

11   a gold card member of AA and have a long history, he

12   said this shouldn't be a problem.  He said this is

13   relatively minor, and it should go away in the next few

14   days.  But for today, you'll need to make other travel

15   arrangements.

16        Q.   Can you describe this individual you were

17   having this conversation with?

18        A.   I believe he was balled.  I mean I only

19   interacted with him for a few seconds.  But I believe

20   he was bald, male, white, either white or Hispanic, and

21   the other two individuals I believe were either white

22   or Hispanic.  I don't know, but they did not give me

23   their names.  He just said he was the head of

24   security.  He was not wearing a flight attendant's

25   uniform or any uniform that indicated to me that he was

Page 105

1      an American Airlines employee.

2          Q.   Did he have any sort badges on or name tags?

3          A.   No, nothing.

4          Q.   All right.

5          A.   And then he hold me he would be filing a

6      report and would include what I had told him in his

7      report, and that this should blow over in the next day

8      or two.

9          Q.   Any other discussions you had with this

10     gentleman calling himself the head of security at that

11     time?

12         A.   That was it.

13         Q.   And then were you able to -- I guess you

14     rebooked your flight to Mexico City for the following

15     day?

16         A.   Not right away.  I went home, and I took a

17     taxi home.  On my way home, I was trying to process

18     everything that happened.  And the first thing I did

19     was start looking under flight attendant assault and

20     the legal ramification and considering whether or not I

21     needed to hire an attorney, a criminal attorney because

22     I didn't know what the ramifications were.  I didn't

23     know if this Mr. Marino was going to file a police

24     report, or if I was going to, you know, have charges

25     filed against me.  I didn't know how far this young man

1    was going to take this.  So I was concerned.  Later

2    that night, I went back and forth all day about whether

3    to go, but I did not purchase another ticket until late

4    that night.

5         Q.   Did anybody throughout all of these events we

6    just discussed, did anybody at American Airlines say

7    that they were going to have you charged with an

8    assault?

9         A.   No.

10        Q.   Did you wind up hiring a criminal defense

11   lawyer?

12        A.   No, I did not.

13        Q.   All right.  So let's see here.  Let me show

14   you this, and this looks like an E-mail from American

15   Airlines to you.  It bears a Bate's label of AA0010

16   through 0011.  Do you recall receiving this?

17        A.   My screen is blank.

18        Q.   How's that?

19        A.   No.  It's just a black screen.

20        Q.   Well, maybe you need to refresh again.

21        A.   Okay.  I'll refresh again.

22        Q.   Thanks.

23        A.   No.  I'm still not seeing it.

24             MR. KOLB:  If you want to reboot your

25   computer then, and we can go off the record again for a

Page 107

1    minute?

2            THE WITNESS:  I'm going to completely exit

3    and then rejoin.

4            MR. KOLB:  All right.  See you in a couple of

5    minutes.

6                (Brief recess was taken.)

7            MR. KOLB:  Let's go back on the record.

8    BY MR. KOLB:

9        Q.   Let me try to share my screen again.  How is

10   that?

11       A.   Yes, I can see it.

12       Q.   Can you tell me what this is?

13       A.    It's the last correspondence I received from

14   American Airlines.

15       Q.   This might be one before the last.  This one

16   says they're currently conducting an internal

17   investigation.  Do you see that?

18       A.   Oh, yeah, you're right.

19       Q.   Does this look like an E-mail you received on

20   or around June 10 of 2021 from American?

21       A.    Yes.  I think this is the last one based on

22   what you have determined -- no, this is the last one

23   that I received.

24       Q.   All right.  So I'll mark this as Exhibit 7.

25   This is an American Airlines E-mail to Mr. Clowdus

Page 108

1    which is Bate stamped AA103 through 111.  In this one,

2    it mentions the Conditions of Carriage.  Do you see

3    that in the first paragraph?

4          A.    Correct.  Yes, I see it.

5                (Defendant's Exhibit No. 7 will so be marked

6    for identification.)

7    BY MR. KOLB:

8          Q.    Is that right around the time you started

9    looking at the Conditions of Carriage, or was it some

10   time later?

11         A.    No.  This around about the time that I

12   started engaging Wil and his law firm.

13         Q.    All right.  Do you recall receiving an E-mail

14   on or about June 10 advising you that your flight

15   privileges had been suspended pending an investigation?

16         A.    Yes, I recall that.  Yes.

17         Q.    Let me show you another one.  Maybe I can

18   help clarify it.  This E-mail is dated June 22nd.  Can

19   you see that?

20         A.    Yeah.

21         Q.    And it starts out American Airlines has

22   completed an internal investigation.  Do you see that?

23         A.    Yes.

24         Q.    All right.  Is it this June 22nd letter, when

25   this is labeled Plaintiff's Production 3 through 4, is

Page 109

1    this the final letter that you recall receiving

2    advising you that you have been permanently suspended?

3         A.   Yeah, I believe this is the final letter.

4         Q.   So let's go back to this one, Exhibit 7

5    marked AA10 through 11 (sic).  Having looked at the

6    subsequent June 22nd E-mail, does it refresh your

7    recollection as to whether this one might have been

8    received by you on June 10 advising you that --

9         A.   Yes.

10        Q.   And your response to this was to try to find

11   a lawyer; is that correct?

12        A.   I think I had already had been speaking -- I

13   don't remember the exact time frame, but I think I had

14   already contacted Wil's partner by then but before

15   this.  But if not, it was immediately following this,

16   but I think I had already spoken to his partner prior

17   to this letter, yes.

18        Q.   All right.  And then sometime later on

19   June 22nd, you received this E-mail from American

20   Airlines labeled Plaintiff's production 3 through 4.

21   Can you see that?

22        A.   Yes.

23             MR. KOLB:  I'm going to mark this as

24   Exhibit 8.

25             (Defendant's Exhibit No. 8 will so be marked

Page 110

1    for identification.)

2    BY MR. KOLB:

3         Q.   You after receipt of this June 22nd letter,

4    have you received any other correspondence from

5    American Airlines regarding the revocation of your

6    flight privileges?

7         A.   Not that I recall.

8         Q.   So let me get rid of that stuff and bring up

9    your second complaint filed.  Let me share this with

10   you.  So this is another customer complaint from you to

11   American a little bit later in the day on June 10, and

12   it's labeled AA97.  Do you see that, sir?

13        A.   Yes.

14        Q.   All right.  And this one says this morning I

15   wrote a message.  Since then a message that I was not

16   allowed to fly the next flight.  I just received an

17   E-mail stating my flight privileges have been suspended

18   pending an internal investigation.  Did I read that

19   correctly?

20        A.   Yes.

21        Q.   Does this help you put in context the E-mail

22   that we marked as Exhibit 7 talking about an ongoing

23   investigation and suspension of flight privileges, and

24   that you might have received it on June 10 sometime

25   prior to this complaint?

Page 111

1      A.   Yes.

2      Q.   Okay.  And it says here that you -- let me

3  see.  All right.  So it says here I thought it prudent

4  to contact you again and give you as much detail as I

5  can recall.  What additional detail were you trying to

6  provide American Airlines in Exhibit 9?

7      A.   Well, I was going to -- I was going to write

8  a more in-depth description of everything that occurred

9  and make it as accurate as I could because the first

10 one, I was more interested in just making them aware of

11 Mr. Marino's behavior.  Now that they had suspended me,

12 I was going to try and give my perspective on what had

13 happened.

14          (Defendant's Exhibit No. 9 will so be marked

15 for identification.)

16 BY MR. KOLB:

17     Q.   And what in this E-mail to American Airlines

18 provides your perspective on what had happened?

19     A.   I'm sorry.  I don't understand the question.

20     Q.   Sure.  Your E-mail says you're going to

21 provide as much detail as you can recall.  What

22 additional detail has been provided in here?

23     A.   Mr. Kolb, this is not an E-mail.  And again I

24 know I'm not allowed to ask you questions, but you

25 should check out American Airlines customer complaint,

Page 112

1    so you understand what is to file a complaint.  It's

2    not an E-mail.

3         Q.   All right.  Let me rephrase the question

4    then.  In this complaint you submitted, you said you're

5    going to provide as much detail as you can recall.

6         A.   Yes.

7         Q.   What additional detail is contained in this

8    complaint other than being suspended from the second

9    flight?

10        A.   Everything that you and I have been

11   discussing through the past hour and a half.

12        Q.   All right.  Well, it doesn't talk about the

13   first advice from Marino to stow your bath, the second

14   instruction to give me your bag or the impact of the

15   bag against Marino, does it?

16        A.   I don't understand your question.

17        Q.   There's nothing in this second complaint that

18   provides any of the detail provided in the first, and

19   my question is what additional detail are you actually

20   providing here?

21        A.   Well, I didn't write it.  I didn't provide

22   it, but it was, you know, to go into more detail of my

23   interaction with Mr. Marino, which there is more detail

24   in my affidavit, and then more detail that I've given

25   you in this deposition.

Page 113

1      Q.   But there's no more detail -- go ahead.
2  Sorry?
3      A.   My first message to American was very
4  limited.
5      Q.   Okay.
6      A.   So I was endeavoring, and I had considered
7  giving them more detail, so that they would have more
8  information on Mr. Marino's behavior.
9      Q.   All right.  In this complaint that we're
10 looking at here, Exhibit 9, where does it talk about
11 Mr. Marino's behavior?
12     A.   It doesn't.
13     Q.   It talks about you as a passenger; correct,
14 as a member of the Advantage Program?
15     A.   Yeah.  I'm telling them who I am.  I just had
16 a flight attendant accuse me of assaulting him.  I
17 thought it might be important for somebody to realize
18 that, you know, I'm not the kind of person that
19 assaults people; that they have a flight attendant who
20 shouldn't be in the business.
21          MR. KOLB:  Objection; nonresponsive.
22 BY MR. KOLB:
23     Q.   It says down here at the bottom, so I'll
24 start a fresh message.  Did you ever do that?
25     A.   No, I did not.  A fresh message.

Page 114

1    Q.   What would have prevented you from continuing

2    to provide all the detail you wanted on June 10 or June

3    11 or any day after that?

4    A.   Because of the limitations of the format that

5    you're forced to use filing with American Airlines

6    customer complaint.

7    Q.   Right.  But you could have continued sending

8    in these complaints until you had exhausted all the

9    details you wanted; right, but you just decided not to

10   do that?

11   A.   Again, if you look at American Airlines

12   customer complaint page, you'll see you are character

13   limited.  So you're writing like one paragraph, and

14   then you're limited.  And then you have to write

15   another one, and then you're limited.  And it just

16   became so tedious, and it became impossible.  And at

17   that point, I was speaking -- I had already decided

18   that I needed to speak to an attorney, and it would

19   probably would be in my best interest to speak to an

20   attorney.

21   Q.   All right.  You could have continued to write

22   these complaints or submit these complaints until you

23   had provided all detail that you promised here.  You

24   just decided not to do that because you got frustrated

25   with the format?

Page 115

1          A.    Correct.

2          Q.    Is that a fair summary?

3          A.    Correct.

4          Q.    Let me go back to June 22nd here.  Let me

5    show this to you again.  It's Exhibit 8, the June 22nd

6    E-mail to you from American.  Do you see that?

7          A.    Yes.

8          Q.    And in substance, it informs you that they've

9    concluded you violated the Conditions of Carriage,

10   which is a breach of the contract, and that you're no

11   longer allowed to fly on American Airlines.  Is that a

12   fair summary of Exhibit 8?

13         A.    Yes.

14         Q.    All right.

15         A.    That's what it says.

16         Q.    Does it say anywhere in here that your

17   advantage account will be closed and your accrued miles

18   voided?

19         A.    It does not.

20         Q.    Does it speak to that at all?

21         A.    It does not.

22         Q.    At what point did you become concerned that

23   your advantage account was closed, frozen or that your

24   miles were voided?

25         A.    I was never concerned about it being closed.

Page 116

1    I was concerned about the fact that I use it to buy

2    tickets, and if you can't fly American Airlines, then

3    what's the point in having the account.

4         Q.   You can use those accrued miles for other

5    things other than flights; correct?

6         A.   I don't know.  I never have.  I've only used

7    them for flights for myself.

8         Q.   Okay.  You've never explored whether you

9    could actually use your -- I don't know -- a couple

10   hundred thousand miles on hotels, cars, purchasing

11   products or anything else that you want; correct?

12        A.   No.  I've never used it for anything other

13   than flights.

14        Q.   And since you filed this lawsuit, you've

15   never explored whether you could use those miles for

16   other things other than flights; correct?

17        A.   Until my conversations with you, I was

18   unaware of that.  And in all honesty, it's -- you're

19   getting miles to use for flights and not to rent cars.

20   Sorry.  That's the whole point of it.

21        Q.   All right.  Let's go back to the Conditions

22   of Carriage.  Let me see if I can find it here.  Let me

23   share this with you again.  We've looked at this

24   before.  It's the Conditions of Carriage that we talked

25   about earlier that's incorporated into your ticket.

```
 1    And if you'll see here in your ticket, the following
 2    conditions constitutes the contract between you,
 3    passenger, and American Airlines.  Do you see that?
 4         A.   Yes.
 5         Q.   And then on Page AA084, there's a section
 6    entitled Acceptance of Passengers.  Do you see that?
 7         A.   Yes.
 8         Q.   And it says here American can refuse
 9    transport for anyone for several reasons including but
10    not limited to, and then it lists about 13 reasons;
11    right?
12         A.   Yes.
13         Q.   Would you agree with me, sir, that based on
14    the Conditions of Carriage, you're not guaranteed
15    transport on or any ticket on any flight at any time --
16         A.   Yes.
17         Q.   -- based on the language I just read to you;
18    is that correct?
19         A.   That's correct.
20         Q.   And then in this Reason Number 10 here, it
21    says that among other reasons, you can be denied
22    transport because you refuse to obey the instructions
23    from any flight crew member.  Do you see that?
24         A.   Yes.
25         Q.   If it had been reported to the captain that
```

1    you had refused to obey the instructions given to you

2    by Mr. Marino, would you agree with the captain --

3    would you agree that the captain would have been -- it

4    would have been appropriate for the captain to deny

5    your transport based on that information?

6         A.   I have no idea.  The captain never spoke to

7    me, so I don't -- you're asking me to speculate about

8    something.  I don't know what he reported to him.

9    Everything that I've read and everything that was told

10   to me, he reported that I assaulted him.  Nobody said

11   anything until I spoke to you about refusing to listen

12   to a flight crew.  I did not disobey.  I did exactly

13   what he told me to do when he told me to when I thought

14   that he told me to do it.

15        MR. KOLB:  Objection; nonresponsive; move to

16   strike.

17   BY MR. KOLB:

18        Q.   My question was if Mr. Marino had reported to

19   the captain that you had refused to obey his

20   instructions, based upon the Conditions of Carriage of

21   your ticket, would it have been appropriate for the

22   captain to deny your travel?

23        MR. WOODROW:  Objection.

24        THE WITNESS:  I don't know how to answer that

25   question.

Page 119

1    BY MR. KOLB:

2         Q.   Why do you not know how to answer the

3    question?

4         A.   I don't know how to answer that question

5    because I don't know what Mr. Marino reported to the

6    captain.  I don't know -- I mean you're asking me to

7    say, to speculate if, if, if, you know.  Okay?  I

8    didn't disobey his instructions.  And the captain never

9    spoke to me to confirm or verify, so I don't know if it

10   was appropriate or not.  It would have been appropriate

11   I think for the captain to come up back and speak to me

12   before any action was taken.  He did not.

13        Q.   Do you have any knowledge that the captain is

14   under any obligation to speak with a passenger when a

15   flight attendant complains about a passenger?

16             MR. WOODROW:  Objection.

17             THE WITNESS:  I have no knowledge.

18   BY MR. KOLB:

19        Q.   So let's look at Reason 13, that if any

20   passenger engages in any action voluntary or

21   involuntary that might jeopardize the safety of the

22   aircraft or its occupants.  Do you see that?

23        A.   Of course, I see it.

24        Q.   If Mr. Marino had reported to the captain

25   that you involuntarily impacted him with your bag,

Page 120

```
 1   would this language have permitted the denial of your
 2   transport?
 3              MR. WOODROW:  Objection.
 4   BY MR. KOLB:
 5       Q.   You can answer.  Mr. Clowdus, can you answer
 6   the question, please?
 7       A.   I'm sorry.  I can barely hear you.  I don't
 8   know why.  I have the volume turned up all the way.
 9       Q.   Sure.  Let me repeat the question.  Well, let
10   me get at it this way.  Would you agree with me that if
11   it's reported to a captain that a passenger has been
12   abusive or violent, the American Airlines' Conditions
13   of Carriage would allow the airline to deny transport
14   for that passenger?
15       A.   I don't know how to answer that question --
16              MR. WOODROW:  Objection.
17              THE WITNESS:  -- and here's why.  You're
18   saying if the flight attendant has authority to report
19   to a captain something that's not true, and then they
20   have the authority to remove that person based on the
21   word from a single flight attendant telling the captain
22   something that is untrue, that's what you're asking
23   me?
24   BY MR. KOLB:
25       Q.   No, sir.  I'm asking you just to look at the
```

Page 121

1    plain English language in front of you.  You're a

2    27 year business man.  You've read contracts before;

3    right?

4         A.   Yes.

5         Q.   You're suing American Airlines on two

6    contracts, one of which you can identify, and one in

7    which you can't.  And I'm just asking you to read the

8    plain English language in front of you.  If it had been

9    reported to a captain, true or not, that a passenger

10   had been violent and abusive, would these Conditions of

11   Carriage allow American Airlines to deny transport to

12   that passenger?

13             (Above question will so be certified.)

14             MR. WOODROW:  Objection.

15   BY MR. KOLB:

16        Q.   What's your answer, sir?

17        A.   No answer.

18             MR. KOLB:  I'm ask the court report to

19   certify that question as well.

20   BY MR. KOLB:

21        Q.   Let me go down to Number 10.  If a captain

22   had learned that a passenger had refused to obey the

23   instructions of a flight attendant, would the plain

24   language of the American Airlines' Conditions of

25   Carriage allow the airline to refuse transport to that

Page 122

1    passenger?

2              MR. WOODROW:  Objection.

3    BY MR. KOLB:

4         Q.   Your answer, sir?

5         A.   No answer.

6         Q.   Are you refusing to answer?

7         A.   You're asking me to speculate about something

8    that I don't -- you know, the plain language says, yes,

9    they have the authority, but that's not what happened.

10   So I don't know why you're asking me the question.

11        Q.   I'm not asking you what happened, sir.  We've

12   already been through that.  I'm asking you to read the

13   plain English.  All right?  And the question is, is

14   based on the plain English, if a passenger is reported

15   to have been disorderly, abusive or violent or refused

16   to obey instructions, the Conditions of Carriage allow

17   the airline to refuse transport; correct?

18        A.   I believe so, yes.

19        Q.   All right.  So let's get rid of that.  Let me

20   go back to the Advantage Terms, and let me make it a

21   little bigger.  I'll represent to you, sir, that

22   Exhibit 4 is the American Advantage Program Terms and

23   Conditions in effect on June 10 of 2021.  And the

24   second page, which is labeled AA0064, it says in this

25   bullet point here, it lists a number of reasons why an

Page 123

1    advantage account can be terminated, suspended, etc.

2    And it says in so many words, that your participation

3    in the program is subject to the Conditions of

4    Carriage.  Do you see that?  Let me highlight it for

5    you.

6         A.   Yes.

7         Q.   Okay.  Would you agree with me then that if a

8    passenger were to violate the American Airlines'

9    Conditions of Carriage, that would also constitute a

10   violation of the American Airlines Advantage Program

11   Terms and conditions?

12        A.   Yes.  If a passenger violates the Conditions

13   of Carriage, yes.  That's what it says.

14        Q.   And then one of the consequences of violating

15   the advantage program terms and conditions is that your

16   tickets and all accrued mileage could be forfeited, and

17   your future participation in the advantage program

18   terminated.  Do you see that?

19        A.   Yes.

20        Q.   All right.  To your knowledge, has American

21   Airlines terminated your advantage program membership?

22        A.   To my knowledge, they have not.

23        Q.   Okay.  And to your knowledge, have they

24   forfeited or voided your accrued miles?

25        A.   To my knowledge, they have not.

Page 124

1      Q.   It asks in some written discovery for you to

2    describe your damages, and I want to go through what

3    you and your counsel have provided.  Let me show you

4    this.  That's not it.  Hang on one second.  All right.

5    There we go.  Let me do it this way.  You listed a

6    number of categories of damages you're seeking in this

7    lawsuit, and I want to run through them with you.

8              MR. KOLB:  And the first, Mr. Woodrow, I'm

9    referring to the supplemental disclosures.

10   BY MR. KOLB:

11     Q.   The first category of damages is the fair

12   differential in twice monthly travel of approximately

13   $1500 a month.  Can you tell me how you calculated that

14   figure?

15     A.   The difference in fair, the cost to travel to

16   Fort Lauderdale versus to Miami, the additional time.

17     Q.   What fair difference is there between

18   Fort Lauderdale and Miami that would give rise to a

19   $1500 a month increase in airfare?

20     A.   The difference in airfare, and it varies

21   from each trip.  It varies from trip to trip, just

22   taking an average.  But I sent you an example of the

23   cost of a ticket from American versus the cost for a

24   ticket from other carriers.

25     Q.   Let me see if I find that.

Page 125

1        A.   And it can fluctuate from a few hundred to

2   even more.

3        Q.   All right.  Can you see that?

4        A.   Yep.

5        Q.   Is that what you were referring to earlier

6   about the fare difference?

7        A.   Correct.

8        Q.   This $75 for American Airlines, is that the

9   cost of cashing in miles at an American Airlines

10  ticket?

11       A.   No.  That's their straight price.  It has

12  nothing to do with using miles or anything else.

13       Q.   $75 to Cali, Columbia?

14       A.   For a one way.  And that fluctuates.  It can

15  go from $75 to $200.  It goes back and forth.

16       Q.   All right.  Other than what is shown in

17  Plaintiff's Exhibit 6 (sic), do you have any other

18  documentation to support a $1500 a month fare

19  differential?

20       A.   Well, it's not a $1500 fare difference.  It's

21  also including the transportation cost between

22  traveling to Fort Lauderdale, which is an hour away,

23  versus 15 minutes to the airport where I live.  And so

24  you have additional transportation costs.  And I can't

25  remember what else was put in there to be honest with

Page 126

1    you.

2         Q.   So we've got the fare differential, and we've

3    got the transportation costs.  Other than this one

4    piece of paper, this Plaintiff's Exhibit 6, do you have

5    any other documentation to support --

6         A.   Not at this moment, no.

7         Q.   Do you have any documentation of increased

8    transportation costs from your house in Miami to

9    Fort Lauderdale Airport?

10        A.   Yes, I can send that to you any time.  All

11   you have to do is look at the cost of an Uber from here

12   to Miami International and the cost of an Uber from

13   here to Fort Lauderdale.

14        Q.   And what portion of the $1500 would comprise

15   increased airfare versus transportation costs?

16        A.   Probably I would say $1,000 to $1200 is

17   increased airfare.

18        Q.   Okay.

19        A.   It's not to mention that I can't use miles.

20   I don't have access to a lounge.  I can't fly

21   business.  I don't have WIFI and the additional time as

22   far as if you look, with most of these flights, you're

23   connecting spending two to three hours connecting

24   through Panama or Bogota or another third city.  So you

25   have additional time and cost.

Page 127

1        MR. KOLB:  Objection; nonresponsive.

2   BY MR. KOLB:

3        Q.   I'm talking simply about the increase travel

4   costs, not the other components of damages you're

5   claiming.  If you can focus just on the increase travel

6   costs.

7        A.   That would be the traveling from here to

8   Fort Lauderdale versus Miami and the increased airfare.

9        Q.   And other than Plaintiff's Exhibit 6, do you

10  have any documentations of any of those damages?

11       A.   No.

12       Q.   Another component of damages, if I'm reading

13  this right, is impediment of ban of maintaining current

14  account and obtaining new business.  It's my

15  understanding Southwest, you're company, Southeast --

16  what's it called, Offset?

17       A.   Yes.

18       Q.   -- has not suffered any loss of business as a

19  result your flight ban from American Airlines; is that

20  correct?

21       A.   Not at the moment.  It has impeded my ability

22  to bring in -- to meet new clients that could bring in

23  new work, but I've not lost any current work at the

24  present.

25       Q.   All right.

Page 128

1        A.    But that could change in next six months to a

2   year.

3        Q.    Or it might not change; correct?

4        A.    Or it might not change, but it likely will.

5        Q.    And since you've found alternate

6   transportation down to all these South American

7   Countries, how has the inability to fly American

8   impeded your ability to meet new clients?

9        A.    Well, the flights to South America are not

10  related to Southeast Offset.

11       Q.    Right.

12       A.    It's flights to the Caribbean or the flights

13  to Key West or flights to New York or to Atlanta.

14       Q.    And there's other airlines that fly to each

15  of those locations; correct?

16       A.    There are to New York and Atlanta, yes.  It's

17  inconvenient because again American has a virtual

18  monopoly out of Miami International, and that's just

19  the facts.  American monopolizes Miami International.

20            MR. KOLB:  Objection; nonresponsive.

21  BY MR. KOLB:

22       Q.    Since you've been banned from flying

23  American, have you been denied opportunity the to meet

24  with any particular client prospect anywhere in the

25  world?

Page 129

1      A.    No, not yet.

2      Q.    You've also got a component of damages here

3  called loss of travel lounge privileges, which you

4  valued at -- you initially value it at $1,000, and in

5  your supplemental disclosures, you've lowered that to

6  $875.  Can you tell me how you calculated those figure?

7      A.    Well, that's what you pay to be a member of

8  the executive lounge.

9      Q.    So that's the annual membership fee?

10     A.    Yes.

11     Q.    You're not still paying that annual

12  membership fee, are you?

13     A.    You know, I don't know.  I don't know.  I

14  don't know whether it renews, and, you know, I'm sure I

15  set it up as an auto renew.  And I doubt that they

16  suspended it because I kept hoping that somebody at

17  American would regain some sanity.

18          MR. KOLB:  Objection, nonresponsive; move to

19  strike.

20  BY MR. KOLB:

21     Q.    Do you have any documents that would support

22  either your $1,000 or your $875 calculation for this

23  component of damages?

24     A.    I do, and I will have to provide it.

25     Q.    Okay.  Thank you.  You've got another

Page 130

1    component of damages entitled loss of loyalty

2    accumulated benefits such as free upgrades.  Can you

3    describe that for me?

4         A.   Well, being a member of the AA Advantage and

5    flying with America, it gives you, you know, free

6    upgrades at times, and it gives you advantages of

7    flying, you know, with American.  You get bumped up to,

8    you early, boarding, so there are advantages to being a

9    member, and you lose those.

10        Q.   And do you have any way of putting a monetary

11   value on those benefits?

12        A.   At the moment, I do not.

13        Q.   You've got a component of damages here called

14   reduction in travel due to imposed difficulty in future

15   repercussions on plaintiff's business.  Can you explain

16   that component of damages to me, sir?

17        A.   Well, it's the loss of business opportunities

18   from not being able to go and -- you can't find new

19   business and investment opportunities sitting in

20   Miami.  You have to be able to travel to do that.

21        Q.   And so would your answers be the same if I

22   asked you the same series of questions about your lost

23   business opportunity component of damages that you're

24   still flying; you haven't lost -- you haven't been

25   denied an opportunity to get any potential clients

Page 131

1    anywhere in the world?

2         A.   Not at the moment, no.

3         Q.   And do you have any way of putting a monetary

4    value on that component of the damages, sir?

5         A.   Can I consider and respond or send it to you

6    at a later date?  I don't think that I can answer that

7    accurately at the moment.

8         Q.   All right.  You've got a component here

9    saying an additional four hours of travel each way at

10   215 hours for a total of $2,000 a month.  Can you

11   explain to me what this component of damages is

12   comprised of and how you came to these calculations?

13        A.   It's additional travel time and trying to put

14   a monetary value on my time based on my income over the

15   past five to ten years.

16        Q.   How did you arrive at the hourly figure of

17   $250 an hour?

18        A.   Taking my income and divided by, you know, a

19   40 hour week.

20        Q.   Do you work a 40 hour week?

21        A.   No.  It's rarely less than 70 or 60, 70, 80,

22   40, 50.  Who knows.

23        Q.   I got it.  I believe we touched on this

24   earlier.  You've never had an occasion to actually bill

25   a client on an hourly basis; right?

1        A.    No.  I am not an attorney.

2        Q.    Or anybody else that bills hourly; correct?

3        A.    Nor anybody else.  I wish I could.

4        Q.    And tell me how you came up with the figure

5    of four hours lost on each way for travel?

6        A.    Well, you have the additional travel time

7    between here and Fort Lauderdale, and then you also

8    have layover times because you can't fly direct.

9    Oftentimes you can't fly direct.  But principally it's

10   the additional time traveling to Fort Lauderdale versus

11   Miami International.

12       Q.    And I guess if it's four hours each way,

13   that's -- it doesn't take four hours to get from Miami

14   to Fort Lauderdale, does it?

15       A.    No.  It's approximately an additional hour

16   each way, so each flight would be an additional two

17   hours.  And then you've got multiple flights during the

18   month, and then if you have layover times, not to

19   mention, which, you know, Fort Lauderdale's immigration

20   and customs takes an additional probably hour and a

21   half over Miami to get through immigration.  And that's

22   not a joke, and I can time it for you.

23       Q.    You can work during your Uber from Miami to

24   Fort Lauderdale and back, can't you?

25       A.    Yeah.  I get car sick, so I don't.  It makes

Page 133

1    me car sick to look at my phone or work on a computer.

2        Q.   All right.  And you can work during a layover

3    in an airport, can't you?

4        A.   If you can get WIFI.

5        Q.   Right.

6        A.   But I also can work on American Airlines

7    because they have WIFI, and other airlines do not.

8        Q.   Which airlines do not have WIFI?

9        A.   None of the airlines I'm flying have WIFI,

10   only American.

11       Q.   Which ones are you flying that don't have

12   WIFI?

13       A.   The one I'm flying now, shoot.  Spirit has no

14   WIFI.

15       Q.   What other airlines doesn't have WIFI that

16   you're using?

17       A.   AeroMexico didn't have WIFI when I flew on

18   AeroMexico.  The only airline I've been flying to

19   South America has been Spirit, but when I flew -- what

20   is the other discount?  I've flown on a few other

21   discount airlines, and none of them have WIFI, only

22   American.

23       Q.   Do you have any documents demonstrating the

24   difference in flight times between American's scheduled

25   flights to all of the locations you would want to fly

Page 134

1      to and the other airlines you're currently using?

2          A.   Do I have documents what, to show the times?

3          Q.   Sure.  You're incurring increased flight

4      times because you can't fly American.

5          A.   If you look at the exhibit you just showed on

6      the fare difference, I'll also show you the time

7      difference.

8          Q.   Is that the only document you have showing

9      the time differences?

10         A.   It's the only one at present, but I can

11     generate as many as you need.  You just have to Google

12     it.

13         Q.   We've asked you to produce that over three

14     months ago, so as soon as you can produce it, it would

15     be helpful.

16         A.   Okay.

17         Q.   All right.  So we're talking about four

18     additional hours of travel each way.  We're really

19     talking about inconvenience; right, with no discernible

20     economic value other than you $250 an hour that you

21     calculated?

22             MR. WOODROW:  Objection.

23     BY MR. KOLB:

24         Q.   Is that correct or not?

25         A.   It's not correct.

Page 135

1      Q.   How is it not correct?

2      A.   It's not correct.

3      Q.   Please correct me.  Let me get at it this

4   way.  You've got four hours of additional travel you

5   estimated based on one document that you've given us,

6   which admittedly is incomplete because it doesn't have

7   all the entire day's airfares.  You come up with $250

8   an hour calculation that you've never used in business

9   based on a 40 hour work week, which you've never worked

10  in 27 years.  What am I missing?

11     A.   What's the question?

12     Q.   How are these damage calculations in any way

13  accurate?

14     A.   I don't understand the question.

15     Q.   Okay.  Your next component of damage is that

16  you've suffered the effective nullification of roughly

17  170,000 reward miles and earned reward status valued at

18  $3,000 based upon an assumption of $1.63 cents per mile

19  derived from the Points Guy.  We clarified earlier that

20  your miles haven't been voided.  You still have them;

21  right?

22     A.   That's what you stated earlier, yes.

23     Q.   Well, I can show you the document.  We

24  provided it to your counsel.  Have you not checked to

25  see if you still have your miles active since you were

Page 136

1    banned?

2         A.   Yes.  But the way you characterize it, I use

3    my miles to fly.  I cannot fly.  So they're practically

4    worthless for all practical purposes.  To me, they are

5    worthless.

6         Q.   That was not my question, was it?

7         A.   Well, that's my answer, isn't it?

8         Q.   Okay.  We'll, we can finish this a different

9    way.

10        A.   I'm giving you my answer.  My answer is I use

11   my miles to fly.  That's all I've ever used them for.

12   Now you're telling me I can use them to buy hotel

13   rooms, and okay if you say so.  I take you on your

14   word.  But I use them to buy tickets.  I am not allowed

15   to fly on American at the moment.

16        Q.   My question simply was, sir, your miles

17   haven't been forfeited or voided, have they?

18        A.   Not that I'm aware of, no.

19        Q.   Let me share my screen with you.

20             MR. KOLB:  And this will be Exhibit 11.

21             (Defendant's Exhibit No. 11 will so be marked

22   for identification.)

23             COURT REPORTER:  Excuse me.  What was Exhibit

24   10, the disclosures, sir?

25             MR. KOLB:  The ticket price differential.  I

Page 137

1    believe it's Plaintiff's 06.

2              COURT REPORTER:  Thank you.

3              (Defendant's Exhibit No. 10 will so be marked

4    for identification.)

5    BY MR. KOLB:

6         Q.   Mr. Clowdus, I'll represent to you that this

7    is a screen shot from the American Advantage members

8    website that shows that as of January 30 -- well, let's

9    see.  When was this -- I believe this was back in

10   October of last year.  No.  Yeah, September 20 of

11   2021.  As of September 20 of 2021, you had

12   approximately 208,200 eligible award miles.  Do you see

13   that?

14        A.   Yes.

15        Q.   Does that in any indicate that your miles

16   have been voided or extinguished?  It seems to indicate

17   just the opposite, doesn't it?

18        A.    That's what it indicates, but you also just

19   showed me in the legal contract for these award miles,

20   that it can be terminated if you are removed for any

21   reason on a flight.  You just told me that that gives

22   them the reason to terminate the award miles.  You're

23   saying it's active, but they can also terminate it as

24   well.

25        Q.   Right.  And it looks like from this, that

Page 138

1    American Airlines has not terminated your miles;

2    correct?

3         A.   That's what it looks like, correct, but it

4    also begs the question for me.  Like if they believe

5    that I violated my contract, why haven't they?  Why did

6    they not terminate them.

7         Q.   My question simply was, sir, even though

8    American Airlines has the right to avoid your miles for

9    any of those reasons we discussed, they've not done

10   that with respect to you, have they?

11        A.   As of September 20th on this piece of paper,

12   they have not chosen to do that yet.

13        Q.   And as of today, you've not checked to see if

14   you have those or any other miles still in your

15   account, have you?

16        A.   I have no idea.  They could have terminated.

17        Q.   Or not.  You could have more miles accruing

18   on your credit card every month; right?

19        A.   Or they could not have, or they could

20   tomorrow.

21        Q.   Do any have indication that American Airlines

22   will terminate the accrued miles shown on Exhibit 11

23   tomorrow or at any other time in the future?

24        A.   What you just showed me indicated that they

25   very well could.  I learned that today from you that

Page 139

1    they have the right to do that.

2         Q.   They have the right to do that.  My question

3    though wasn't about their right.  My question was do

4    you have any indication that they intend to do that?

5         A.   No, not yet.

6         Q.   They haven't done it since June 10, so why

7    would you think they would do it at any time in the

8    future?

9         A.   Listen, they've done a lot of things I wasn't

10   expecting them to do.

11            MR. KOLB:  Objection; nonresponsive.

12   BY MR. KOLB:

13        Q.   Can you answer the question I asked?

14        A.   I just did.

15            MR. KOLB:  Ms. Court Reporter, can you read

16   back my last question.

17        (Previous question read back by court reporter.)

18   BY MR. KOLB:

19        Q.   American Airlines hasn't voided your award

20   eligible miles since June 10 of 2019.  What indication

21   do you have that they intend to or will do so at any

22   time in the future?

23        A.   I have no indication.

24        Q.   Are aware you can use your accrued eligible

25   miles to fly Jet Blue?

Page 140

1      A.   No, I was not aware of that, I believe, but

2   anyway go ahead.

3      Q.   The calculation of $3,000 is based upon the

4   Points Guy who believes they are worth 1.63 cents a

5   mile.  What do you know about the Points Guy and his

6   methodology for calculating 1.63 cents per mile?

7      A.   I know nothing.  That was Wil and his firm

8   that did that.  I gave them the information.  I'm

9   assuming that Wil is familiar with that.

10     Q.   All right.  Have you ever met or spoken with

11  the Points Guy or anybody that works that?

12     A.   No.

13     Q.   Do you have any personal knowledge as to the

14  Points Guy's method of valuation for accrued miles?

15     A.   No.

16     Q.   Let me show you what's been provided to us by

17  your counsel.  All right.  Can you see this?  Can you

18  see what's on my screen?

19     A.   Yes, I can see it.

20     Q.   This is 21 pages provided by your counsel.

21  It purports to be from a website called the Points

22  Guy.  And on down to Page 3, he lists how they value

23  accrued miles, and it's got dates of January 2021,

24  December of 2021 and January of 2023.  Do you see that?

25     A.   Yeah, I see it.

Page 141

1      Q.   All right.  And let me move this out of the
2    way.  The 1.63 cents a mile comes from a valuation that
3    the Points Guy apparently came up with in January of
4    2022.  Do you agree with that?
5      A.   Yeah.  I can see it.
6      Q.   Is there any indication of what the Points
7    Guy thinks the advantage accrued miles would be worth
8    on June 10 of 2021 or June 22nd of 2021?
9      A.   I have no idea.
10     Q.   Let me go back to the advantage program terms
11   and conditions.  So I'm showing you Exhibit 4 again,
12   and I'm going to point out a couple of terms.  This
13   here on Page 1, which is labeled AA63, that the
14   accumulation of miles credit does not entitle members
15   to any vested rights with respect to mileage credits,
16   awards or program benefits.  Do you see that?
17     A.   Yes.
18     Q.   All right.  What does that language mean to
19   you, if anything?
20     A.   Are we going to read every piece of contract
21   and every piece of paper from American Airlines and
22   spend eight hours doing this?  Is this a fiscal way of
23   like running up hours?  I'm just curious.  Is this
24   really relevant?  I'm a little baffled by this of three
25   and a half hours in on reading the small type on

Page 142

1    contracts, really?

2         Q.   I'm just asking you about -- I'm just asking

3    you about the contracts you sued on.  Certainly you

4    have to expect to be questioned about those.  Do you

5    realistically expect to be able to sue --

6         A.   I know you're jacking your hours up for

7    American, but it's getting to the point of being

8    ridiculous, don't you think?  I hired an attorney who I

9    told what happened, and they told me American violated

10   the contract.  Now, you know, I didn't read every

11   little small type.

12        Q.   Okay.

13        A.   So, no, I didn't read this.  I don't know

14   what it's about.  I have an attorney that I trust to

15   handle it for me.  So continue with your questions.

16   I'm sorry.  But it's becoming fairly obvious that three

17   and a half hours in, that this is less about this

18   lawsuit as it is about billing hours.  That's what it

19   appears to me.  I'm sorry.  I'm just speaking out loud

20   here because I don't understand your --

21        Q.   I'm finding you just as offensive as a

22   Flight Attendant Marino did, but let's try to move on.

23   Okay?

24        A.   Well, you know, Mr. Marino verbally attacked

25   me, and then he got me kicked off the plane, and now

Page 143

1    you're defending him when no one else at American

2    defended him, nobody, not his supervisor, no one else.

3         Q.   You're in for an education, Mr. Clowdus.

4         A.   I think you are, too.

5         Q.   Let's move on.

6         A.   I think you are, too.

7         Q.   So my question was, what does this

8    highlighted language mean to you in terms of whether

9    you own the mileage credits or benefits that you

10   accrued in the advantage program?

11        A.   It means if you violate your contract, I'm

12   assume it means you don't own it.

13        Q.   Well, it doesn't say if you violate the

14   contract.  It says flat out you don't have any vested

15   rights with respect to any program benefits; correct?

16        A.   Okay.  I believe you, Mr. Kolb.  If you say

17   so, I believe you.

18        Q.   Isn't that what the document says?  I'm not

19   asking about your belief.  I'm asking for your

20   understanding of the plain English language here that

21   I've highlighted.

22        A.   Okay.  If that's what you're saying, I said I

23   believe you.

24        Q.   Okay.

25        A.   The next question.  I mean how much more are

Page 144

1    we going to go through this?

2         Q.   Until you answer a question, we're going to

3    keep doing it.  I'm trying to get done quite honestly.

4    I've got some other things to do today other than enjoy

5    your company.

6         A.   Okay.

7         Q.   On the next Page, AA64, it says award tickets

8    have no cash value.  Do you see that?

9         A.   Yes, I see it.

10        Q.   Do you know if the Points Guy has ever read

11   this document when he came up with the cash value for

12   your accrued miles?

13        A.   Is this a real question?

14        Q.   Yeah.  You're relying on the Points Guy?

15        A.   I don't know the answer to that question.

16        Q.   It's your damage calculation, sir, and if you

17   don't know, who does?

18        A.   MR. WOODROW:  Objection.

19             THE WITNESS:  I hired an attorney to do

20   this.  That's what my attorney is there for.  I relayed

21   the facts of what happened and what Mr. Marino did to

22   me, and then I left it up to them.

23   BY MR. KOLB:

24        Q.   All right.  Let's try another sentence from

25   the English language.  This is on AA66.  Can you read

Page 145

1    the language that I've highlighted there, sir?

2          A.    Yes, I can read it.

3          Q.    Can you read it out loud for the jury to

4    hear?

5          A.    There's no jury.  There's just you.

6          Q.    There will be when I read this at your

7    trial.  Can you read that?

8          A.    You just asked me to read it for the jury.

9          Q.    Can you read it out loud --

10         A.    Accrued mileage credit and award tickets do

11   not constitute property of the member.

12         Q.    Do you have an understanding of what that

13   language means?

14         A.    Yes, I understand what it means.

15         Q.    And what is that understanding?

16         A.    My understanding is accrued mileage credit

17   and award tickets do not constitute property of the

18   member.

19         Q.    Can you explain to me then how you believe

20   you can sue for the loss of mileage that was never your

21   property?

22         A.    I'm suing because I had a flight who falsely

23   accused me of something because he was having a bad

24   day, and now I have lost across the board because of

25   this flight attendant's bad day.

Page 146

1          MR. KOLB:  Objection; nonresponsive.

2          THE WITNESS:  Now what the damages are and

3     how they're calculated, I will leave up to the

4     attorneys and to the jury.  And if there is no -- you

5     know, if this means there's no, then I will live with

6     that.  I leave it up the jury and the attorneys.

7          MR. KOLB:  Objection; nonresponsive.

8     BY MR. KOLB:

9     Q.  My question was really directed towards your

10    component of damages that you suffered the effective

11    nullification of 170,000 reward miles.  And my question

12    is, in light of the fact that those miles are not your

13    property, can you explain to me and the jury how it is

14    you think you can sue for the loss of something which

15    was never yours?

16    A.  And I'll give you the same answer.  I leave

17    it up to the attorneys and to the jury to decide that.

18    Q.  Okay.  We talked earlier about your mental

19    anguish and emotional distress.  Has that affected your

20    daily life, your social relationships, your social life

21    at all, or is it just business?

22    A.  We covered that before.  Why are we covering

23    it again?  I don't understand why you continue asking

24    the same questions over and over.

25    Q.  Well, this is a different question.  I asked

1   you earlier about how you could describe your anxiety,

2   and this question is how has it affected your daily

3   life?

4        A.   It has affected everything.  It affects my

5   ability to travel.  It has affected my ability to see

6   my girlfriend.  It's affected my ability to travel with

7   my friends.  So I mean it's such an ambiguous

8   open-ended question.  I don't understand the question.

9        Q.   Other than what you've told me earlier, can

10  you describe for me any other way in which your

11  emotional distress, which you claimed to have suffered,

12  has affected your daily life, your social life or your

13  relationships?

14       A.   I don't know how to answer that question.

15       Q.   You've got another component of damages where

16  you claim to have suffered a damaged reputation.  Can

17  you tell me how your reputation has been damaged?

18       A.   My reputation is everything in Miami with the

19  business community.  My biggest client is a daily legal

20  paper, and I make approximately -- I net a million

21  dollars a year.  The contractor is coming up.  My

22  reputation is everything as far as maintaining that

23  client.  And in this current environment where there

24  are legitimate flight attendants that are legitimately

25  being beat to death, to have a flight attendant falsely

Page 148

1   accuse me of something, the damage to my reputation

2   would be massive and probably will cost me millions of

3   dollars in business.  If you're going to ask me

4   immediately this moment, no, I've not lost that client,

5   not yet, but I very well could.

6        Q.   Do you have any indication if that's likely

7   to happen?

8        A.   Well, I know the client, and I know the

9   environment.

10       Q.   Are they aware of this?

11       A.   What's that?

12       Q.   Are they aware of this incident?

13       A.   No.  No one is aware of it.  I've kept this

14   completely under wraps as much as possible to avoid

15   that.

16       Q.   All right.  Do you have any knowledge that

17   American Airlines has published its report of your

18   assault on Marino and its ban of you from their airline

19   to anyone else on American Airlines?

20       A.   I have no knowledge at the moment.

21       Q.   Do you have any knowledge that other than the

22   one or two people that you've spoken in general terms

23   to about the June 10th incident and the ban, that

24   anybody else anywhere on the planet knows about these

25   events?

Page 149

1      A.   I mean I think you asked me this question
2  earlier, but again not that I'm aware of.
3      Q.   Would you agree with me that the first
4  publication of the circumstances of June 10, 2021 and
5  following occurred when you filed your lawsuit?
6      A.   I don't know that it was.  I don't know what
7  American has done.  I don't know what they've done or
8  not done.
9      Q.   Okay.
10      A.   I can't answer that question if I don't know
11  what American has done.
12      Q.   All right.  You don't have any knowledge that
13  American has published it to any third party?
14      A.   I don't have any knowledge of that.
15      Q.   My question is based on what you know.  Would
16  you agree that the first publication of the events of
17  June 10 and subsequent occurred when you filed your
18  lawsuit in federal Court in Miami?
19           MR. WOODROW:  Objection.
20  BY MR. KOLB:
21      Q.   You can answer.
22      A.   I can't answer that.
23      Q.   Why not?
24      A.   Because I don't -- I don't know what American
25  has done, and you keep speculating and say if

Page 150

1   American.  If they haven't, then maybe and maybe not,

2   but I don't know.  I don't know what American has done

3   and what they haven't.  If you're telling me

4   categorically that they haven't published it, then,

5   yes, I would agree that that was first time it was

6   published.  But I don't know what American has done.

7         Q.    Okay.

8         A.    And I don't know what Mr. Marino has done.  I

9   don't know who Mr. Marino has told.

10        Q.    You've got a component of damages that talks

11  about limitation on choices such as running for

12  political office.

13        A.    Yes.

14        Q.    Have you ever sought political office before?

15        A.    Not yet.  I have considered it, and I have

16  met with people and discussed it over the past ten

17  years.

18        Q.    Who have you met with most recently regarding

19  your political aspirations?

20        A.    My neighbor across the street is very

21  politically active, my business partner --

22        Q.    Mr. Brice?

23        A.    -- and a few friends.  Yes.

24        Q.    Who is your neighbor?

25        A.    Lydia Harrison.

Page 151

1        Q.    Do currently have any plans to run for
2    political office in the future?
3        A.    Yes, I'm considering it.
4        Q.    And what are you considering running for and
5    when?
6        A.    In this house seat in this location in Miami
7    Beach, and I don't know if I will in the next two years
8    or in the next four years.  I don't know.  It's open
9    ended.
10        Q.    Okay.
11        A.    When I considered it a few years ago, it was
12    an open seat, and that's why I was considering it.
13        (Court Reporter off record to change paper.)
14    BY MR. KOLB:
15        Q.    Mr. Clowdus, we're back on the record and in
16    the home stretch.  How would these events of June 10
17    and subsequent impair your ability to run for political
18    office?
19        A.    I'm sorry?  Do you really think that being
20    accused in this current environment of assaulting a
21    flight attendant and being banned by an airline
22    wouldn't impact it?
23        Q.    Nobody knows about it, sir, other than your
24    lawsuit.
25        A.    Do you think people -- I have no idea.  Do

Page 152

1    you think Mr. Marino hasn't told anyone?  Do you think

2    that Mr. Marino hasn't gone out there and spoke to

3    people?  Do you think that any other employees of

4    American Airlines haven't spoken to people?  Do you

5    think this really would stay completely anonymous

6    within American?  Do you really believe that?

7              MR. KOLB:  Objection; nonresponsive.

8    BY MR. KOLB:

9        Q.  My question quite simply, sir, and the longer

10   you drag this out, the longer we're going to be here.

11   It's totally up to you.

12       A.  Okay.

13       Q.  My question was how would the events of June

14   10 and subsequent impact your aspirations to run for

15   political office?

16       A.  It would probably prohibit it.  It would

17   probably negate it.

18       Q.  How?

19       A.  I answered the question.  It would negate it.

20       Q.  You're aware of a Congressman named

21   Matt Gaetz from South Florida?

22       A.  No.

23       Q.  He's been accused of child sex trafficing,

24   and he's still in office.  How would the events of

25   June 10 and subsequent affect your aspirations for

Page 153

1    political office, sir?

2         A.   You're asking me about another person and

3    speculating about another event.  I'm telling you I

4    gave you my answer.  So why are we debating somebody

5    else who is a child sex predator --

6         Q.   I'm trying to show you the absurdity of your

7    position.

8         A.   No.  The only absurd one here is you and your

9    questions.  If you think running for political office

10   would not be negatively impacted by being accused of a

11   Federal crime, then I don't know what else to say to

12   you.  I have no further explanation.  I mean you're

13   debating something with me that it's your opinion and

14   my opinion.  We have two separate opinions.  Why are we

15   debating it?

16        Q.   Other than what you've told me, do you have

17   any explanation as to how the events of June 10 and

18   subsequent would impact your ability to run for

19   political office in the future?

20        A.   It would negatively impact it, if not

21   prohibit it.

22        Q.   And other than what you've told me, do you

23   have any other explanation for how that would

24   negatively impact your ability to run for office?

25        A.   No.  No.

1    Q.   You've got a claim under a law called The

2    Tickets Act, and I'm assuming you didn't read it.  Will

3    you agree with me that you were not denied boarding

4    because of an oversold or overbooked flight?

5    A.   I was not denied boarding because of an

6    oversold flight, yes.

7    Q.   All right.  When you discussed the

8    possibility of filing this lawsuit with your business

9    partner, Mr. Brice, can you describe for me what you

10   two discussed, what the conversation was?

11   A.   A cost benefit analysis.

12   Q.   And what were those costs and benefits?

13   A.   I'm sorry.  I don't understand the question.

14   You want me to describe the personal conversation with

15   my business partner?

16   Q.   About this lawsuit, yes, sir, absolutely.

17   A.   What is the question again?  What exactly is

18   it that you're asking?

19   Q.   What was the substance of your conversation

20   with Mr. Brice about the wisdom of filing this lawsuit?

21   A.   What could be gained and what could be lost.

22   What would I spend and what could I gain.  That was the

23   substance of it.

24   Q.   And was the spend in gain quantified in any

25   way?

Page 155

1         A.    Well, quantified.  We looked at the cost of
2    the litigation versus the likelihood of succeeding
3    versus the likelihood of not succeeding versus the cost
4    to me both finally business-wise and personal
5    reputation, and for the next 15 to 20 years, the
6    inability to fly on American and living in Miami.  So,
7    yes, we did an extensive cost benefits analysis.
8         Q.    Was that put down in writing anywhere?
9         A.    No.
10        Q.    Was anybody else part of that conversation?
11        A.    No.
12        Q.    All right.  Is there anything else that you
13   want to add or any answers that you want to change
14   before we close this out?
15        A.    No.
16        Q.    Okay.
17        A.    No.
18        Q.    Have you understood my questions today?
19        A.    Some, and some, I didn't.
20        Q.    Have you told me each instance when you
21   didn't understand my question?  Let me put it that
22   way.
23        A.    I did the best I could.
24        Q.    And has your cell phone remained off except
25   for breaks, and all other apps remained off through the

Page 156

1    course of the deposition?

2         A.   It's off right now.

3         Q.   Fair enough.

4         A.   Yes, it's off.

5         Q.   And any zoom days, I've got to trust.

6              MR. KOLB:  That's all I have for you, sir. I

7    appreciate your patience.

8              THE WITNESS:  I appreciate your questions.

9    Thank you very much.

10             MR. KOLB:  You're being kind.  I appreciate

11   that.

12             THE WITNESS:  Yes, I am.

13             MR. WOODROW:  Yeah, I just have a couple of

14   questions for you, and then we can get out of here.

15                      CROSS-EXAMINATION

16   BY MR. WOODROW:

17        Q.   So, Troy, is it your plan in the near future

18   to move to south America?

19        A.   Yes.

20             MR. KOLB:  Objection to form.

21   BY MR. WOODROW:

22        Q.   How will you maintain your business in Miami

23   once you move to South America?

24        A.   To fly to Miami.

25        Q.   And how often do you anticipate that you will

Page 157

1    need to fly to Miami to maintain your business?

2         A.    Two to three to four times a month depending

3    on what's going on, but a minimum of twice, maybe four

4    times a month.

5         Q.    Okay.  And so did anyone ever contact you

6    from American Airlines during the course of the

7    investigation that allegedly occurred after the

8    incident?

9         A.    No.

10        Q.    Did you receive any response to your

11   complaints that you filed on-line?

12        A.    I received a couple of correspondence.

13   Actually I did have someone call me to tell me that

14   they were a customer service agent.  I don't remember

15   the exact conversation, but I remember somebody called

16   me to tell me that it was under investigation, and

17   basically that was it.  But they did not interview me

18   or ask me any details or ask me anything about what

19   happened.

20        Q.    And when you filled out this second customer

21   complaint, where were you at the time?  Describe your

22   location and what was happening.

23        A.    I think I was at home.  I think I was at home

24   at the time.  I think I had just gotten home.  The

25   first time was in the American Airlines lounge, and the

Page 158

1    second one was at home.

2         Q.   And at the time, were there any other factors

3    that discouraged you from submitting any additional

4    complaint?

5         A.   I had started writing the additional

6    complaint, and the website logged me out after I had

7    written it.  And it was so frustrating trying to do it,

8    that I gave up, so that's why I never filed it.

9         Q.   Well, normally when you fly, and you have

10   WIFI on American, is it unusual for you to do work

11   during the flight time?

12        A.   No.  I always work while I'm flying, and when

13   I'm on American, I have WIFI.

14        Q.   And have you been able to work on any of

15   these flights since?

16        A.   No.  No.

17        Q.   Did you ever fail to follow a flight member

18   instruction --

19             MR. KOLB:  Objection to form.

20             THE WITNESS:  Never.

21   BY MR. WOODROW:

22        Q.   -- in your mind?  Did you ever act in an

23   unruly or violent way during this incident?

24             MR. KOLB:  Object to form.

25             THE WITNESS:  No.

Page 159

```
 1   BY MR. WOODROW:
 2       Q.   Did you in any way act to jeopardize the
 3   safety of the aircraft during this incident?
 4            MR. KOLB:  Objection to form.
 5            THE WITNESS:  No.
 6   BY MR. WOODROW:
 7       Q.   Do you believe that you violated the contract
 8   of carriage in any way?
 9       A.   No.
10            MR. KOLB:  Objection to form.
11   BY MR. WOODROW:
12       Q.   Do you believe that you violated the
13   conditions of the American Advantage Program in any
14   way?
15            MR. KOLB:  Objection to form.
16            THE WITNESS:  No.
17            MR. WOODROW:  All right.  If we could take a
18   five-minute break, and you turn your cell phone on,
19   Troy.
20            THE WITNESS:  Sure.
21            MR. WOODROW:  And then we can come back
22   shortly.  I appreciate it.
23                (Brief recess was taken.)
24            MR. WOODROW:  All right.  I think we can wrap
25   it up, and we don't have any further questions.
```

Page 160

1          MR. KOLB:  Dawn, thank you for your time.

2     Mr. Clowdus, thank you for you patience.

3          COURT REPORTER:  I have just a couple of

4     questions.  For the read and sign, do we have a yes on

5     that?

6          MR. WOODROW:  Yes.  Yes, please.

7          COURT REPORTER:  Do you want this

8     transcribed, Mr. Kolb?

9          MR. KOLB:  Yes.

10          COURT REPORTER:  And do you need a copy of

11     this, Mr. Woodrow?

12          MR. WOODROW:  Yes.  Yes, we do.

13          COURT REPORTER:  Thank you very much.

14

15          (Deposition concluded at 2:00 p.m.)

16

17

18

19

20

21

22

23

24

25

Page 161

1                    CERTIFICATE OF REPORTER OATH

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5             I, the undersigned authority, hereby certify

6    that the witness named herein personally appeared

7    before me via zoom videoconference and was duly sworn.

8             WITNESS my hand and official seal this

9    February 1, 2022; transcribed & uploaded February 11,

10   2022.

11

12

13

14

15         DAWN NEUKOMM, RPR

16         NOTARY PUBLIC - STATE OF FLORIDA

17         COMMISSION NO. GG 332574

18         EXPIRES JULY 25, 2023

19

20

21

22

23

24

25

Page 162

1              REPORTER'S DEPOSITION CERTIFICATE

2    STATE OF FLORIDA

3    COUNTY OF HILLSBOROUGH

4              I, Dawn Neukomm, Registered Professional

5    Reporter and Notary Public in and for the State of

6    Florida at large, hereby certify that the witness

7    appeared before me for the taking of the foregoing

8    deposition via zoom videoconference, and that I was

9    authorized to and did stenographically and

10   electronically report the deposition, and that the

11   transcript is a true and complete record of my

12   stenographic notes and recordings thereof.

13             I FURTHER CERTIFY that I am neither an

14   attorney, nor counsel for the parties to this cause,

15   nor a relative or employee of any attorney or party

16   connected with this litigation, nor am I financially

17   interested in the outcome of this action.

18             DATED THIS February 1, 20221, at Tampa,

19   Hillsborough County, Florida.

20

21             *Dawn Neukomm*

22             DAWN NEUKOMM, RPR

23

24

25

Page 163

1    WILLIAM T. WOODROW, III, ESQ.

2    will@stoneandwoodrowlaw.com

3                          February 14, 2022

4    RE:    Clowdus, Troy v. American Airlines

5        2/1/2022, Troy Clowdus (#5002471)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   Erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Page 164

1  Clowdus, Troy v. American Airlines

2  Troy Clowdus (#5002471)

3              E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19 PAGE_____ LINE_____ CHANGE_____

20 _____

21 REASON_____

22

23 _____    _____

24 Troy Clowdus                              Date

25

Page 165

1    Clowdus, Troy v. American Airlines

2    Troy Clowdus (#5002471)

3                    ACKNOWLEDGEMENT OF DEPONENT

4         I, Troy Clowdus, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Troy Clowdus                       Date

13   *If notary is required

14                         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                         _____ DAY OF _____, 20___.

16

17

18                         _____

19                         NOTARY PUBLIC

20

21

22

23

24

25

**[& - 6:30]**

| & |
|---|
| **&**   2:3,11 3:7,18 161:9 |

| 0 |
|---|
| **0011**   106:16 |
| **05**   31:23 |
| **06**   137:1 |

| 1 |
|---|
| **1**   1:16 3:13 27:21 27:23 38:24 68:10 68:13 69:10,16,17 78:13 90:8 141:13 161:9 162:18 |
| **1,000**   126:16 129:4 129:22 |
| **1.63**   135:18 140:4 140:6 141:2 |
| **10**   4:3 5:22 6:10 48:20 49:14,24 53:16 60:23 90:6 90:7 98:16 107:20 108:14 109:8 110:11,24 114:2 117:20 121:21 122:23 136:24 137:3 139:6,20 141:8 149:4,17 151:16 152:14,25 153:17 |
| **10,000**   31:3 |
| **108**   3:22 |
| **109**   3:24 |
| **10:00**   1:17 |
| **10th**   5:15 15:17 19:22 22:3,6 32:2 43:12 45:1,12,19 46:22 47:22 148:23 |
| **11**   4:5 12:19 13:2 15:10 109:5 114:3 |

**136:**20,21 **138:**22 161:9
**111**   4:2 108:1
**11th**   45:22
**12**   12:25
**1200**   126:16
**12th**   51:2
**13**   117:10 119:19
**136**   4:5
**137**   4:3
**14**   163:3
**14069**   161:14 162:21
**15**   5:22,23 6:10 85:23 91:2 92:14 125:23 155:5
**1500**   124:13,19 125:18,20 126:14
**156**   3:4
**16**   5:22
**161**   3:5
**162**   3:6
**163**   3:7
**164**   3:8
**170,000**   135:17 146:11
**1:21**   1:2

| 2 |
|---|
| **2**   3:14 4:2 31:24 32:5 90:8 |
| **2,000**   131:10 |
| **2/1/2022**   163:5 |
| **20**   16:16 18:19 54:11 55:12 83:22 85:23 137:10,11 155:5 165:15 |
| **200**   125:15 |
| **2002**   15:9 |
| **2003**   13:23 |
| **2005**   11:19 |

**2006**   11:19
**201**   2:5
**2012**   12:24
**2019**   139:20
**2020**   37:2
**2021**   5:15 12:4 60:23 90:6 107:20 122:23 137:11,11 140:23,24 141:8,8 149:4
**2022**   1:16 141:4 161:9,10 163:3
**20221**   162:18
**2023**   140:24 161:18
**205**   11:23
**208,200**   137:12
**20th**   138:11
**21**   140:20
**215**   131:10
**2250**   2:13
**22902**   2:5
**22nd**   50:5 108:18 108:24 109:6,19 110:3 115:4,5 141:8
**23155**   1:2
**25**   161:18
**250**   2:4 131:17 134:20 135:7
**26**   16:21
**27**   3:13 121:2 135:10
**275-7378**   2:6
**2:00**   1:17 160:15

| 3 |
|---|
| **3**   3:16 33:14,15 108:25 109:20 140:22 |
| **3,000**   135:18 140:3 |

**30**   15:18 37:2 83:22 98:13,14,15 99:1 137:8 163:17
**32**   3:14
**33**   3:16
**332574**   161:17
**33301**   2:13
**36**   3:17

| 4 |
|---|
| **4**   3:17 32:9 36:12 36:13 42:9 108:25 109:20 122:22 141:11 |
| **40**   131:19,20,22 135:9 |
| **401**   2:12 |

| 5 |
|---|
| **5**   3:3,19 51:3,6,7 51:10 |
| **5-11**   11:23 |
| **50**   131:22 |
| **50/50**   19:9 |
| **5002471**   163:5 164:2 165:2 |
| **50s**   10:1,4 |
| **51**   3:19 |
| **5:48**   98:22 |

| 6 |
|---|
| **6**   3:21 89:7,25 125:17 126:4 127:9 |
| **6/10/21**   3:23 |
| **6/22/21**   3:24 |
| **60**   131:21 |
| **60,000**   15:4 |
| **60th**   20:3 |
| **67**   28:16 31:4 |
| **69**   28:23 |
| **6:30**   56:19 70:14 70:15 |

[6:45 - advisory]

**6:45**  90:21

**7**

**7**  3:22 107:24
  108:5 109:4
  110:22
**70**  29:3 131:21,21
**703-3944**  2:14
**71**  36:17
**72**  28:16 31:4
**73**  34:14
**74**  35:4
**75**  37:9,12 125:8
  125:13,15
**77**  41:24

**8**

**8**  3:24 109:24,25
  115:5,12
**80**  34:14 131:21
**855**  2:6
**875**  129:6,22
**89**  3:21

**9**

**9**  4:2 36:6 111:6
  111:14 113:10
**9/11**  15:9,15
**954**  2:14
**9:00**  98:23

**a**

**a.m.**  1:17
**aa**  3:21,23,24 4:2
  101:2 103:15
  104:11 130:4
**aa.com**  90:5
**aa0010**  106:15
**aa0064**  122:24
**aa084**  117:5
**aa096**  90:4
**aa10**  109:5

**aa103**  108:1
**aa63**  36:17 141:13
**aa64**  144:7
**aa66**  144:25
**aa97**  110:12
**aaadvantage**  37:1
**aadvantage**  3:18
  37:2
**abilities**  47:24
**ability**  98:18
  127:21 128:8
  147:5,5,6 151:17
  153:18,24
**able**  24:6 46:21
  48:11 102:24
  104:5,6 105:13
  130:18,20 142:5
  158:14
**abrasive**  47:18
  56:22 59:6
**absolutely**  7:18,24
  68:8 77:23,23
  78:4 84:15 86:15
  154:16
**absurd**  153:8
**absurdity**  153:6
**abusing**  99:16
**abusive**  120:12
  121:10 122:15
**acceptance**  117:6
**access**  42:20
  126:20
**accessible**  43:4
**accident**  77:10
**accidental**  76:24
  77:11
**accidentally**  83:19
  103:25
**account**  115:17,23
  116:3 123:1
  127:14 138:15

**accounting**  50:6
**accrued**  115:17
  116:4 123:16,24
  138:22 139:24
  140:14,23 141:7
  143:10 144:12
  145:10,16
**accruing**  138:17
**accumulated**
  130:2
**accumulation**
  141:14
**accuracy**  93:12
  163:9
**accurate**  49:24
  50:1,3,6,16,17
  53:1 92:25 97:3
  111:9 135:13
**accurately**  53:10
  131:7
**accuse**  113:16
  148:1
**accused**  8:24
  43:20,20 44:9
  83:20 93:24 104:1
  145:23 151:20
  152:23 153:10
**accuses**  37:24
**accustomed**  67:24
**acknowledgement**
  165:3
**acknowledgment**
  163:12
**act**  154:2 158:22
  159:2
**acting**  56:15 58:23
  58:25
**action**  1:2 28:5
  29:2 34:15 35:1
  35:11 37:8,24
  39:24 40:15,23

**41**:10 119:12,20
  162:17
**active**  4:5 135:25
  137:23 150:21
**acts**  83:14
**adamant**  87:11
**add**  51:15,20
  52:24 53:2,13
  155:13
**additional**  111:5
  111:22 112:7,19
  124:16 125:24
  126:21,25 131:9
  131:13 132:6,10
  132:15,16,20
  134:18 135:4
  158:3,5
**additions**  165:6
**address**  18:25
**adduced**  5:3
**admiral's**  88:25
  99:4
**admittedly**  135:6
**advantage**  35:6,9
  35:14,18 36:7
  42:8 98:11 113:14
  115:17,23 122:20
  122:22 123:1,10
  123:15,17,21
  130:4 137:7 141:7
  141:10 143:10
  159:13
**advantages**  130:6
  130:8
**advice**  97:7 112:13
**advised**  92:22
**advising**  92:5,8
  97:9 108:14 109:2
  109:8
**advisory**  92:19

**aeromexico**  45:24
46:4 133:17,18
**affect**  152:25
**affidavit**  9:17
49:24 50:5,15,21
51:14,19,23 52:6
52:25 53:3,8
67:14 112:24
**affinity**  13:24
**aftermath**  46:18
**agent**  99:6,19
157:14
**agents**  87:9 99:13
100:20
**aggressive**  47:18
56:15 58:25 59:6
**ago**  5:21 6:10 11:3
13:13 17:12 20:8
32:10 33:12 45:19
51:18,22 54:16
134:14 151:11
**agree**  31:12 34:2
50:4 117:13 118:2
118:3 120:10
123:7 141:4 149:3
149:16 150:5
154:3
**agreement**  35:24
**ahead**  44:6 52:12
57:22 60:9 102:15
113:1 140:2
**air**  72:13 73:4
**aircraft**  16:7,9,12
61:12,20 64:23
66:9 79:5,8 80:19
80:23 82:13 84:21
86:11,14 101:1
102:2 103:14
119:22 159:3
**airfare**  124:19,20
126:15,17 127:8

**airfares**  135:7
**airline**  22:1 23:8
30:18 31:9 45:23
60:6 120:13
121:25 122:17
133:18 148:18
151:21
**airline's**  97:20
**airlines**  1:8 2:16
5:11 9:5,18 15:18
15:23 16:1 21:20
24:1,3 25:6 28:20
29:21 30:6 35:9
35:14,18 36:7
37:25 42:21 43:3
45:2 87:9 89:4
95:5,6 98:16
100:6 101:22,24
105:1 106:6,15
107:14,25 108:21
109:20 110:5
111:6,17,25 114:5
114:11 115:11
116:2 117:3
120:12 121:5,11
121:24 123:8,10
123:21 125:8,9
127:19 128:14
133:6,7,8,9,15,21
134:1 138:1,8,21
139:19 141:21
148:17,19 152:4
157:6,25 163:4
164:1 165:1
**airport**  43:19 44:7
46:19 86:4 98:6
101:25 125:23
126:9 133:3
**aisle**  53:20 56:9,24
57:1,2 66:3,3,5
68:24 78:12 101:8

**alive**  11:5
**allegation**  37:12
**allegations**  29:14
39:7
**allege**  56:14
**alleged**  82:10
**allegedly**  157:7
**alleging**  40:15
**allen**  19:5
**allotted**  163:20
**allow**  59:20 77:1
120:13 121:11,25
122:16
**allowed**  5:15 23:5
110:16 111:24
115:11 136:14
**alternate**  128:5
**alternative**  25:4,5
25:6 103:1
**alto**  12:17,22
**ambiguous**  147:7
**amended**  3:19
51:1
**america**  18:11,16
20:5,5,21,21 23:11
24:16 128:9 130:5
133:19 156:18,23
**american**  1:8 2:16
5:11 9:18 15:18
15:22 16:1 18:11
21:19,25 23:9,10
23:16 24:18 29:21
30:6,18 31:5 35:6
35:9,14,18 36:7
37:24 40:18 42:21
43:2 45:2 87:9
89:4 91:5 92:22
93:13 95:5,5
97:20 98:15 99:15
100:5 101:22,24
102:25 105:1

106:6,14 107:14
107:20,25 108:21
109:19 110:5,11
111:6,17,25 113:3
114:5,11 115:6,11
116:2 117:3,8
120:12 121:5,11
121:24 122:22
123:8,10,20
124:23 125:8,9
127:19 128:6,7,17
128:19,23 129:17
130:7 133:6,10,22
134:4 136:15
137:7 138:1,8,21
139:19 141:21
142:7,9 143:1
148:17,19 149:7
149:11,13,24
150:1,2,6 152:4,6
155:6 157:6,25
158:10,13 159:13
163:4 164:1 165:1
**american's**  35:2
99:8 133:24
**amount**  42:22
**amphetamine**
60:13
**amphetamines**
59:1,2,16,22,24,25
60:17,23
**analysis**  154:11
155:7
**angry**  46:10 65:18
76:20 104:1
**anguish**  43:11,15
47:14 146:19
**announcement**
46:7
**annoyed**  65:18

**annual** 129:9,11
**anonymous** 152:5
**answer** 6:19 19:7
  28:13 29:16 31:10
  32:25 37:19 38:2
  40:24,25 42:12
  50:8 51:12 52:3
  52:10,13,14,15
  60:19 66:15 79:2
  88:18 96:3 118:24
  119:2,4 120:5,5,15
  121:16,17 122:4,5
  122:6 131:6 136:7
  136:10,10 139:13
  144:2,15 146:16
  147:14 149:10,21
  149:22 153:4
**answered** 41:12
  41:13 96:5 152:19
**answering** 65:11
**answers** 3:20 7:1
  7:11 29:25 49:21
  51:1,6 130:21
  155:13
**anticipate** 156:25
**anticipated** 14:3
**anxiety** 44:8,18,18
  44:21,23,23,24
  45:6,13,17,25 46:1
  46:2,16 47:8,12
  48:2 147:1
**anybody** 9:22 11:4
  15:25 35:23,24
  46:12,14 69:15
  73:12 106:5,6
  132:2,3 140:11
  148:24 155:10
**anyway** 55:8 87:5
  140:2
**apologize** 31:16
  34:8 74:4,8 75:25

76:1,17,18 83:24
  84:5 104:2
**apologized** 80:2,5
  83:21 84:5,8,9,10
  84:11
**apparently** 141:3
**appear** 5:12
**appearances** 2:1
**appeared** 161:6
  162:7
**appears** 142:19
**appended** 165:7
**applicable** 163:8
**appreciate** 29:10
  33:1 89:22 156:7
  156:8,10 159:22
**approach** 101:2
**appropriate** 118:4
  118:21 119:10,10
**approximate**
  48:24 49:13
**approximately** 8:8
  8:10 18:19 124:12
  132:15 137:12
  147:20
**approximation**
  8:16
**apps** 8:1 155:25
**area** 18:6 25:17
  61:21 82:24
  103:16
**arm** 67:17 72:4
  74:17,22 83:19
**arrangements**
  103:1 104:15
**arrest** 102:10
**arrested** 14:12
  43:19,24 44:4
  102:9
**arrive** 131:16

**article** 57:17 58:2
**arts** 13:14 14:7
**asked** 5:12 29:21
  29:22 30:16 39:16
  39:17 41:12 42:11
  51:11 67:19 79:20
  79:22,23 83:7,12
  83:13,18 84:24
  85:1,7,18 87:2
  90:12 91:7 96:5
  100:6 101:10
  102:20 103:24
  104:8 130:22
  134:13 139:13
  145:8 146:25
  149:1
**asking** 29:8 30:11
  30:22 36:9,9 39:3
  39:10,13 41:1
  42:2,17 65:7
  118:7 119:6
  120:22,25 121:7
  122:7,10,11,12
  142:2,2 143:19,19
  146:23 153:2
  154:18
**asks** 124:1
**aspirations** 150:19
  152:14,25
**assault** 82:9,10
  105:19 106:8
  148:18
**assaulted** 80:25
  81:6 102:19
  103:19 118:10
**assaulting** 8:24
  79:13 113:16
  151:20
**assaults** 113:19
**assist** 61:17 83:23
  98:17

**assisted** 87:12
**assume** 6:18 30:8
  30:21 94:23
  143:12
**assumed** 9:1 54:14
  62:8 72:4 75:10
  78:24 79:1 90:25
**assuming** 17:13
  30:21 57:12 65:1
  87:24 93:25 140:9
  154:2
**assumption** 57:14
  64:11 84:7 95:4
  135:18
**assumptions** 94:25
**atlanta** 128:13,16
**attached** 163:11
**attachment** 30:24
**attack** 44:8
**attacked** 142:24
**attacks** 43:18 45:6
  45:13,17,18
**attempted** 94:19
**attempting** 76:19
  76:25
**attend** 7:16 48:11
**attendant** 8:25
  44:19 46:2,8,10
  47:17 48:17 49:5
  53:15 54:13 60:22
  61:7,16,21 62:20
  63:12,13 77:4
  79:13 81:1,5 93:5
  93:7 99:16,23
  102:20 103:19
  105:19 113:16,19
  119:15 120:18,21
  121:23 142:22
  147:25 151:21
**attendant's** 79:9
  87:6 104:24

145:25
**attendants** 30:14
57:7,15,18,19 58:5
60:17 61:1,11
63:8 68:25 78:3,5
78:15 147:24
**attended** 13:9,10
13:20
**attendant** 8:2
**attention** 73:13
**attorney** 1:15 2:7
2:15 9:3,11 35:16
38:5 40:6,17
42:14 105:21,21
114:18,20 132:1
142:8,14 144:19
144:20 162:14,15
163:13
**attorneys** 2:4,12
9:1 26:12 146:4,6
146:17
**attribute** 48:3
**austin** 13:25 14:4
**authority** 84:20
94:7,11,24 95:6,7
95:17 120:18,20
122:9 161:5
**authorize** 38:19
**authorized** 162:9
**auto** 129:15
**available** 100:23
163:6
**avenue** 12:19
**average** 124:22
**avoid** 138:8
148:14
**awake** 70:15
**award** 137:12,19
137:22 139:19
144:7 145:10,17

**awards** 141:16
**aware** 93:10,18
99:15,23 111:10
136:18 139:24
140:1 148:10,12
148:13 149:2
152:20
**awhile** 5:23 95:25

**b**

**b** 3:11
**ba** 14:7
**baby** 14:3
**bachelor** 13:9
**bachelor's** 13:10
14:7
**back** 7:3,21 12:4
13:13 22:18 23:4
23:7 24:7,11
25:16 34:10 37:7
44:5,16 52:6 53:4
55:14 57:10 61:19
68:24 71:13 72:17
75:15,24,25 76:8
78:25 79:20 84:24
85:11,17 86:9,12
95:2,22 99:9
101:8 103:11
106:2 107:7 109:4
115:4 116:21
119:11 122:20
125:15 132:24
137:9 139:16,17
141:10 151:15
159:21
**bad** 22:19 92:12
145:23,25
**badges** 105:2
**baffled** 141:24
**bag** 48:20,24
53:22 54:1,3
55:18 56:4 61:25

62:8 63:14,21,23
64:1,2,5,8,12,14
64:17,21,23 65:2,4
65:7,16,17,20,24
65:25 66:12,13,20
66:25 67:10,11,16
67:20,23 68:5
69:21 70:7,18,24
71:2,6,8,10,15,20
71:24,25 72:6,8,15
72:24 73:2,22,23
74:10,18,22,24
77:3,4,5,6,14,18
77:19,22 79:10
82:4 83:18 91:19
92:1,3,8,20 97:8
97:10,16 103:24
103:25 112:14,15
119:25
**baggage** 32:13
**bags** 79:22,23
**bald** 104:20
**balled** 104:18
**ban** 127:13,19
148:18,23
**bank** 17:5,20
**bankruptcies**
14:23
**bankruptcy** 15:8
**banned** 128:22
136:1 151:21
**bar** 14:2
**barely** 12:13 120:7
**barked** 67:11
**barks** 65:16
**based** 42:15 57:23
64:9,9 107:21
117:13,17 118:5
118:20 120:20
122:14 131:14
135:5,9,18 140:3

149:15
**basically** 6:6 9:8
9:10 24:10 27:1
34:17 51:11
157:17
**basis** 26:25 27:9
27:14 29:13 47:15
48:3 88:10 131:25
**bate** 31:23 36:17
36:17 108:1
**bate's** 31:22 90:3
106:15
**bath** 112:13
**beach** 12:15 60:3,5
60:7,10,14 151:7
**bears** 106:15
**beat** 147:25
**becoming** 142:16
**begins** 36:17
**begs** 138:4
**behaving** 74:1
**behavior** 59:3
80:6 83:21,25
84:6 92:23 95:14
111:11 113:8,11
**belief** 49:25
143:19
**believe** 14:15
29:18 44:12 47:2
58:24 60:7,11,15
60:21 61:25 67:14
75:2 92:5 101:4,5
104:18,19,21
109:3 122:18
131:23 137:1,9
138:4 140:1
143:16,17,23
145:19 152:6
159:7,12
**believes** 140:4

**belongings** 84:24
**belt** 30:13
**benefit** 154:11
**benefits** 41:25
   42:23 130:2,11
   141:16 143:9,15
   154:12 155:7
**best** 6:16 41:14
   99:17 114:19
   155:23
**better** 16:19 50:14
**beyond** 13:8 28:14
   38:8
**big** 57:3,11 96:14
**bigger** 12:12
   122:21
**biggest** 47:16,21
   147:19
**bill** 26:23 27:8,14
   131:24
**billing** 142:18
**bills** 132:2
**bin** 53:22 54:4
   55:3,19 56:12
   63:21,23 65:7,21
**bipc.com** 2:14
**birthday** 20:3,25
   48:11
**bit** 7:6 14:22 23:19
   110:11
**black** 89:23 98:1
   106:19
**blames** 94:21
**blank** 106:17
**blocking** 82:22
**blow** 105:7
**blue** 139:25
**board** 5:15 69:13
   88:22 145:24
**boarded** 53:18
   55:18 56:2 67:9

86:25 90:12,23
   91:6 100:25
**boarding** 54:10,14
   54:21 55:1,21
   56:4 62:14,22,25
   64:15,23 69:8
   72:18 90:17 91:1
   91:11,13 97:12
   100:14,15,21
   101:4 130:8 154:3
   154:5
**body** 59:14
**bogota** 126:24
**bonus** 57:9
**bonuses** 57:23
**born** 13:25
**bottom** 90:4
   113:23
**boulevard** 2:12
**breach** 28:5 34:15
   40:15,18 41:2,6
   42:5 115:10
**break** 6:22 7:21
   55:10,11 89:19
   103:4,6 159:18
**breakdown** 43:24
   44:2
**breaks** 155:25
**brice** 19:5,10
   150:22 154:9,20
**brief** 13:7 55:13
   103:10 107:6
   159:23
**briefcase** 90:13
   91:7,17
**briefly** 13:10
   14:15
**bright** 84:16
**bring** 79:22 110:8
   127:22,22

**broke** 46:9 55:16
**brother** 11:18
**brother's** 11:14
**brought** 79:23
   100:23
**buchanan** 2:11
**build** 73:25
**built** 43:2
**bulkhead** 54:8
   82:21
**bullet** 122:25
**bump** 67:17 74:16
   74:16
**bumped** 83:19
   103:25 130:7
**business** 6:1,4,7
   13:11,12 15:9,12
   17:15,24 18:6
   19:24 20:10,14
   21:7 25:7 26:1,7
   26:22 27:8 44:1
   54:12,24 61:22
   63:4,6,6,7 66:10
   66:25 68:11,14,23
   78:7 101:20
   113:20 121:2
   126:21 127:14,18
   130:15,17,19,23
   135:8 146:21
   147:19 148:3
   150:21 154:8,15
   155:4 156:22
   157:1
**busy** 6:24
**buy** 31:8 41:4
   42:24 116:1
   136:12,14

**c**

**cabin** 57:8 72:22
   75:4

**calculated** 124:13
   129:6 134:21
   146:3
**calculating** 140:6
**calculation** 129:22
   135:8 140:3
   144:16
**calculations**
   131:12 135:12
**cali** 21:13,13,16
   22:19 23:2,3,9,20
   24:2,6 25:1,18
   47:19 125:13
**call** 22:4 157:13
**called** 14:24 16:23
   43:22 127:16
   129:3 130:13
   140:21 154:1
   157:15
**calling** 23:12
   41:15 85:17
   105:10
**calm** 76:24 81:20
**camped** 95:25
**captain** 78:17,22
   78:25 79:1,4
   84:18 88:16
   117:25 118:2,3,4,6
   118:19,22 119:6,8
   119:11,13,24
   120:11,19,21
   121:9,21
**car** 132:25 133:1
**card** 35:24 104:11
   138:18
**care** 48:2 76:4,5
   87:18 88:4 104:2
**career** 80:3 83:17
**caribbean** 18:8,10
   128:12

carlos  87:6 90:11
carriage  3:16 33:9
  33:19,21,24 34:1,3
  108:2,9 115:9
  116:22,24 117:14
  118:20 120:13
  121:11,25 122:16
  123:4,9,13 159:8
carriers  124:24
carry  48:20 63:3
  96:19,25
cars  116:10,19
case  1:2 38:6,15
  92:23
cash  144:8,11
cashing  125:9
categorically
  150:4
categories  124:6
category  124:11
caught  67:25
cause  28:5 34:15
  35:1,10 37:8,24
  39:24 40:14,23
  41:10 162:14
celebrating  20:3
cell  7:14 71:19
  155:24 159:18
cents  135:18 140:4
  140:6 141:2
ceo  19:6
certain  50:12
certainly  142:3
certificate  3:5,6
  161:1 162:1
certifications  14:8
certified  121:13
certify  121:19
  161:5 162:6,13
chair  7:9,10

chance  62:6 97:21
  97:22
change  22:11,12
  128:1,3,4 151:13
  155:13 164:4,7,10
  164:13,16,19
changed  7:6 11:24
changes  163:10
  165:6
changing  95:14
chapter  15:10
character  98:1
  114:12
characterize  136:2
charged  44:13
  106:7
charges  105:24
charlottesville  2:5
chat  92:2
check  32:14
  111:25
checked  99:4
  135:24 138:13
child  152:23 153:5
children  10:13,14
chit  92:2
choices  150:11
choose  46:24
chosen  138:12
christian  18:3
circumstance
  67:25
circumstances
  10:19 21:17,19
  99:18 149:4
cities  14:5 24:5
city  19:23 20:23
  20:24 43:21,22,25
  44:3 45:19 47:17
  48:11 60:12 85:25
  85:25 86:3,18,25

105:14 126:24
civil  1:2 6:1,1
claim  28:10 34:25
  41:2 147:16 154:1
claimed  147:11
claiming  43:10
  47:14 127:5
claims  41:18 43:16
clarified  135:19
clarify  6:15 40:5
  108:18
class  25:7 44:1
  54:12,24 61:22
  63:4,8 66:10,25
  68:6,11,14,23 69:3
  69:6,13,16 73:9,11
  78:2,6,7
clear  57:1,1 65:24
  91:8
cleared  102:23
  103:2
clearly  54:5 76:15
client  27:9 128:24
  131:25 147:19,23
  148:4,8
clients  26:23
  127:22 128:8
  130:25
close  72:22 155:14
closed  23:1 57:8
  57:21 69:9 115:17
  115:23,25
closer  20:12
clowdus  1:5,12 2:8
  5:2,9,10 11:13,14
  11:15 16:23 17:1
  17:10,15 26:16
  41:25 55:16 64:2
  107:25 120:5
  137:6 143:3
  151:15 160:2

163:4,5 164:1,2,24
  165:1,2,4,12
club  88:25 98:11
  99:4
coach  63:6 96:17
coaching  7:17
  96:6
cockpit  75:5,18
  81:10,12 82:24
coffee  59:4
cognizant  23:17
cold  46:9
columbia  21:2,2
  24:18 25:23
  125:13
combination
  70:21
come  25:15 27:2
  75:15 78:25 87:1
  119:11 135:7
  159:21
comes  6:5 83:2,5
  141:2
coming  56:23
  147:21
command  64:5
commencing  1:17
comment  54:9
commission
  161:17
common  60:13,16
communicate  53:9
community  18:5,7
  147:19
company  14:24
  16:23,24 17:8,17
  18:1 26:3,17
  127:15 144:5
complained  57:20
complains  119:15

[complaint - correct]                                                                   Page 8

complaint   3:13,21
  4:2 9:18 27:19
  28:1,17 32:10
  34:11,13 37:5,7
  38:10,22,23 39:2,7
  39:21 40:8 67:19
  87:2,11 89:4,24
  90:6,19 91:15
  92:7,18 93:9,13
  97:2,19 98:12,18
  99:8,13,23 100:12
  104:8,9 110:9,10
  110:25 111:25
  112:1,4,8,17 113:9
  114:6,12 157:21
  158:4,6
complaints   84:13
  102:6 114:8,22,22
  157:11
complete   6:19 7:1
  51:14,19 52:4,25
  162:11 165:8
completed   54:11
  54:14,22 55:22
  56:4 91:2,11,13
  97:12 108:22
  163:17
completely   46:24
  67:25 77:11 92:25
  97:3 107:2 148:14
  152:5
complied   29:1,18
  29:20 30:6,9,15,18
  31:5 37:10,15
  38:2 40:1
comply   34:1 62:10
  79:9,14
component   127:12
  129:2,23 130:1,13
  130:16,23 131:4,8
  131:11 135:15

components   127:4
compose   99:11
comprise   126:14
comprised   131:12
computer   85:23
  106:25 133:1
concern   5:14 6:7
  24:23
concerned   24:25
  86:1 93:12,15,17
  106:1 115:22,25
  116:1
concerns   39:1
concluded   115:9
  160:15
conclusions   29:9
conditions   3:16,18
  32:15,18 33:9,19
  33:21,24 34:1,3
  35:9,19 36:8 37:1
  37:14 40:1 42:8
  47:23 108:2,9
  115:9 116:21,24
  117:2,14 118:20
  120:12 121:10,24
  122:16,23 123:3,9
  123:11,12,15
  141:11 159:13
conduct   56:17
conducting   107:16
conference   7:4
confirm   7:24 36:5
  119:9
confrontational
  70:12
confusion   65:19
  65:22
congressman
  152:20

connect   24:5
connected   162:16
connecting   43:22
  85:25 126:23,23
connection   5:24
  11:16 27:7 81:7
consequences
  123:14
consider   131:5
considered   25:6
  47:5 113:6 150:15
  151:11
considering
  105:20 151:3,4,12
constitute   34:4
  123:9 145:11,17
constitutes   117:2
contact   67:16 72:6
  90:5 111:4 157:5
contacted   109:14
contained   112:7
contains   51:12
contend   35:2
context   110:21
continue   96:17
  142:15 146:23
continued   4:1
  114:7,21
continuing   114:1
contract   27:4 28:6
  28:9,15 29:2,3,13
  29:18 30:7,8,10,13
  30:15,19,20,23,25
  31:5,7,9,13 32:15
  32:18 34:4,16,18
  34:24 36:10 37:4
  37:11,15,21 38:1,3
  38:5,8 39:24
  40:15,16,17,19,22
  41:2,3,4,7,9 42:6,6
  42:7,10,15,19,20

115:10 117:2
  137:19 138:5
  141:20 142:10
  143:11,14 159:7
contractor   15:3
  147:21
contracts   28:20
  121:2,6 142:1,3
contractual   6:6
contrary   97:11
control   88:3
conversation   33:2
  33:3,4 39:12,14,17
  39:18,19 75:17
  76:11 81:16,20,23
  82:15,17 85:4,12
  85:21 104:17
  154:10,14,19
  155:10 157:15
conversations
  84:18 116:17
convey   93:11
conveyed   40:6
  103:23
convicted   14:12
cool   89:18
copies   163:14
copy   160:10
corner   32:12 72:5
corporate   9:3,11
correct   10:5,7
  21:9 25:4,24 26:8
  28:8 32:10 34:5,6
  38:7,24,25 40:16
  45:7,9,10 47:4
  48:12,21,22 54:7
  55:23 56:25 62:11
  63:4,13 65:8
  69:23 74:25 75:5
  75:13,19 77:15,16
  77:18,22 78:3,17

[correct - defendant's]

80:20 81:8,9 82:6
82:7,10,11,23,25
83:1 85:3 87:22
89:5 92:13 94:25
97:8,13,14,17
98:12 102:2
103:16,17,20
108:4 109:11
113:13 115:1,3
116:5,11,16
117:18,19 122:17
125:7 127:20
128:3,15 132:2
134:24,25 135:1,2
135:3 138:2,3
143:15 165:8
**corrections** 165:6
**correctly** 46:16
110:19
**correspondence**
107:13 110:4
157:12
**cost** 25:16 27:2
124:15,23,23
125:9,21 126:11
126:12,25 148:2
154:11 155:1,3,7
**costa** 21:3,12
25:23
**costs** 125:24 126:3
126:8,15 127:4,6
154:12
**counsel** 8:7 36:8
38:19 39:6 52:7
124:3 135:24
140:17,20 162:14
163:14
**count** 28:16 32:9
37:5
**counter** 44:2

**countries** 26:8
128:7
**country** 23:6,17
**counts** 59:25
**county** 161:4
162:3,19
**couple** 13:13
14:21 55:10 97:6
107:4 116:9
141:12 156:13
157:12 160:3
**course** 38:21
52:16 56:13 85:19
119:23 156:1
157:6
**court** 1:1 6:11
41:17 43:6 93:2
121:18 136:23
137:2 139:15,17
149:18 151:13
160:3,7,10,13
**courteous** 83:7
**covered** 146:22
**covering** 146:22
**covid** 22:9,9,25
**credit** 35:24
138:18 141:14
145:10,16
**credits** 141:15
143:9
**crew** 117:23
118:12
**crime** 43:20 44:10
44:13 153:11
**criminal** 9:1
105:21 106:10
**criminally** 9:2
**crippling** 46:18
**cross** 3:4 24:14
46:11 156:15

**cs** 163:15
**cs5002471** 1:23
**csm** 61:3
**curious** 141:23
**current** 48:1
127:13,23 147:23
151:20
**currently** 10:6,8
12:15 107:16
134:1 151:1
**curse** 73:17
**customer** 61:4
87:9 90:4 93:7
97:19 99:6,13,19
100:5,20 110:10
111:25 114:6,12
157:14,20
**customs** 86:2
132:20
**cut** 22:18 42:23
**cv** 1:2

**d**

**d** 2:11 9:14
**dad** 14:2
**daily** 18:6 146:20
147:2,12,19
**damage** 135:12,15
144:16 148:1
**damaged** 22:24
23:5,12 24:13
147:16,17
**damages** 124:2,6
124:11 127:4,10
127:12 129:2,23
130:1,13,16,23
131:4,11 146:2,10
147:15 150:10
**date** 1:16 8:14
131:6 164:24
165:12

**dated** 51:2 90:5
108:18 162:18
**dates** 140:23
**daughter** 65:12
**david** 11:13,14,15
**dawn** 1:20 160:1
161:15 162:4,22
**day** 18:16 19:15
19:15,17,21 23:22
25:10 40:7 43:17
45:20,21 46:1,5
48:13,14 49:25
61:12 69:6 83:14
105:7,15 106:2
110:11 114:3
145:24,25 165:15
**day's** 135:7
**days** 8:11 23:9
102:23,24 104:14
156:5 163:17
**de** 9:12 75:25
81:21
**deal** 43:1
**deals** 35:1
**death** 147:25
**debating** 153:4,13
153:15
**december** 140:24
**decide** 146:17
**decided** 64:7
114:9,17,24
**decision** 47:24
78:20 79:2,4
**declare** 165:4
**deemed** 165:6
**defend** 99:15
**defendant** 1:9,15
2:15 41:23,24
**defendant's** 3:13
3:14,16,17,19,21
3:22,24 4:2,3,5

27:23 32:5 33:15
36:13 51:7 89:25
108:5 109:25
111:14 136:21
137:3
**defended** 143:2
**defending** 143:1
**defense** 106:10
**definitely** 78:14
**definitively** 78:9
**degree** 13:10,14
13:19
**degrees** 14:8
**demeaning** 70:11
**demeanor** 59:5
**demonstrating**
133:23
**denial** 120:1
**denied** 117:21
128:23 130:25
154:3,5
**deny** 118:4,22
120:13 121:11
**departs** 57:16
**depending** 157:2
**depends** 25:19
63:12
**deplane** 79:5
94:24 103:18
**deplaned** 45:1
78:20 80:10,12,15
80:20,23
**deplaning** 86:5
88:22
**deponent** 5:3
163:13 165:3
**depose** 40:11
**deposing** 163:13
**deposition** 1:12
3:6 5:18 8:2,5
9:16,23 28:2

31:25 96:19,22
112:25 156:1
160:15 162:1,8,10
**depth** 111:8
**derived** 135:19
**describe** 43:14
44:21 48:8 51:11
101:16 104:16
124:2 130:3 147:1
147:10 154:9,14
157:21
**described** 60:8
**describes** 44:23
**description** 47:13
111:8
**destinations** 57:10
**destroy** 48:16
**detail** 10:20,22
32:22 35:21 111:4
111:5,21,22 112:5
112:7,18,19,22,23
112:24 113:1,7
114:2,23
**detailed** 39:14
49:23
**details** 22:21 50:2
88:9 93:17 114:9
157:18
**detained** 44:4
**determine** 59:20
**determined**
107:22
**develop** 20:9
**developed** 20:10
**devices** 7:15 54:25
62:21
**difference** 78:24
96:14 124:15,17
124:20 125:6,20
133:24 134:6,7

**differences** 134:9
**different** 22:1 42:9
136:8 146:25
**differential** 4:4
124:12 125:19
126:2 136:25
**difficult** 46:19
53:9 70:12
**difficulty** 21:25
130:14
**diffuse** 76:19
**dimensions** 48:24
**diminished** 44:17
**direct** 3:3 5:6 24:3
72:3 132:8,9
**directed** 146:9
**direction** 70:18
**directly** 77:14
**disappeared** 15:4
**disbelief** 67:21
69:24 70:1
**discernible** 134:19
**disclose** 8:16
**disclosures** 124:9
129:5 136:24
**discount** 133:20
133:21
**discouraged** 158:3
**discovery** 124:1
**discrepancies**
92:15
**discuss** 5:13
**discussed** 8:17
10:18 11:9 21:16
32:23 91:12 106:6
138:9 150:16
154:7,10
**discusses** 37:24
**discussing** 32:9
112:11

**discussion** 39:6
82:5
**discussions** 105:9
**disobey** 118:12
119:8
**disorderly** 122:15
**dissipated** 46:16
**dissuade** 94:19
**distinction** 64:4
**distress** 43:11,15
47:14 146:19
147:11
**district** 1:1,1
**divided** 131:18
**divorce** 47:7
**divorced** 10:8
45:16
**doctor** 60:2
**document** 36:16
93:3 134:8 135:5
135:23 143:18
144:11
**documentation**
26:13 125:18
126:5,7
**documentations**
127:10
**documents** 34:4
129:21 133:23
134:2
**doing** 27:2 70:2
87:12 96:24
141:22 144:3
**dollars** 147:21
148:3
**door** 91:14
**doors** 57:8,21 69:8
72:22 90:23 101:6
101:7
**doubt** 129:15

**dozen** 98:14
**drafts** 52:5,17,20
**drag** 152:10
**drill** 56:25 58:23
**due** 130:14
**duly** 5:4 161:7
**duties** 17:10 19:12

**e**

**e** 3:1,11,23,24 9:14
9:14 106:14
107:19,25 108:13
108:18 109:6,19
110:17,21 111:17
111:20,23 112:2
115:6 164:3,3,3
**ear** 7:11
**earlier** 62:1 75:3
85:5 90:16 97:11
98:25 102:18
116:25 125:5
131:24 135:19,22
146:18 147:1,9
149:2
**early** 130:8
**earned** 135:17
**earphones** 46:6,8
65:6,13,15
**easier** 34:7
**east** 2:12
**easy** 78:8
**eating** 26:16
**economic** 134:20
**edit** 97:24 98:2,18
99:11
**education** 13:8
16:7 143:3
**effect** 122:23
**effective** 135:16
146:16
**effort** 62:9 71:14

**eight** 44:11 141:22
**either** 14:23 29:19
48:18 49:6 54:17
59:3 61:15 72:4
74:21 81:23 85:11
104:20,21 129:22
**el** 24:20
**elapsed** 66:11
**electronic** 54:25
62:21
**electronically**
162:10
**elevated** 68:4,5
**eligible** 137:12
139:20,24
**emotional** 43:11
43:14 47:13 48:7
146:19 147:11
**employee** 45:2
93:11,13,19 99:14
99:20 100:9 105:1
162:15
**employees** 15:23
18:17 101:23
152:3
**employment** 16:14
16:21
**empty** 74:11
**encounter** 68:17
75:23 86:10
**encountered** 82:3
**encountering**
53:15
**endeavoring** 113:6
**ended** 147:8 151:9
**ends** 36:17
**engage** 8:8
**engages** 119:20
**engaging** 92:2
108:12

**english** 121:1,8
122:13,14 143:20
144:25
**enjoy** 144:4
**enriques** 71:13
**enriques** 61:5,6
76:14 79:20 80:10
80:14,16 81:14,17
81:20 82:4,12,16
83:2,21,24 84:1,4
84:14,18,23 85:13
85:17 86:16 87:13
88:9,12,16 93:6,25
94:10,12 95:1,8
100:16
**entered** 61:20
82:13
**entire** 43:1 77:20
80:3 92:24 99:17
135:7
**entitle** 141:14
**entitled** 8:18 28:5
117:6 130:1
**environment**
147:23 148:9
151:20
**errata** 3:8 163:11
163:13,17
**erratas** 163:15
**erupted** 73:6
**escalate** 75:25
81:21
**escorted** 86:11,14
**esq** 2:3,10,11
163:1
**essence** 87:18
**estate** 16:24 17:18
21:6,14 26:2,6,10
**estimate** 27:2
**estimated** 135:5

**estimates** 25:15
**evaluation** 47:3,9
48:2
**event** 15:24 64:11
68:12 153:3
**events** 40:7 43:12
50:6,16 82:8 91:3
91:6,11 106:5
148:25 149:16
151:16 152:13,24
153:17
**everybody** 57:3,11
73:9,11
**evidence** 79:7
**exact** 8:13 56:11
76:5 95:12,17
109:13 157:15
**exactly** 36:1 66:18
118:12 154:17
**exam** 14:2
**examination** 3:3,4
5:6 156:15
**example** 46:4
124:22
**exception** 29:3
**exchanged** 52:20
**exclaimed** 73:6
**excuse** 13:4 76:1
136:23
**executive** 129:8
**exhausted** 114:8
**exhibit** 3:13,14,16
3:17,19,21,22,24
4:2,3,5 27:21,23
31:24 32:5 33:14
33:15 36:12,13
38:24 42:9 51:6,7
89:7,25 107:24
108:5 109:4,24,25
110:22 111:6,14
113:10 115:5,12

122:22 125:17
126:4 127:9 134:5
136:20,21,23
137:3 138:22
141:11
**exhibits** 4:1
**exhorting** 56:16
**exit** 107:2
**expect** 142:4,5
**expecting** 23:25
43:19 139:10
**expense** 26:20
**expenses** 26:14,16
**experience** 9:5
15:17 16:6 54:23
55:1 59:16 60:3
64:9
**experienced** 44:21
45:16,18 80:3
83:16
**expires** 161:18
**explain** 40:5 67:21
76:22 92:15
130:15 131:11
145:19 146:13
**explained** 74:3
83:19 92:17
**explaining** 97:23
**explanation** 39:14
81:2 153:12,17,23
**explored** 116:8,15
**extended** 71:21
**extensive** 155:7
**extinguished**
137:16
**extremely** 22:20
46:19 59:4 65:18
73:6 84:15
**eye** 26:6
**eyes** 73:5 77:3

## f

**f** 53:3 75:3
**face** 7:4,4,8,9 73:4
**facilitate** 71:15
**facility** 19:18
**fact** 23:17 39:11
39:18 53:8 58:5
92:15 93:10,18
104:9,10 116:1
146:12
**factor** 22:11
**factors** 158:2
**facts** 38:5,15 40:6
40:14,18 51:15,20
79:7 87:19,21
128:19 144:21
**fail** 158:17
**fails** 97:7 163:19
**failure** 79:9,14
**fair** 6:20 8:5 35:17
38:3,4 40:2 115:2
115:12 124:11,15
124:17 156:3
**fairly** 44:10 50:1,3
142:16
**falsely** 43:20
145:22 147:25
**familiar** 86:3
140:9
**family** 20:12
**far** 16:2,19 25:12
105:25 126:22
147:22
**fare** 125:6,18,20
126:2 134:6
**fast** 26:7,9
**father's** 11:15
**fault** 95:16
**favorite** 14:4
**february** 1:16
161:9,9 162:18

163:3
**federal** 41:17
43:20 44:10 96:10
149:18 153:11
**fee** 26:24 27:1
129:9,12
**feel** 65:13 72:6,24
74:11
**feeling** 44:24
**feet** 56:9 64:12,17
65:2
**felt** 67:10,16,16
74:16,16
**fernandez** 61:4
**fifth** 34:15 35:1,10
37:5,8,23 39:24
40:14,23 41:10
**figure** 44:5 124:14
129:6 131:16
132:4
**file** 15:7 38:11,19
40:8 42:14 87:2
87:11,14,16,19
88:5 99:12,22
100:12 104:8
105:23 112:1
**filed** 5:12 14:24
30:6 33:20 40:11
41:16 90:6 104:9
105:25 110:9
116:14 149:5,17
157:11 158:8
**filing** 105:5 114:5
154:8,20
**filled** 89:3 97:19
157:20
**final** 109:1,3
**finally** 155:4
**financial** 18:2,15
**financially** 162:16

**find** 20:14 27:19
43:25 70:13 80:22
98:17,17 99:5,8,9
109:10 116:22
124:25 130:18
**finding** 142:21
**fine** 7:21 13:14
14:7 29:10
**finger** 76:2,4
**fingers** 24:15
**finish** 55:1 62:13
62:22,25 96:9,18
136:8
**finished** 13:14
69:8 101:4
**firm** 8:9,21 9:7
108:12 140:7
**first** 5:3 8:25
15:23 44:14 53:14
53:17,21 55:17
61:1,7 62:7 66:12
68:6 69:3,5,13,13
69:15,25 73:9,11
73:22 74:2 78:2,6
79:16,19 80:18,23
81:3 82:3 83:15
84:14 86:5,21,22
88:22 89:3 90:6
91:18,23 92:19
95:9 97:7 100:19
100:25 101:9
105:18 108:3
111:9 112:13,18
113:3 124:8,11
149:3,16 150:5
157:25
**fiscal** 141:22
**fit** 40:8
**five** 8:11 10:14
12:14 27:13,16
30:24 45:12 66:16

66:18 67:8 103:4
103:5 131:15
159:18
**fixed** 24:8,25
**flat** 26:24 27:1
143:14
**flew** 23:1,2 43:17
45:19 48:13
133:17,19
**flight** 8:24 23:7
30:14 33:25 43:22
44:4,19 46:2,5,8
46:10 47:17 48:17
49:5 53:15 54:12
57:7,15,18,19 58:5
58:10 60:16,22,25
61:1,7,11,16,21
62:19,20 63:8,12
63:13 68:25 77:4
78:3,4,15 79:9,12
79:13,15,19 80:25
81:1,3,4,5,8 84:14
85:24,25 86:1,6,17
86:21,24,25 87:6
88:22 90:8,8 93:5
93:7,19,23 94:7,10
94:13,15,17 95:9
95:16 98:7,22
99:16,23 100:13
100:14 101:3
102:18,19 103:19
104:10,24 105:14
105:19 108:14
110:6,16,17,23
112:9 113:16,19
117:15,23 118:12
119:15 120:18,21
121:23 127:19
132:16 133:24
134:3 137:21
142:22 145:22,25

147:24,25 151:21
154:4,6 158:11,17
**flights** 5:14 25:1,9
25:12 45:2 57:9
99:1,11 116:5,7,13
116:16,19 126:22
128:9,12,12,13
132:17 133:25
158:15
**flimsy** 49:19
**floppy** 67:1
**florida** 1:1,21 2:13
10:15,16 11:8
15:5 18:6,9,10,21
152:21 161:3,16
162:2,6,19
**flown** 24:15,20
133:20
**fluctuate** 125:1
**fluctuates** 125:14
**fluent** 28:20
**fly** 18:16 21:19,21
21:25 22:1,20
23:13 24:3,4 25:9
25:10 31:9,12
45:23 54:8 81:18
81:19 88:8,15
102:24,25 104:6
110:16 115:11
116:2 126:20
128:7,14 132:8,9
133:25 134:4
136:3,3,11,15
139:25 155:6
156:24 157:1
158:9
**flying** 15:19 23:9
24:1,18 25:6,7,11
30:17 32:2 54:11
54:24 76:5 81:24
85:16 95:3 128:22

130:5,7,24 133:9
133:11,13,18
158:12
**focus** 127:5
**focussed** 33:19
**folks** 26:23
**follow** 84:24
101:10,25 158:17
**followed** 102:3
**following** 9:2
45:20,21,25 46:5
56:10 105:14
109:15 117:1
149:5
**follows** 5:5
**foot** 31:3
**forced** 114:5
**foregoing** 162:7
165:5
**forfeited** 123:16
123:24 136:17
**form** 156:20
158:19,24 159:4
159:10,15
**format** 114:4,25
**fort** 2:13 25:10
124:16,18 125:22
126:9,13 127:8
132:7,10,14,19,24
**forth** 52:6 106:2
125:15
**found** 8:23 9:7
46:19 128:5
**four** 8:11 10:16
23:23 66:16,18
67:8 131:9 132:5
132:12,13 134:17
135:4 151:8 157:2
157:3
**fourth** 28:5

**frame** 109:13
**free** 130:2,5
**frequency** 22:22
25:9
**frequent** 22:16
**frequently** 22:3,7
25:17
**fresh** 113:24,25
**friend** 10:11 16:3
20:2
**friendliest** 24:18
**friendly** 59:9
**friends** 59:23
147:7 150:23
**front** 6:11 17:4
53:19 56:22 61:13
68:18 75:7 76:9
81:12,14 82:17
85:15 96:9 100:17
101:5 102:4 121:1
121:8
**frozen** 58:14,16
89:14,18 115:23
**frustrated** 114:24
**frustrating** 158:7
**full** 6:19 7:1 30:22
86:20
**fully** 53:12 70:15
**further** 62:16
64:13 153:12
159:25 162:13
**future** 63:25 64:11
123:17 130:14
138:23 139:8,22
151:2 153:19
156:17

**g**

**gaetz** 152:21
**gain** 154:22,24
**gained** 154:21

**galley**  53:19 61:21
  81:14 82:24 86:7
**gardens**  18:24,25
  19:18
**gasped**  99:21
**gate**  84:25 99:3,10
  100:16,24 103:16
**gates**  86:24
**gather**  84:24
**general**  10:21,25
  21:3 63:5 87:25
  88:11,12 93:3,6,9
  148:22
**generalities**  92:22
**generally**  5:24
**generate**  98:12,14
  134:11
**generated**  97:3
**gentleman**  103:14
  105:10
**getting**  7:16 17:5
  23:13 24:24 26:23
  56:20 85:23 89:21
  116:19 142:7
**gg**  161:17
**girl**  20:8 46:5,7
**girlfriend**  22:4
  25:18 147:6
**gist**  81:22
**give**  8:13 11:21
  13:7 17:23 23:4
  27:2 30:22 31:22
  34:21 46:4 54:24
  58:18 63:7 65:16
  65:17 66:20 67:11
  67:20,23 68:5
  71:2 77:4,5 80:4
  82:8 89:9 90:12
  91:7 93:3 97:24
  104:22 111:4,12
  112:14 124:18

146:16
**given**  20:18 42:12
  100:7 112:24
  118:1 135:5 165:9
**gives**  44:17 130:5
  130:6 137:21
**giving**  7:1 32:25
  49:23 113:7
  136:10
**glaring**  65:15 73:5
**go**  16:14 21:13
  24:15 25:21 26:9
  31:2,16 32:24
  37:7 44:6,7,8,15
  46:1,19 47:6
  52:12 55:7 57:2,2
  57:2,22 58:19
  60:8 83:9 85:11
  102:15 104:13
  106:3,25 107:7
  109:4 112:22
  113:1 115:4
  116:21 121:21
  122:20 124:2,5
  125:15 130:18
  140:2 141:10
  144:1
**goes**  81:10 125:15
**going**  6:18 8:17
  15:6 21:12 22:10
  22:12 23:10 27:20
  31:17 34:17 37:7
  41:11 44:13,25
  47:7 55:18 69:19
  72:18 74:5 75:10
  78:2 85:12 86:22
  86:23 87:4,14,16
  87:18 90:17 93:1
  93:1,2 96:1,17,18
  105:23,24 106:1,7
  107:2 109:23

111:7,7,12,20
  112:5 141:12,20
  144:1,2 148:3
  152:10 157:3
**gold**  104:11
**good**  33:5 49:5
  53:19 58:21 67:7
  104:9,10
**google**  134:11
**gotten**  157:24
**grab**  86:23
**grabbed**  100:23
**grad**  13:11,13
**grade**  28:14 38:9
**great**  13:24 32:22
  42:25 43:3 48:18
**grown**  67:23
**guaranteed**
  117:14
**guard**  68:1
**guess**  9:25 10:3
  12:3 14:25 24:8
  64:7 105:13
  132:12
**guy**  74:3 135:19
  140:4,5,11,22
  141:3,7 144:10,14
**guy's**  140:14
**guys**  58:14 89:10

**h**

**h**  2:10 3:11 164:3
**half**  112:11 132:21
  141:25 142:17
**hall**  55:8
**hand**  24:10 66:23
  71:18,19,19,20,22
  71:24 72:8 74:10
  76:2 77:19,20
  91:16 161:8
**handed**  66:1 70:7
  70:23 71:6,8

91:18 97:16
  103:24
**handing**  73:23
**handle**  142:15
**handling**  16:11
**hands**  71:18 72:12
  72:13 73:4,20
**hang**  31:15 56:3
  89:11 103:7 124:4
**happen**  23:25
  44:25 148:7
**happened**  40:7
  49:23,25 51:11
  61:15 65:10,17
  68:12,16 69:16,18
  70:20 72:25 74:6
  75:8 76:3,24
  79:24,25 83:11,13
  85:7,10 87:10
  99:22 100:12
  102:20,21 105:18
  111:13,18 122:9
  122:11 142:9
  144:21 157:19
**happening**  26:19
  66:3 157:22
**happens**  23:18
  86:17 101:3
**happy**  15:21
**harassing**  96:20
  96:21
**hard**  26:6,9
**harrison**  150:25
**hate**  30:21
**head**  53:19,23
  55:3 67:20 69:24
  69:25 101:23
  102:17 103:15
  104:4,23 105:10
**health**  47:3

**hear** 33:2 62:12
  65:6 68:7 73:9
  75:17 76:12,15
  81:17,18 82:1,19
  85:15 89:23 120:7
  145:4
**heard** 54:5 57:7
  62:7,13 63:19
  65:24 73:13 76:9
  81:13 101:11
  102:21
**hearing** 88:7
**height** 11:21,24
  12:3
**help** 31:6 34:25
  61:16 68:21
  108:18 110:21
**helpful** 134:15
**helping** 85:24
**herald** 18:4
**hereto** 165:7
**hesitant** 28:21
**high** 13:8
**highlight** 123:4
**highlighted** 90:14
  143:8,21 145:1
**hillsborough**
  161:4 162:3,19
**hire** 105:21
**hired** 38:4 142:8
  144:19
**hiring** 106:10
**hispanic** 104:20
  104:22
**history** 104:11
**hit** 72:2 73:7,20,24
  74:4,11,13,13,14
  74:19 75:6 76:21
  77:24 82:6
**hitting** 83:20
  104:1

**hold** 17:8 20:17
  105:5
**holding** 16:24
  17:17 73:1,21
**hole** 98:2
**home** 23:14
  105:16,17,17
  151:16 157:23,23
  157:24 158:1
**honest** 7:1 11:4
  32:25 40:25 62:23
  66:15 125:25
**honestly** 144:3
**honesty** 116:18
**honored** 30:19
**hope** 27:5
**hoping** 61:15,17
  61:18 75:14,15
  129:16
**hostile** 24:19
**hotel** 136:12
**hotels** 116:10
**hour** 55:12 112:11
  125:22 131:17,19
  131:20 132:15,20
  134:20 135:8,9
**hourly** 26:25 27:9
  27:14 131:16,25
  132:2
**hours** 23:23 24:25
  27:17 88:24 89:1
  98:4,9,11,22,25
  99:10,11 126:23
  131:9,10 132:5,12
  132:13,17 134:18
  135:4 141:22,23
  141:25 142:6,17
  142:18
**house** 126:8 151:6
**how's** 106:18

**huge** 46:12
**hundred** 97:25
  116:10 125:1
**hyper** 59:4

**i**

**idea** 10:21 11:21
  12:5,7,13 60:18
  79:24 83:12 87:25
  93:4 118:6 138:16
  141:9 151:25
**identification**
  27:24 32:6 33:16
  36:14 51:8 90:1
  108:6 110:1
  111:15 136:22
  137:4
**identified** 25:3
**identify** 31:6 97:7
  121:6
**idle** 92:2
**iii** 2:3 163:1
**immediate** 46:18
**immediately** 8:23
  62:10,21 63:3
  65:21 75:25
  109:15 148:4
**immigration** 23:3
  24:17 47:19 86:3
  132:19,21
**impact** 46:12
  72:24 74:15
  112:14 151:22
  152:14 153:18,20
  153:24
**impacted** 22:22
  47:24 67:15 71:25
  74:24 77:6,22
  82:4 119:25
  153:10
**impair** 151:17

**impeded** 127:21
  128:8
**impediment**
  127:13
**implication** 31:1
  94:20
**implying** 94:21
**important** 58:10
  64:3,4 113:17
**imposed** 130:14
**impossible** 99:9
  114:16
**impression** 58:7
  62:18 88:11,12
**inability** 128:7
  155:6
**inaccuracies** 97:7
**inasmuch** 29:8
**incident** 8:10,22
  8:23 11:2 14:17
  15:16 22:19 44:12
  48:7,15 88:10
  90:7 148:12,23
  157:8 158:23
  159:3
**incidents** 47:15
  48:3
**include** 97:9 105:6
**included** 50:21
**including** 56:20
  117:9 125:21
**income** 131:14,18
**incomplete** 135:6
**inconvenience**
  84:9,12 134:19
**inconvenient**
  128:17
**incorporated** 17:2
  34:3 116:25
**incorrect** 90:20

**increase** 25:16 124:19 127:3,5
**increased** 126:7 126:15,17 127:8 134:3
**incurring** 134:3
**indicate** 137:15,16
**indicated** 80:16 104:25 138:24
**indicates** 137:18
**indication** 138:21 139:4,20,23 141:6 148:6
**individual** 61:2 68:10,12,13,22 69:10,17 79:11 80:24 102:17 104:16
**individuals** 61:9 101:7 102:4 103:13 104:21
**information** 17:4 26:24 39:4 79:4 90:5 113:8 118:5 140:8
**informed** 101:23 102:18
**informs** 115:8
**ingersoll** 2:11
**initial** 68:17 75:20 75:23
**initially** 20:8 129:4
**instagram** 14:16
**instance** 155:20
**instruct** 91:22,23 96:2
**instructing** 57:1 66:12 96:4
**instruction** 54:6 62:7,10,12 63:18

65:24 91:16,19 92:11 112:14 158:18
**instructions** 79:10 117:22 118:1,20 119:8 121:23 122:16
**instructs** 66:13
**intend** 6:23 139:4 139:21
**intentional** 76:22 76:23
**interact** 28:21 60:25
**interacted** 12:13 61:7 88:1 93:8 104:19
**interacting** 56:1
**interaction** 53:21 55:17 112:23
**interactions** 15:22 84:14
**intercom** 43:23
**interest** 14:19 114:19
**interested** 111:10 162:17
**internal** 107:16 108:22 110:18
**international** 13:17 57:9 101:24 126:12 128:18,19 132:11
**internet** 9:9,10
**interpret** 38:8
**interrogatories** 51:6
**interrogatory** 3:19 49:21 51:1,3 51:10

**interrupted** 101:11
**intertwined** 21:10
**interview** 157:17
**intimidating** 67:4
**investigation** 107:17 108:15,22 110:18,23 157:7 157:16
**investment** 20:11 130:19
**investments** 21:7 21:15 26:2,6
**invoice** 27:5
**involuntarily** 119:25
**involuntary** 119:21
**involved** 16:22,25
**ipad** 8:3 49:15 62:5,5 63:10
**irritated** 65:18
**island** 12:19 13:2
**islands** 18:8
**issue** 15:20 39:25 40:16,23
**issued** 32:1
**issues** 6:5
**items** 102:1,3

**j**

**jacking** 142:6
**january** 51:2 137:8 140:23,24 141:3
**jeopardize** 119:21 159:2
**jet** 23:13 139:25
**jetway** 79:21 83:4 83:8,9 85:2,12,19 85:20,22 100:17 102:16

**job** 1:23 17:10 27:3 39:25 40:2 60:17
**jobs** 26:24
**joke** 132:22
**judge** 6:11
**july** 50:5 52:23 161:18
**june** 5:15 11:25 12:4 13:1 15:17 19:22 22:3,6,16 25:17 32:2 37:2 43:12 45:1,12,19 45:22 46:22 47:22 48:20 49:14,24 53:16 60:23 90:6 90:7 107:20 108:14,18,24 109:6,8,19 110:3 110:11,24 114:2,2 115:4,5 122:23 139:6,20 141:8,8 148:23 149:4,17 151:16 152:13,25 153:17
**jury** 6:12 145:3,5 145:8 146:4,6,13 146:17
**justifiable** 41:25
**justified** 92:16

**k**

**keep** 6:25 94:13,17 96:3 144:3 149:25
**keeping** 26:5
**kelly** 2:10 5:11 41:19 95:25 96:12
**kelly.kolb** 2:14
**kept** 85:16 129:16 148:13
**key** 128:13

**kicked** 44:4 93:19
 93:23 94:1,6,10
 95:9 142:25
**kind** 6:3 33:11
 34:22 113:18
 156:10
**kirt** 9:12
**knew** 22:10 87:19
 87:21
**know** 6:4,23,24
 8:20 10:21 15:4
 15:25 21:18 22:9
 23:16,25 25:5,11
 27:4 29:16,25
 30:9 37:6,18,18,20
 37:21 40:16,22,24
 41:17 42:19,21
 44:9 48:6 49:13
 50:8,9,12,18,21
 52:1,3 53:7,21,25
 54:3 55:2 56:11
 56:11,12,24 57:5,6
 57:13,13,14,14
 58:6 59:2,25
 60:18 61:3,8
 63:16,25 64:24
 66:14,18 68:4,20
 69:8 70:9,10,14
 72:7,12 73:11,25
 74:19,23,24 75:1,8
 75:11,11,13,14,16
 76:13,14,21 78:8
 78:23 79:25 80:16
 81:11,13 82:12,16
 83:13,15,18 84:20
 84:22 85:8,10,20
 88:3,18,19 89:19
 90:22,23,24 91:13
 91:24 92:21,22
 93:16 94:20 95:4
 95:4,5 99:7,12

100:8,9 104:22
 105:22,23,24,25
 111:24 112:22
 113:18 116:6,9
 118:8,24 119:2,4,5
 119:6,7,9 120:8,15
 122:8,10 129:13
 129:13,13,14,14
 130:5,7 131:18
 132:19 140:5,7
 142:6,10,13,24
 144:10,15,17
 146:5 147:14
 148:8,8 149:6,6,7
 149:10,15,24
 150:2,2,6,8,9
 151:7,8 153:11
**knowing** 72:10
 100:10
**knowledge** 29:19
 58:4,9 72:1,3
 78:16,19,21 79:3,6
 79:18 80:11,19
 88:8,14 93:22
 94:6,8,9 119:13,17
 123:20,22,23,25
 140:13 148:16,20
 148:21 149:12,14
**knows** 21:19,20
 131:22 148:24
 151:23
**kolb** 2:10 3:3 5:7
 5:11 7:23 12:10
 27:25 28:12 29:10
 29:12 30:2,4 32:7
 33:14,17 36:12,15
 37:17,22 38:18
 39:5,10,16,21,22
 40:20,21 41:13,16
 41:21,22 43:5,9
 49:7,10,12 51:5,9

52:9,11,18 55:7,11
 55:14,15 58:21,22
 64:4,19,20 80:7,9
 88:6 89:15,17
 90:2 92:6 93:20
 93:21 95:21 96:2
 96:6,9,13,16,21
 97:1 98:8,10
 99:24,25 103:3,7
 103:11,12 106:24
 107:4,7,8 108:7
 109:23 110:2
 111:16,23 113:21
 113:22 118:15,17
 119:1,18 120:4,24
 121:15,18,20
 122:3 124:8,10
 127:1,2 128:20,21
 129:18,20 134:23
 136:20,25 137:5
 139:11,12,15,18
 143:16 144:23
 146:1,7,8 149:20
 151:14 152:7,8
 156:6,10,20
 158:19,24 159:4
 159:10,15 160:1,8
 160:9

---

**l**

**l** 9:14
**label** 90:3 106:15
**labeled** 108:25
 109:20 110:12
 122:24 141:13
**lack** 16:19
**landed** 43:21
**language** 117:17
 120:1 121:1,8,24
 122:8 141:18
 143:8,20 144:25
 145:1,13

**laptop** 8:1 63:11
 99:7
**large** 1:21 66:25
 162:6
**las** 2:12
**latch** 91:24
**late** 106:3
**latin** 18:11 20:5,21
**latitude** 63:7
**lauderdale** 2:13
 25:10 124:16,18
 125:22 126:9,13
 127:8 132:7,10,14
 132:24
**lauderdale's**
 132:19
**laugh** 77:21
**law** 2:4,12 8:8,21
 9:7 93:2 108:12
 154:1
**lawsuit** 5:12,14
 10:19 11:2,9
 14:24 21:17 30:5
 31:21 32:3 33:20
 38:20 40:11,14
 41:16 42:8,15
 43:10 47:15 48:4
 56:14 82:9 88:10
 116:14 124:7
 142:18 149:5,18
 151:24 154:8,16
 154:20
**lawsuits** 14:22
**lawyer** 6:24 7:9,10
 36:2 40:9,11
 41:19 106:11
 109:11
**lawyer's** 39:25
 40:2
**lawyers** 35:25

**layover**  132:8,18
    133:2
**leans**  83:6
**learned**  121:22
    138:25
**leather**  48:25
    90:12 91:7
**leave**  8:4 63:14
    103:14 146:3,6,16
**leaving**  80:18
**led**  58:24
**left**  13:12 32:12
    50:3 51:23 62:4
    66:22 71:12,20,21
    71:24 74:10 76:8
    77:19 102:1
    144:22
**leg**  62:4,16 66:22
    67:17 74:17 83:20
**legal**  1:18 6:5 9:4
    17:20 18:6 29:8
    30:12,24,25 93:3
    95:17 105:20
    137:19 147:19
    163:23
**legitimate**  147:24
**legitimately**
    147:24
**legs**  62:1,2,2 64:8
    64:22 65:5 66:21
**leon**  9:12
**letter**  3:7 108:24
    109:1,3,17 110:3
**level**  16:2 31:3
**liable**  9:2
**life**  32:19 43:2
    46:24 62:22
    146:20,20 147:3
    147:12,12
**lifted**  24:24

**light**  146:12
**likelihood**  155:2,3
**limit**  98:1
**limitation**  150:11
**limitations**  22:12
    114:4
**limited**  21:20
    23:14,18 113:4
    114:13,14,15
    117:10
**limiting**  22:11
**line**  19:20 42:18
    89:4 157:11 164:4
    164:7,10,13,16,19
**lines**  98:14
**linked**  20:23
**list**  86:21
**listed**  124:5
**listen**  118:11
    139:9
**lists**  117:10 122:25
    140:22
**litigation**  10:22
    155:2 162:16
**litigations**  6:2
**little**  14:22 23:19
    28:23 46:5,7 63:7
    97:25 110:11
    122:21 141:24
    142:11
**live**  12:15,19
    125:23 146:5
**lived**  12:17,20,22
**lives**  21:12 60:7,10
    60:11
**living**  10:9 12:24
    13:1 155:6
**llp**  2:3
**loan**  6:3 17:6
**located**  18:23

**location**  151:6
    157:22
**locations**  128:15
    133:25
**locked**  23:11
**logged**  158:6
**london**  22:22,23
**long**  5:21 6:24
    12:17,20 17:12
    23:20 45:19 49:20
    104:11
**longer**  42:24 43:4
    115:11 152:9,10
**look**  8:13 23:24
    26:1,9,12 38:5
    42:18 53:4 61:15
    65:6,14 70:17
    76:22 101:22
    107:19 114:11
    119:19 120:25
    126:11,22 133:1
    134:5
**looked**  12:8 14:15
    26:10 40:17 67:10
    68:16,18,22,24
    69:18 72:12,17
    73:1,3 109:5
    116:23 155:1
**looking**  9:4 20:10
    20:16 21:6,14
    34:14 38:23 41:24
    47:20 57:10 64:14
    64:16,22 65:5
    67:3 68:19,20,21
    69:18,19,22 70:6
    70:23 72:9,14,15
    74:9,20 77:9,14
    97:17 105:19
    108:9 113:10
**looks**  91:16 106:14
    137:25 138:3

**lose**  130:9
**loss**  127:18 129:3
    130:1,17 145:20
    146:14
**lost**  15:14 55:6
    67:5 127:23
    130:22,24 132:5
    145:24 148:4
    154:21
**lot**  19:19 24:16
    25:1 26:18 34:7
    46:23 50:11 59:4
    97:24 139:9
**loud**  36:24 56:15
    56:21 58:25 68:2
    68:6 73:6,9 76:16
    142:19 145:3,9
**lounge**  87:10
    100:6 126:20
    129:3,8 157:25
**love**  14:4 96:15
**lowered**  129:5
**loyalty**  35:3 37:9
    37:25 42:6,7,22
    130:1
**luxury**  54:25
**lydia**  150:25

**m**

**m**  3:1
**machine**  89:14
**magazines**  18:8
**magistrate**  43:8
    96:10
**mail**  3:23,24
    106:14 107:19,25
    108:13,18 109:6
    109:19 110:17,21
    111:17,20,23
    112:2 115:6
**main**  2:4

**maintain** 156:22
  157:1
**maintaining**
  127:13 147:22
**majority** 19:17
**making** 29:11
  47:24 84:6 93:18
  94:25 111:10
**male** 102:12
  104:20
**males** 24:18
**man** 6:24 12:14
  67:23 81:19 85:16
  85:17 88:8,15
  105:25 121:2
**management**
  19:15
**manager** 23:13
  61:4
**manic** 56:15,21
  58:25 59:13
**manner** 56:15
  83:7
**mannerisms** 59:3
  59:9,11
**manufacturing**
  19:15
**marine** 61:24
**marino** 8:25 12:2
  48:17 49:5 53:15
  54:6 55:17,24
  56:3 58:25 60:22
  61:1,17 64:22
  65:2,6 66:12
  67:15 68:2 69:22
  70:3,7,16,23 71:2
  71:11,15,17,25
  72:16,24 73:16,19
  74:12,13,25 75:4
  76:12,15 77:6,14
  77:18,22 78:17

80:1,5 81:10,18,22
82:4,5,16 83:14
84:10,20 85:13,15
85:15 86:6,10
87:3,6,11,15,17,25
88:1,2,7,9 90:11
91:19 92:23 93:8
93:10,23 94:6,19
94:20,21,22,24
95:1,2,7,8,13,13
95:17,20 97:8,9,16
99:20 100:2
105:23 112:13,15
112:23 118:2,18
119:5,24 142:22
142:24 144:21
148:18 150:8,9
152:1,2
**marino's** 56:17
  62:7 75:17 80:6
  83:21,25 84:6
  88:15 92:19 95:16
  111:11 113:8,11
**mark** 27:21 33:14
  36:12 51:5 107:24
  109:23
**marked** 27:23
  32:5 33:15 36:13
  42:9 51:7 89:25
  108:5 109:5,25
  110:22 111:14
  136:21 137:3
**marriage** 47:10
**married** 10:6
**mask** 30:14
**masks** 53:9,10
  54:17
**massachusetts**
  10:17
**massive** 148:2

**master's** 13:14,16
**matt** 152:21
**matter** 103:1
  104:2
**matters** 6:1
**mean** 19:19 23:15
  28:18,19 30:21
  35:20 47:17 48:10
  48:15 49:8,18
  50:11 55:2 60:10
  66:15 68:3 70:9
  89:18 90:21 95:11
  102:8 104:18
  119:6 141:18
  143:8,25 147:7
  149:1 153:12
**means** 95:12
  143:11,12 145:13
  145:14 146:5
**meant** 38:14
**media** 14:16
**medical** 45:7
  59:19 60:3
**medications** 6:25
**meet** 9:22 21:11
  87:1 127:22 128:8
  128:23
**meeting** 9:21
**member** 104:11
  113:14 117:23
  129:7 130:4,9
  145:11,18 158:17
**members** 137:7
  141:14
**membership**
  123:21 129:9,12
**memory** 50:7,14
**men** 101:18
**mental** 43:11,15
  47:3,14,23 146:18

**mention** 91:18
  126:19 132:19
**mentioned** 33:12
**mentions** 91:15
  108:2
**message** 110:15,15
  113:3,24,25
**messages** 65:12
**met** 20:8 21:5
  26:11,11 100:16
  100:24 140:10
  150:16,18
**method** 140:14
**methodology**
  140:6
**mexico** 19:23
  20:23,24 43:17,21
  43:22,25 44:3
  45:19 47:17 48:11
  85:24,25 86:3,18
  86:25 105:14
**mia** 25:11
**miami** 9:13,14
  12:15 13:17 18:4
  18:24,24,25 19:18
  44:5 59:24 60:3,5
  60:7,10,11,14
  101:24 103:15
  124:16,18 126:8
  126:12 127:8
  128:18,19 130:20
  132:11,13,21,23
  147:18 149:18
  151:6 155:6
  156:22,24 157:1
**mid** 10:1,3
**mile** 135:18 140:5
  140:6 141:2
**mileage** 123:16
  141:15 143:9
  145:10,16,20

**miles** 4:5 26:19,21
  115:17,24 116:4
  116:10,15,19
  123:24 125:9,12
  126:19 135:17,20
  135:25 136:3,11
  136:16 137:12,15
  137:19,22 138:1,8
  138:14,17,22
  139:20,25 140:14
  140:23 141:7,14
  144:12 146:11,12
**military** 13:3,5
**million** 147:20
**millions** 148:2
**mind** 57:13 62:17
  158:22
**minimum** 157:3
**minor** 104:13
**minute** 25:15 31:2
  34:21 55:10 58:18
  103:4,5 107:1
  159:18
**minutes** 66:15,16
  66:19 67:8 83:22
  85:23 91:3 92:14
  98:13,14,15,16
  99:1 107:5 125:23
**minutiae** 93:17
**missed** 103:22
**missing** 86:1
  135:10
**mission** 22:9
**misunderstanding**
  102:22 104:5,7
**moment** 20:17,17
  32:10 33:12 49:3
  51:22 54:16 58:8
  72:11 126:6
  127:21 130:12
  131:2,7 136:15

148:4,20
**moments** 71:5
**monetary** 130:10
  131:3,14
**money** 24:5 25:13
  41:7 42:23 43:1
**monitor** 18:3
  86:22
**monitored** 100:22
**monopolizes**
  128:19
**monopoly** 23:10
  128:18
**month** 20:6 22:8
  22:15 25:19,20
  46:22 124:13,19
  125:18 131:10
  132:18 138:18
  157:2,4
**monthly** 124:12
**months** 11:3 15:15
  44:11,14 46:20
  128:1 134:14
**morning** 53:20
  56:19 57:6 58:11
  70:14,15 74:1
  81:6 84:16 90:22
  98:23 100:6
  110:14
**mouth** 53:5 71:9
  96:3
**move** 30:3 41:15
  41:20 43:5 56:16
  71:17 74:10 80:7
  118:15 129:18
  141:1 142:22
  143:5 156:18,23
**moved** 70:18
  71:10 72:15 77:14
  79:11

**movements** 59:14
**moving** 14:13
  59:12,14 71:15
  77:3
**multiple** 24:5 47:5
  81:18 132:17

**n**

**n** 3:1,1 9:14
**name** 5:8,10 11:12
  11:14,15 43:22
  87:6 101:11 105:2
**named** 152:20
  161:6
**names** 100:7,8,21
  104:23
**narrative** 49:23
  51:14,19 52:2
**navigate** 85:24
**near** 156:17
**necessary** 7:15 8:1
  87:4 165:6
**need** 6:22 7:14
  18:25 47:2 55:7
  62:13,25 63:17,21
  63:23 64:1,3,6,10
  67:9 89:8 91:24
  92:1,3,8,19 97:10
  99:22 101:13,25
  103:1,5 104:14
  106:20 134:11
  157:1 160:10
**needed** 22:1 95:15
  105:21 114:18
**negate** 152:17,19
**negatively** 153:10
  153:20,24
**neighbor** 150:20
  150:24
**neither** 162:13
**nervous** 22:20
  23:16

**net** 147:20
**neukomm** 1:20
  161:15 162:4,22
**never** 13:6 14:14
  14:19 15:20 22:2
  22:10 32:19 35:20
  46:13 47:6 48:10
  52:1 54:12 61:18
  62:6,14,16,20,22
  64:13 67:23 71:12
  71:21,24 75:16
  77:19 80:2 83:16
  83:25 95:2,22
  100:7 115:25
  116:6,8,12,15
  118:6 119:8
  131:24 135:8,9
  145:20 146:15
  158:8,20
**nevertheless** 46:21
**new** 127:14,22,23
  128:8,13,16
  130:18
**newspaper** 18:5
**newspapers** 18:2
**nice** 14:6
**night** 106:2,4
**nodded** 53:19
  55:19
**nonresponsive**
  30:3 40:20 43:5
  64:19 80:7 93:20
  95:21 98:8 99:24
  113:21 118:15
  127:1 128:20
  129:18 139:11
  146:1,7 152:7
**nope** 72:23
**normal** 101:20
**normally** 15:21
  54:23 158:9

**notary**  161:16
  162:5 165:13,19
**note**  163:10
**noted**  165:7
**notes**  162:12
**noticeable**  24:14
**nullification**
  135:16 146:11
**number**  43:3 71:4
  117:20 121:21
  122:25 124:6

**o**

**o**  3:1 9:14,15
  12:20 26:2
**oath**  3:5 5:4 6:10
  161:1
**obey**  117:22 118:1
  118:19 121:22
  122:16
**object**  29:7 30:2
  37:20 41:11 95:24
  158:24
**objection**  12:6
  37:16 38:16 39:3
  39:9 40:20 43:5
  51:13 64:19 80:7
  87:23 92:4 93:20
  95:21 96:7 98:8
  99:24 113:21
  118:15,23 119:16
  120:3,16 121:14
  122:2 127:1
  128:20 129:18
  134:22 139:11
  144:18 146:1,7
  149:19 152:7
  156:20 158:19
  159:4,10,15
**objections**  29:11
**obligation**  119:14

**observe**  59:11
**observed**  56:17
**obtain**  13:19
**obtaining**  127:14
**obvious**  142:16
**occasion**  20:4
  23:21 24:23 27:8
  27:13,16 32:17
  33:23 35:8,13
  51:12 102:13
  131:24
**occupants**  119:22
**occupations**  16:19
**occupied**  17:18
**occurred**  82:10
  85:22 88:1 91:3,6
  93:4 111:8 149:5
  149:17 157:7
**october**  137:10
**offensive**  142:21
**office**  23:6,12,12
  23:23 24:9 150:12
  150:14 151:2,18
  152:15,24 153:1,9
  153:19,24
**officer**  17:14 23:3
**officers**  17:14
  24:17
**offices**  23:1
**official**  161:8
**offset**  6:8 11:17,19
  15:13 16:15 17:18
  17:23,25 18:18
  19:4,7,13,24 25:24
  26:22 27:8 127:16
  128:10
**oftentimes**  21:11
  132:9
**oh**  15:3 36:22
  49:11 84:15 96:15
  98:19 107:18

**okay**  6:16 7:17,19
  7:22 8:12,17,19
  9:6 13:3 15:3
  18:17 19:2 29:24
  32:25 33:3,4
  35:22 38:17 44:6
  45:11 47:12 49:11
  50:10,15,25 51:22
  52:23 53:6,14
  55:5,7,9 58:17
  60:1 61:6 66:17
  67:7 69:21 71:25
  75:8 79:17,21
  80:18 86:8 87:7
  89:15,18,20 91:15
  97:23 101:1 103:9
  106:21 111:2
  113:5 116:8 119:7
  123:7,23 126:18
  129:25 134:16
  135:15 136:8,13
  142:12,23 143:16
  143:22,24 144:6
  146:18 149:9
  150:7 151:10
  152:12 155:16
  157:5
**olas**  2:12
**older**  11:14,18
**onboard**  16:11
**once**  14:19 54:10
  62:22 156:23
**ones**  47:16,21
  100:21 133:11
**ongoing**  110:22
**open**  86:23 90:24
  91:14 147:8 151:8
  151:12
**opened**  17:4,5
**operated**  64:10

**operation**  16:7
**operational**  19:14
**operations**  19:16
**opinion**  153:13,14
**opinions**  153:14
**opportunities**
  20:11,11,14 21:7
  26:1,3 97:24
  130:17,19
**opportunity**  40:10
  128:23 130:23,25
**opposed**  88:16
**opposite**  137:17
**options**  23:18
  25:12
**order**  84:21
**ordered**  79:8
**original**  25:16
**outcome**  162:17
**outside**  46:13
**overbooked**  154:4
**overhead**  53:22
  54:4 55:3,19
  56:12 63:21,23
  65:7,21 90:13
  91:8
**overhear**  76:11
  81:15 84:17
**overheard**  76:12
  82:15
**oversold**  154:4,6
**owned**  12:21
  17:18

**p**

**p.m.**  1:17 160:15
**page**  3:2,12 26:24
  30:24 98:16 99:8
  114:12 117:5
  122:24 140:22
  141:13 144:7
  164:4,7,10,13,16

164:19

**pages** 22:24 36:6
140:20

**paid** 28:24 57:8,12
57:16,20 58:5

**pair** 49:15

**panama** 21:2,2,11
23:1 25:22 126:24

**panic** 43:18 44:24
45:6,13,18

**paper** 42:18 126:4
138:11 141:21
147:20 151:13

**papers** 18:6,7 34:8

**paperwork** 42:21

**paragraph** 28:16
28:23 29:3 31:4
34:14 35:4 37:9
37:12 41:24 108:3
114:13

**parents** 11:5

**part** 15:11 20:12
32:18 33:18 42:22
90:19 155:10

**participation**
123:2,17

**particular** 27:3
31:7 33:18 72:11
128:24

**particulars** 5:13

**parties** 162:14

**partner** 19:8 22:5
109:14,16 150:21
154:9,15

**party** 48:11
149:13 162:15

**pass** 100:22

**passed** 50:12
56:23

**passenger** 32:13
56:23 66:24 69:11

73:15 78:13 90:12
90:23 113:13
117:3 119:14,15
119:20 120:11,14
121:9,12,22 122:1
122:14 123:8,12

**passengers** 16:11
56:2,16 59:5
64:15,23 91:6
92:24 99:16 117:6

**passport** 22:23,25
23:4,12,15 24:7,8
24:9,13,24

**patience** 89:22
156:7 160:2

**pay** 27:6 28:14
31:11 36:1 38:8
41:5 57:18 129:7

**paying** 73:13
129:11

**pc** 2:11

**pecchio** 2:11

**pending** 108:15
110:18

**people** 26:12
56:20 59:15,24
69:3,5,11 74:2
78:2,6 93:7 100:5
113:19 148:22
150:16 151:25
152:3,4

**period** 16:18
45:12 52:19 63:24

**periodicals** 18:8

**permanently**
109:2

**permitted** 120:1

**person** 40:13
53:17 57:1 59:4
68:15 70:12 73:14
73:14 78:7 101:9

101:10 113:18
120:20 153:2

**personal** 15:7 16:2
29:19 42:25 58:4
80:11 88:8,14
93:22 94:6,8,9
140:13 154:14
155:4

**personally** 49:9
161:6

**personnel** 101:2
102:12

**perspective**
111:12,18

**pertains** 34:25
38:1

**phone** 7:14,25
65:5 69:20 70:19
70:20,23 71:20
72:17 74:9,20
77:3 133:1 155:24
159:18

**physical** 47:23
48:7

**physically** 19:20

**picked** 65:25 67:1
71:20 102:1,3

**piece** 17:19 42:18
126:4 138:11
141:20,21

**pilot** 46:6 61:16,18
75:10,15,15,16
95:2,18,22

**pissed** 65:22

**place** 1:18 26:11
64:17 65:2 99:8

**placed** 64:21

**plain** 121:1,8,23
122:8,13,14
143:20

**plaintiff** 1:6 2:7
51:14

**plaintiff's** 3:19,21
4:2 31:23 51:13
108:25 109:20
125:17 126:4
127:9 130:15
137:1

**plan** 156:17

**plane** 44:19 53:17
53:18 57:3,16,23
61:14 75:7 76:6
81:12,24 84:9
86:19 93:8 94:4
95:3 100:18,22
101:13,25 142:25

**planet** 148:24

**plans** 48:1 151:1

**plant** 18:20

**plastic** 25:7

**please** 5:8 6:15
36:21 40:5 49:2
76:25 83:7 120:6
135:3 160:6

**pleased** 15:21

**podium** 84:25

**point** 23:14 47:1
65:19 67:13 71:3
73:16 75:3 78:14
82:8 84:25 90:25
114:17 115:22
116:3,20 122:25
141:12 142:7

**pointed** 97:6

**points** 135:19
140:4,5,11,14,21
141:3,6 144:10,14

**police** 105:23

**political** 150:12,14
150:19 151:2,17
152:15 153:1,9,19

**politically** 150:21
**portion** 126:14
**position** 17:9 61:9
  153:7
**positive** 101:5
**possibility** 154:8
**possible** 94:16
  148:14
**possibly** 22:14
**posted** 14:17
**potential** 130:25
**pounds** 11:23
  49:16
**practical** 136:4
**practically** 18:5
  136:3
**predator** 153:5
**prefer** 7:7
**preference** 96:10
**preoccupied** 65:12
**preparation** 9:23
  28:2
**prepare** 9:15
**preparing** 11:12
**present** 19:20 48:9
  82:17 127:24
  134:10
**presently** 48:5
**president** 17:13
**pretty** 23:10 48:15
  95:4
**prevented** 70:22
  70:25 114:1
**previous** 139:17
**previously** 91:11
**price** 4:4 125:11
  136:25
**primarily** 21:2,7
**primary** 70:8
**principally** 20:23
  132:9

**principle** 24:23
**principles** 19:4
**print** 18:1,4,7,14
  18:15 27:4
**printed** 18:2
**printing** 18:1,3,20
**prior** 22:3,6 26:18
  26:19 32:19 35:12
  45:12,14 109:16
  110:25
**private** 23:13
**privileged** 39:4,12
  39:15,18,20
**privileges** 108:15
  110:6,17,23 129:3
**probably** 5:22
  11:3 14:3 22:8
  50:8 53:2 98:13
  114:19 126:16
  132:20 148:2
  152:16,17
**problem** 6:17 8:6
  23:2,2 93:11,13,18
  99:14,20 100:9
  104:12
**problems** 48:6
  100:14
**proceeded** 83:17
**process** 26:12
  54:21 72:18 90:17
  91:1 97:12 105:17
**produce** 134:13,14
**produced** 31:18
  31:21 36:8
**production** 19:18
  108:25 109:20
**products** 116:11
**professional** 1:20
  45:7 47:3 83:6
  84:16 162:4

**program** 3:18
  35:3,6,10,15,18
  36:7 37:2,9,10,11
  37:15,25 42:6,7,22
  113:14 122:22
  123:3,10,15,17,21
  141:10,16 143:10
  143:15 159:13
**prohibit** 152:16
  153:21
**promise** 96:14
**promised** 114:23
**promises** 96:15
**proof** 79:7
**properties** 12:23
  16:23 17:1,10,16
**property** 12:21
  17:6,19 145:11,17
  145:21 146:13
**proprietary** 26:24
**prospect** 128:24
**protect** 17:8
**provide** 26:13
  41:5,6,8 47:13
  111:6,21 112:5,21
  114:2 129:24
**provided** 111:22
  112:18 114:23
  124:3 135:24
  140:16,20
**provides** 51:14
  111:18 112:18
**providing** 112:20
**provision** 29:1
  30:7
**provisions** 29:17
  37:11
**prudent** 111:3
**public** 161:16
  162:5 165:19

**publication** 149:4
  149:16
**published** 148:17
  149:13 150:4,6
**pull** 49:22 66:20
  89:6
**purchase** 31:11
  106:3
**purchasing** 26:13
  116:10
**pure** 57:24
**purely** 77:11
**purports** 140:21
**purpose** 20:1,7
  26:7 27:17 92:24
  99:17
**purposes** 136:4
**pursue** 20:19 26:3
**push** 34:8 46:25
**put** 14:20 20:16
  23:6 27:11 43:6
  52:2,2 53:2,7,22
  54:3,10,13 55:18
  55:21 56:8,12
  62:1,2,4,21 63:21
  64:5,8 76:2 91:25
  94:15 95:15 98:4
  110:21 125:25
  131:13 155:8,21
**puts** 86:19
**putting** 42:18
  70:22 130:10
  131:3

| q |
| --- |

**quantified** 154:24
  155:1
**question** 6:19
  25:17 28:19 29:16
  30:1,5 39:11
  40:22,24 51:12
  52:3 64:21 79:2

94:2,5 100:1
111:19 112:3,16
112:19 118:18,25
119:3,4 120:6,9,15
121:13,19 122:10
122:13 135:11,14
136:6,16 138:4,7
139:2,3,13,16,17
143:7,25 144:2,13
144:15 146:9,11
146:25 147:2,8,8
147:14 149:1,10
149:15 152:9,13
152:19 154:13,17
155:21
**questioned** 5:4
142:4
**questions** 6:15
34:18,22 38:13
40:10 97:22
111:24 130:22
142:15 146:24
153:9 155:18
156:8,14 159:25
160:4
**quick** 16:15 17:23
34:16
**quite** 26:19 144:3
152:9

**r**

**r** 164:3,3
**race** 101:17
**raise** 39:1
**raises** 47:17
**ramification**
105:20
**ramifications**
105:22
**ran** 11:12 14:21
**range** 31:22

**rarely** 131:21
**reached** 47:1
65:25 91:17 97:16
**reaching** 67:17
**reaction** 73:19,23
74:2
**read** 3:7 28:8
32:17,20,21 34:16
34:19,20,21 35:8
35:14,20,24 36:11
36:16,18,20,24
38:10 51:25 57:7
57:15,17 58:6,7
110:18 117:17
118:9 121:2,7
122:12 139:15,17
141:20 142:10,13
144:10,25 145:2,3
145:6,7,8,9 154:2
160:4 163:9 165:5
**reading** 33:11,24
38:22 57:17
127:12 141:25
**ready** 98:6
**real** 16:15,24
17:17,23 21:6,14
23:17 26:2,6,10
34:16 144:13
**realistically** 44:12
142:5
**realize** 51:25 93:1
113:17
**really** 22:22 23:14
26:20 28:18 40:25
61:8,18 83:12
134:18 141:24
142:1 146:9
151:19 152:5,6
**realtors** 26:11
**reason** 20:13
41:25 45:13 60:21

70:6,8,17 79:8
80:4 117:20
119:19 137:21,22
163:11 164:6,9,12
164:15,18,21
**reasons** 117:9,10
117:21 122:25
138:9
**rebooked** 86:16
105:14
**reboot** 106:24
**recall** 11:3 12:11
14:10 27:12,15
50:12 52:19 58:1
97:4 101:14
106:16 108:13,16
109:1 110:7 111:5
111:21 112:5
**receipt** 110:3
163:18
**receive** 157:10
**received** 13:9 90:5
107:13,19,23
109:8,19 110:4,16
110:24 157:12
**receiving** 106:16
108:13 109:1
**recess** 55:13
103:10 107:6
159:23
**recognize** 41:21
**recollection** 48:23
53:15 69:2 72:1
73:8 91:8 109:7
**record** 31:23,24
36:5 55:14 103:11
106:25 107:7
151:13,15 162:11
**recordings** 162:12
**recounting** 49:24
50:16

**reduction** 130:14
**reference** 14:17
92:7,18
**referenced** 163:6
**referring** 64:11
93:5 124:9 125:5
**refresh** 89:8
106:20,21 109:6
**refreshes** 58:19
**refuse** 117:8,22
121:25 122:17
**refused** 81:22
94:20 118:1,19
121:22 122:15
**refusing** 118:11
122:6
**regain** 129:17
**regal** 12:17,22
**regard** 56:18
**regarding** 84:13
90:7 110:5 150:18
**registered** 1:20
162:4
**regret** 78:23
**regularly** 20:4
**reissued** 24:8
**rejoin** 107:3
**relate** 48:6,7
**related** 19:23 21:4
128:10
**relationship** 20:9
20:10 21:5
**relationships**
146:20 147:13
**relative** 162:15
**relatively** 104:13
**relayed** 144:20
**relevant** 141:24
**relied** 35:16 42:14
**reluctant** 20:19

relying  144:14
remained  155:24
  155:25
remember  6:10
  13:22 17:11 27:11
  50:13,20 88:23
  109:13 125:25
  157:14,15
remembering
  82:20
removal  81:7
remove  120:20
removed  33:25
  79:12 80:5,24
  81:3 84:8 137:20
renew  129:15
renews  129:14
rent  116:19
reorganized  15:10
repaired  23:15
  24:10
repeat  6:15 120:9
repercussions
  130:15
rephrase  28:22
  112:3
replaced  22:25
report  87:14,14,16
  87:19 88:5 91:2
  103:19 105:6,7,24
  120:18 121:18
  148:17 162:10
reported  1:20 81:6
  102:19 117:25
  118:8,10,18 119:5
  119:24 120:11
  121:9 122:14
reporter  1:20 3:5
  43:6 136:23 137:2
  139:15,17 151:13
  160:3,7,10,13

161:1 162:5
reporter's  3:6
  162:1
represent  5:11
  31:20 122:21
  137:6
representation  9:4
represented  8:7
reputation  147:16
  147:17,18,22
  148:1 155:5
requested  17:7
require  62:20 63:9
required  17:6 27:5
  29:22 30:17
  165:13
requirement
  17:20 37:10
reread  50:2
research  9:2
researching  8:25
reservation  37:2
residence  10:10
respect  138:10
  141:15 143:15
respond  131:5
response  52:4
  103:21 109:10
  157:10
rest  56:1
result  43:11 47:14
  127:19
return  163:13,17
revenue  15:14
review  18:7 97:25
  98:2,19 99:12
  163:7
reviewed  9:17,17
  9:19 28:1
reviewing  33:20

revise  97:24 98:18
  99:12
revocation  110:5
reward  135:17,17
  146:11
rica  21:3,12 25:23
rid  110:8 122:19
ridiculous  142:8
right  5:10 6:9,22
  7:13,24 8:4,15 9:8
  9:25 10:1,4,6 12:2
  12:19,23 13:15,24
  14:6,21 15:25
  16:14,16,22 17:9
  17:22 19:6,17,22
  20:20,22 21:22
  22:5 24:1,3,12,20
  25:14 26:5,14
  27:7 28:8,10
  31:14 32:12,24
  33:5,23 34:13,24
  37:4 39:21 40:5
  42:16 45:25 46:15
  48:10 49:17 50:4
  52:5,22 53:14
  54:5 56:7 58:1
  60:20 61:24 62:9
  62:15 63:18 64:25
  65:23 66:2 67:8
  69:2 71:19 72:14
  73:16 74:20 76:7
  77:2 79:3 82:3,20
  82:20 83:2 84:23
  85:2 86:16 87:13
  90:4 92:12 94:23
  96:6 97:6,15
  98:23 100:19
  101:6,19 103:3,13
  105:4,16 106:13
  107:4,18,24 108:8
  108:13,24 109:18

110:14 111:3
  112:3,12 113:9
  114:7,9,21 115:14
  116:21 117:11
  121:3 122:13,19
  123:20 124:4
  125:3,16 127:13
  127:25 128:11
  131:8,25 133:2,5
  134:17,19 135:21
  137:25 138:8,18
  139:1,2,3 140:10
  140:17 141:1,18
  144:24 148:16
  149:12 154:7
  155:12 156:2
  159:17,24
rights  37:3 141:15
  143:15
rise  82:9 124:18
robert  2:11
room  7:4
rooms  136:13
rooney  2:11
roughly  13:21
  46:22 135:16
row  56:23 78:10
rows  73:12
rpr  1:20 161:15
  162:22
rules  22:12
run  6:4 19:14
  124:7 151:1,17
  152:14 153:18,24
running  141:23
  150:11 151:4
  153:9
runway  63:12
rush  57:3,11

**s**

s  3:11 164:3
safe  95:4
safety  119:21
  159:3
salvador  24:20
sanity  129:17
sarcastic  54:2
sat  23:22 73:21
satchel  48:25
satisfied  15:22
saw  12:8 40:8 56:8
  56:8 58:1 61:20
  64:17,17 65:1,2
  68:12,14 69:11,17
  73:14 78:13 83:25
saying  30:24 33:25
  53:11,13 54:15
  62:24,24 63:1
  64:10 77:2 89:13
  96:5 120:18 131:9
  137:23 143:22
says  28:23 32:12
  32:13,14 37:9
  41:2,23 42:5
  51:13 66:20 67:19
  74:13 83:11 85:10
  90:11 93:4 97:12
  104:4 107:16
  110:14 111:2,3,20
  113:23 115:15
  117:8,21 122:8,24
  123:2,13 143:14
  143:18 144:7
scared  77:24,25
  102:8,9
scary  23:19
scheduled  133:24
school  13:8,11,13
schools  14:8

science  18:3
scream  68:4
screen  27:20 31:16
  31:18 50:23 58:14
  89:12,23 97:25
  98:15 106:17,19
  107:9 136:19
  137:7 140:18
screenshot  4:5
scroll  36:6 51:3
seal  161:8
search  9:9
seat  25:7 30:13
  53:20 62:3 65:11
  66:4,6,7 67:2,13
  68:18,23 69:21
  71:12 74:11 78:11
  78:12 82:21 83:3
  85:11 86:23
  100:23 151:6,12
seated  53:23 57:11
  68:9,10,24 71:10
  71:12 73:12 78:11
  83:5 88:19
seats  57:4 66:8,10
  66:25 78:7,9
second  31:15,22
  52:23 65:24 66:13
  67:20 75:20,22
  79:12,15 80:25
  81:3,8,13 86:17
  88:23 89:9,11
  100:13,14 101:3
  103:14 104:10
  110:9 112:8,13,17
  122:24 124:4
  157:20 158:1
seconds  12:14
  75:24 76:9 104:19
section  28:4 117:5

security  16:9 44:8
  44:16 46:1 101:24
  102:18 103:15
  104:4,24 105:10
see  14:16 21:13
  23:13 25:21 27:19
  27:21 28:6,24
  29:3 31:6,18
  32:15,16 33:7,8
  34:11,25 35:3
  36:3 37:12,13
  42:1,4 49:1,19
  51:3,15 58:14,16
  58:18 61:11,14
  67:5 68:10,18,20
  68:23 69:1,7,15,18
  69:19 72:4 73:3,4
  74:8 75:12 78:7,9
  78:14 82:18,18
  88:17,19,20 89:8
  89:10,10,11,16,23
  89:24 90:13
  106:13 107:4,11
  107:17 108:2,4,19
  108:22 109:21
  110:12 111:3
  114:12 115:6
  116:22 117:1,3,6
  117:23 119:22,23
  123:4,18 124:25
  125:3 135:25
  137:9,12 138:13
  140:17,18,19,24
  140:25 141:5,16
  144:8,9 147:5
seeing  47:10 68:21
  68:21 106:23
seek  47:8 48:1
seeking  124:6
seen  35:18,20 45:7
  59:23,24 98:20

semester  13:20
send  98:1,19
  126:10 131:5
sending  114:7
sent  38:23 52:6
  98:21 124:22
  163:14
sentence  144:24
sentinel  18:4
separate  17:8 26:3
  26:17 153:14
september  137:10
  137:11 138:11
sequence  85:14
sergeant  56:25
  58:23
series  130:22
serious  44:10
serve  13:3,5
service  41:5,6,8
  61:4 87:9 93:7
  99:6,13,19 100:5
  100:20 157:14
set  26:2,17 56:9
  62:15 129:15
seven  12:22
sewed  24:10
sex  101:16 152:23
  153:5
shake  70:1
shaking  69:24
share  27:20 31:16
  50:23 89:12 107:9
  110:9 116:23
  136:19
sharing  31:14 33:6
sheet  3:8 163:11
shirt  49:16
shook  53:23 55:3
  67:20 69:25

shoot   133:13
shortly   159:22
shot   137:7
show   31:17 33:7
  34:10 36:3 92:3
  106:13 108:17
  115:5 124:3 134:2
  134:6 135:23
  140:16 153:6
showed   134:5
  137:19 138:24
showing   86:2 90:3
  90:10 134:8
  141:11
shown   125:16
  138:22
shows   137:8
shut   17:3 46:24
  96:3,22 101:6
shutting   101:7
siblings   10:13,14
  11:13
sic   12:24 109:5
  125:17
sick   132:25 133:1
side   7:17 16:19
  19:14 30:12 66:8
  72:4 74:22
sidetrack   24:16
sign   3:7 27:3 160:4
  163:12
signature   161:14
  162:21
signed   50:5 51:17
  52:7 163:20
significant   22:5,6
simpler   28:23
simply   31:4 127:3
  136:16 138:7
  152:9

single   120:21
sir   5:8,17 7:2,25
  9:16 11:1 15:6,6,7
  16:4 19:1 31:2
  33:7 36:21 59:18
  59:21,23 60:24
  71:7,7 94:2,5 97:2
  97:21 100:1
  110:12 117:13
  120:25 121:16
  122:4,11,21
  130:16 131:4
  136:16,24 138:7
  144:16 145:1
  151:23 152:9
  153:1 154:16
  156:6
sister   10:21
sit   44:19 56:8
sitting   7:9,10
  23:11 46:5 65:11
  78:8 99:7 130:19
situation   20:18
  76:1 81:21 84:12
six   12:21 15:15
  128:1
sketch   13:7 17:24
skill   16:6
skimmed   35:17
skips   92:11
sleepy   56:20
slightly   22:23
slowly   44:17
small   34:19 48:25
  49:15 98:15
  141:25 142:11
smaller   12:11 50:2
smooth   81:21
social   14:16
  146:20,20 147:12

soliloquy   43:7
solutions   1:18
  163:23
somebody   41:5
  46:11 61:17 67:24
  75:11 113:17
  129:16 153:4
  157:15
someplace   64:16
somewhat   54:2
soon   53:18 75:24
  100:22 104:6
  134:14
sorry   11:1 45:9
  74:6 76:3,23
  102:15 111:19
  113:2 116:20
  120:7 142:16,19
  151:19 154:13
sort   33:11 47:2
  105:2
sought   45:5
  150:14
sounds   102:22
  104:4,7
source   16:20
  80:23
south   15:4 18:5,9
  18:10,11,16,21
  20:5,21 23:11,16
  24:16 128:6,9
  133:19 152:21
  156:18,23
southeast   6:8
  11:17,19 15:13
  16:15 17:18,23,24
  18:17 19:4,7,13,24
  25:24 26:22 27:7
  127:15 128:10
southern   1:1

southwest   127:15
spanish   43:23
speak   9:22 78:22
  78:25 79:21 83:3
  85:1,18 114:18,19
  115:20 119:11,14
speaking   9:3,21
  25:22 29:11 70:9
  76:10,13 81:14
  93:6,9 109:12
  114:17 142:19
speaks   46:2
  103:15
specific   93:1,16
  95:10
specifically   14:16
  19:12 21:22,24
  30:20 47:6 56:6
  56:17 59:7 84:5
  84:10,11 94:18
specifics   22:2
  41:17
speculate   118:7
  119:7 122:7
speculating   57:24
  58:8 149:25 153:3
speculation   41:15
  41:16 57:25
spend   98:16
  141:22 154:22,24
spending   126:23
spent   19:17 42:22
  83:22 85:23
spirit   24:4 25:3,6
  133:13,19
spoke   8:11 10:24
  47:11 61:10 69:25
  71:13 75:13,16,18
  85:15 87:8 95:2
  95:23 118:6,11
  119:9 152:2

spoken  10:22
  46:13 87:24 99:5
  109:16 140:10
  148:22 152:4
spot  84:16
spun  75:6 76:8
stamp  36:17,17
stamped  23:24
  108:1
stand  71:14 86:19
  86:21
standing  53:18
  56:1,22 64:25
  65:3 71:11
stands  26:5
star  43:6
staring  65:13
  67:10
start  33:24 44:19
  46:11 96:11
  105:19 113:24
started  9:3 13:12
  20:10 46:8 52:22
  74:4 108:8,12
  158:5
starting  8:25
starts  75:4 108:21
state  1:21 5:8
  97:15 161:3,16
  162:2,5
stated  135:22
statement  88:15
states  1:1 23:8,9
stating  110:17
stature  12:11
status  135:17
stay  95:19 152:5
staying  10:11
stenographic
  162:12

stenographically
  162:9
step  65:12 83:7
stone  2:3
stoneandwoodro...
  2:6 163:2
stood  55:25 56:9
  56:24 62:15 64:12
  64:14 101:15
stop  31:14 33:6
  96:20,24
store  55:3 90:13
  91:8,19 92:20
  97:8,10
stove  64:1 65:20
  91:23
stow  53:25 54:21
  56:5 61:25 62:8
  63:3,9,17,23 64:2
  65:7,24 66:12,13
  67:9 79:10 92:8
  112:13
straight  74:9
  125:11
stranded  47:20
strap  49:20 72:5
  74:23
street  2:4 150:20
stretch  151:16
strike  30:3 43:6
  80:8 118:16
  129:19
strong  74:14
structured  17:12
stuck  23:20
stuff  6:6 19:19
  49:14 54:13 110:8
stunned  73:21
subject  28:9,16
  31:7 32:3,9,14
  35:10 37:5 41:9

42:7 43:15 123:3
submit  114:22
submitted  51:17
  112:4
submitting  158:3
subscribed  165:14
subsequent  109:6
  149:17 151:17
  152:14,25 153:18
subsequently
  80:22
substance  39:10
  115:8 154:19,23
succeeding  155:2
  155:3
sue  142:5 145:20
  146:14
sued  142:3
suffered  43:10
  45:13 47:8 127:18
  135:16 146:10
  147:11,16
suffering  47:22
suing  121:5
  145:22
suit  101:20
suite  2:5,13
suits  101:8,20
sum  39:23
summarize  37:23
  51:10
summarizing  35:2
summary  38:3,4
  40:2 115:2,12
sun  18:4
sunglasses  49:15
superglued  24:11
supervisor  23:23
  143:2
supplemental
  124:9 129:5

support  125:18
  126:5 129:21
supposed  30:25
  36:10
sure  7:9,16 30:8
  38:1,2 39:24 40:1
  40:9 49:2 53:4,11
  53:12 54:17 61:3
  62:23 65:14 72:5
  74:13,22 75:2
  86:20 90:10
  100:17,24 111:20
  120:9 129:14
  134:3 159:20
surrounded
  101:12
suspended  108:15
  109:2 110:17
  111:11 112:8
  123:1 129:16
suspension  110:23
sweat  46:9
sweating  46:11
swing  69:21
sworn  5:4 161:7
  165:14
swung  66:24 67:1
  67:13 71:20

                t

t  2:3 3:1,11 49:16
  163:1 164:3,3
table  7:4 34:8
tags  105:2
take  6:22 28:4
  31:3 43:7 46:7
  48:10 55:9,11
  62:5 64:7 65:15
  73:2 74:10 81:24
  83:4 84:23 87:18
  89:19 106:1
  132:13 136:13

159:17
**taken** 1:15 5:18
  55:13 103:10
  107:6 119:12
  159:23
**takes** 132:20
**talk** 11:4 15:12
  17:22 44:20 46:12
  75:10 80:1 83:8
  88:2 95:13 100:13
  112:12 113:10
**talked** 32:22 81:13
  116:24 146:18
**talking** 26:15 41:3
  59:8,15 60:5,6
  65:14 67:4 70:11
  71:5 74:2 75:22
  79:15,16 110:22
  127:3 134:17,19
**talks** 37:8 113:13
  150:10
**tampa** 162:18
**taxi** 105:17
**taxiing** 63:9,15
**tedious** 114:16
**tell** 12:8 14:25
  22:21 29:6,13
  33:1 34:24 36:11
  37:14 48:17,19
  49:4,7 51:23 56:3
  56:16 63:14 65:1
  74:5 78:5,6,9 80:4
  80:14 83:17 87:13
  91:25 94:14,16
  95:8 101:3 102:10
  103:21 107:12
  124:13 129:6
  132:4 147:17
  157:13,16
**telling** 51:18 84:3
  85:16,21 91:5

97:4 113:15
  120:21 136:12
  150:3 153:3
**tells** 14:3
**temporarily** 10:12
**ten** 69:3,5 131:15
  150:16
**tend** 63:6
**terminate** 137:22
  137:23 138:6,22
**terminated** 123:1
  123:18,21 137:20
  138:1,16
**terms** 3:18 30:9
  35:9,14,18 36:7
  37:1 38:2 42:8
  93:9 122:20,22
  123:11,15 141:10
  141:12 143:8
  148:22
**terrace** 12:18
**testified** 5:5 62:1
**testify** 90:16
**testimony** 40:3
  72:21 77:10,13,17
  77:21 78:1 84:4
  93:14 97:2,11
  163:9,18 165:8
**texas** 13:11,19
**text** 65:11
**thank** 33:5 45:11
  87:1,7 129:25
  137:2 156:9 160:1
  160:2,13
**thankfully** 23:22
**thanks** 9:15
  106:22
**theology** 13:10
  14:7
**therapist** 47:10

**thereof** 162:12
**thing** 21:1 53:2,7
  53:13 68:8 105:18
**things** 7:6 22:10
  50:13,19,20,22
  51:22 57:19 71:4
  81:22 92:11 116:5
  116:16 139:9
  144:4
**think** 8:11 11:20
  17:11 25:20 27:10
  30:11 31:12 35:23
  41:13 42:11 49:16
  50:2,9,17,19,20
  52:4 53:13,17
  55:6 57:10 60:13
  60:16 62:24 63:1
  64:4 88:24 89:13
  95:3 96:21 103:22
  107:21 109:12,13
  109:16 119:11
  131:6 139:7 142:8
  143:4,6 146:14
  149:1 151:19,25
  152:1,1,3,5 153:9
  157:23,23,24
  159:24
**thinking** 44:3
  53:11,12 93:16
**thinks** 141:7
**third** 23:3 126:24
  149:13
**thought** 43:24
  50:11,22 52:24
  61:6 72:7,8 73:2
  74:17,21 101:9
  102:9 111:3
  113:17 118:13
**thoughts** 52:1
**thousand** 116:10

**threat** 96:13
**threats** 96:11
**three** 22:8,15 23:8
  26:8 42:11 49:16
  66:8 86:24 99:21
  99:22 100:3,4,5
  101:7,18 102:12
  103:13 126:23
  134:13 141:24
  142:16 157:2
**throw** 77:17
**thumbnail** 13:7
  17:24
**ticket** 4:4 28:10,24
  29:14 30:23 31:8
  31:10,11 32:13,18
  34:4 41:4 106:3
  116:25 117:1,15
  118:21 124:23,24
  125:10 136:25
**tickets** 3:15 28:20
  31:20,24 32:1,8
  42:25 116:2
  123:16 136:14
  144:7 145:10,17
  154:2
**ties** 101:8,20
**time** 1:17 6:23
  10:24 11:20 15:7
  16:18 21:1 23:3
  27:9,14 43:18
  44:7,7,15,17,18,18
  45:11 46:1,2,10,16
  47:9,11,17 50:12
  50:13,24 52:19
  56:1 57:10,16,24
  58:10 66:11,13
  67:20 68:9 75:20
  75:22 76:14 77:20
  81:13 83:15 84:17
  88:21 99:2 102:7

105:11 108:8,10
108:11 109:13
117:15 124:16
126:10,21,25
131:13,14 132:6
132:10,22 134:6,9
138:23 139:7,22
150:5 157:21,24
157:25 158:2,11
160:1 163:19
**timeframe**  163:8
**times**  7:3 18:2,15
20:6 22:8,15
24:17,21 42:12
47:5 81:18 130:6
132:8,18 133:24
134:2,4 157:2,4
**tiny**  97:25
**title**  36:16,21,22
90:4
**titled**  33:9
**today**  5:13,16 6:11
6:25 8:7 9:16
11:12 12:9 97:11
104:14 138:13,25
144:4 155:18
**told**  21:23 22:18
30:7 38:5,15 40:9
40:17 60:20 61:24
63:16 64:5 78:17
79:11,19,24,25
80:2,25 81:5
83:11,14 85:4
86:24 87:10,20,22
88:9 91:23 92:1
94:12,19 98:25
99:12,19,21,22
100:1,11,12
102:20,21 103:23
105:6 118:9,13,13
118:14 137:21

142:9,9 147:9
150:9 152:1
153:16,22 155:20
**tomorrow**  138:20
138:23
**tone**  54:2 59:9
67:2 76:5
**top**  32:12 85:22
102:16
**torn**  22:24
**total**  131:10
**totally**  92:25
152:11
**touch**  25:14 45:3
102:12
**touched**  131:23
**track**  27:17
**trade**  14:8
**trafficing**  152:23
**training**  16:6
59:19
**transcribed**  160:8
161:9
**transcript**  162:11
163:6,20 165:5,8
**transport**  117:9
117:15,22 118:5
120:2,13 121:11
121:25 122:17
**transportation**
125:21,24 126:3,8
126:15 128:6
**travel**  19:22 20:1,4
20:7,17,20 21:4,6
21:11 25:16,22
26:7,14,15,19 34:5
46:21 104:14
118:22 124:12,15
127:3,5 129:3
130:14,20 131:9
131:13 132:5,6

134:18 135:4
147:5,6
**traveled**  46:23
**traveling**  21:1,14
43:2 125:22 127:7
132:10
**treat**  47:6
**treatment**  45:6
47:2,8 48:2 102:6
**trial**  145:7
**tried**  11:4 22:24
74:8 75:25 76:17
80:1 88:2 94:12
95:13 104:1
**triggering**  29:2
**triggers**  44:15
**trip**  124:21,21,21
**troy**  1:5,12 2:8 5:2
5:9 26:16 156:17
159:19 163:4,5
164:1,2,24 165:1,2
165:4,12
**true**  50:18 58:7
120:19 121:9
162:11 165:8
**trust**  142:14 156:5
**trusted**  40:7
**truthful**  6:20
**try**  28:22 37:23
39:23 76:17 107:9
109:10 111:12
142:22 144:24
**trying**  17:11 31:3
31:6 52:2 76:20
76:22 81:20 83:22
92:25 93:3,11
98:6 99:7 105:17
111:5 131:13
144:3 153:6 158:7
**tsa**  46:1

**tuesday**  1:16
**turn**  7:14,21
159:18
**turned**  7:25 70:3
86:12 120:8
**twice**  24:4 25:19
46:21 81:10
124:12 157:3
**two**  14:23 22:8,15
28:21 34:4 45:2
47:16 49:16 61:9
66:8,10,10 70:21
71:18 73:12 78:2
83:9 88:24 89:1
98:4,9,11,22,25
99:10,11 102:4
104:21 105:8
121:5 126:23
132:16 148:22
151:7 153:14
154:10 157:2
**type**  141:25
142:11
**typically**  27:3,4

**u**

**u.s.**  24:7
**uber**  126:11,12
132:23
**ultimately**  24:6,24
**unaware**  116:18
**unclear**  14:22
**uncommon**  60:4
60:12
**underneath**  32:14
**undersigned**  161:5
**understand**  5:16
6:12,14 8:3 13:18
19:6 28:18,19
30:12,25 38:7
39:2 40:25 41:1
45:5 61:8 99:1

111:19 112:1,16
135:14 142:20
145:14 146:23
147:8 154:13
155:21
**understanding**
20:20 28:15 30:22
46:15 54:9,20
55:20,20 63:2
127:15 143:20
145:12,15,16
**understood** 6:18
11:5 15:16 29:22
30:1,17 53:12
54:6,18 62:14
63:18,20 155:18
**underway** 90:17
**unfortunate** 15:23
**uniform** 101:21
104:25,25
**unintentional**
77:12
**unique** 63:4
**united** 1:1 23:8,9
**university** 13:9,11
13:17,19
**unpleasant** 70:13
**unruly** 158:23
**untrue** 120:22
**unusual** 158:10
**updated** 37:1
**upgraded** 43:25
**upgrades** 130:2,6
**uploaded** 161:9
**upset** 76:20
**upstairs** 87:8,8
**use** 42:24 60:13,17
62:5,5 73:16 82:1
95:12 114:5 116:1
116:4,9,15,19
126:19 136:2,10

136:12,14 139:24

**v**

**v** 163:4 164:1
165:1
**valuable** 41:24
**valuation** 140:14
141:2
**value** 129:4
130:11 131:4,14
134:20 140:22
144:8,11
**valued** 129:4
135:17
**vantage** 78:14
**varies** 124:20,21
**verbally** 53:3
142:24
**verge** 101:6
**verify** 119:9 163:9
**veritext** 1:18
163:14,23
**veritext.com.**
163:15
**versus** 25:11
124:16,23 125:23
126:15 127:8
132:10 155:2,3,3
**vested** 141:15
143:14
**vicinity** 21:3
**videoconference**
1:19 161:7 162:8
**view** 82:22
**violate** 37:11
123:8 143:11,13
**violated** 31:5
115:9 138:5 142:9
159:7,12
**violates** 123:12
**violating** 37:25
123:14

**violation** 14:13
35:3 123:10
**violent** 120:12
121:10 122:15
158:23
**virginia** 2:5
**virtual** 128:17
**visit** 20:18
**visiting** 20:2,2
21:10 22:4,7
25:18
**visits** 22:17
**voice** 47:18 54:3
59:9 67:3 70:11
73:6
**voided** 115:18,24
123:24 135:20
136:17 137:16
139:19
**volume** 120:8
**voluntary** 119:20
**vs** 1:7

**w**

**wait** 85:12
**waiting** 43:21 44:2
**walk** 99:3
**walked** 68:17,17
74:5,6 79:22
85:19,20 86:18
100:16
**walking** 75:4
**want** 17:7 25:14
25:21 28:4,13
33:2 36:20,24
49:1,22 52:24
55:9 58:18 68:3
87:5 106:24
116:11 124:2,7
133:25 154:14
155:13,13 160:7

**wanted** 8:15 17:7
65:20 80:5 114:2
114:9
**wanting** 91:24
**waved** 76:2,4
**way** 19:23 27:11
59:8,12,13,14,15
63:11 67:3,22
70:8 72:10 74:1,1
86:7 91:10 105:17
120:8,10 124:5
125:14 130:10
131:3,9 132:5,12
132:16 134:18
135:4,12 136:2,9
141:2,22 147:10
154:25 155:22
158:23 159:2,8,14
**we've** 25:22 26:15
67:6 92:15 100:6
103:18 116:23
122:11 126:2,2
134:13
**wear** 30:13,13
**wearing** 46:6 53:8
53:10 54:17
101:19 104:24
**web** 98:16 99:8
**website** 97:20 99:5
137:8 140:21
158:6
**week** 8:10,21
48:18 49:6 52:21
52:23 98:20
131:19,20 135:9
**weekend** 48:16
**weeks** 51:18
**weigh** 49:18
**weight** 11:22,23
11:24 12:3 48:24
49:13

**went**   13:13 15:9
  22:19,22 23:3
  43:18 75:7 76:8
  81:11,12 85:23
  87:7,8 91:12
  92:12 93:25
  105:16 106:2
**west**   2:4 128:13
**when's**   10:24
**whispering**   7:11
**white**   104:20,20
  104:21
**wifi**   25:8 126:21
  133:4,7,8,9,12,14
  133:15,17,21
  158:10,13
**wil**   7:19 9:7 22:18
  28:11 32:22 37:19
  46:13 52:8,14
  108:12 140:7,9
**wil's**   109:14
**william**   2:3 163:1
**wind**   106:10
**window**   66:6,7
  82:21 88:20
**wisdom**   154:20
**wise**   155:4
**wish**   132:3
**witness**   7:19,22
  12:7 28:11 37:19
  38:17 52:8,14,16
  87:24 89:16 92:5
  95:22 96:17,20,22
  98:9 103:5,9
  107:2 118:24
  119:17 120:17
  144:19 146:2
  156:8,12 158:20
  158:25 159:5,16
  159:20 161:6,8
  162:6 163:8,10,12

163:19
**wmlj**   14:24,25
  15:1,3
**woman**   20:9 21:5
  21:16
**woodrow**   2:3,3 3:4
  7:20 8:8,21 9:22
  12:6 29:7 31:17
  31:21 37:16 38:16
  39:3,9,13,17,19
  41:11,14,19 49:4,8
  49:11 52:10,15
  55:6,9 58:20
  87:23 89:13 92:4
  95:24 96:4,8,11,15
  96:19,24 118:23
  119:16 120:3,16
  121:14 122:2
  124:8 134:22
  144:18 149:19
  156:13,16,21
  158:21 159:1,6,11
  159:17,21,24
  160:6,11,12 163:1
**woodrow's**   7:10
**word**   16:19 56:25
  64:8 74:14 75:3
  120:21 136:14
**words**   53:4 56:11
  70:16 71:1,9
  73:17 74:7 82:1
  95:10,12 123:2
**work**   11:18 27:17
  127:23,23 131:20
  132:23 133:1,2,6
  135:9 158:10,12
  158:14
**worked**   63:10,10
  83:16 135:9
**working**   52:22
  54:25 62:18 70:20

86:24
**works**   15:25
  140:11
**world**   128:25
  131:1
**worth**   42:25 140:4
  141:7
**worthless**   136:4,5
**wrap**   104:5 159:24
**wraps**   148:14
**write**   111:7 112:21
  114:14,21
**writing**   92:21
  114:13 155:8
  158:5
**written**   98:20
  124:1 158:7
**wrong**   28:9 73:24
  74:3
**wrote**   38:6 90:21
  98:21 110:15

**x**

**x**   3:1,11 39:20
  42:22

**y**

**y**   39:20
**yeah**   7:7,8,20 11:1
  12:7 13:23 14:1,6
  15:2,14 18:25
  22:5,6 24:22 25:2
  25:8 26:18 36:1
  36:19,23 39:15
  45:15 46:11 47:20
  55:11 58:21 67:6
  68:16 71:4 74:16
  85:1,9 88:17
  89:16 91:13 103:7
  107:18 108:20
  109:3 113:15
  132:25 137:10

140:25 141:5
  144:14 156:13
**year**   11:25 13:21
  15:17 19:23 21:8
  22:16 32:2 45:12
  45:12 47:22 50:5
  51:2 121:2 128:2
  137:10 147:21
**years**   5:22,23 6:10
  12:21,22 13:13
  15:18 16:16,25
  20:8 27:13,17
  43:3 54:11 131:15
  135:10 150:17
  151:7,8,11 155:5
**yell**   67:24
**yelled**   77:24
**yelling**   46:9 67:22
  68:2 70:5,10,16
  71:1
**yep**   72:20 91:4
  125:4
**york**   128:13,16
**young**   105:25

**z**

**z**   39:20
**zoom**   1:19 7:16
  8:2 156:5 161:7
  162:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.