IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Troy Clowdus
    PLAINTIFF

VS.

American Airlines Inc.,

DEFENDANT.

Civil Action No.: 1:21-cv-23155-MM

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION TO ALLOW MEXICAN WITNESSES TO TESTIFY REMOTELY AT EVIDENTIARY HEARING**

Plaintiff TROY CLOWDUS files his Reply to Defendant AMERICAN AIRLINES, INC's ["AA"] Response in Opposition to their Motion to Allow Mexican Witnesses to Testify Remotely at Evidentiary Hearing.

When Plaintiff drafted the instant motion, he assumed that it would be unopposed for two reasons: first, because if AA truly believed its own Cross Motion and wished to prevail, the testimony of Mr. Muriel and the relevant passengers *would be essential for AA to prove* that he engaged in the witness tampering that AA so stridently alleges, and second, because with respect to two of the three witnesses, it is *legally impossible* for them to enter the United States to testify live—<u>a fact AA does not and cannot deny</u>. Plaintiff also assumed AA would not oppose the motion because it made clear that it was not opposed to AA's Mexican witnesses testifying remotely in order to save AA and its witnesses, who are attorneys, the time and expense of international travel. However, AA instead chose to spend 13 pages vigorously arguing why the Court should not hear or consider *the only evidence that could theoretically establish AA's allegations*, forcing Plaintiff to choose between succinctly responding to what ought to have

1

been a straightforward request and defending himself against a motion that shamelessly distorts the record.[1] Unfortunately, AA cannot escape two *factual* hurdles that support his request to allow his Mexican witnesses to testify remotely:

> I.   **The Record of Improper Communication with Potential Witnesses in Defiance of the Court's Explicit Order.**

In May of this year, AA brought a motion against Plaintiff's counsel, on an expedited basis, requiring Plaintiff's counsel to travel to Miami to defend himself. The basis of the motion was that the Plaintiff's counsel was threatening witnesses, but the real reason that AA brought the motion was to quash a deposition that it did not want the Plaintiff to take. Plaintiff's counsel had not threatened witnesses, and the Court agreed. The Court denied AA's motion and allowed the deposition to take place. It cost the Plaintiff thousands of dollars to defend against this

---

[1] AA consistently tries to distort Plaintiff's communications with his investigator by cherry picking snippets of those communications without proper context. For instance, AA cites Mr. Muriel in its Response as saying: "I am going, in some way, to ask Juan [Ramirez] to tell us before a notary that he did not sign anything because he did not agree with what they sent him as a declaration . . ." But AA deliberately omits the context: Mr. Muriel had just spoken with Ramirez about the draft statement that AA had just disclosed and told Clowdus that Ramirez told him, "He did not sign the document because what they say in it is not true." Clowdus responds: "Can you get Juan to put in writing everything that he told them? Exactly what he told them?," at which point Muriel *THEN* responds that he'll try to do one better: he'll see if he can get him to put it in writing and *then get it notarized*. Clowdus responds not to worry about a notary – just get the explanation. Muriel responds: "So let him write to me as the events unfolded because according to what Juan says, the airline is lying."

Similarly, AA points to a text sent by Clowdus in March, 2022, months before AA ever filed its Cross Motion for Sanctions, asking whether he could come to Miami to testify *at trial*, as evidence that Plaintiff should have foreseen that he would need Muriel to testify at *an evidentiary hearing accusing him of witness tampering*. Even if this were the case, which is preposterous, it is unclear what AA believes Clowdus should have done back in March. Forced Muriel, who is 89 years old, to renew his passport and visa, which Clowdus had no idea – and no reason to know – was expiring, for a hearing on a motion that had not even been filed? Clowdus never asked Muriel about his passport and visa in March because he had no reason to. The only reason the issue has come up is because AA filed a speculative and factually baseless Cross Motion which accuses him, without any evidentiary basis, of witness tampering.

motion, but the Court did not award the Plaintiff his fees because the Court correctly concluded that Plaintiff's counsel had done something it deemed of sufficient gravity to justify the expense of an in-person rebuke: the undersigned had approached a witness with Mr. Clowdus' version of events and asked for help. It did not matter that from Mr. Clowdus' perspective he approached the witness with "the truth" and asked for help; it was improper and potentially prejudicial.

AA also was a party to this admonition moving forward, and AA went further to assure the Court that it never harasses witnesses who do not want to cooperate because of its "business concerns." But the day after the Court's hearing, *AA did exactly what it represented to the Court it did not do*. It hired the Mexican Firm Velarde-Danache to persuade passengers to give depositions who *clearly did not want any further contact from AA*. Although AA has attempted to distance itself from the actual texts that violated the Court's order, it has not adequately explained why it hired a Mexican law firm to pursue those witnesses when it told the court they would not be testifying at trial. It also does not automatically absolve AA of responsibility for those texts or the consequences resulting from them, which is why reluctantly Plaintiff filed its original motion and why a full evidentiary hearing with all relevant witnesses is necessary.

AA argues that Plaintiff has failed to establish good cause for the Mexican witnesses to testify remotely. But if the legal inability to enter the United States does not constitute good cause, in the case of Mr. Muriel and Mr. Espinosa, it is unclear what would.[2] Rather, it appears

---

[2] AA dismisses the fact that Mr. Ramirez recently started a new job as a fact of no consequence, as if it is simply a matter of mere inconvenience for a young person starting out in the work force. But Plaintiff should not be required to ask Mr. Ramirez to obtain a sworn affidavit from his new employer stating that he cannot leave work for what would likely be two days, since international travel is involved, in order to establish good cause, particularly where Mr. Ramirez is not a party to the case and where his attorney has represented that he would be unable to do so. Furthermore, Mr. Ramirez is not just any witness. He is a critical fact witness with respect to the allegations that are the subject of both the Motion for Sanctions and AA's Cross Motion.

that, at least with respect to the passengers, AA doesn't want the Court to hear from either of these witnesses because they are the only ones who can fully speak to the intensity with which Velarde pursued them and the issues concerning their declarations. Espinoza's affidavit indicates that it was the relentless harassment of AA that inspired him to retain counsel and get involved. AA responds that Espinoza is a liar, who has been tampered with. But AA apparently does not want the Court to speak with Espinoza and get to the bottom of it, even though by doing so it could potentially support its own Cross Motion.

Far from the self-serving testimony that can be anticipated from most other quarters, the most reliable way for the Court to determine the merits of the respective sanctions motions is for the Court to conduct its own fact-finding inquiry from these two passengers. AA should be right along-side the Plaintiff asking the Court to please allow it *if AA believed its own motion*. The fact that it so vigorously opposes a motion it should welcome ought to raise eyebrows.

## II.   Four AA Passenger Statements All Bear Remarkable Similarities and All Have Been Repudiated in Some Way.

AA does not argue, nor can it, that the testimony of Plaintiff's Mexican witnesses is not relevant to the issues that are the subject of the evidentiary hearing. On the contrary, at least with respect to Mr. Muriel, they maintain that he is at the heart of their Cross Motion for Sanctions. Yet inexplicably, AA insists these witnesses should not be permitted to testify remotely because they cannot be subject to vigorous cross-examination. AA cites no authority for this proposition, of course, because there is none. Indeed, if that were the case, Rule 43 (a) would be unconstitutional. Rather, the issue is whether the testimony of these witnesses is sufficiently important, given the reasons for their inability to testify live, to allow them to testify remotely.

*Ramirez* testified that he did not sign the statement that he was sent because what AA said in it was not true. *Espinoza* has given an affidavit that he signed the statement from AA without fully comprehending all of it, and that the words that AA attributed to him are not true. The words – the adjectives – that these two repudiated were those of aggression and anger. They saw and recounted neither, but AA sought to amplify the basic narratives that they provided. In his deposition, *Quintana* similarly repudiated *the same inflammatory adjectives* from the statement that he had earlier signed – stating that Clowdus seemed "calm," "complied peacefully," and that he could not tell whether or not he was angry because "he could not see his face." These amplified statements that have been repudiated by multiple witnesses were likely "case-winning" for AA, and how and why they were repudiated is at the heart of the respective motions.

Furthermore, if, as AA contends, Plaintiff's investigator engaged in witness-tampering, he did a very bad job of it. Other than obtaining an affidavit establishing the element of publication from Ramirez (which the Plaintiff established in numerous other ways), neither Ramirez's nor Espinoza's statements help Plaintiff's case in any way. Neither passenger saw enough to say that it was an accident or that Merino over-reacted and was at fault. All either passenger statement does is remove the gratuitous adjectives that AA slipped in, but otherwise helps the Plaintiff not at all. More importantly, *neither Muriel nor Plaintiff ever asked Espinoza for a statement*.

AA wants to convince the Court that it never intentionally tried to put words in these passengers' mouths. But a side-by-side comparison of the statements reveals that the words came from AA, not the passengers. For example, all four statements, including the first draft sent by AA to passenger *Elja Keizer* said that at all times the flight attendants' behavior was

5

"courteous, professional, and calm or polite." Keizer pushed back and changed those words to "normal." But that string of adjectives remains in *Quintana's statement*, in *Espinoza's statement*, and in *Ramirez's draft statement*. These words did not come from the passenger's mouths, faithfully transcribed by AA: these were words that AA wrote and hoped that the passengers would adopt. AA attempted to do the same thing with its words of aggression, and it backfired. Of course, AA does not want Ramirez or Espinoza to testify because that is precisely what their testimony will reveal. It will also reveal the laughable joke of AA's 89-year-old "great and mighty persuader" Mr. Muriel, who has agreed to reschedule a medical procedure he scheduled in order to testify. *See* Exh. A. It will also establish the facts that AA consistently attempts to obscure: Ramirez was fed up with AA and stopped taking its calls *long before* Mr. Muriel ever made contact with him, and Mr. Muriel *has never made contact with Espinoza in any way*.

It is important for both Ramirez and Espinoza to testify because if the Court concludes that they have been tainted by AA's misconduct the court must fashion a remedy. While these witnesses may have not provided direct support for the Plaintiff's claim, if they had been approached properly and had given the depositions that at least Espinoza had initially agreed to (per AA), they may have supported the Plaintiff's claim in a number of other ways, such as impeaching the account of flight attendant Gray and her claimed presence during the incident, impeaching Gray's claims that Clowdus was loud and angry while being led off the plane, or impeaching Merino's claim that he never spoke with any passenger about the incident. This case boils down to the jury determining which side is telling the truth and there are only limited ways to do so. The Plaintiff now has no opportunity to put the testimony of these passengers in front

6

of a jury because after AA's manipulative approach, they just want to clear the record and be left alone.

Furthermore, if the Court determines this to have been AA's modus operandi with these two passengers, then the Court has a strong additional basis to conclude that AA took the exact same manipulative approach with passenger Quintana and has reaped an illegitimate reward. The Court recognized that there was something "strange" going on with Quintana and his mother even before the glaring inconsistencies between Quintana's statement and his deposition testimony were revealed and the improper attempt by AA to coach the mother for her deposition with Quintana also on the phone was exposed.

The cancer of Quintana's tainted testimony has almost certainly infected the Plaintiff's star witness, AA employee Henriquez, who changed his tune and distanced himself from the Plaintiff in his deposition.  AA has never denied showing Henriquez Quintana's statement during preparation for his deposition, and nothing would make someone reconsider their perception of events more compellingly than the presumably impartial first-hand observations of a third party – a third-party who perceived anger and aggression from the Plaintiff in the statement that he signed and Henriquez read but who did not perceive those same things in his later deposition that Henriquez did not read.

AA has treated this litigation like a knife fight, and its response to the present motion is just another example.  It has greatly and vexatiously increased the cost of this litigation at every turn, hoping to wear down the plaintiff, who it knows does not have unlimited resources.  Having slandered the Plaintiff's investigator, it now seeks to muzzle his defense, and after claiming that its two passengers are weak-minded or corruptible liars, it urges the Court to look no further.

The Plaintiff's approach is what it has been from the start: there is no fact and no inquiry that the Plaintiff seeks to hide from the Court. *Sunshine is the best disinfectant*.

Respectfully Submitted,

/s/ William T. Woodrow

William T. Woodrow III (*pro hac vice*)
Stone & Woodrow LLP
250 West Main St. Suite 201
Charlottesville, VA 22902
Fax:   646 873-7529
Voice: 855-275-7378
will@stoneandwoodrowlaw.com
*Counsel for Plaintiff*
David Pollack, Esq.
The Pollack Law Firm
75 Valencia Avenue, suite 100
Coral Gables, FL 33134
Fax:   305-372-5904
Voice: 305.372.5900
www.DavidPollackLaw.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on September 16, 2022.

/s/ William T Woodrow
*Attorney for Plaintiff*

8